FILED

2024 Aug-13  PM 02:07
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **ALFONSO MORRIS, AIS #0000Z695** | } | |
| | } | |
| **Petitioner,** | } | |
| | } | |
| **v.** | } | **Case No.:   2:18-cv-1578-RDP** |
| | } | |
| **PHILLIP MITCHELL, Warden of St.** | } | |
| **Clair[1]  Correctional Facility,** | } | |
| | } | |
| **Respondent.** | } | |

## <u>MEMORANDUM OPINION</u>

This matter is before the court on Alfonso Morris's Petition for Writ of Habeas Corpus By a Prisoner in State Custody Under Death Sentence. (Doc. # 1). *See* Title 28, U.S.C. § 2254. Morris was convicted of capital murder for the killing of Mariam Rochester and was sentenced to death. (Doc. # 1 at 5). Here, this court sits in a habeas capacity under Title 28, U.S.C. § 2254 and considers Alfonso Morris's petition for federal relief from two Alabama capital convictions and a death sentence. Morris alleges that several guilt- and penalty-phase aspects of his capital trial for the robbery, burglary, and murder of Miriam Rochester violated his rights under the United States Constitution.

The Alabama courts have adjudicated most of Morris's federal claims within his petition. As a result, the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA")—which amended § 2254—demands deference to those state-court constitutional outcomes and constrains

---

[1]  The United States Supreme Court clarified in *Rumsfeld v. Padilla*, 542 U.S. 426, 435 (2004), that "the proper respondent [in a habeas action] is the warden of the facility where the prisoner is being held." Consequently, the court **DIRECTS** the Clerk to substitute Phillip Mitchell, Warden of St. Clair Correctional Facility—Petitioner's place of incarceration—for Jefferson S. Dunn, Commissioner of the Alabama Department of Corrections, as the appropriate state party on CM/ECF. *See* http://www.doc.state.al.us/facility?loc=33 (last visited July 17, 2024).

the scope of this court's review. Once AEDPA deference has attached to a constitutional claim, the standard for detaching it, while not insurmountable, is high. AEDPA draws a deferential line between objectively-wrong constitutional results and those outcomes in which the state courts' correctness is subject to fairminded disagreement. Adhering to that statutory balance, this court must rectify proven legal and factual errors of extreme constitutional malfunction in Morris's state-court capital proceedings. But this court must bear in mind the correct legal standard applicable here because AEDPA precludes substituting its judgment or otherwise reviewing de novo the decisions of Alabama courts. The question is this: Did they unreasonably reject Morris's arguments?

As the court explains below, many of Morris's adjudicated claims fall well within AEDPA's sizeable deferential range because the Alabama courts reached a reasonable result. For those closer calls—with few exceptions—no objective constitutional error occurred because fairminded jurists could defend the correctness of the state court decision. Thus, Morris lacks an AEDPA avenue to habeas relief on nearly all of his claims, which the Alabama courts addressed on the merits. As to those few adjudicated claims in which AEDPA deference is in doubt, the court concludes habeas relief is inappropriate either under de novo review or because the Alabama Criminal Court of Appeals ("ACCA") did not address all the constitutional components of the asserted constitutional violation egregiously. And for various reasons, Morris cannot prevail on his remaining unadjudicated habeas allegations.

Before turning to Morris's habeas claims and Respondent's defenses, the court sets out a table of contents, shares some background about this capital case, and acknowledges several recurring standards of review under AEDPA.

## TABLE OF CONTENTS

I.    BACKGROUND.................................................................................9

      A.    State Court Proceedings..........................................................9

      B.    Federal Habeas Proceedings...................................................17

II.   HABEAS REVIEW UNDER AEDPA..........................................18

III.  ANALYSIS.......................................................................................22

      A.    Claim A—Morris has not demonstrated a right to habeas relief because
            of unreliable eyewitness testimony.....................................................22

            1.    State Court Proceedings.............................................22

            2.    The proper application of AEDPA deference precludes habeas
                  relief on Morris's exhausted *Biggers* claim..............................32

            3.    Morris's remaining allegations related to his identification claim
                  do not entitle him to habeas relief........................................47

                  a.    Exhaustion and procedural default..................................47

                  b.    Other deficiencies........................................................52

      B.    Claim B—Morris has not demonstrated a right to habeas relief because
            the jury venire did not undergo racial bias screening.....................................53

            1.    State Court Proceedings.............................................53

            2.    Regardless of whether AEDPA deference applies, Morris has not
                  established a constitutional violation related to his racial bias
                  claim..................................................................................56

      C.    Claim C—Morris has not established a right to habeas relief on his
            *Atkins* claim................................................................................63

            1.    State Court Proceedings.............................................63

            2.    Morris has not overcome AEDPA deference on any aspect of his
                  *Atkins* claim...........................................................................71

3

        a.      **Morris has not developed a legal basis for relief under § 2254(d)(1)'s first clause**……………………………………**71**

        b.      **Morris has not shown that the state courts decided his *Atkins* claim unreasonably under (d)(1) or (d)(2)**………………**72**

            i.     **Intellectual Functioning Prong**…………………………**73**

            ii.    **Adaptive Functioning Prong**…………………………...**82**

            iii.   **Onset Prong**…………………………………………**82**

**D.**    **Claim E—Morris has not demonstrated a right to habeas relief because of unreliable DNA Evidence**……………………………………………………**98**

    **1.**      **State Court Proceedings**………………………………………**98**

    **2.**      **AEDPA deference precludes habeas relief on Morris's unreliable DNA evidence claim**………………………………………**99**

**E.**    **Claim G—Morris has not established a right to habeas relief because of a speedy trial violation**…………………………………………………**107**

    **1.**      **State Court Proceedings**……………………………………**107**

    **2.**      **Even if AEDPA deference is inapplicable because of an unreasonable factual determination, Morris has not proven that the state violated his Sixth Amendment right to a speedy trial**………**110**

    **3.**      **Morris's remaining allegations do not support habeas relief**………**120**

**F.**    **Claim H—Morris has not demonstrated a right to habeas relief due to the trial court's failure to hold a new competency hearing**…………………**121**

    **1.**      **State Court Proceedings**……………………………………**122**

    **2.**      **Morris has not satisfied his AEDPA deferential burden on his incompetency claim**………………………………………**125**

**G.**    **Claim I—Morris has not established a right to habeas relief because of how the trial court treated him on the stand**…………………………………**131**

    **1.**      **State Court Proceedings**……………………………………**131**

2.      Even if AEDPA deference is inapplicable because of a contrary application of Supreme Court precedent, Morris has not proven that the trial court's limited interruptions violated his constitutional rights.................................................132

H.      Claim J—Morris has not established a right to habeas relief because of unduly prejudicial victim impact evidence......................................138

1.      State Court Proceedings.................................................138

2.      Morris has not overcome AEDPA deference on his due process challenge of the victim impact evidence under the Fourteenth Amendment.................................................140

I.      Claim K—Morris has not established a right to habeas relief because of improper prosecutorial comments in the guilt phase....................................144

1.      State Court Proceedings.................................................146

2.      Morris has not met his AEDPA burden on his improper prosecutorial comments claim.................................................148

3.      Morris's remaining allegations do not support habeas relief.............156

J.      Claim L—Morris has not established a right to habeas relief because of improper reasonable doubt instructions in the guilt phase.........................157

1.      State Court Proceedings.................................................157

2.      Morris has not overcome AEDPA deference on his claim that the trial court mischarged the jury on reasonable doubt........................160

3.      Morris's remaining allegations do not support habeas relief.............171

K.      Claim M—Morris has not established a right to habeas relief because of improper penalty-phase instructions.................................................172

1.      State Court Proceedings.................................................172

2.      Morris has not overcome AEDPA deference on his claim that the trial court incorrectly charged the jury on the sentencing factors....174

a.      Morris has not overcome AEDPA deference on his unanimity requirement claim.................................................175

  **b.**  Morris has not overcome AEDPA deference on his for unanimity mitigating circumstances claim.................................177

  **c.**  Morris has not overcome AEDPA deference on his outweighing claim.....................................................................181

**L.** **Claim N—Morris has not demonstrated a right to habeas relief because the sentencer relied upon robbery and burglary convictions as independent aggravating factors**.................................................................................185

 **1.** **State Court Proceedings**.....................................................................186

 **2.** **Morris has not demonstrated he is entitled to relief under AEDPA because Alabama treats burglary and robbery as separate aggravating factors**...................................................................................188

**M.** **Claim O—Morris has not established a right to habeas relief based on Alabama's capital sentencing structure**.................................................194

 **1.** **Overview of *Apprendi*, *Ring*, and *Hurst***...............................................195

 **2.** **State Court Proceedings**.....................................................................197

 **3.** **Morris has not overcome AEDPA deference on the structural challenge of his death sentence under the Sixth Amendment**...........198

 **4.** **Morris's remaining allegations related to this claim do not support habeas relief**.............................................................................202

**N.** **Claim P—Morris has not demonstrated a right to habeas relief based on the fact that his second capital trial ended in a hung jury**...........................203

 **1.** **State Court Proceedings**.....................................................................203

 **2.** **Habeas Analysis**.................................................................................206

  **a.**  Morris cannot rely on the Fourteenth Amendment's due process clause as an independent basis for habeas relief........206

  **b.**  Morris has not overcome AEDPA deference on his exhausted death-sentence claim under the Eighth Amendment...............................................................................207

   **i.**  Rule 28(a) and Claims D, F, and Q..............................210

O.     **Claim F—Morris has not demonstrated a right to habeas relief on his claim regarding DNA witnesses claim for procedural and substantive reasons**................................................................................213

     1.    **State-barred procedural default under Rule 28(a)(10) precludes habeas relief on this DNA claim**..............................................214

     2.    **Alternatively, Morris has not proven a de novo right to constitutional relief**.......................................................216

P.     **Claim D—Morris has not established a right to habeas relief on his *Strickland* claims**............................................................220

     1.    **Pretrial Subclaim D.2.h—Trial counsel should have pursued a speedy trial**.....................................................226

     2.    **Pretrial Subclaim D.2.i—Trial counsel should have revisited the issue of Morris's incompetency**..................................230

     3.    **Guilt-Phase Subclaim D.2.a—Trial court should have challenged the reliability of Patterson's pretrial identification**..............232

     4.    **Guilt-Phase Subclaim D.2.b—Trial counsel should have objected to the DNA evidence**.............................................235

     5.    **Guilt-Phase Subclaim D.2.c—Trial counsel should have presented an alternative theory of the state's blood evidence**...............239

     6.    **Guilt-Phase Subclaim D.2.d—Trial counsel should have challenged the state's failure to preserve evidence**....................240

     7.    **Guilt-Phase Subclaim D.2.e—Trial counsel should have challenged the state's failure to present all forensic witnesses**........242

     8.    **Guilt-Phase Subclaim D.2.f—Trial counsel should have challenged Mary McCombs's presence in the courtroom**................245

     9.    **Guilt-Phase Subclaim D.2.g—Trial counsel should have objected to the rape question**.............................................248

     10.   **Guilt-Phase Subclaim D.2.j—Trial counsel should have objected to interruptions**................................................250

11. **Guilt-Phase Subclaim D.2.l—Trial counsel should have objected to the state's prejudicial comments**.........................................**251**

12. **Penalty-Phase Subclaim D.2.k—Trial counsel should have objected to judicial bias**.............................................................**254**

13. **Penalty-Phase Subclaim D.1.a—Trial counsel inadequately investigated and  presented mitigation evidence**...............................**257**

14. **Penalty-Phase Subclaim D.1.b—Trial counsel should have objected to the jury instructions**...........................................**294**

15. **Penalty-Phase Subclaim D.1.c—Trial counsel should have challenged the counting of aggravating circumstances**.....................**298**

16. **Cumulative Subclaim D.3—Trial counsel's cumulative errors violated *Strickland***....................................................................**299**

17. **Morris cannot obtain habeas relief based upon his remaining allegations in Claim D**.........................................................**302**

Q. **Claim Q—Morris has not established a right to habeas relief based on the cumulative effects of all alleged constitutional errors**...........................**302**

1. **State-barred procedural default under Rule 28(a)(10) precludes habeas relief on the Rule 32 part of this cumulative claim**...............**303**

2. **Regardless of whether AEDPA deference precludes habeas relief on the direct appeal portion of this cumulative claim, Morris has not established a constitutional violation even under de novo review**...............................................................................**303**

IV. **REMAINING REQUESTS**.......................................................**306**

V. **CONCLUSION**........................................................................**307**

## I.      BACKGROUND

On the evening of February 24, 1997, an elderly woman, Miriam Rochester, was brutally murdered in her Jefferson County, Alabama home. *Morris v. State (Morris Direct II)*, 60 So. 3d, 326, 336 (Ala. Crim. App. 2010). As detailed below, law enforcement arrested Morris for public intoxication within the same patrolling area as Rochester's residence early the following morning. *Morris Direct II*, 60 So. 3d at 337. The police transported a paramedic, Juanita Patterson, to that arrest area for a possible identification of Morris as a suspect in Rochester's murder. *Id.* at 358. Patterson had described Morris to the police—the night preceding his public-intoxication arrest—after encountering him near Rochester's house roughly one hour before the homicide. *Id.* at 337. During a single-suspect or one-man showup conducted that morning, Patterson identified Morris as the same man she had seen and interacted with the previous night in Rochester's neighborhood. *Id.* at 358.

Shortly after Patterson's eyewitness identification of Morris at the single-suspect showup, authorities issued an arrest warrant charging Morris with the burglary/murder of Rochester. (Doc. # 15-1 at 44-45). Ala. Code § 13A-5-40(a)(4). Roughly eight months after Morris's arrest, a Jefferson County Grand Jury indicted Morris for the capital murder of Rochester during a robbery and burglary—capital offenses under Ala. Code § 13A-5-40(a)(2) and (a)(4), respectively. (Doc. # 15-1 at 41-43).

### A.      State Court Proceedings

The state tried Morris for capital murder three times. Attorneys Jonathan Tindle and Billy Jewel represented Morris at each of the three trials. (Docs. # 15-5 at 22; 15-47 at 112; 15-16 at 180). The guilt phase of the first trial concluded on April 3, 2003, with the jury finding Morris

guilty of both capital counts. (Docs. # 15-1 at 17-18; 15-2 at 170-71). During the penalty phase, the jury recommended capital punishment by a 10 to 2 vote. (Doc. # 15-2 at 167). The trial court held a sentencing hearing, accepted the jury's recommendation, and sentenced Morris to death in May 2003. (Doc. # 15-27 at 81-92).

On direct review, the ACCA reversed the convictions and death sentence citing federal constitutional error. *Morris v. State (Morris Direct I)*, 956 So. 2d 431, 453 (Ala. Crim. App. 2005). The ACCA determined that the trial court had "violated Morris's fundamental due-process rights and the Supreme Court's holdings in *Ake v. Oklahoma* and *Atkins v. Virginia*" by denying him "funds to hire an independent mental-health expert." *Morris Direct I*, 956 So. 2d at 452-53. *See Ake v. Oklahoma*, 470 U.S. 68, 74 (1985) ("[T]he Constitution requires that a [s]tate provide access to a psychiatrist's assistance on th[e] issue [of sanity at the time of the offense] if the defendant cannot otherwise afford one."); *Atkins v. Virginia*, 536 U.S. 304, 321 (2002) (holding that capital "punishment is excessive and that the Constitution places a substantive restriction on the [s]tate's power to take the life of a mentally retarded offender" under the Eighth Amendment) (internal quotation marks omitted).

On remand, the trial court granted Morris's request for expert funding. (Doc. # 15-27 at 33). The trial court held a hearing on November 26, 2007, to determine whether Morris's mental capacity made him ineligible for the death penalty under the Supreme Court's legal framework established in *Atkins*. (Doc. # 15-28 at 179). The trial court rejected Morris's *Atkins* claim and scheduled the capital case for a retrial. (Docs. # 15-32 at 4-5; 15-27 at 45, 55). After the second jury was "unable to reach a [guilt-phase] verdict, . . . the trial court declared a mistrial." *Morris Direct II*, 60 So. 3d at 336; (Doc. # 15-27 at 46).

Morris's third trial began on May 5, 2008. The ACCA summarized the facts and testimony in that third trial's guilt phase as follows:

> [O]n February 24, 1997, Miriam Rochester, who was 85 years-old, used a walker, and weighed 92 pounds, was beaten to death in her home. Rochester had transformed her home into a duplex and had taken in a boarder, Elizabeth Russell, who was also elderly and in poor health. The two ladies had become friends, and, on the night of the offense, at approximately 9:30 p.m., Rochester telephoned one of Russell's sons to inform him that Russell had become ill and was being taken to the hospital.
>
> A rescue unit and fire engine arrived at the house at approximately 9:00 p.m. and were shown to Russell by Rochester. The paramedic who was the driver of the rescue unit testified that the "house was very neat and orderly." After Russell was assessed and the ambulance called, the paramedic testified that she went outside to check on her truck. She testified that she saw someone "fooling around my rescue unit acting like he was looking in the windows, fooling with the doors." She then asked the person if there was a problem and if she could help him. The man, whom she identified in court as Morris, walked up to her and asked what was happening and who was sick; he insisted that he wanted to go inside the house. The paramedic testified that at one point Morris attempted to bypass her and enter the house, but she prevented him from doing so. He told her that "he lived in that area and he knew everybody and he had a right to go in there."
>
> Although Morris smelled strongly of alcohol, the paramedic testified that Morris understood what she was telling him and that his responses were appropriate. As the paramedic saw the rescue crew carrying Russell out to the ambulance, she also saw Morris finally turn and walk away. The paramedic thereafter stepped into the ambulance and through the opened back doors of the vehicle saw that Morris had returned. She informed her partner that Morris had been causing trouble previously, and her partner instructed him to leave. The paramedic testified that she saw Morris walk approximately half of a block away as the rescue crew left.
>
> At approximately 10:00 p.m., Russell's son telephoned Rochester to update her on Russell's condition. He received a call from his brother about an hour later, informing him that the brother had been to Rochester's house at his mother's request and that the door was open and the house appeared to have been ransacked. Both of Russell's sons then went to the house and without entering determined that the house had been vandalized. They attempted to telephone Rochester and then telephoned the police.
>
> The police and rescue units arrived around midnight, among them the same paramedic who had earlier cared for Russell. She testified that she originally

believed that Russell was the deceased. However, because of the number of police officers present, she determined that the death was not believed to be due to natural causes. She informed the officers that she had been called to the house earlier on that night and that the house had not been in disarray. She also told them about Morris's presence and behavior. She did not know his name at that time but gave the officers his description.

The first officer who had arrived at the scene testified that there were "pry marks" on the door, indicating forced entry. He took a description from the paramedic of the man who had attempted to gain entry into the house and, after the scene was processed, he left at approximately 4:00 a.m. and resumed his patrol of the area. At approximately 5:00 a.m., he observed a man fitting the description of the person who had earlier attempted to enter Rochester's house. The man appeared to be intoxicated and was staggering down the middle of the street. The officer asked the man questions and he responded in a "slurred, but logical way." The officer determined that it was not safe for the man to continue and arrested him for public intoxication. The officer identified Morris at trial as the man he had arrested. He asked the man if he was carrying any weapons, and he responded that he had a pocketknife in his right front pocket. He also stated that he had other items in his pockets that he described as "junk." The officer stated that the items were pieces of costume jewelry. He also had a couple of pills and a cigarette in his pockets. Morris identified himself as "Anthony Morris" and gave the officer an address for his residence.

Before the officer left the scene of Morris's arrest, the paramedic was brought to that location to determine if she could identify him as the man she had seen earlier. The paramedic testified that she was certain that he was the man she had seen earlier at Rochester's house. Morris was taken to the administrative building where officers concluded that he was too intoxicated to be interviewed. He was taken to jail for the night and interviewed the following day.

Rochester's granddaughter and Russell's son identified some of the jewelry taken from Morris as belonging to the victim and Russell. Blood found on Morris's shoe was determined to be Rochester's and a cigarette butt found in Rochester's house contained Morris's DNA.

Morris testified at trial that he had been drinking on the day of the offense and had gotten into an argument with the man with whom he had been living. He left the house and eventually began gambling with a man known as "Cue Ball." He testified that he won a bag of jewelry from "Cue Ball" and that, as he was attempting to gather the jewelry, "Cue Ball" snatched money from him and a fight ensued. He stated that other gamblers got involved in the altercation, because they did not want him to leave since he was winning. Morris stated that he suffered cuts and bruises, as well as a laceration over his eye, in the altercation. He testified that

"Cue Ball" threw the jewelry at him and that he picked it up and walked to a
Huddle House restaurant for breakfast. He stated that he became belligerent with
the waitress because he had been drinking, and he was forced to leave. He also
testified that after eating he put a cigarette in his mouth but did not light it.

Morris testified that he then encountered a police officer who indicated that Morris
appeared to have been drinking and arrested him for public intoxication. Morris
stated that he was taken in the police car "to the scene of a crime in a house[,]"[]
where a woman identified him. While he was standing in front of the police
vehicle, he stated that a dog "came from somewhere" and ran around his feet. He
was subsequently taken to the hospital to treat the laceration to his eye and then
was taken to the jail.

*Morris Direct II*, 60 So. 3d at 336-38 (citations and footnotes omitted).

The guilt- and penalty-phase results of the third trial were essentially the same as the first

trial. The jury convicted Morris of both capital counts. (Doc. # 15-27 at 48-49). And the jury

recommended death as the appropriate punishment by a 10 to 2 vote. (Docs. # 15-41 at 15-16;

15-27 at 57). The trial court accepted the jury's proposed punishment and sentenced Morris to

death a second time. (Doc. # 15-27 at 51-68); *see also State v. Morris ("Morris Sentencing")*,

No. CC-1997-5397, 2008 WL 8096901 (Ala. Cir. Ct. June 20, 2008) (* pagination on Westlaw

unavailable).

As part of the penalty-phase process, the trial court referenced the jury's advisory verdict

and evaluated both the aggravating and mitigating factors:

The jury, after due deliberation, recommended the punishment of death and
on questioning the jury individually, the Court determined that the vote of the jury
in favor of death was correctly shown as on the verdict form as ten (10) jurors
recommended punishment to be fixed at death and two (2) jurors recommended
punishment be fixed at life without the possibility of parole. The Court further
makes the finding that in fixing the punishment, the jurors were not influenced by
passion, prejudice, or any other arbitrary factors. . . .

[T]his Court having been the trial court and having heard all testimony in
this matter adopts all evidence previously presented at the guilt phase of the
proceedings and the sentencing phase of the proceedings . . . [and] consider[s] [that

13

evidence] . . . in affixing punishment.

## [**AGGRAVATING CIRCUMSTANCES**]

The Court finds from the evidence that three (3) aggravating circumstances were proven beyond a reasonable doubt. The first is that the Defendant had previously been convicted of another capital offense or a felony involving the use of violence to the person, to-wit assault in the 2nd degree as set out in § 13A-5-49(2). The second aggravating circumstance present was under § 13A-5-49(4) that the Defendant intentionally caused the death of the victim during the commission of a robbery in the 1st degree. The third aggravating circumstance present was under § 13A-5-49(4), that the Defendant intentionally caused the death of the victim during the commission of a burglary in the 1st degree.

The Court finds specifically that statutory aggravating circumstance number one, under [§] 13A-5-49(1) is not applicable in this case, in that the Defendant was not under a sentence of imprisonment when this offense was committed.

The Court finds specifically that aggravating circumstance number three, under [§] 13A-5-49(3) was not applicable in this case, in that this Defendant did not knowingly create a great risk of death to many persons.

The Court finds specifically that aggravating circumstance number five, under [§] 13A-5-49(5) is not applicable in this case in that the offenses were not committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody.

The Court finds specifically that aggravating circumstance number six under [§] 13A-5-49(6) was not applicable in this case, in that the offenses were not committed for pecuniary gain.

The Court finds specifically that aggravating circumstance number seven, under [§] 13A-5-49(7), was not applicable in this case, in that the offenses were not committed to disrupt or hinder the lawful exercise of any governmental function or the enforcement of laws.

The Court specifically finds that aggravating circumstance number eight, under [§] 13A-5-49(8), is not applicable in this case, in that the offenses were not especially heinous, atrocious, or cruel compared to other capital offenses.

The Court specifically finds that aggravating circumstance number nine, under [§] 13A-5-49(9), is not applicable in this case, in that the Defendant did not intentionally kill two or more persons by one act or pursuant to one scheme or

course of conduct.

The Court specifically finds that aggravating circumstance number ten, under [§] 13A-5-49(10), is not applicable in this case, in that these offenses were not one of a series of intentional killings committed by the Defendant.

### [**MITIGATING CIRCUMSTANCES**]

The Court does not find statutory mitigating circumstance number one under § 13A-5-51(1) to be present, to-wit: The Defendant has a significant history of prior criminal activity because according to the pre-sentence investigation as prepared by the Alabama Board of Pardons and Paroles, the Defendant has a significant criminal background and has previously been convicted of eight (8) felony convictions for burglary 3rd degree, theft of property 2nd degree, and theft of property 1st degree. The State of Alabama introduced duly certified copies of Defendant's eight (8) felony convictions at the sentencing hearing.

The Court does not find circumstance number three under § 13A-5-51(3) to be applicable in this case as the victim, Miriam Rochester, was not a participant in the Defendant's conduct, and she did not consent to it.

The Court does not find circumstance number four under § 13A-5-51(4) to be applicable in this case as there was neither an accomplice, nor was the Defendant's participation relatively minor.

The Court does not find circumstance number five under § 13A-5-51(5) to be applicable in this case as there was no evidence presented that the Defendant acted under extreme duress or under the substantial domination of another person.

The Court does not find circumstance number six under § 13A-5-51(6) to be applicable in this case as there was no evidence that the Defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired.

The Court does not find circumstance number seven under § 13A-5-51(7) to be applicable in that the Defendant was thirty six (36) years of age at the time he committed this offense.

There were no non-statutory mitigating circumstances presented at the sentencing hearing, and this Court specifically finds that there are no non-statutory mitigating circumstances present in this case.

**[JUDGMENT]**

After consideration of all the matters that were presented to this Court, the testimony heard at trial, and the sentencing hearing before this Court, both in mitigation and by aggravation, taking into consideration all other matters that were proffered before this Court as here and above stated in this order, and disregarding pleas or references to the Court to consider the sentence on the basis of passion or prejudice, the Court does now find and is convinced beyond a reasonable doubt and to a moral certainty that the aggravating circumstances outweigh the mitigating circumstances and as such are sufficient to uphold the jury's recommendation of punishment at death.

It is therefore the judgment of this Court that the Defendant should be sentenced to death.

(Doc. # 15-27 at 62-66); *see also Morris Sentencing*, 2008 WL 8096901.

Attorneys Randall S. Susskind, Anna P. Engh, and Gregory M. Lipper represented Morris in the appeal of his second death sentence (after the third trial). (Doc. # 15-52 at 2). Morris raised mostly trial court errors in that appeal, including arguments that the trial court: (1) admitted unreliable eyewitness identification testimony; (2) disallowed racial bias screening during the jury selection process; (3) denied Morris's *Atkins* claim; (4) mistreated him on the stand; (5) forewent a new competency hearing; (6) admitted unduly prejudicial victim impact evidence; and (7) instructed the jury improperly. Morris's appellate claims, which he directed at the prosecution included his assertions that the prosecutors: (1) violated his right to a speedy trial; (2) called only one DNA forensic technician as a witness; and (3) made improper statements during closing arguments.

The ACCA affirmed Morris's second conviction and capital sentence on February 5, 2010, and denied his application for rehearing on April 16, 2010. *Morris Direct II*, 60 So. 3d at 326. On September 17, 2010, the Alabama Supreme Court denied Morris's petition for a writ of certiorari review. *Id.* The United States Supreme Court denied certiorari review on March 21,

16

2011. *Morris v. Alabama*, 562 U.S. 1287 (2011).

In September 2011, Morris timely petitioned the Jefferson County Circuit Court for postconviction relief under Alabama Criminal Procedural Rule 32. (Docs. # 15-56 at 66; 15-57 at 32). The state answered and moved to dismiss the petition. (Doc. # 15-57 at 44). After Morris responded, the Rule 32 court summarily dismissed his petition without holding an evidentiary hearing. (Docs. # 15-58 at 87; 15-56 at 10-57). Morris objected unsuccessfully to the collateral court's adoption of the state's proposed dismissal order. (Doc. # 15-61 at 35).

Morris filed a postconviction appeal. The ACCA denied relief on April 29, 2016, and declined to rehear Morris's appellate challenge on September 2, 2016. *See Morris v. State (Morris Collateral)*, 261 So. 3d 1181 (Ala. Crim. App. 2016). Morris petitioned the Alabama Supreme Court for a writ of certiorari. After granting the writ on January 27, 2017, the Alabama Supreme Court quashed it on March 23, 2018. *Ex parte Morris*, 261 So. 3d 1203 (Ala. 2018); *Morris Collateral*, 261 So. 3d at 1181.

### B.    Federal Habeas Proceedings

On September 25, 2018, Morris, through his habeas counsel,[2] filed a § 2254 petition in this court. (Doc. # 1). Respondent answered and filed a brief on February 12, 2019. (Docs. # 21, 22). Morris requested an evidentiary hearing on April 24, 2019. (Doc. # 28). Respondent opposed Morris's motion and the court denied the request without prejudice on August 2, 2019. (Docs. # 29, 30). On October 1, 2019, the court permitted Morris to supplement his petition and evidentiary hearing request with a memorandum. (Docs. # 31-1, 32).

---

[2] Attorneys Andrew Guy, Anna P. Engh, and Sarah Tremont of Covington and Burling LLP and Ryan Christopher Becker of the Equal Justice Initiative represent Morris on federal habeas review. (Docs. # 1, 7, 26).

## II.    HABEAS REVIEW UNDER AEDPA

AEDPA governs this court's review of Morris's habeas claims. *See Guzman v. Sec'y, Fla. Dep't of Corr.*, 663 F.3d 1336, 1345 (11th Cir. 2011) (explaining that AEDPA applies to habeas petitions filed after April 24, 1996). When a petitioner has obtained a state-court adjudication of a constitutional claim on the merits, § 2254(d) significantly restricts a federal court's authority to award habeas relief. "AEDPA imposes a highly deferential standard for evaluating state-court rulings and demands that state-court decisions be given the benefit of the doubt." *Guzman*, 663 F.3d at 1345 (internal quotation marks omitted) (quoting *Renico v. Lett*, 559 U.S. 766, 773 (2010).

Under § 2254(d)(1), a petitioner opens the door to habeas relief if he establishes that a state court rejected the merits of a constitutional claim in a manner "that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Under (d)(2), the petitioner must show that a denial of constitutional relief "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in . . . [s]tate court." 28 U.S.C. § 2254(d)(2); *see also Boyd v. Allen*, 592 F.3d 1274, 1292 (11th Cir. 2010) (quoting 28 U.S.C. § 2254(d)). Periodically in this opinion, the court uses "clearly established constitutional error," "clearly established AEDPA error," or "AEDPA (d)(1) error" as alternative ways to collectively describe § 2254(d)(1)'s clauses.

The petitioner bears the burden of showing that an adjudicated issue falls within § 2254(d)(1) or (d)(2). *Woodford v. Visciotti*, 537 U.S. 19, 25 (2002) (per curiam); *see also id.* at 24-25 (explaining that "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the state-court decision applied [a constitutional

18

holding] incorrectly"). Additionally, "[w]here there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground." *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991); *see also Wilson v. Sellers*, 584 U.S. 122, 125, 138 S. Ct. 1188, 1192 (2018) (holding that habeas courts reviewing adjudicated claims under AEDPA should "'look through' the unexplained decision to the last related state-court decision . . . and then presume that the unexplained decision adopted the same [merits-based] reasoning").

The exceptions contained in § 2254(d)'s "clearly established Federal law" under (d)(1) are limited to Supreme Court decisions that predate "the last adjudication of [a federal claim's] merits in state court." *Greene v. Fisher*, 565 U.S. 34, 36, 40 (2011); *id.* at 38 (explaining that "§ 2254(d)(1) requires federal courts to focu[s] on what a state court knew and did, and to measure state-court decisions against this Court's precedents *as of the time the state court renders its decision*") (internal quotation marks omitted) (alteration and emphasis in *Greene*). Additionally, the statutory term "refers to the holdings, as opposed to the dicta, of [Supreme Court] decisions as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000) (O'Connor, J., majority opinion about part II of the Court's opinion).

Section 2254(d)(1)'s two main clauses – "contrary to" and "unreasonable application" – have separate meanings. *See Alderman v. Terry*, 468 F.3d 775, 791 (11th Cir. 2006) ("[T]he 'contrary to' and 'unreasonable application' clauses are interpreted as independent statutory modes of analysis."). As to (d)(1)'s first clause, a state court's decision is contrary to "clearly established precedents [of the Supreme Court] if it applies a rule that contradicts the governing law set forth in [the Court's] cases, or if it confronts a set of facts that is materially indistinguishable from a

decision of th[e] Court but reaches a different result." *Brown v. Payton*, 544 U.S. 133, 141 (2005).

And, as to (d)(1)'s second clause, "[t]he pivotal question is whether the state court's application of the [relevant constitutional] standard was unreasonable." *Harrington v. Richter*, 562 U.S. 86, 101 (2011). AEDPA requires this court to accord a state court "deference and latitude that are not in operation when the case involves review under the [relevant constitutional] standard itself." *Id.* Consistent with § 2254(d)(1) deference, "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Richter*, 562 U.S. at 101 (internal quotation marks omitted) (emphasis in original) (quoting *Williams*, 529 U.S. at 410).

If a state court denies a federal claim as meritless and "'fairminded jurists could disagree' on the correctness of th[at] . . . decision," then habeas relief under AEDPA's unreasonable application clause does not apply. *Richter*, 562 U.S. 86, 101 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The Supreme Court has clarified that a "rule's specificity" must factor into the unreasonableness evaluation. *Richter*, 562 U.S. at 101. "The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Id.* (internal quotation marks omitted).

Under § 2254(d)(2), a petitioner may challenge the state court factual findings underlying an adjudicated federal claim as unreasonable based on the evidentiary record. *Wood v. Allen*, 558 U.S. 290, 293 (2010). "[W]hether a state court errs in determining the facts [under AEDPA] is a different question from whether it errs in applying the law." *Rice v. Collins*, 546 U.S. 333, 342 (2006).

Additionally, a presumption of correctness attaches to state court factual findings under § 2254(e)(1). *See* 28 U.S.C. § 2254(e)(1) (providing that "a determination of a factual issue made

by a [s]tate court shall be presumed to be correct"). Only with "clear and convincing evidence"
may a petitioner overcome a state court's presumptively correct factual findings. 28 U.S.C. §
2254(e)(1); *see also Ward v. Hall*, 592 F.3d 1144, 1177 (11th Cir. 2010) ("Clear and convincing
evidence entails proof that a claim is highly probable, a standard requiring more than a
preponderance of the evidence but less than proof beyond a reasonable doubt.") (internal quotation
marks omitted). The Supreme Court has not addressed the relationship between § 2254(e)(1) and
§ 2254(d)(2). *Wood*, 558 U.S. at 293; *see id.* at 304-05 ("[W]e leave for another day the questions
of how and when § 2254(e)(1) applies in challenges to a state court's factual determinations under
§ 2254(d)(2)."); *see also Cave v. Sec'y, Fla. Dep't of Corr.*, 638 F.3d 739, 747 (11th Cir. 2011)
("We have not yet had an occasion to completely define the respective purviews of (d)(2) and
(e)(1), and this case presents no such opportunity."). *But see Newland v. Hall*, 527 F.3d 1162,
1183-84 (11th Cir. 2008) (explaining that the "review of a state court's findings of fact — to
ascertain whether the court's decision was based on an unreasonable determination of facts — is
circumscribed by both section 2254(d)(2) and 28 U.S.C. § 2254(e)(1)").

   As the Supreme Court has reminded us, "[i]f this [habeas review] standard is difficult to
meet, that is because it was meant to be. As amended by AEDPA, § 2254(d) stops short of
imposing a complete bar on federal-court relitigation of claims already rejected in state
proceedings." *Richter*, 562 U.S. at 102; *see also Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)
("The question under AEDPA is not whether a federal court believes the state court's
determination was incorrect but whether that determination was unreasonable—a substantially
higher threshold."); *Guzman*, 663 F.3d at 1346 ("Ultimately, before a federal court may grant
habeas relief under § 2254(d), 'a state prisoner must show that the state court's ruling on the claim

being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'") (quoting *Richter*, 562 U.S. at 103).

With these AEDPA principles in mind, the court turns to its analysis of Morris's habeas allegations.

## III.   ANALYSIS

### A.   Claim A—Morris has not demonstrated a right to habeas relief because of unreliable eyewitness testimony.

Morris contends that the state introduced unreliable witness testimony tied to an "unduly suggestive identification procedure" in violation of his Fifth, Sixth, Eighth, and Fourteenth Amendment rights. (Doc. # 1 at 14 ¶ 50). Morris asserts that the ACCA's rejection of this claim was contrary to and an unreasonable application of Supreme Court precedent under § 2254(d)(1), as well as an unreasonable factual determination under (d)(2). (Doc. # 1 at 19 ¶ 66). Respondent counters that the ACCA applied the "correct . . . controlling Supreme Court precedent . . . in a methodical . . . manner" and that Morris's "argument reveals nothing more than a disagreement about the [state] court's conclusion." (Doc. # 22 at 37). As explained below, Morris has not met his AEDPA burden with respect to this portion of his claim. The court begins by summarizing the state court proceedings.

#### 1.   State Court Proceedings

During the guilt-phase, the state called Patterson who identified Morris "on the morning following the offense" as the same man who had been outside Rochester's home around 9:00 on the evening of the murder. *Morris Direct II*, 60 So. 3d at 357; (Doc. # 15-18 at 81, 87). Patterson, who worked for Birmingham Fire and Rescue Service, was one of the paramedics who came to

Rochester's home twice in response to calls that night. *Morris Direct II*, 60 So. 3d at 357; (Doc. # 15-18 at 77). The first emergency call concerned Russell, who lived with Rochester. *Morris Direct II*, 60 So. 3d at 357; (Doc. # 15-18 at 83).

After assessing Russell's medical condition, Patterson's partner contacted the hospital for care and transport instructions, and Patterson "went outside to check on [the rescue] truck." (Doc. # 15-18 at 85). According to Patterson, she noticed "a person fooling around [the] rescue unit" and "looking into windows." (*Id*. at 86). Patterson asked the man, "[i]s there a problem[?] [C]an I help you[?]" (*Id*. at 86, 93). Patterson recalled that the individual walked towards her on the sidewalk and questioned "what was going on" in Rochester's house. (*Id*. at 86). Patterson testified that the man "wanted to enter the house" and that to prevent him from "walk[ing] around her," she "put [her] hands up to block him." *Morris Direct II*, 60 So. 3d at 357; (*Id*. at 88). Patterson recalled that, at this point in their exchange, she and the man were "literally toe to toe" and "less than twenty-four inches apart." *Morris Direct II*, 60 So. 3d at 357 (internal quotation marks omitted); (*Id*.).

Patterson told the individual to leave; he appeared to comply, but she saw him again (before leaving the home during her initial emergency visit). *Morris Direct II*, 60 So. 3d at 357. According to Patterson, after assisting in the transfer of Russell to an ambulance, she spotted the individual while stepping down from the back of that vehicle. *Morris Direct II*, 60 So. 3d at 357; (Doc. # 15-18 at 92). Patterson estimated that the man was "within ten feet" of her. *Morris Direct II*, 60 So. 3d at 357; (Doc. # 15-18 at 94). Patterson recalled telling her partner that he was the same man who had been a "problem" on the sidewalk earlier that evening. *Morris Direct II*, 60 So. 3d at 357; (Doc. # 15-18 at 93). Patterson's recollection was that her partner got the person to leave the area after that second appearance. *Morris Direct II*, 60 So. 3d at 357; (Doc. # 15-18 at 93).

23

Patterson testified about her visibility, including lighting from the house, street, rescue units, likely a "pretty good moon," and, during her second sighting of the man, "scene lights" on the ambulance. *Morris Direct II*, 60 So. 3d at 357-58 (internal quotation marks omitted); (Doc. # 15-18 at 94-95). Patterson described the nightly conditions as "very clear for [her] to see [the individual]." *Morris Direct II*, 60 So. 3d at 358 (internal quotation marks omitted); (Doc. # 15-18 at 95).

Patterson stated that she returned to Rochester's home "around midnight" because of a second call. (Doc. # 15-18 at 97). After learning that the second emergency dispatch was because of Rochester's murder, Patterson testified that she told the police about the incidents involving the individual earlier that evening. (Doc. # 15-19 at 1). According to Patterson, she described the man to police as "approximately five foot eight, medium build, [with a] dark complexion[.] . . . . [and not] real clean shaven." (Doc. # 15-19 at 1-2). Patterson recalled telling the police about the clothes he was wearing, including "a baseball cap, a sateen jacket, [a] possible sweatshirt[,] . . . desert . . . sand . . . camouflage pants[,] and tennis shoes." (Doc. # 15-19 at 2).

Later, in the early morning hours, Morris was arrested for public intoxication. (Doc. # 15-1  at 23). Patterson testified that following her earlier description to police of the potential murder suspect, between 4:00-5:00 a.m. the police picked her up and took her to the location where Morris had been arrested for public intoxication. *Morris Direct II*, 60 So. 3d at 358; (Doc. # 15-19 at 5). Patterson recalled that the location was different from the area of Rochester's house and that "[i]t was still kind of dark outside." (Doc. # 15-19 at 5). Patterson said the police wanted her to identify the person, but they did not specify why. (Doc. # 15-19 at 6). Patterson stated that she remained in the police car as law enforcement "walked [Morris] out into the street." (Doc. # 15-19 at 6).

24

According to Patterson, she "looked at [Morris] and realized who he was." (Doc. # 15-19 at 6). Patterson testified that "to be extra sure" before "accus[ing] [Morris] of a crime," she wanted to hear the suspect's voice. *Morris Direct II*, 60 So. 3d at 358; (Doc. # 15-19 at 7). Before she made that request, Morris spoke "[v]ery loud[ly] and clear[ly]" and she recognized his voice from the previous night. *Morris Direct II*, 60 So. 3d at 358; (Doc. # 15-19 at 7).

Patterson did not know Morris before the murder. (Doc. # 15-18, 86, 93). But, "[she] knew when [she] saw [Morris] it was him, but that [hearing him speak] was just a confirmation to [her] that it was him." *Morris Direct II*, 60 So. 3d at 358 (internal quotation marks omitted); (Doc. # 15-19 at 7). Patterson testified that in identifying Morris after the murder, she reported to the police that he had "an injury on his forehead that [had] not [been] there earlier." *Morris Direct II*, 60 So. 3d at 358; (Doc. # 15-19 at 7). Patterson ended her direct testimony reconfirming that "Morris . . . [w]as the man that she had seen on those two occasions [—the night of and the morning after Rochester's murder—]'without a doubt.'" *Morris Direct II*, 60 So. 3d at 358; (Doc. # 15-20 at 3).

Morris challenged unsuccessfully the reliability of Patterson's out-of-court identification on direct appeal. *Morris Direct II*, 60 So. 3d at 359-60 (citing *Neil v. Biggers*, 409 U.S. 188 (1972) and *Manson v. Brathwaite*, 432 U.S. 98 (1977)). Morris presented his federal claim to the ACCA as one arising under the Fourteenth Amendment's due process clause. (Doc. # 15-52 at 97). In assessing the ACCA's analysis of Morris's claim, the court reviews *Biggers* and *Brathwaite* in detail.

In *Biggers*, the Supreme Court disagreed with the district court's habeas holding that a rape victim's pretrial identification of the respondent at a single-suspect showup (rather than a police lineup) was a due process violation. *Biggers*, 409 U.S. at 193, 195, 200. Before considering the

merits of the respondent's due process claim, the *Biggers* Court summarized the facts and holdings from four other eyewitness testimony opinions, *id.* at 196-98, and provided "[s]ome general guidelines [that] emerge[d] from th[o]se cases," *id.* at 198.

The Supreme Court discerned from those cases that the crux of a due process inquiry for an out-of-court statement is whether a "likelihood of misidentification" is "'very substantial.'" *Id.* at 198 (quoting *Simmons v. United States*, 390 U.S. 377, 384 (1968)). The Court observed that "disapprov[al]" of "[s]uggestive confrontations" comes from an "increase[d] . . . likelihood of misidentification." 409 U.S. at 198. "[C]ondemn[ation]" of "unnecessarily suggestive [confrontations]" stems from an added component that "the increased chance of misidentification is gratuitous." *Id.* But as the *Biggers* Court confirmed while referencing its prior precedent, "the admission of evidence of a showup without more does not violate due process." *Id.*; *see Stovall v. Denno*, 388 U.S. 293, 302 (1967) (concluding that the severity of the surviving victim's condition made "an immediate hospital confrontation . . . imperative"), *abrogated on other grounds by United States v. Johnson*, 457 U.S. 537 (1982) (*Johnson was* in turn abrogated by *Griffith v. Kentucky*, 479 U.S. 314 (1987).

The *Biggers* Court continued that "[w]hat is less clear from our cases is whether, as intimated by the [d]istrict [c]ourt, unnecessary suggestiveness alone requires the exclusion of [identification] evidence." 409 U.S. at 198-99. The Supreme Court expressed an "inclin[ation] to agree . . . [with the assessment] that the police did not exhaust all possibilities in seeking persons physically comparable to [the] respondent" for a lineup identification. *Id.* at 199. But the *Biggers* Court diverged from the habeas conclusion that simply using a showup before exhausting the option of a lineup required exclusion of the identification evidence under the due process clause.

*Id.*

Against this backdrop, the *Biggers* Court moved on "to the central question [of] whether, under the totality of the circumstances," the victim's "identification was reliable even though the confrontation procedure was suggestive." *Id.* (internal quotation marks omitted). To reach that due process answer, the Supreme Court identified factors to consider, such as "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." *Id.* at 199-200. "Weighing all the factors," including the victim's "more than ordinarily thorough" description of her assailant and the "'no doubt'" certainty of her identification, the *Biggers* Court determined that "no substantial likelihood of misidentification" existed. *Id.* at 200-01. Thus, the Supreme Court upheld the state trial court's admission of the eyewitness evidence. *Biggers*, 409 U.S. at 201.

In *Brathwaite*, the Supreme Court revisited *Biggers* and *Stovall* in the context of an admittedly "suggestive and unnecessary identification procedure." *Brathwaite*, 432 U.S. at 99. The eyewitness was an undercover narcotics officer, and the out-of-court confrontation consisted of reviewing one photograph. 432 U.S. at 99-101.

The *Brathwaite* circumstances began with the undercover officer and an informant going to an apartment building to buy drugs from "a known narcotics dealer." *Id.* at 100. Although they arrived at the seller's suspected apartment in the evening, "there was still daylight," and "[t]he area was illuminated by natural light from a window in the third floor hallway." *Id.* The undercover officer knocked on a door, which "opened 12 to 18 inches," and "observed a man standing at the door and, behind him, a woman." *Id.* The informant "identified himself" to the people in the

27

apartment. *Id.* After the officer requested narcotics from and exchanged money with the man, "[t]he door closed." *Id.* Once the door reopened for the drug exchange, the officer "stood within two feet of the [seller]" and observed his face. The time between the door's first opening and second closing was "[f]ive to seven minutes," and "about eight minutes" elapsed between the officer and informant's arrival at and departure from the building. *Id.* at 100-01.

After the undercover transaction, the police officer returned to headquarters. *Id.* at 101. The officer, who "did not know the seller's identity," described him as "a colored man, [who stood] approximately five feet eleven inches tall, [and had a] dark complexion, black hair [in a] short Afro style, . . . high cheekbones, and . . . [a] heavy build." *Id.* (internal quotation marks omitted). The officer recalled that the man "was wearing . . . blue pants and a plaid shirt." *Id.* (internal quotation marks omitted).

Another officer, who had heard the undercover officer's description, "suspect[ed] . . . that [the] respondent might be the seller." *Id.* Notably, the respondent, whom the second officer "kn[e]w . . . by sight," *id.* at 101, was not the same person as the known narcotics dealer, who had been the "intended" subject of the undercover drug transaction, *id.* at 100 n.2 (internal quotation marks omitted). After "obtain[ing] a photograph of [the] respondent," the other officer "left it at [the undercover officer's] office. *Id.* at 101. Two days later, the undercover officer "viewed the photograph for the first time upon his return to headquarters" with nobody else present. *Id.* at 101. The undercover officer "identified the person" in the photograph as the man from the apartment who had sold him narcotics. *Id.*

"Eight months later," at the criminal trial, the undercover officer testified that he had "no doubt whatsoever . . . that the person shown on the photograph was respondent." *Id.* at 102 (internal

28

quotation marks omitted). The prosecutor gave "[n]o explanation . . . for the failure to utilize a photographic array or to conduct a lineup." *Id.* And, the officer "made a positive in-court identification without objection." *Id.*

After challenging his conviction in state court unsuccessfully, the respondent sought habeas relief. *Id.* at 103. Although the Second Circuit of Appeals reversed the district court judgment upholding his conviction, the Supreme Court reversed that appellate habeas judgment. *Id.* The Second Circuit gave two reasons for concluding there was a due process decision. One, the undercover officer's "examination of the single photograph was unnecessary and suggestive." *Id.* at 104. Two, "the [eyewitness] evidence was unreliable." *Id.*

In reversing the Second Circuit's judgment in *Brathwaite*, the Supreme Court reviewed *Biggers* and *Stovall*. *Brathwaite*, 432 U.S. at 104-07. The *Brathwaite* Court acknowledged that those two cases created an arguably ambiguous impression about the role reliability plays in the due process assessment of "a suggestive and unnecessary identification procedure." *Brathwaite*, 432 U.S. at 106. Accordingly, the simple question in *Brathwaite* was "whether the *Biggers* analysis applie[d] to post-*Stovall* confrontations as well to those pre-*Stovall*." *Brathwaite*, 432 U.S. at 107.

The Supreme Court next turned to the district court's treatment of the respondent's due process claim. *Id.* The Court summarized that after determining that "the police [had] used an impermissibly suggestive procedure in obtaining the out-of-court identification," the district court identified and applied the *Biggers* reliability factors. *Brathwaite*, 432 U.S. at 107-08. The *Brathwaite* Court recounted the district court's assessment of reliability offered to establish that "no substantial likelihood of irreparable misidentification" had occurred. *Id.* at 108. Those circumstances specific to the confrontation included the close proximity of "'two feet'" between

29

the undercover officer and the respondent, a "duration . . . of at least a 'couple of minutes,'" "natural light from a window . . . and . . . adequate light to see clearly in the hall," and the officer's training. *Id.* Post-confrontation circumstances included the officer's detailed post-confrontation description of the respondent, out-of-court identification within "'two days'" of the undercover deal, and the "'no-doubt'" identification of the respondent at trial. *Id.*

After discussing both the district court and Second Circuit's competing analyses, the *Brathwaite* Court turned to an evaluation of the respondent's "propos[al] [of] a per se rule of exclusion" to resolve the post-*Stovall* open question. *Brathwaite*, 432 U.S. at 109. The Supreme Court considered the pros and cons of adopting such a per se exclusionary rule rather than approving a more flexible, totality-of-the-circumstances approach. *Id.* at 110-13. The *Brathwaite* Court concluded that *Stovall* and *Biggers* "did not, singly or together, establish a strict exclusionary rule or new standard of due process." *Brathwaite*, 432 U.S. at 113.

The Supreme Court held that "reliability is the linchpin in determining the admissibility of identification testimony for both pre- and post-*Stovall* confrontations." *Brathwaite*, 432 U.S. at 114. After announcing the proper standard, the *Brathwaite* Court applied the *Biggers* framework to the circumstances of the respondent's due process claim. *Brathwaite*, 432 U.S. at 114-16. The Supreme Court confirmed that the undercover officer's pretrial identification of the respondent satisfied the factors of "opportunity to view," "degree of attention," "accuracy of the description," "level of certainty," and "time between the crime and the confrontation." *Brathwaite*, 432 U.S. at 114-16. The Supreme Court concluded that "the corrupting effect of the challenged [evidence]" did not outweigh the "indicators of [the officer's] ability to make an accurate identification." *Id.* at 116. Although the Court concluded that use of a photographic array would, "[o]f course," be a

better practice, balancing the *Biggers*' factors, "[t]he defect, if there [was] one, [went] to weight and not to substance." *Id.* at 117.

With this legal overview firmly in mind, the court turns to the ACCA's analysis of Morris's due process claim. Morris did not challenge Patterson's identification testimony as unreliable at trial. *See generally, Morris Direct II*, 60 So. 3d at 357-69 (no discussion of an objection or motion to suppress). Still, the ACCA appears to have evaluated this claim under Alabama's harmless-error rather than the plain-error standard. *See Morris Direct II*, 60 So. 3d at 357 (describing Morris's allegation that the introduction of Patterson's "unduly suggestive" identification "was not independently reliable . . . [or] harmless error").

Harmless error under Alabama Appellate Procedure Rule 45 covers "[e]rror[s] [w]ithout [i]njury" and applies in civil and criminal cases. Ala. R. App. 45 (emphasis in rule's title omitted). Under Rule 45, "[n]o judgment may be reversed or set aside, []or new trial granted . . . on the ground of . . . the improper admission or rejection of evidence . . . unless . . . , after an examination of the entire cause, it . . . appear[s] that the error complained of has probably injuriously affected substantial rights of the parties." *Id.*

Plain error under Alabama Appellate Procedure Rule 45A, on the other hand, is exclusive to death penalty cases. Ala. R. App. P. 45A. Rule 45A requires the ACCA to "notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action . . . , whenever such error has or probably has adversely affected the substantial right of the appellant." *Id.*

The ACCA recited the *Biggers* reliability framework and applied the *Biggers* factors to Patterson's testimony under the applicable totality-of-the-circumstances standard. *Morris Direct*

*II*, 60 So. 3d at 359. The ACCA determined that "all [five factors] support[ed] the reliability of [her] identification of Morris as the man she had confronted at the scene of the offense only hours before the murder." *Id.* The ACCA concluded that "even if the one-man showup had been unduly suggestive, it did not taint [Patterson's] identification as it did not invite an irreparable misidentification." *Id.*; *cf. Coleman v. Alabama*, 399 U.S. 1, 5 (1970) (upholding trial court's admission of an in-court identification over a claim that an "'impermissibly suggestive'" pretrial lineup "'g[a]ve rise to a very substantial likelihood of irreparable misidentification'") (alteration added) (quoting *Simmons*, 390 U.S. at 384). With this state court background in mind, the court moves to habeas review.

### 2. The proper application of AEDPA deference precludes habeas relief on Morris's exhausted *Biggers* claim

The court begins habeas review with an AEDPA assessment of Morris's exhausted *Biggers* claim under the Fourteenth Amendment's due process clause. Invoking § 2254(d)(1), Morris contends that the ACCA's analysis contains both a contrary to and an unreasonable application of Supreme Court precedent. But Morris has failed to meet the standard under either clause.

Preliminarily, Morris's efforts to meet (d)(1)'s first clause fall short. As explained earlier, a petitioner satisfies AEDPA's contrary to clause if the state court misapplies the Supreme Court's governing law or reaches a different constitutional outcome than the Court, despite facing materially indistinguishable facts. The ACCA's discussion of *Biggers* in the evaluation of Morris's due process claim eliminates his reliance on the governing-law aspect of (d)(1)'s first clause. *Cf. Rice*, 546 U.S. at 342 ("In this case there is no demonstration that [the state courts] acted contrary to clearly established federal law in recognizing and applying [the appropriate constitutional] []framework."). And consistent with the unreasonable application analysis below, Morris has not

identified a factually-indistinguishable Supreme Court decision with an outcome favorable to him.

To meet (d)(1)'s unreasonable application clause, Morris relies on a litany of decisions. But Morris does not explain how these authorities show that the ACCA's due process analysis contained extreme constitutional error. And even to the extent that these cases suggest a different due process result, none of the cases demonstrates that the ACCA's reliability assessment conflicts unreasonably with clearly established Supreme Court precedent.

For example, Morris cites *Biggers*, *Brathwaite*, and *Stovall* in support of his AEDPA argument that the ACCA unreasonably rejected his claim that police's use of a suggestive single-suspect showup violated his due process rights. (Docs. # 1 at 14-16, 18 ¶¶ 50-52, 56, 60; 27 at 17). But as the Supreme Court concluded, neither the showups in *Biggers* or *Stovall*, nor the single photograph in *Brathwaite* violated the due process clause. Consequently, the holdings from those decisions do not clearly establish that the ACCA rejected Morris's due process claim unreasonably under Supreme Court precedent.

Based on the same-race circumstances in *Brathwaite*, Morris argues that the cross-racial nature of the confrontation in his case makes Patterson's identification unreliable. (Docs. # 1 at 18 ¶ 60; 27 at 20 n.4). But to meet his AEDPA burden, Morris must identify Supreme Court authority in which a cross-racial confrontation resulted in an unreliable identification under the totality of the circumstances. That is, even accepting that an identification from a cross-racial confrontation is less reliable than a same-racial one, that does not establish that the ACCA committed extreme constitutional error under *Biggers* with respect to Morris's claim.

Morris also argues that because the police did not use a photo array or a lineup, he meets AEDPA's unreasonable application standard. But the outcomes in *Biggers* and *Brathwaite*

*establish* that a failure to use a less suggestive identification procedure does not automatically translate into a due process violation. Morris also references trial testimony that the better practice would have been to also ask Patterson's partner to attempt to identify the person who was outside Rochester's house before the murder. (Doc. # 27 at 18). But without clearly established law on that point, the police's failure to seek a corroborating identification from a second witness does not establish that the ACCA evaluated the reliability of Patterson's identification of Morris unreasonably under *Biggers*.

Reviewing the ACCA's decision under *Bigger*'s totality-of-the-circumstances test reinforces (rather than detracts from) the reasonableness of the state appellate court's conclusion that Patterson's pretrial identification was reliable. Akin to the undercover officer in *Brathwaite*, Patterson as a paramedic, was trained to have attention to detail and had experience in emergency situations. *Cf. Biggers*, 409 U.S. at 200 (pointing out that the rape victim "was no casual observer"). Patterson saw Morris twice before Rochester's murder, described him to police within hours of the offense, and identified him in the single-suspect showup within twelve hours of their encounter on the sidewalk close to Rochester's home. Patterson's two observations of Morris before the murder included a close-up and "problem[atic]" "toe-to-toe" exchange with him. Although Patterson saw Morris in the late evening, she stated that light from several sources aided in her ability to see him clearly both times. Patterson testified that she recognized Morris when she first saw him at the showup and that hearing his voice reinforced her certainty about her identification. Patterson described Morris to police—including his height, build, complexion, and clothing—roughly three hours after seeing him outside Patterson's house and identified him within six hours of that pre-identification report. *See Perry v. New Hampshire*, 565 U.S. 228, 232 (2012)

("[I]f the indicia of reliability are strong enough to outweigh the corrupting effect of the police-arranged suggestive circumstances, the identification evidence ordinarily will be admitted, and the jury will ultimately determine its worth.").

The other Supreme Court cases that Morris mentions in his petition are *Perry*, *United States v. Wade*, 388 U.S. 218 (1967), and *Kyles v. Whitley*, 514 U.S. 419 (1995). The Supreme Court discussed *Biggers*' reliability standards in these cases. But, because those decisions do not clearly establish law under circumstances comparable to Morris's due process claim, they cannot satisfy his AEDPA (d)(1) burden.

For example, the *Perry* Court addressed a due process claim which did not involve a "lineup, showup, or photograph array" allegedly "infected [with] improper police influence." *Perry*, 565 U.S. at 232-33. Instead, the eyewitness identification of the petitioner arose under "suggestive circumstances," which the police had not arranged. *Perry*, 565 U.S. at 232. The *Perry* Court held that the "[d]ue [p]rocess [c]lause does not require a preliminary judicial inquiry into the reliability of an eyewitness identification when the identification was not procured under unnecessarily suggestive circumstances arranged by law enforcement." *Id.* at 248. Thus, the *Perry* Court's holding does not help Morris.

In *Wade*, the Supreme Court faced a claim challenging the constitutionality of a "post-indictment lineup conducted for identification purposes without notice to and in the absence of the accused's appointed counsel." *Wade*, 388 U.S. at 219-20. The *Wade* Court concluded that "vacat[ing] the conviction pending a hearing to determine whether the in-court identifications had an independent source, or whether, in any event, the introduction of the evidence was harmless error" was "the appropriate procedure to . . . follow[]." *Id.* at 242. But the Supreme Court's

35

consideration of a post-indictment identification without the benefit of counsel in *Wade* does not demonstrate that the ACCA unreasonably decided Morris's pre-indictment identification claim.

Comparable to Morris's guilt-phase approach, *Kyles* is a capital case involving a misidentification defense. But, rather than *Biggers*, the source of the petitioner's habeas claim was the state's failure to "[d]isclos[e] . . . [two witnesses'] statements [that] would have resulted in a markedly weaker case for the prosecution and a markedly stronger one for the defense." *Kyles*, 514 U.S. at 441. The *Kyles* Court ordered a new trial "[b]ecause the net effect of the evidence withheld by the [s]tate . . . raise[d] a reasonable probability that its disclosure would have produced a different result." 514 U.S. at 421-22.

Given the Supreme Court's evaluation of the conflicting statements in *Kyles*, Morris maintains that some differences between Patterson's description of the suspect's clothing before the murder and what Morris was found wearing hours after the murder entitles him to habeas relief under AEDPA. (Docs. # 1 at 17 ¶ 59; 27 at 20). That argument is off the mark.

This case is distinguishable from *Kyles* because the alleged discrepancies about Patterson's description of "the suspect's jacket and hat" do not undercut the reliability of her out-of-court identification to a "marked" degree, much less show that the ACCA denied Morris's *Biggers* claim unreasonably. The court reaches a similar conclusion about Morris's reliance on Patterson's description of the suspect as not "real clean shaven." (Doc. # 1 at 18 ¶ 63). The lack of corroboration of that detail in the police incident or lookout report does not demonstrate that the ACCA unreasonably applied Supreme Court authority under AEDPA.

In reply, Morris compares his *Biggers* showup claim to the circumstances in another Supreme Court capital habeas case. *Sexton v. Beaudreaux*, 585 U.S. 961, 138 S. Ct. 2555 (2018)

(per curiam). (*See* Doc. # 27 at 20-21) (explaining that "*Sexton* involved two separate photo lineups where the eyewitness chose the defendant both times . . . before the eyewitness observed the suspect in person and confirmed the identification) (emphasis omitted) (citing *Sexton*, 138 S. Ct. at 2560). In *Sexton*, the respondent argued successfully before the Ninth Circuit that trial counsel had provided ineffective assistance for not filing a motion to suppress based upon *Biggers*. *Id.* at 2558. The Supreme Court reversed the Ninth Circuit's habeas judgment under AEDPA. *Id.* at 2558-61. The Court determined that "[t]he state court could have reasonably concluded that [the respondent] failed to prove that, under the totality of the circumstances, the identification was not reliable." *Id.* at 2559-60. Thus, the outcome in *Sexton* does not establish that the ACCA committed an extreme *Biggers* error on his claim.

The Supreme Court also recognized that the "deference to the state court should have been near its apex in th[e] case, which involve[d] a[n] [ineffective-assistance-of-counsel] claim based on a motion that turn[ed] on general, fact-driven standards such as suggestiveness and reliability." *Sexton*, 138 S. Ct. at 2560. Thus, the *Sexton* Court's guidance acknowledges that a state court's resolution of a *Biggers* claim deserves a sizeable range of deference under AEDPA. This undermines Morris's contention that the ACCA overstepped in an objectively unreasonable manner on his claim.

Morris also mentions *Richter* in his reply brief. (Doc. # 27 at 21). Although *Richter* is an AEDPA capital habeas case, the Supreme Court did not consider a *Biggers* claim. Rather, the Court reviewed an ineffective assistance claim based on trial counsel's failure to obtain a blood evidence expert. *Richter*, 562 U.S. at 92, 97. Thus, the Supreme Court's holding in *Richter* cannot clearly establish unreasonableness in the ACCA's rejection of Morris's *Biggers* claim.

37

Although Morris does not discuss it, another key Supreme Court identification decision is *Foster v. California*, 394 U.S. 440 (1969). The *Biggers* Court recognized *Foster* as "[t]he only case to date in which th[e] Court ha[d] found identification procedures to be violative of due process." *Biggers*, 409 U.S. at 197. But the Supreme Court's due process holding in *Foster* turned on a pattern of suggestive pretrial identification procedures, which "made it all but inevitable that [the witness] would identify [the] petitioner whether or not he was in fact 'the man.'" *Foster*, 394 U.S. at 443. Here, the police did not "repeatedly" tell Patterson at the showup that Morris "[wa]s the man." At trial, Patterson expressed "without a doubt" that she had identified Morris correctly at pretrial. Thus, *Foster* does not establish that the ACCA unreasonably rejected Morris's *Biggers* claim.

Morris cites four Eleventh Circuit habeas opinions discussing *Biggers*. *Johnson v. Dugger*, 817 F.2d 726 (11th Cir. 1987) (per curiam), *Masse v. Sec'y, Fla. Dep't of Corr.*, 700 F. App'x 890 (11th Cir. 2017) (per curiam), *United States v. Winfrey*, 403 F. App'x 432 (11th Cir. 2010) (per curiam), *Blanco v. Singletary*, 943 F.2d 1477 (11th Cir. 1991). (Doc. # 27 at 18 & n.1). But these decisions lend no aid to Morris in carrying his unreasonable application burden.

For example, in *Johnson*, the Eleventh Circuit acknowledged the "wide[] condemn[ation]" of showups. 817 F.2d at 729. Still, the Eleventh Circuit observed pre-AEDPA that "immediate confrontations allow identification before the suspect has altered his appearance and while the witness'[s] memory is fresh, and [may operate to] permit the quick release of innocent persons." *Id*. And to the extent that the showup was "impermissibly suggestive" in *Johnson*, "the out-of-court identification was not unreliable." *Id*. The Eleventh Circuit reached similar showup conclusions to *Johnson* in the non-binding cases of *Masse* and *Winfrey*. *See Masse*, 700 F. App'x

at 894 ("Moreover—even if the show-up identification procedure was suggestive—it was nonetheless reliable under [*Biggers*]."); *Winfrey*, 403 F. App. at 436 (concluding under the Fifth Amendment that "out-of-court identification was [neither] impermissibly suggestive [n]or unreliable [n]or that it tainted [the] in-court identification"). Thus, *Johnson*, *Masse*, and *Winfrey* reinforce, rather than detract from, the reasonableness of the ACCA's *Biggers* decision in Morris's appeal.

*Blanco* was a habeas case in which the Eleventh Circuit considered a showup identification based on a description of the suspect, who wore "a 'grayish' jogging suit [and who was] in front of the victim's house immediately after the murder." *Blanco*, 943 F.2d at 1508. The witness was "[un]able to see the upper portion of the figure, due to some tree branches." *Id.* After the petitioner's "arrest shortly after the murder," the witness identified the petitioner in a showup as the same person who was outside the victim's house near the time of the murder. *Id.* at 1508-09.

The Eleventh Circuit observed that "[t]he police [had] not aggravate[d] the suggestiveness of the encounter" and that the out-of-court identification had "been made quite soon after the initial sighting." *Id.* at 1509. Still, the Eleventh Circuit noted that if the showup identification had been "the only evidence of . . . guilt, it would not [have] be[en] sufficient to support the conviction." *Id.* But, because additional evidence established the petitioner's guilt, including another witness's identification of the petitioner in a lineup, "[t]he error . . . , if any, was harmless beyond a reasonable doubt." *Id.*

The Eleventh Circuit's critique of the showup in *Blanco* is inadequate to meet Morris's AEDPA burden for several reasons. First, unlike the pre-identification partial view in *Blanco*, Patterson had two separate unobstructed views of Morris's complete body and face only hours

before Rochester's murder and her identification of him. Second, Patterson provided a more detailed description of Morris before the showup than the eyewitness did before the showup in *Blanco*. Third, because *Blanco* is a pre-AEDPA decision, the Eleventh Circuit's review did not mandate a deferential analysis under § 2254(d)(1).

Morris references two other Eleventh Circuit habeas decisions, but they are unrelated to identification testimony. The first case, *Brown v. Dugger*, 831 F.2d 1547 (11th Cir. 1987), is a pre-AEDPA case in which the petitioner asserted claims under the "confrontation clause of the Sixth Amendment, the self-incrimination clause of the Fifth Amendment and the due process clause of the Fourteenth Amendment." *Id.* at 1550. Morris relies on a concurring opinion in *Brown* to argue that "Patterson's unreliable identification was far from harmless" given that his second trial ended in a deadlock. (Doc. # 1 at 19 ¶ 65); *see Brown*, 831 F.2d at 1558 (Clark, J., concurring in part) (drawing harmfulness from a comparison of the "first trial [that] ended with a hung jury unable to reach a verdict" and the second trial that restricted the petitioner's right to confront his accomplice and ended in a conviction). But nothing in *Brown* suggests that the ACCA committed AEDPA error in the rejection of Morris's claim that Patterson's identification testimony was unreliable or admitted erroneously. And, regardless, Morris's analogy to *Brown* is unhelpful because Patterson testified at his second capital trial. (Doc. # 15-47 at 111, 113). Consequently, unlike the record in *Brown*—in which the trial testimony differed on retrial—the juries in Morris's second and third trials heard the same identification testimony from Patterson.

*Brewster v. Hetzel*, 913 F.3d 1042 (11th Cir. 2019), is an ineffective assistance case in which the Eleventh Circuit determined that AEDPA deference did not apply. (Doc. # 27 at 17). *See Brewster*, 913 F.3d at 1051 (declining to apply AEDPA deference to the state courts' denial

of a "recast[ed]" ineffective assistance claim). Citing *Brewster*, Morris argues that this court should apply de novo review to the respondent's argument that the one-man showup "was not unnecessarily or unduly suggestive." (Doc. # 27 at 17) (internal quotation marks omitted). A de novo review of that aspect is inappropriate here because the ACCA assumed suggestiveness for analysis purposes and did not reach an unreasonable *Biggers* result as to reliability.

The remaining authorities that Morris relies on are non-binding and, regardless, do not persuade this court that he has met his AEDPA burden. *Cossel v. Miller*, 229 F.3d 649, 651, 655-56 (7th Cir. 2000) (reversing denial of a *Biggers*-based ineffective assistance claim under AEDPA based on a rape victim's unreliable in-court identification, including "a ten-second window in which to view her assailant by the light of the moon and street light," her conflicting "pre[-]identification description," an inability to identify her attacker in a photo array or single photograph, an inability to recognize her attacker's voice in a later lineup, and a six-year gap between the offense and the criminal trial); (Docs. # 1 at 14, 16 ¶¶ 51, 56; 27 at 20 n.3); *Raheem v. Kelly*, 257 F.3d 122, 138 (2d Cir. 2001) (reversing denial of a *Biggers* claim pre-AEDPA because of a suggestive lineup, in which only the suspect "appeared in a black leather coat," and circumstances that "d[id] not suggest reliability independent of" that article of clothing); *see id.* (discounting the witnesses' degree of attention because they were "chatting, drinking scotch, and watching a football game" leading up to the shooting and, after reviewing a photo array, misidentified a second "gunman who had accosted them directly and taken their money and jewelry"); (Doc. # 1 at 17 ¶ 58); *United States v. Funches*, 84 F.3d 249, 255 (7th Cir. 1996) (discussing but not deciding the issue of unnecessary suggestiveness "because even if the show-up was unduly suggestive, the totality of the circumstances [demonstrates] that [the] identification

was nonetheless reliable"); (Doc. # 27 at 18-19); *Wray v. Johnson*, 202 F.3d 515, 530 (2d Cir. 2000) (concluding that habeas relief was appropriate pre-AEDPA"[g]iven the frailties in the [s]tate's properly admitted evidence, along with the prosecutor's emphasis on [the impermissibly suggestive] showup identification . . . and the jury's request to hear that evidence again"); (Doc. # 27 at 19); *Pratt v. Parratt*, 615 F.2d 486, 488 (8th Cir. 1980) (concluding pre-AEDPA that *Biggers* reliability factors were met, or, alternatively, only harmless error had occurred in light of a "showup occurring only five hours [after the offense] and [the victim's] fe[eling] [of] certain[ty] [about] her identification of [the petitioner] as her assailant"); (Doc. # 27 at 19 n.2); *Bey v. Superintendent Greene SCI*, 856 F.3d 230, 241 (3d Cir. 2017) (evaluating whether an "instruction could be reasonably understood as requiring the jury to accept an eyewitness's identification of [the petitioner] as the shooter" on habeas review but not considering a *Biggers* claim); (Doc. # 27 at 21-22).

Morris also points to decisions of district courts. *Vasquez v. Poole*, 331 F. Supp. 2d 145, 158-59, 161 (E.D.N.Y. 2004) (describing showup at the precinct as "arguably unnecessarily suggestive" but concluding, under AEDPA, that the victim's "identification was sufficiently reliable to let a jury consider it"); (Doc. # 27 at 18); *United States v. Smith*, 621 F. Supp. 2d 1207, 1217 (S.D. Ala. 2009) (referencing the denial of "a motion to exclude the photograph identifications as unduly suggestive under *Biggers*" "during an earlier phase of th[e] case," but permitting a defense "expert [witness to testify at trial] on eyewitness identifications generally and cross-racial identifications in particular"); (Doc. # 27 at 20 n.4). These decisions are obviously non-binding and, as the parenthetical explanations show, neither *Vasquez* nor *Smith* suggests that the ACCA decided Morris's *Biggers* claim unreasonably in any event.

Morris also cites several state law cases in response to Respondent's position that one-man showups within "twenty-four hours after the initial observance" are not "unnecessarily suggestive." (Doc. # 27 at 19 n.2) (internal quotation marks omitted); (Doc. # 22 at 24). Morris argues that Respondent's reliance on these cited authorities is misguided because the decisions do not turn on suggestiveness, police-arranged showups, or elapsed periods of eight or more hours between what the witness saw and the out-of-court confrontation. (Doc. # 27 at 19 n.2). But the key for Morris on AEDPA review is whether any of the state court outcomes indicate that the ACCA decided his *Biggers* claim unreasonably—not whether Respondent presented or analyzed the cases correctly. And because none of the state courts concluded that relief was appropriate under the totality of the circumstances in these decisions, Morris's discussion of them is inconsequential to his AEDPA burden. *See, e.g.*, *Mercer v. State*, 493 S.E.2d 921, 922-23 (Ga. 1998) (rejecting identification claim); *State v. Briley*, 151 So. 3d 633, 642-46 (La. Ct. App. 2014) (same); *State v. Green*, 84 So. 3d 573, 579-82 (La. Ct. App. 2011) (same); *Guerrero v. State*, 943 So. 2d 774, 777-80 (Miss. Ct. App. 2006) (same); *Whitehurst v. State*, 690 S.W.2d 110, 111-12 (Tex. App. 1985) (same); *State v. Eoff*, 193 S.W.3d 366, 375-77 (Mo. Ct. App. 2006) (same); *State v. Cain*, 652 So. 2d 611, 613-15 (La. Ct. App. 1995) (same).

Morris has not shown that the ACCA decided his *Biggers* claim unreasonably under § 2254(d)(1)'s second clause. Although Morris also invokes the "contrary to" clause (Doc. # 1 at 19 ¶ 66), this court's unreasonable application analysis confirms that he has not shown a contrary application of Supreme Court precedent.

Morris alternatively asserts that the ACCA's decision was unreasonable under § 2254(d)(2). (Docs. # 1 at 19 ¶ 66; 27 at 20). Under § 2254(d)(2), a petitioner may challenge the

state court factual findings underlying an adjudicated federal claim as unreasonable based on the evidentiary record. *Wood v. Allen*, 558 U.S. at 293.

Morris's attempt to obtain habeas relief under (d)(2) is less developed than his (d)(1) position. Beyond disagreeing with the *Biggers* outcome on direct appeal, Morris offers little argument to show that the ACCA's decision contains "an unreasonable determination of the facts in light of the evidence presented in the [s]tate court proceeding." 28 U.S.C. § 2254(d)(2).

Morris references the state court's "reli[ance] on [] Patterson's description of the suspect's clothes as an indicia of reliability" as a basis for relief under (d)(2). (Docs. # 27 at 20; 1 at 17 ¶ 59). The court understands Morris's (d)(2) argument to be that the ACCA based its reliability assessment on an unreasonable determination that Patterson had provided an accurate description of the suspect before the showup identification.

Specifically, Morris alleges that Patterson's description of the suspect's jacket and hat did not line up at all with Morris's appearance. (Doc. # 27 at 20). The trial transcript pages which Morris cites contain Birmingham Police Officer Eric Smith's testimony from the first and third trials. On the referenced pages, Officer Smith testified about the suspect's description within the BOLO, the contents of which came from Patterson's pre-identification report to the police. (Docs. # 15-6 at 169, 188; 15-20 at 36, 58).

According to Officer Smith, the BOLO described the suspect as "wearing a black sweat suit-type jacket" and "a dark baseball cap." (Doc. # 15-6 at 188). And Officer Smith confirmed that Morris "was wearing a red jacket with white stripes" during his arrest for public intoxication in the early morning following the murder. (Doc. # 15-6 at 188). Patterson's recollection was that the suspect wore a jacket made of sateen without specifying any color or pattern and a baseball

cap. (Doc. # 15-19 at 2).

But even a rigorous examination of this evidence indicates that the only arguable discrepancy in Patterson's description of the suspect's clothing pre-showup and Morris's at the showup was the jacket. That is, Patterson did not describe the suspect as wearing a red jacket with white stripes when she saw him twice outside of Rochester's home. Of course, a reasonable explanation for this difference is that Morris could have changed jackets at some point after the pre-offense encounter with Patterson. In any event, even if Patterson gave an inaccurate description of the jacket, that does not mean that the ACCA relied unreasonably on her otherwise accurate pre-identification description in support of its *Biggers* finding. Likewise, the differing testimony about the jacket certainly does not suggest that the ACCA relied "on an unreasonable determination of the facts in light of the evidence" when analyzing the four remaining *Biggers* factors.

Alternatively, a presumption of correctness attaches to state court factual findings under § 2254(e)(1). *See* 28 U.S.C. § 2254(e)(1) (providing that "a determination of a factual issue made by a [s]tate court shall be presumed to be correct"). Only with "clear and convincing evidence" may a petitioner overcome a state court's presumptively correct factual findings. 28 U.S.C. § 2254(e)(1); *see also Ward*, 592 F.3d at 1177 ("Clear and convincing evidence entails proof that a claim is highly probable, a standard requiring more than a preponderance of the evidence but less than proof beyond a reasonable doubt.") (internal quotation marks omitted). The Supreme Court has not yet addressed the relationship between § 2254(e)(1) and § 2254(d)(2). *Wood*, 558 U.S. at 293; *see id.* at 304-05 ("[W]e leave for another day the questions of how and when § 2254(e)(1) applies in challenges to a state court's factual determinations under § 2254(d)(2).") *see also Cave*

*v. Sec'y, Fla. Dep't of Corr.*, 638 F.3d 739, 747 (11th Cir. 2011) ("We have not yet had an occasion to completely define the respective purviews of (d)(2) and (e)(1), and this case presents no such opportunity."). But to the extent that (e)(1) applies to a (d)(2) unreasonable factual challenge under AEDPA, Morris has not overcome with clear and convincing evidence (as he is required to) the presumption that the ACCA assessed the "fact-driven" *Biggers* reliability factors under the totality of the circumstances correctly. *Sexton*, 138 S. Ct. at 2560.

Even if Morris could show a (d)(1) or (d)(2) error on the ACCA's part, thus triggering de novo review, he bears additional burdens. First, Morris must prove to this court that there was a due process violation under *Biggers*. Second, Morris must show that the non-structural constitutional error had a "substantial-and-injurious effect" on his trial under *Brecht v. Abrahamson*, 507 U.S. 619 (1993). *See also United States v. Elliot*, 732 F.3d 1307, 1309 (11th Cir. 2013) (per curiam) ("The admission of [an] unreliable identification is subject to harmless error analysis.") (internal quotation marks omitted). Before AEDPA, "the Supreme Court held [in *Brecht*] that on federal habeas review, courts must assess the prejudicial impact of constitutional error in a state criminal trial under the 'substantial-and-injurious-effect' standard." *Wellons v. Hall*, 554 F.3d 923, 939 (11th Cir. 2009), *judgment vacated on other grounds*, 558 U.S. 220 (2010). Under the *Brecht* standard, "habeas petitioners may obtain plenary review of their constitutional claims, but they are not entitled to habeas relief based on trial error unless they can establish that [the mistake] resulted in actual prejudice." *Wellons*, 554 F.3d at 939-940 (alteration added) (internal quotation marks omitted) (quoting *Brecht*, 507 U.S. at 637). Although *Brecht* is a pre-AEDPA decision, the Court "confirmed the application of *Brecht*'s more deferential 'substantial-and-injurious-effect' standard when assessing the prejudicial impact of constitutional error on

46

federal habeas review" post-AEDPA in *Fry v. Pliler*, 551 U.S. 112 (2007). *Wellons*, 554 F.3d at 940.

Morris meets the *Brecht* standard if the state's (assumed) improper use of Patterson's identification testimony "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637 (internal quotation marks omitted). But here, the evidence of Morris's guilt—even without Patterson's identification—was compelling. The results of the murder investigation revealed that some jewelry in Morris's possession belonged to Rochester and Russell, blood on Morris's shoe was Rochester's, and DNA evidence on a cigarette butt located in Rochester's house was Morris's. Thus, even if Morris had penetrated § 2254(d)'s barrier (and to be clear, he has not) and proven a *Biggers* claim de novo (which, he has not done either), habeas relief because of harmfulness under *Brecht* is inappropriate. That is, Morris cannot show that the admission of Patterson's identification testimony impacted the jury's guilty verdict substantially or injuriously, given the strength of the remaining evidence connecting him to Rochester's murder.

### 3. Morris's remaining allegations related to his identification claim do not entitle him to habeas relief.

Having analyzed Morris's exhausted Fourteenth Amendment due process identification claim under AEDPA, the court next addresses the habeas concepts of exhaustion and procedural default. The court then turns to other deficiencies with Morris's identification claim.

#### a. Exhaustion and procedural default.

Under § 2254(b) and (c), a federal court must limit its grant of habeas applications to cases in which an applicant has exhausted all state remedies. *Cullen v. Pinholster*, 563 U.S. 170, 182 (2011) ("Section 2254(b) requires that prisoners must ordinarily exhaust state remedies before filing for federal habeas relief."); 28 U.S.C. § 2254(c) ("An applicant shall not be deemed to have

exhausted the remedies available [in state court] . . . if he has the right under the law of the State to raise, by any available procedure, the question presented."). Exhaustion requires that a petitioner "'give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process,' including review by the State's last court of last resort, even if review in that court is discretionary." *Pruitt v. Jones*, 348 F.3d 1355, 1358-59 (11th Cir. 2003) (alteration in *Pruitt* omitted) (quoting *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999)). "Alabama's discretionary direct review procedures bring Alabama [habeas petitioners] within the scope of the *Boerckel* rule." *Id*. at 1359 (internal quotation marks omitted) (quoting *Smith v. Jones*, 256 F.3d 1135, 1140 (11th Cir. 2001)). As a result, *Boerckel* applies to Alabama's postconviction appellate review structure, too. *See Pruitt*, 348 F.3d at 1359 ("Nothing in *Boerckel*'s reasoning suggests that a different rule should apply in state post-conviction appeals as opposed to direct appeals."); *id.* (concluding that petitioner had "failed to exhaust his state remedies by not petitioning the Alabama Supreme Court for discretionary review of the denial of his state habeas petition").

The purpose of the exhaustion requirement is to afford state courts the first opportunity to correct federal questions about the validity of criminal convictions. *See Snowden v. Singletary*, 135 F.3d 732, 735 (11th Cir. 1998) (recognizing that for habeas review "[t]o be appropriate," the petitioner "must have raised these claims in state court to allow the state courts the opportunity to rule on the federal issues"); *see also Smith v. Newsome*, 876 F.2d 1461, 1463 (11th Cir. 1989) ("Federal courts are not forums in which to relitigate state trials.") (internal quotation marks omitted) (quoting *Barefoot*, 463 U.S. at 887).

Moreover, "to exhaust state remedies fully the petitioner must make the state court aware that the claims asserted present federal constitutional issues. 'It is not enough that all the facts necessary to support the federal claim were before the state courts or that a somewhat similar state-law claim was made.'" *Snowden*, 135 F.3d at 735 (quoting *Anderson v. Harless*, 459 U.S. 4, 6 (1982) (per curiam)). Rather, "an issue is exhausted if 'the reasonable reader would understand [the] claim's particular legal basis and specific factual foundation' to be the same as it was presented in state court." *Pope v. Sec'y, Fla. Dep't of Corr.*, 680 F.3d 1271, 1286 (11th Cir. 2012) (alteration in *Pope*) (quoting *Kelley v. Sec'y, Fla. Dep't of Corr.*, 377 F.3d 1317, 1344-45 (11th Cir. 2004)). *Cf. Pope*, 680 F.3d at 1284 ("A failure to exhaust occurs . . . when a petitioner has not 'fairly present[ed]' every issue raised in his federal petition to the state's highest court, either on direct appeal or on collateral review." (alteration in *Pope* modified) (quoting *Mason v. Allen*, 605 F.3d 1114, 1119 (11th Cir. 2010) (per curiam))).

At times, the doctrines of exhaustion and procedural default intertwine. For example, if a petitioner seeks habeas relief based on a mixture of exhausted and unexhausted federal claims, a district court may dismiss the petition without prejudice. *Rose v. Lundy*, 455 U.S. 509, 519 (1982). Alternatively, a court may stay the habeas action to allow the petitioner to first avail himself of his state remedies. *See Rhines v. Weber*, 544 U.S. 269, 277-87 (2005) (discussing "[s]tay and abeyance" option for mixed habeas petitions). But, "if it is clear from state law that any future attempts at [state court] exhaustion would be futile" because of the state's procedural framework, then a "federal court[] may treat [that] unexhausted claim[] as procedurally defaulted, even absent a state court determination to that effect." *Bailey v. Nagle*, 172 F.3d 1299, 1305 (11th Cir. 1999) (per curiam) (citing *Snowden*, 135 F.3d at 737); *see also Snowden*, 135 F.3d at 736 (explaining

that this habeas doctrine avoids a game of "needless 'judicial ping-pong'" when a state procedural rule "obvious[ly]" bars a state court from considering the merits of an unexhausted federal claim) (citing *Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991)). The court refers to this habeas construct as unexhausted procedural default. *Compare Bailey*, 172 F.3d at 1303 (separating the petitioner's habeas claims into "categories" of ones either presented or unpresented "to the Alabama courts"). An "unexhausted procedural default" encompasses claims that a petitioner never raised or only partially exhausted in state court.

A second type of procedural default occurs when a petitioner presents his federal claim without following "'independent and adequate' state procedures." *Mason*, 605 F.3d at 1119 (quoting *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977)). If a state court relies on such a procedural mistake of a petitioner to dismiss the alleged constitutional violation, then that petitioner "will have 'procedurally defaulted his claim[]' in federal court." *Mason*, 605 F.3d at 1119 (alteration added) (quoting *Boerckel*, 526 U.S. at 848). Under the procedural default doctrine, "[a] state court's rejection of a petitioner's constitutional claim on state procedural grounds will generally preclude any subsequent federal habeas review of that claim." *Ward v. Hall*, 592 F.3d 1144, 1156 (11th Cir. 2010) (internal quotation marks omitted) (alteration in *Ward*) (quoting *Judd v. Haley*, 250 F.3d 1308, 1313 (11th Cir. 2001)); *see also Snowden*, 135 F.3d at 737 ("Federal courts may apply state rules about procedural bars to conclude that further attempts at exhaustion would be futile."). The court refers to this habeas scenario as "state-barred procedural default."

But, to be clear, not all procedural dismissals of a federal claim in state court will prohibit habeas review. Instead, "a state court's rejection of a federal constitutional claim on procedural grounds may only preclude federal review if the state procedural ruling rests upon 'adequate and

independent' state grounds." *Ward*, 592 F.3d at 1156 (quoting *Marek v. Singletary*, 62 F.3d 1295, 1301 (11th Cir. 1995)). The Eleventh Circuit uses "a three-part test . . . to determine when a state court's procedural ruling constitutes an independent and adequate state rule of decision." *Judd*, 250 F.3d at 1313 (citing *Card v. Dugger*, 911 F.2d 1494, 1516 (11th Cir. 1990)). "First, the last state court rendering a judgment in the case must clearly and expressly state that it is relying on state procedural rules to resolve the federal claim without reaching the merits of that claim." *Judd*, 250 F.3d at 1313. "Second, the state court's decision must rest entirely on state law grounds and not be intertwined with an interpretation of federal law." *Ward*, 592 F.3d at 1156-57 (citing *Judd*, 250 F.3d at 1313). "Third, the state procedural rule must be adequate, i.e., firmly established and regularly followed and not applied 'in an arbitrary or unprecedented fashion.'" *Ward*, 592 F.3d at 1157 (quoting *Judd*, 250 F.3d at 1313).

      With these habeas concepts in mind, the court returns to Morris's identification claim. He asserts (without elaboration) that his showup allegations relate to a cognizable constitutional right under the Fifth, Sixth, and Eighth Amendments. (Doc. # 1 at 14 ¶ 50). But on direct review, Morris only raised a claim for constitutional relief under the Fourteenth Amendment's due process clause. (Doc. # 15-52 at 97). Additionally, he has made no argument that Respondent, through his counsel, has waived the exhaustion requirement expressly under § 2254(b)(3). *See* 28 U.S.C. § 2254(b)(3) ("A State shall not be deemed to have waived the exhaustion requirement or be estopped from reliance upon the requirement unless the State, through counsel, expressly waives the requirement."). Under Alabama's procedural rules, Morris cannot show he exhausted any potential claims based on the Fifth, Sixth, and Eighth Amendments. Thus, a dismissal of those claims is appropriate.

### b.   Other deficiencies.

But even putting aside his failure to exhaust, Morris's conclusive allegations do not warrant relief under the heightened pleading rule applicable to habeas claims. *See* Rule 2(c), *Rules Governing Section 2254 Cases in the United States District Courts* (requiring petitioner to "specify all the grounds for relief[,]" "state the facts supporting each ground[,]" and "state the relief requested"); *McFarland v. Scott*, 512 U.S. 849, 856 (1994) (explaining that habeas Rule 2(c) requires heightened pleading); *Mayle v. Felix*, 545 U.S. 644, 649 (2005) (contrasting that Rule 2(c) "requires a more detailed statement" with Federal Rule of Civil Procedure 8(a)(2)'s "short and plain statement of the claim" standard).

Alternatively, although Morris has the burden of establishing a right to habeas relief under these amendments, his bare allegations do not suffice. Consequently, his claims under the Fifth, Sixth, and Eighth Amendments are due to be dismissed as abandoned, underdeveloped, or unproven. *See, e.g.*, *Tharpe v. Humphrey*, No. 5:10-CV-433 CAR, 2014 WL 897412, at *3 n.4 (M.D. Ga. Mar. 6, 2014) (recognizing that merely alleging a habeas claim without developing argument constitutes either abandonment or a failure to meet the burden of proof), *aff'd sub nom. Tharpe v. Warden*, 834 F.3d 1323 (11th Cir. 2016); *United States v. Krasnow*, 484 F. App'x 427, 429 (11th Cir. 2012) ("A party abandons all issues on appeal that he or she does not 'plainly and prominently' raise in his or her initial brief." (quoting *United States v. Jernigan*, 341 F.3d 1273, 1283 n.8 (11th Cir. 2003))); *U.S. Steel Corp. v. Astrue*, 495 F.3d 1272, 1287 n.13 (11th Cir. 2007) (explaining that a court need not address a "perfunctory and underdeveloped argument" that lacks legal authority or elaboration).

For these reasons, Morris is not entitled to relief on his various claims based on his identification.

**B.      Claim B—Morris has not demonstrated a right to habeas relief because the jury venire did not undergo racial bias screening.**

Morris next claims that the trial court's refusal to screen the jury venire for racial bias—using a written questionnaire he proposed in a motion—violated his Fourteenth Amendment rights. (Doc. # 1 at 21 ¶ 69). Morris maintains that de novo review applies to this claim because the ACCA's rejection of this exhausted claim contains extreme AEDPA error under (d)(1) and (d)(2). (Doc. # 1 at 21 ¶ 70). Respondent disagrees, arguing that the ACCA's "decision was reasonable." (Doc. # 21 at 5 ¶ 14).

**1.      State Court Proceedings**

After remand, and before the second trial, Morris moved to send a questionnaire for prospective jurors to complete "at least three weeks prior to trial." (Doc. # 15-15 at 150). According to Morris, the parties, and the trial court could use the responses from the questionnaire to screen for "improper bias or prejudice [that would] undermine[] [his] rights to a fair trial or otherwise result[] in [an] arbitrary or prejudicial imposition of the death penalty." (Doc. # 15-15 at 151 ¶ 5). Morris pointed out that a "trial court's refusal to allow certain voir dire questions" about juror prejudice in *Turner v. Murray*, 476 U.S. 28 (1986) (plurality opinion), "required [a] reversal of the death sentence." (Doc. # 15-15 at 151 ¶ 4).

Two of Morris's suggested questions involved race:

Are most of the people you usually see in your neighborhood:

White ____      Black ____      Blacks and Whites ____

. . .

How often do people with whom you work make disparaging remarks about other racially [sic] groups?

__Very Often __Often __Occasionally __Rarely __Very Rarely __Never __I don't know

(Doc. # 15-15 at 159, 161 ¶¶ 34, 38).

The trial court denied Morris's motion in a handwritten order [after the jury was unable to reach a guilt-phase verdict in his second capital trial.] (Doc. # 15-15 at 33, 46). The trial court did not discuss on the record why it denied the motion, and Morris did not seek reconsideration of the trial court's ruling. Before voir dire started in the third trial, Morris did not renew his request for the trial court to screen for or submit suggested questions about racial prejudice. Neither the trial court nor Morris questioned prospective jurors during group voir dire about their possible racial bias. (Docs. # 15-16 at 192-97, 199-201; 15-17 at 2-17, 55-61). And race did not come up during individual voir dire. (Doc. # 15-17 at 63-73).

Morris appealed the trial court's ruling on his questionnaire motion, claiming the denial violated his Fifth, Sixth, Eighth, and Fourteenth Amendment rights. (Doc. # 15-52 at 129). Referencing *Mu'Min v. Virginia*, 500 U.S. 415 (1991), Morris argued that the Constitution afforded him the right to screen for potential racial prejudice because he was "a black defendant charged with a violent crime against a white person." (Doc. # 15-52 at 129) (internal quotation marks omitted) (quoting *Mu'Min*, 500 U.S. at 424).

The ACCA rejected this claim on several grounds. *Morris Direct II*, 60 So. 3d at 378. The ACCA described the "voir dire examination of the venire" as "thorough" and noted that the trial court "did not limit the [parties'] questioning." *Id.* The ACCA added that Morris had offered "no specific claim or indication of prejudice by a juror who sat on his jury or another member of the

venire." *Id.* The ACCA relied on Alabama appellate authorities which evaluated the denial of a juror questionnaire under an abuse of discretion standard. *Id.*

In *Ex parte Land*, 678 So. 2d 224, 242 (Ala. 1996), the appellant argued that the trial court should have permitted "the use of a jury questionnaire, or individual voir dire examination of prospective jurors, . . . to detect bias arising from [the capital case's] pretrial publicity, without contaminating the entire venire." The appellant also asserted "that the group voir dire examination" about the death penalty enabled "members of the venire" to learn from others' answers how "to avoid being struck for cause." *Id.* After noting that "[a] trial court is vested with great discretion in determining how voir dire examination will be conducted," the Alabama Supreme Court "conclude[d] that the trial court [had] not abuse[d] its discretion" given the "extensive group voir dire" on both challenged subjects. *Id.*

In *Brown v. State*, 11 So. 3d 866, 885 (Ala. Crim. App. 2007), *aff'd sub nom. Ex parte Brown*, 11 So. 3d 933 (Ala. 2008), the ACCA addressed whether the trial court should have permitted a juror questionnaire "to uncover prejudices." In rejecting the claim, the ACCA noted that the appellant had not "point[ed] to . . . [a] specific instance [in which] the voir dire was . . . [in]adequate to show any prejudices." *Id.* The ACCA determined that "[t]here [wa]s no indication that the circuit court abused its broad discretion in denying [the] request for juror questionnaires." *Id.*; *see also Hodges v. State*, 856 So. 2d 875, 913 (Ala. Crim. App. 2001), *aff'd*, 856 So. 2d 936 (Ala. 2003) (referencing *Land*'s holding that "the method of voir dire examination is within the discretion of the trial court and . . . [the] refusal to allow the use of [a] juror questionnaire is not an abuse of that discretion") (first alteration added); *Sneed v. State*, 1 So. 3d 104, 135 (Ala. Crim. App. 2007) (concluding that the trial court committed no error in denying the motion for a juror

questionnaire).

None of the Alabama cases which the ACCA cited addressed a claim like Morris's—a constitutional right to screen jurors for potential racial bias in the context of an interracial capital crime. The ACCA did not mention *Mu'Min* or the other authorities that Morris referenced in his brief on appeal. (Doc. # 15-52 at 129). Likewise, the ACCA did not discuss *Turner* or the other federal cases that Morris cited in support of his trial court motion. (*See, e.g.*, Doc. # 15-15 at 151) (describing *Turner* as requiring "especially careful" voir dire and a "reversal of [a] death sentence" if a trial court precludes "certain . . . questions"). With this review of the state court proceedings in mind, the court turns to a review of Morris's claim.

### 2. Regardless of whether AEDPA deference applies, Morris has not established a constitutional violation related to his racial bias claim.

Citing Supreme Court decisions, Morris argues that the ACCA resolved his claim contrary to or unreasonably under the constitutional holdings of those authorities. Thus, Morris's habeas allegations are adequate to explore whether relief is appropriate under § 2254(d)(1).

But that is not the case with respect to Morris's reliance on § 2254(d)(2). Although Morris invokes (d)(2), he has not pointed to any evidence that undermines the reasonableness of any factual determinations made by the state courts. That is, Morris has not shown the ACCA's analysis of his screening claim was unreasonable factually. Nor has Morris overcome the presumption of correctness that attaches to state court factual findings by offering clear and convincing evidence under (e)(1). So, the court focuses on whether Morris's cited authorities show that the ACCA reached a contrary to or unreasonable decision based on Supreme Court precedent under (d)(1).

Morris contends that he has overcome AEDPA deference under (d)(1) because "the state courts' actions in [his] case [on this claim] parallel the action[s] of the courts in *Turner*." (Doc. # 1 at 20 ¶ 68). As summarized above, Morris raised the concern of racial bias with the trial court in the juror questionnaire motion and pursued that claim with the ACCA on direct review. But neither the trial court nor the ACCA provided a federal analysis of that issue.

Because of that omission, there is an argument under the Eleventh Circuit's contrary-to analysis in *Romine v. Head*, 253 F.3d 1349 (11th Cir. 2001), that AEDPA's deferential framework gives way to the de novo standard on habeas review of this claim. *See Romine*, 253 F.3d at 1365 (reviewing claim de novo after expressing "grave doubt" about whether the state appellate court "applied federal law at all, let alone the governing law set down in Supreme Court decisions"); *see id.* ("[U]nder *Williams* that means the federal habeas court will be unconstrained by § 2254(d)(1) because the state-court decision falls within that provision's contrary to clause.") (internal quotation marks omitted).

Under the circumstances of Morris's screening allegations, the court need not resolve that AEDPA question. Whether AEDPA deferential review or de novo review applies, Morris must have a meritorious constitutional claim to qualify for habeas relief. Here, Morris cannot satisfy that constitutional component of his habeas burden. And in the absence of a valid constitutional claim, the parties' dispute about what standard applies here is moot. (*See* Doc. # 27 at 23) ("[F]orcing the defendant to raise the [racial] issue directly to the jury risks inflaming potential prejudices and thus runs counter to the constitutional protection set forth in *Turner*.").

Morris primarily relies on the Supreme Court's decision in *Turner*. (Docs. # 1 at 20-21 ¶¶ 67-68; 27 at 22-23). So, the court examines whether Morris's juror questionnaire claim falls within

*Turner*'s constitutional framework. In doing so, the court compares the proceedings related to Morris's request to use questions to the venire and what occurred in *Turner*.

In *Turner*, "a black man," received a death sentence "for the murder of a white storekeeper." 476 U.S. at 29 (White, J., majority opinion with respect to part I). The petitioner argued that the "trial judge deprived him of his constitutional right to a fair and impartial jury by refusing to question prospective jurors on racial prejudice." *Id.* at 31 (White, J., majority opinion with respect to part I). Like Morris, the petitioner sought to screen the jury venire for racial bias because the state was prosecuting him for an interracial capital crime. *Id.* at 29 (White, J., majority opinion with respect to part I). But the method of the proposed screening and the contents of the questions were different. Unlike Morris, who proposed asking prospective jurors about racial bias in a questionnaire mailed with the jury venire summons before trial, the petitioner in *Turner* asked the trial court to consider a list of suggested questions "prior to the commencement of voir dire." *Id.* (italics omitted) (White, J., majority opinion with respect to part I). The petitioner included within that list one question that asked the prospective juror whether the case's interracial nature would "prejudice [that person] against [the petitioner] or affect [that person's] ability to render a fair and impartial verdict based solely on the evidence?" *Id.* at 30-31 (internal quotation marks omitted) (White, J., majority opinion with respect to part I). As noted above, although Morris proposed two general questions about race, he did not suggest an inquiry about the ability to be fair if a case had an interracial component.

In *Turner* the trial court "declined to ask the [racial prejudice] question." *Id.* at 31 (White, J., majority opinion with respect to part I). In Morris's case the trial court gave no explanation on the record for denying the request. But, in *Turner*, the trial court held that the issue "ha[d] been

ruled on by the Supreme Court." *Id.* (internal quotation marks omitted) (White, J., majority opinion with respect to part I). That response was vague because the *Turner* trial court did not identify the case name or otherwise clarify whether the unnamed authority was from the Supreme Court of the United States or Virginia Supreme Court. *Id.* n.2 (White, J., majority opinion with respect to part I).

The petitioner in *Turner* appealed the trial court's refusal to ask the jury venire about racial prejudice. The Virginia Supreme Court, relying on the interplay of *Ham v. South Carolina*, 409 U.S. 524 (1973), and *Ristaino v. Ross*, 424 U.S. 589 (1976), denied the petitioner's claim. *Turner*, 476 U.S. at 31 (White, J., majority opinion with respect to part I). In *Ham*, the Supreme Court concluded that the "refusal to examine jurors . . . as to possible [racial] prejudice" was unconstitutional given the petitioner's known "civil rights activities" and the defense that law enforcement had "framed [him] on the drug charge." *Ham*, 409 U.S. at 525. The *Ristaino* Court held that the Constitution does not require "a question specifically directed to racial prejudice" in a non-capital case charging interracial violence but lacking any *Ham* circumstances. *Ristaino*, 424 U.S. at 590. In evaluating the petitioner's claim in *Turner*, the Virginia Supreme Court concluded that under *Ristaino*, "a trial judge's refusal to ask prospective jurors about racial attitudes[] . . . is not constitutionally objectionable in the absence of factors akin to those in *Ham*." *Turner*, 476 U.S. at 31 (White, J., majority opinion with respect to part I).

After losing on direct appeal, the *Turner* petitioner sought federal habeas review. *Id.* at 32 (White, J., majority opinion with respect to part I). The federal habeas court concluded that the petitioner's claim was "like *Ristaino* and unlike *Ham*" and denied habeas relief. *Turner*, 476 U.S. at 32 (White, J., majority opinion with respect to part I). The Fourth Circuit affirmed the district

court's judgment. *Id.* at 32-33 (White, J., majority opinion with respect to part I).

The Supreme Court held on habeas review that "a capital defendant accused of an interracial crime is entitled to have prospective jurors informed of the race of the victim and questioned on the issue of racial bias." 476 U.S. at 36-37 (White, J., majority opinion with respect to part III). A plurality of the justices identified the Sixth and Fourteenth Amendments as the constitutional underpinnings for the majority holding. *See Turner*, 476 U.S. at 36 ("The right to an impartial jury is guaranteed by both the Sixth Amendment, made applicable to the States through the Fourteenth Amendment, and by principles of due process.").

The Supreme Court described the *Turner* holding as "minimally intrusive" because "the trial judge retain[ed] discretion as to the form and number of questions on the subject, including the decision whether to question the venire individually or collectively." *Id.* at 37 (White, J., majority opinion with respect to part III). The Supreme Court also required a capital defendant to take action in order to trigger the *Turner* rule. That is, "a judge's failure to question the venire on racial prejudice" in an interracial capital case is not unconstitutional under *Turner* "unless a [capital] defendant has specifically requested such an inquiry." *Turner*, 476 U.S. at 37 (White, J., majority opinion with respect to part III). The *Turner* Court noted that "[s]hould defendant's counsel decline to request voir dire on the subject of racial prejudice, we in no way require or suggest that the judge broach the topic sua sponte." *Id.* at 37 n.10 (italics omitted) (White, J., majority opinion with respect to part III). Finally, the *Turner* Court concluded that "[t]he inadequacy of voir dire" under these circumstances entitled the petitioner to a penalty-phase resentencing, not a guilt-phase retrial. *Id.* at 37 (italics omitted) (White, J., majority opinion with respect to part III).

The *Turner* Court reached this penalty-phase outcome "based on a conjunction of three factors," which created "an unacceptable risk of racial prejudice" at sentencing. *Id.* These considerations were the prosecution of a capital crime "involving interracial violence, the broad discretion given the jury at the death-penalty hearing, and the special seriousness of the risk of improper sentencing in a capital case." *Id.*

Morris contends his juror questionnaire is equivalent to the proposed voir dire claim examined in *Turner*. He argues that the pretrial denial of his juror questionnaire motion obligated the trial court to screen prospective jurors for racial bias during voir dire, even though he did not submit any suggested questions on that topic. And, because no racial screening occurred, Morris asserts that his death sentence based on an interracial capital conviction is unconstitutional. But the constitutional framework developed by the *Turner* Court places a specific burden on a capital defendant to propose voir dire about racial bias to trigger constitutionally required screening of the jury venire. So, for there to be a cognizable constitutional claim under *Turner*, a defendant charged with an interracial capital crime must propose the relevant voir dire questions. Yet here, Morris did not follow the procedure outlined in *Turner*. He has not established a viable constitutional claim in the context of *Turner*'s intentionally "minimally[-]intrusive" framework.

Nor has Morris referenced a case, much less a controlling decision of the Supreme Court, in which a court has considered juror questionnaire allegations like the one he proposed and extended *Turner*'s framework to them or concluded that a constitutional violation occurred under a different approach. The other Supreme Court cases that Morris cites in support of this argument are *Mu'Min*, *Ham*, *Pena-Rodriguez v. Colorado*, 580 U.S. 206, 137 S. Ct. 855 (2017), and *Morgan v. Illinois*, 504 U.S. 719 (1992). (Docs. # 1 at 21 ¶ 69; 27 at 23). But, as explained above, the

61

pretrial publicity claim in *Mu'Min* and the sham arrest based on race in *Ham* are simply not similar to Morris's juror questionnaire allegations. The same is true for *Pena-Rodriguez* and *Morgan. See Pena-Rodriguez*, 137 S. Ct. at 861 (evaluating whether the Constitution requires "an exception to the no-impeachment rule" of a jury's verdict when "compelling evidence . . . [exists] that racial animus was a significant motivating factor in [a juror's] vote to convict"); *Morgan*, 504 U.S. at 721 (addressing whether "a state trial court may, consistent with the Due Process Clause of the Fourteenth Amendment, refuse inquiry into whether a potential juror would automatically impose the death penalty upon conviction of the defendant"). Consequently, these remaining Supreme Court decisions do not establish the constitutional merits of Morris's juror questionnaire allegations.

Morris notes that a habeas district court has described *Turner* as "compell[ing] . . . [a] state trial court [to] adequately explore issues of racial prejudice during voir dire" when a capital case involves interracial circumstances. (*See* Doc. # 27 at 23) (emphasis omitted) (quoting *Davis v. Jones*, 441 F. Supp. 2d 1138, 1182 (M.D. Ala. 2006), *aff'd*, 506 F.3d 1325 (11th Cir. 2007). But the capital petitioner's "individually-sequestered voir dire" claim, which the *Davis* district court addressed, related to bias from "extensive pretrial publicity," not potential racial bias. *Id.* at 1159, 1177-78 (italics omitted). The *Davis* court referenced *Turner* only in the context of summarizing the Supreme Court's pretrial publicity decision in *Mu'Min. Id.* at 1180-82. *Davis* therefore does not establish the constitutional merits of Morris's juror questionnaire allegations.

Thus, Morris's juror questionnaire claim is due to be denied, even if AEDPA deference is inapplicable.

C.    **Claim C—Morris has not demonstrated a right to habeas relief on his *Atkins* claim.**

Morris contends that the state courts violated his Eighth Amendment rights under *Atkins*. (Doc. # 1 at 21, 33 ¶¶ 71, 100); *see Atkins*, 536 U.S. at 317, 321 (concluding that the Eighth Amendment restricts a state from executing a criminal defendant who is "mentally retarded" and "leav[ing] . . . the task of developing appropriate ways to enforce the constitutional restriction" to each state) (internal quotation marks omitted).[3] The ACCA rejected his *Atkins* claim, but Morris argues that the ACCA's rejection of that claim was extreme constitutional error under (d)(1) and (d)(2). (Doc. # 1 at 21-22, 34 ¶¶ 71, 100). Respondent counters that the ACCA addressed Morris's *Atkins* appeal reasonably, and for that reason habeas relief is unavailable under AEDPA. (Doc. # 22 at 5-7 ¶¶ 16, 19, 22).

1.    **State Court Proceedings**

Morris's *Atkins* claim is based in part on the ACCA's decision vacating the judgment after his first capital trial. The ACCA reversed Morris's conviction and sentence "because he was not provided with funds to hire an independent mental-health expert" in violation of his constitutional rights. *Morris Direct II*, 60 So. 3d at 336 (citing *Morris Direct I*). In remanding to the state trial court, the ACCA concluded that "a mental-health expert was vital to Morris's case" not only in the guilt, but also—because of *Atkins*—at the sentencing phase. *Morris Direct I*, 956 So. 2d at 451. On remand, the trial court held an *Atkins* hearing to evaluate whether Morris's diminished mental

---

[3] The court acknowledges the trend to replace the diagnosis of "mental retardation" with newer medical labels such as "intellectual disability" or "intellectual developmental disability." *Burgess v. Comm'r, Ala. Dep't of Corr.*, 732 F.3d 1308, 1310 n.1 (11th Cir. 2013) (internal quotation marks omitted). But following the Eleventh Circuit's approach in *Burgess* and because the record refers to Morris being evaluated for mental retardation, this court "use[s] the term 'mental retardation' to maintain consistency" with the record and avoid confusion with the discussion of the "relevant precedent." *Id.*

capacity was severe enough to preclude his execution under the Eighth Amendment. *Morris Direct II*, 60 So. 3d at 336. The trial court heard evidence, considered the parties' arguments, and determined that Morris did not meet "the test set out in *Atkins*." *Morris Direct II*, 60 So. 3d at 336.

Morris challenged the trial court's *Atkins* determination under the Eighth Amendment on direct review. *Morris Direct II*, 60 So. 3d at 339; (Doc. # 15-52 at 46). Morris argued that "the trial court made serious factual errors – which lead it to ignore significant evidence of [his] mental retardation – and also relied on reasoning foreclosed by courts," including in *Morris Direct I*. (*Id.* at 47). The ACCA reviewed for an abuse of discretion and affirmed the trial court's *Atkins* determination. *Morris Direct II*, 60 So. 3d at 339, 347.

The ACCA began by summarizing the *Atkins* framework and its interplay with state law. The ACCA noted that "Alabama has yet to statutorily define mental retardation in the context of determining the sufficiency of an *Atkins* claim." *Morris Direct II*, 60 So. 3d at 339. To distinguish capital defendants who are ineligible for the death penalty because of sufficient mental dysfunction from those eligible for execution, the ACCA looked to several sources.

For example, the ACCA pointed to the definition of "[m]entally retarded" under Alabama's "'Retarded Defendant Act,'" *Morris Direct II*, 60 So. 3d at 339, which is now "known as the 'Intellectually Disabled Defendant Act.'" Ala. Code § 15-24-1. Under that statutory approach, a "mentally retarded" person is one "with significant subaverage general intellectual functioning . . . [and] . . . concurrent impairments in adaptive behavior[, which] . . . manifested during the developmental period, as measured by appropriate standardized testing instruments." *Morris Direct II*, 60 So. 3d at 339 (quoting Ala. Code § 15-24-2(3)).

The ACCA discussed the Alabama Supreme Court's "direct[ion] . . . [to] appl[y] the most common or broadest definition of mental retardation" when reviewing *Atkins* claims. *Morris Direct II*, 60 So. 3d at 339 (internal quotation marks omitted) (quoting *Smith v. State*, 213 So. 3d 239, 248 (Ala. 2007)). The ACCA also restated the Alabama Supreme Court's summary in *Ex parte Perkins*, 851 So. 2d 453, 456 (2002) of statutes that prohibit "the execution of a mentally[-challenged] person." *Morris Direct II*, 60 So. 3d at 340. Under the *Perkins* guidance, capital defendants with "significantly subaverage intellectual functioning (an IQ of 70 or below), . . . significant or substantial deficits in adaptive behavior," and a record of those mental impairments "before . . . age 18" are ineligible for the death penalty. *Morris Direct II*, 60 So. 3d at 340 (internal quotation marks omitted) (quoting *Perkins*, 851 So. 2d at 456).

The ACCA also described the *Atkins* Court's identification of criteria common to "clinical definitions of mental retardation" as "suggest[ed] guidance for determining whether" the Eighth Amendment prohibited a capital defendant's execution. *Morris Direct II*, 60 So. 3d at 340. These three guideposts were "'subaverage intellectual functioning, . . . significant limitations in adaptive skills such as communication, self-care, and self-direction[, and] . . . manifestation before age 18.'" *Id.* (quoting *Atkins*, 536 U.S. at 318). Against this backdrop, the ACCA explained that "until the Alabama Legislature establishes a definition . . . to . . . use[] in determining *Atkins* claims, Alabama courts will continue . . . 'to apply the guidelines that have been judicially developed thus far.'" *Id.* (quoting *Morrow v. State*, 928 So. 2d 315, 324 (Ala. Crim. App. 2004)).

The ACCA clarified that a capital defendant has the burden to prove an *Atkins* claim and that "questions regarding weight and credibility determinations are better left to the circuit court." *Morris Direct II*, 60 So. 3d at 340-41 (internal quotation marks omitted). The ACCA added that

"if Morris fails to prove even one of the three prongs of the *Atkins*' test by a preponderance of the evidence, he has not satisfied his burden of proof." *Morris Direct II*, 60 So. 3d at 341.

Having surveyed the legal landscape, the ACCA turned to the evidence presented during the *Atkins* hearing. The court provides a condensed overview to aid in its AEDPA analysis.

The ACCA began by reviewing the testimony of Morris's witnesses, including "the testimony of Dr. Allen Shealy, a psychologist, who . . . [beginning in 2007] had interviewed Morris" twice "for . . . three hours each time," met with "Morris's two sisters[,] and reviewed a number of Morris's records, including [from] . . . prison and school." *Morris Direct II*, 60 So. 3d at 341; (Doc. # 15-28 at 193). The ACCA noted that Dr. Shealy opined that "Morris was mildly mentally retarded and . . . had a full-scale IQ of 50" based on results from the Wechsler Adult Intelligence Scales and two other intelligence tests. *Morris Direct II*, 60 So. 3d at 341. The ACCA noted Dr. Shealy's adaptive behavior findings that "Morris was significantly impaired in several areas, particularly in communication. . . . in daily living and somewhat in socialization." *Id.*

The ACCA observed that Dr. Shealy had "discounted the importance of" the concern that "Morris may have been malingering" on testing. *Id.* at 341-42. The ACCA acknowledged Dr. Shealy's opinion that the "issue of malingering on [Morris's] more current tests was moot" because of his understanding, based on a psychological report from Morris's hospitalization as a prisoner, that Morris "was in special education classes as a child." *Id.* at 342; (Doc. # 15-29 at 3). As for Morris's onset period, the ACCA noted that Dr. Shealy relied on the Alabama Department of Mental Health's statement "that the reported history information on Morris suggested [impaired] adaptive behavior . . . since childhood, as well as . . . school records," to conclude that Morris's "mental retardation had manifested before . . . [the] age [of] 18." *Id.* at 342. Among the school

information that Dr. Shealy considered was an IQ score of 73 from "Morris's first IQ test administered when [he] was six years of age." *Id.* at 341.

The ACCA discussed that one of Morris's sisters provided testimony about "his adaptive behavior as a child." *Id.* His sister described Morris as "a slow learner" with an inability to "manage money or his medicine." *Id.* Additionally, she testified that Morris "did not separate colors before doing the wash, . . . clean well, . . . prepare meals." *Id.* According to her testimony, Morris "had never lived alone[,] . . . [or] married but had fathered two children." *Id.*

The ACCA next examined the state's evidence. The state put on two witnesses who assessed Morris's mental status and concluded that he was malingering. *Id.* at 342, 344.

One witness was "Wyatt Rhone, a patient-education coordinator at Taylor Hardin Secure Medical Facility." *Id.* at 342. Rhone testified that he saw Morris six times as an outpatient in 2006 and thirteen times as an inpatient about "10 to 11 months later." *id.* at 342. Mr. Rhone stated that "Morris's beginning assessment score was a zero," which did not improve "at the completion of the six-week [outpatient] course." *Id.* According to Rhone, these scores were "difficult to believe . . . because the questions concerned very basic knowledge, and . . . occasion[ally] Morris was able to discuss far more complex matters." *Id.*

Rhone also testified about Morris's inpatient testing results too, which included another assessment score of zero, "true-false test" scores of zero and one correct out of ten, and Morris's "refus[al] to answer multiple-choice questions." *Id.* Concerning the true-false test results, Rhone concluded that Morris's "managing to answer all of [the questions] wrong" reflected "an intellectual ability to reason that [intended outcome] out." *Id.* (internal quotation marks omitted).

67

The second witness was the state's expert, "Dr. Glenn King, a clinical and forensic psychologist, who interviewed Morris [twice] at the Jefferson County Detention Facility." *Id.* at 343. The "overall score" of Morris's IQ test administered by Dr. King was 41. *Id.* at 344. According to Dr. King, that result "placed [Morris] 'below the lowest one tenth of one percent of the general population" in terms of intellectual functioning. *Id.* But, Dr. King testified that Morris "IQ scores were 'totally inconsistent' with his 'general presentation' during the interview, as well as his responses and statements on the videotapes made at the time of the arrest." *Id.* Dr. King gave examples of questions which "Morris answered incorrectly," but which "people who suffer from extreme mental retardation" could respond to appropriately. *Id.* Dr. King noted several other inconsistencies involving Morris's achievement test results and "written requests for health care consultations." *Id.*

The ACCA also assessed Dr. King's testimony about the results of Morris's adaptive-behavior testing, which covered ten areas "dealing with the ability to communicate, . . . use community resources, and [understand] functional academics." *Id.* According to Dr. King, the "three or lower [scores] on absolutely everything indicat[ed] that [Morris] essentially [wa]s nonfunctional." *Id.* (alterations added) (internal quotation marks omitted). Dr. King characterized Morris's "answers on some of the items" as "absurd." *Id.* (internal quotation marks omitted). The ACCA noted two responses in which Morris stated that "he was unable to answer the telephone or . . . cut his meat in order to eat it." *Id.*

The ACCA discussed Dr. King's testimony about administering "the Test of Memory Malingering" to Morris. *Id.* at 345. According to Dr. King, the "scores on that test" supported the finding that "Morris was malingering." *Id.* Referring back to assessments completed at Taylor

Hardin, the ACCA noted Dr. King's observation that "the chances of Morris's having scored a 0 on a 10-question true-false test was 1 in 4,000." *Id.* Dr. King referenced also that a Taylor Hardin psychiatrist and forensic examiner, "who had . . . interviewed Morris, believed that he was malingering." *Id.*

The ACCA summarized Dr. King's conclusions "that Morris functions in the high borderline to low average range of intellectual ability with an IQ possibly in the low 80s" and demonstrates adaptive skills such as driving and supporting himself financially through "odd jobs [like] lawn service and steel-mill assembly work." *Id.* at 343, 345. The ACCA referenced Dr. King's reliance on Morris's IQ score of 73 in first grade and the lack of school records confirming "that Morris was ever in special-education classes" as support for his expert opinion. *Id.* Dr. King acknowledged that school records reflected that Morris "was a slow learner" but disclosed no disabilities, despite "a place on the form" for that information. *Id.* The ACCA also noted Dr. King's observation that Morris "was rated as average in seventh grade for participation in class discussions and activities." *Id.*

The ACCA referenced testimony from other *Atkins* hearing witnesses, including a nurse, "who stated that she had met with Morris at least six times at the Jefferson County jail and that he was "familiar[] with his medical conditions[,] . . . [treatment] history[,] and past medications." *Id.* at 342. The ACCA discussed the testimony of an Alabama Probation and Parole Officer, who recounted the family and employment information that Morris shared during a presentence interview, such as Morris's providing "lawn service self-employed" for approximately five years and "hustling . . . to make a living." *Id.* at 343 (internal quotation marks omitted). The ACCA also reviewed the testimony of a Birmingham Police Officer, who testified that Morris used his

brother's name, other personal information, and signature "as his own" during a post-arrest interview. *Id.*

The ACCA next outlined the trial court's reasons for denying Morris's *Atkins* claim. First, the trial court found that none of the examiners "could . . . establish an accurate IQ score" given that they "all . . . believed that Morris was malingering" to some degree. *Id.* Second, the trial court "found that Morris was able to adapt and function, referencing his ability to sell drugs and [show] street-savv[y]." *Id.* Third, the trial court found "no manifestation of retardation before age 18, stating that . . . Morris's school records were more reliable than the accounts given by his family members." *Id.*

In denying his appeal of the trial court's *Atkins* judgment, the ACCA concluded that "Morris ha[d] not prove[n] by a preponderance of the evidence that he is mentally retarded." *Id.* As support, the ACCA referenced the experts' conflicting testimony about "Morris's intellectual functioning" and their agreement that Morris "was malingering." *Id.* The ACCA determined that the trial court had not "exceed[ed] its discretion" in "evaluat[ing]" and "reconciling" the expert evidence. *Id.*

The ACCA reached a similar conclusion related to the trial court's treatment of the conflicting evidence about Morris's adaptive functioning. The ACCA noted that most of the evidence about Morris's need "to live[] with family members" and his inability to "perform[] certain basic tasks" "came from Morris . . . or his sisters." *Id.* at 346-47. The ACCA contrasted this minimally-functioning evidence with Morris's ability to manage more demanding activities such as working in lawn care and assembly, dealing in drugs and gambling, renting from and living with a disabled man when the offense occurred, using his brother's name and personal information

when dealing with law enforcement, and requesting medical attention and medication while in custody. *Id.* at 346 & n.4, 347. The ACCA determined that the trial court had "properly weighed and evaluated" the differing adaptive behavior evidence and committed no error "as the finder of fact." *Id.* at 347.

The ACCA also determined that Morris had failed to prove that the "alleged deficits in his adaptive behavior[–]which might indicate retardation[–]had manifested before the age of 18." *Id.* at 346. The ACCA explained that the presentence report undermined the early onset evidence his sisters provided and that the onset information in Morris's school records was equivocal. *Id.* at 346-47. The ACCA observed that the trial court was "better suited" to address these "credibility and weighing choices" and concluded that the trial made no "improper" determination. *Id.* at 347.

### 2. Morris has not overcome AEDPA deference on any aspect of his *Atkins* claim.

After careful review, the court concludes Morris cannot overcome AEDPA deference on any aspect of his *Atkins* claim.

### a. Morris has not developed a legal basis for relief under § 2254(d)(1)'s first clause.

Although Morris mentions (d)(1)'s contrary to clause, he acknowledges that the ACCA evaluated his claim under *Atkins*. Morris does not contend that the ACCA misstated the governing framework or overlooked some other clearly established applicable principle. Rather, Morris cites case law to support his position that the ACCA unreasonably applied *Atkins*, a stringent standard, but one less demanding than the materially-indistinguishable facts test under (d)(1). Morris also argues that the ACCA based its decision to affirm the trial court's *Atkins* judgment on unreasonable factual determinations. Morris has not come close to making a showing entitling him to relief under

(d)(1)'s first clause. But the court considers whether Morris's arguments under (d)(1)'s second clause and (d)(2) have merit.

> **b.      Morris has not shown that the state courts decided his *Atkins* claim unreasonably under (d)(1) or (d)(2).**

The Supreme Court has explained that the unreasonable application clause is intentionally "'difficult to meet'" because AEDPA reserves permission for "federal court intervention" to cases reflecting an "'extreme malfunctio[n] in the state criminal justice syste[m].'" *Shinn v. Kayer*, 592 U.S. __,141 S. Ct. 517, 523, 526 (2020) (per curiam) (alterations in *Shinn*) (quoting *Richter*, 562 U.S. at 102). To satisfy this statutory hurdle under AEDPA, Morris relies on a mixture of federal and Alabama cases. One of those cases, *Thomas v. Allen*, 607 F.3d 749 (11th Cir. 2010), provides a helpful structure for the court's analysis. (Doc. # 1 at 21 ¶ 71).

In *Thomas*, the Eleventh Circuit upheld a district court judgment awarding habeas relief based on *Atkins*. *Thomas*, 607 F.3d at 750. The Eleventh Circuit recited the intellectual-functioning, adaptive-behavior, and onset requirements of an Alabama *Atkins* claim based on *Perkins*. *Thomas*, 607 F.3d at 752. The Eleventh Circuit described a three-part temporal test as an "additional element" that the Alabama Supreme Court fashioned in *Smith*. *Thomas*, 607 F.3d at 752. Under *Smith*, a capital defendant seeking *Atkins* relief must prove "significantly subaverage intellectual functioning abilities and significant deficits in adaptive behavior . . . before the age of eighteen, on the date of the capital offense, and currently." *Thomas*, 607 F.3d at 752-53; *see also Smith*, 213 So. 3d at 248 (adding "at the time the crime was committed" and "currently" components to the *Perkins* definition of "mental retardation").

With Alabama's *Atkins* structure in mind, the court considers whether Morris's arguments establish a right to habeas relief under (d)(1)'s second clause or (d)(2). Here, based on the context

of Morris's *Atkins* claim, the court combines the (d)(1) and (d)(2) analyses.

i.      *Intellectual Functioning Prong*

Morris acknowledges that, in evaluating an *Atkins* claim, the Alabama Supreme Court has "defined subaverage intellectual functioning as an IQ of 70 or below." (Doc. # 1 at 22 ¶ 72). At the heart of Morris's intellectual functioning challenge is his assertion that the state courts should have accepted his adult IQ scores, "which did not exceed 53." (Doc. # 1 at 22 ¶ 72). From an AEDPA standpoint, this means that Morris must show that the ACCA unreasonably concluded that the trial court did not err in relying on opinions that Morris was malingering. One habeas obstacle for Morris is that none of the cases he references involves a review of evidence that the capital defendant was malingering during tests. And without identifying an authority that turns on some evidence of dubious IQ scores, Morris has not shown that the ACCA's decision to affirm the trial court's denial of Morris's *Atkins* claim is objectively wrong under AEDPA.

*Atkins* is the only Supreme Court authority Morris cites to support his claim. But Morris's arguments related to *Atkins* do not demonstrate that the ACCA unreasonably applied Supreme Court precedent in rejecting of his Eighth Amendment claim. Before turning to the constitutional analysis in *Atkins*, the court provides some background.

The petitioner in *Atkins* and his accomplice, William Jones, used a semiautomatic handgun to abduct, rob, and fatally shoot their victim. *Id.* at 307. The petitioner and Jones agreed on "most of the details . . . except[] that each stated that the other had actually shot and killed [the victim]." *Id.* Jones entered into a plea deal and avoided the death penalty. He testified against the petitioner. *Id.* at 307 & n.1. The petitioner also testified in the guilt phase. *Id.* at 307. The jury "credited" Jones's "more coherent and credible" testimony over the petitioner's account, and convicted the

petitioner of abduction, armed robbery, and capital murder. *Id.*

A forensic psychologist testified in the penalty phase that petitioner "had a full scale IQ of 59" and "mild[] mental[] retardation." *Id.* at 308 (internal quotation marks). Still, the petitioner received a death sentence. *Id.* at 307. A second jury reached the same conclusion on resentencing after the case was remanded because of "a misleading verdict form" used in the first penalty phase. *Id.* at 309. A rebuttal expert testified in the resentencing hearing that the petitioner "was not mentally retarded, but rather was of average intelligence at least, and diagnosable as having antisocial personality disorder." *Id.* at 309 (internal quotation marks omitted).

The petitioner argued on appeal that his mental retardation precluded a death sentence. *Id.* at 310. Over the sharp criticism of two dissenting justices, "[t]he majority of the state court rejected th[e] [petitioner's] contention [because of the] holding in *Penry* [*v. Lynaugh*, 492 U.S. 302 (1989), *abrogated by Atkins, holding modified by Boyde v. California*, 494 U.S. 370 (1990)]." The *Penry* Court held that "the Eighth Amendment [does not] preclude[] the execution of . . . [mildly to moderately] mentally retarded persons . . . . [s]o long as sentencers can consider and give effect to mitigating evidence of mental retardation in imposing [a] sentence." 492 U.S. at 308, 340.

Given these circumstances and acknowledging a "dramatic shift" in the "national consensus" since *Penry*, *Atkins*, 536 U.S. at 310, 317, the Supreme Court revisited whether the Eighth Amendment prohibits states from executing mentally retarded defendants as "cruel and unusual punishments," *id.* at 307 (internal quotation marks omitted). In abrogating *Penry*, the Supreme Court "conclude[d] that [capital] punishment" of mentally retarded defendants is "excessive" and unconstitutional under the Eighth Amendment's "evolving standards of decency." *Id.* at 321 (internal quotation marks omitted). The *Atkins* Court identified "two reasons consistent

74

with the legislative consensus that the mentally retarded should be categorically excluded from execution" for its holding. *Id.* at 318.

First, the *Atkins* Court explained that executing mentally retarded offenders does not serve the "social purposes" of retribution and deterrence due to their "lesser culpability" and impaired ability to "process information" and "control . . . conduct." *Id.* at 319-20. Second, the Supreme Court pointed to the "special risk of wrongful execution" for "[m]entally retarded defendants in the aggregate" attributable to their "reduced capacit[ies]" and the "two-edged sword" that mental retardation as a mitigating factor may present—such as a jury finding future dangerousness as an aggravating factor. *Id.* at 321. But the *Atkins* Court did not resolve whether, after remand, the Commonwealth of Virginia could execute the petitioner. *Id.* at 321. Instead, the *Atkins* Court recognized the prospect of "serious disagreement" over the issue of "determining which offenders are in fact retarded." *Id.* at 317. To illustrate that point, the *Atkins* Court noted that "the Commonwealth of Virginia dispute[d] that [the petitioner] suffer[ed] from mental retardation." 536 U.S. at 317. Without addressing the specific merits of the commonwealth's position, the Supreme Court commented that "[n]ot all people who claim to be mentally retarded will be so impaired as to fall within the range of mentally retarded offenders about whom there is a national consensus." *Id.* Given this gap, the Supreme Court instructed states to "develop[] appropriate ways to enforce" the *Atkins* holding. *Id.* at 317.

Contrary to Morris's argument, the Supreme Court did not hold that an IQ score of 73 satisfies "the intellectual functioning prong of the mental retardation definition." (Doc. # 1 at 33 ¶ 98) (internal quotation marks omitted). Instead, the *Atkins* Court explained the criteria relevant to the Eighth Amendment inquiry–subaverage intellectual functioning, significant limitations in

adaptive skills, and an onset date before age eighteen–based on "clinical definitions of mental retardation." *Id.* at 317-18 (internal quotation marks omitted).

Referencing a psychiatric textbook, the *Atkins* Court noted that "between 1 and 3 percent of the population has an IQ between 70 and 75 or lower, which is typically considered the cutoff IQ score for the intellectual function prong of the mental retardation definition." *Atkins*, 536 U.S. at 309 n.5. And, pointing to a mental disorders manual, the Supreme Court observed that "[m]ild mental retardation is typically used to describe people with an IQ level of 50-55 to approximately 70." *Id.* (internal quotation marks omitted).

The *Atkins* Court's guidance included two similar three-part definitions of mental retardation endorsed by the American Association on Mental Retardation and the American Psychiatric Association. *Id.* at 309 n.3. Under these definitions, a defendant with functional limitations in "two or more" areas meets the adaptive prong of mental retardation. *Id.* Combining the two descriptions of adaptive functioning which the *Atkins* Court cited, the areas are: "communication, self-care, home living, social[/interpersonal] skills, community use [of resources], self-direction, health and safety, functional academics, leisure, and work." *Id.*

Here, Morris contends that the state courts unreasonably rejected his lower IQ scores. (Doc. # 1 at 22 ¶ 72). But neither the *Atkins* holding nor the Supreme Court's guidance addresses how a court should deal with evidentiary issues when faced with conflicting expert opinions or malingered testing results. (*Cf.* Doc. # 15-32 at 5) (pointing to the absence of "a clear-cut answer [in the *Atkins* hearing] as to what [Morris's] real functioning IQ is").

For example, an expert in *Atkins* testified that the petitioner's "limited intellect had been a consistent feature throughout his life, and that [the] IQ score of 59 [wa]s not an aberration,

malingered result, or invalid test score." *Atkins*, 536 U.S. at 309 n.5 (internal quotation marks omitted). Similarly, the results from a test administered to the petitioner in *Thomas*, "did not suggest [that he was] malingering." *Thomas*, 607 F.3d at 754. Thus, *Atkins* and *Thomas* do not show that the ACCA applied Supreme Court precedent unreasonably in affirming the trial court's denial of Eighth Amendment relief to Morris.

As for Alabama authorities, Perkins, and *Smith* do not discuss how a trial court should consider competing evidence of malingering when evaluating whether a capital defendant's intellectual functioning qualifies as subaverage under *Atkins*. Those cases are of no help to him and he references no other case law to show that the ACCA unreasonably applied Supreme Court precedent in reviewing the trial court's finding on this subpart.

Morris also challenges the state court resolution as factually unreasonable based on several grounds. (Doc. # 1 at 2324 ¶¶ 76-79). First, Morris disputes the state court's finding that "all the examiners believed he was malingering." (Doc. # 1 at 23 ¶¶ 76-79). In contesting the reasonableness of this intellectual functioning determination, Morris references testimony from his *Atkins* expert, Dr. Shealy, and a report from Dr. Kimberly Ackerson, a certified forensic examiner. (Doc. # 1 at 23 ¶ 76); *Morris Direct I*, 956 So. 2d at 436.

Morris maintains that Dr. Shealy's opinion of Morris's admitted ability to tell time demonstrates the malingering determination's unreasonableness under (d)(2). (Doc. # 15-29 at 18). According to Dr. Shealy, Morris admitted being able to tell time but denied being able to read or write. *Id.* Dr. Shealy commented that if Morris "had been malingering," then "why . . . would [Morris] have offered . . . what he could do." *Id.* But this testimony about malingering pertains to Dr. Shealy's assessment of Morris's answers to questions about adaptive behavior, not the results

of IQ testing. (Doc. # 15-29 at 16). Additionally, Dr. Shealy qualified his opinion on Morris's malingering later by stating that "throughout [the] evaluation [Morris] was making an effort to show what he could do, at least at times." (Doc. # 15-29 at 18). Dr. Shealy acknowledged having an impression that Morris feigned some answers to functional questions, but Dr. Shealy's testimony does not establish that the ACCA based its decision on an unreasonable factual determination.

At the trial court's request, Dr. Ackerson, "who was under contract [with] the Alabama Department of Mental Health and Mental Retardation," evaluated Morris's competency before the first capital trial. *Morris Direct I*, 956 So. 2d at 436. As part of her 1999 forensic assessment, Dr. Ackerson interviewed Morris twice and administered an intelligence test, which resulted in a full-scale IQ score of 53. *Morris Direct I*, 956 So. 2d at 437; (Doc. # 15-1 at 10). Dr. Ackerson reported that Morris's score reflected a "moderate range of mental retardation[,] . . . well below the first percentile." *Morris Direct I*, 956 So. 2d at 437 (internal quotation marks omitted). Dr. Ackerson also noted that Morris "appeared to put forth his best effort during testing, and he was generally cooperative during the interview sessions." *Id.*

But Dr. Ackerson changed her opinion of Morris's mental functioning after reviewing letters that he had purportedly written and Dr. Kamal Nagi's assessment of Morris at Taylor Hardin. (Docs. # 15-44 at 31-33; 15-43 at 199). Dr. Nagi provided a forensic evaluation of Morris in January 2002 and testified at his December 2002 competency hearing. (Doc. # 15-4 at 1-8); (Docs. # 15-43 at 199-202; 15-44 at 3-28).

Dr. Nagi rejected "Dr. Ackerson's opinion that Morris was moderately mentally retarded." *Morris Direct I*, 956 So. 2d at 451. (Doc. # 15-43 at 198). Likewise, Dr. Nagi did not accept the

Alabama Department of Mental Health's similar opinion about Morris's mental capacity or that Morris "suffered from longstanding deficits in adaptive functioning." *Morris Direct I*, 956 So. 2d at 451. (Doc. # 15-44 at 23-34). Instead, Dr. Nagi concluded that Morris "[wa]s either borderline or mildly retarded." (Doc. # 15-43 at 198; *see also* Doc. # 15-4 at 6) ("Intellectually, [Morris] seem[ed] to be functioning in the borderline range."); *Morris Direct I*, 956 So. 2d at 451 ("Dr. Nagi twice testified that Morris might be mildly mentally retarded.").

Nevertheless, Dr. Nagi also reported that Morris showed signs of malingering and incredibility while receiving treatment at Taylor Hardin. (*See, e.g.*, Doc. # 15-4 at 3) (explaining that Morris "did not participate and appeared to be faking his lack of knowledge and inability to learn"); *id.* at 4 (noting that Morris's description of his symptoms "showed exaggeration . . . and inconsistency compared to the . . . previous [report]"); *id.* at 5 (characterizing Morris as "inconsistent in presentation throughout the current hospitalization and . . . interviews" with Dr. Nagi); *id.* (observing that "[a] person with learning deficits[, which Morris] tri[ed] to portray could not have readily identified 10 digit [telephone] numbers and who they belonged to so readily"); *id.* (contrasting Morris's "exaggerat[ion] . . . in regard to his memory for major events," such as how long he had been in jail or at Taylor Hardin, with examples of "detailed description[s]" of his arrest and other experiences); *id.* at 6 (discussing that the results of Morris's psychological testing for "feigned memory impairment . . . . clearly indicated [an] exaggeration"); *id.* at 7 (observing that Morris "intentionally and volitionally . . . avoid[ed] . . . discuss[ing] anything about his charges[,] . . . why he was arrested[,] or" why he was at Taylor Hardin); *id.* (reporting that Dr. Nagi and "the treatment team" "believed" that Morris was "malinger[ing]"); *id.* at 7-8 (stating that Morris "[wa]s educable . . . about the courtroom" contrary to his "consistent[] and intentional[] deni[als] [of]

awareness of any charges" or understanding of "the information provided" to him in competency training).

To be sure, Morris's malingering served as the basis for Dr. Nagi's rejection of Dr. Ackerson's opinion. As Dr. Nagi explained in a firm written opinion, Morris "[wa]s intellectually brighter than when measured by Dr. Ackerson in 1999" and that Morris "appeared to try to malinger[] through 'not knowing' anything" at that time. (Doc. # 15-4 at 6).

Additionally, Dr. Nagi concluded that Morris had a "fair" insight given the efforts "to selectively provide . . . information related to his charges, apparently knowing that he [wa]s in legal trouble." (Doc. # 15-4 at 6). Dr. Nagi described Morris's judgment as "fair for hypothetical situations." (*Id.*). In wrapping up his report, Dr. Nagi summarized that "[e]ven though . . . Morris [could] be academically and somewhat intellectually limited, he [wa]s clearly 'street smart.'" (*Id.* at 8).

After reviewing the writing samples and Dr. Nagi's clinical impressions, Dr. Ackerson testified, outside the presence of the jury, that Morris was "certainly not mentally retarded and that he . . . d[id] have intact cognitive abilities." (Docs. # 15-8 at 18; 15-31 at 52). As Respondent observes, even with the "authorship of the letters . . . in question," Dr. Ackerson's reliance on the contents of Dr. Nagi's report "remained valid." *See also Morris Direct I*, 956 So. 2d at 452 ("The [s]tate proffered only that its expert would testify that [Morris] had signed the[] [documents].") (emphasis omitted); (Docs. # 22 at 58; 15-44 at 43-70) (state's collection of handwritten documents introduced at the 2002 competency hearing).

Consistent with Dr. Nagi's report, Dr. Ackerson clarified on cross-examination that "a combination of all . . . [the] [documents]" caused the change in her opinion about Morris's mental

capacity. (Doc. # 15-44 at 34). Dr. Ackerson understood the contents of Dr. Nagi's report to reflect that Morris "was malingering . . . [and] falsifying various psychiatric symptoms and . . . [his] level of cognitive deficits," including feigning "a much lower intellectual functioning that he truly was." (Doc. # 15-44 at 31). Dr. Ackerson testified that scoring zero twice on a "courtroom procedures assessment," which Morris did at Taylor Hardin, "[wa]s quite suspicious and atypical." (Doc. # 15-44 at 35-36; *see id.* at 36) ("[I]f someone scores a zero percent on that post-test, that's extremely suspicious and that warrants further investigation as to what might be going on" with the patient.).

Second, Morris challenges the trial court's decision to accept Dr. King's malingering test results (despite evidence of that test's unreliability), discount Dr. Shealy's diagnosis of Morris's low intellectual functioning (even though Dr. Shealy had accounted for Morris's malingering), and disregard Dr. Shealy's point that malingering was irrelevant (because the deficits appeared in Morris before age 18). (Doc. # 1 at 23-24 ¶¶ 77-79). Morris's arguments merely reflect a disagreement with the trial court's findings in resolving conflicting evidence, but they do not rise to the level of showing objective unreasonableness.

Even if Morris has poked holes in the strength of the trial court's findings, he has not come close to establishing that the Alabama courts made an objectively unreasonable factual determination. Nor has Morris overcome the presumptively correct finding that he does not meet the subaverage intellectual functioning prong with clear and convincing evidence under § 2254(e)(1). Because fairminded jurists could reasonably agree or disagree about the intellectual functioning finding, Morris has failed to satisfy AEDPA's (d)(2) exception or overcome (e)(1)'s presumption of correctness.

### ii.    Adaptive Functioning Prong

As to the adaptive functioning prong, again Morris fails to refer to any precedential authority in which AEDPA error occurred when the trial court had to consider issues of malingering and resolve conflicts in expert opinions. As discussed under the intellectual functioning prong, neither the *Atkins* holding nor the Supreme Court's guidance in that decision delves into resolving conflicting expert opinions or accounting for signs of a defendant with dubious testing results. Thus, Morris has not carried his (d)(1) burden under AEDPA.

Under (d)(2), Morris contends that the state courts unreasonably rejected his adaptive limitations in home living, functional academics, and employment. (Doc. # 1 at 26 ¶ 84). However, as discussed above, *Atkins* does not address the issue of discounting testimony of family members about a defendant's adaptive functioning. (*Cf.* Doc. # 15-32 at 6) (finding at the end of the *Atkins* hearing that Morris is "fully capable of adapting and surviving and understanding what he's doing"). Even accepting that, with his school records, Morris has shown an unreasonable factual error in the area of functional academics, he has not made the required showings under (d)(2) or (e)(1) in home living and employment.

### iii.    Onset Prong

As for the onset prong and Morris's childhood IQ score of 73, Morris acknowledges that, in evaluating an *Atkins* claim, the Alabama Supreme Court has "defined subaverage intellectual functioning as an IQ of 70 or below." (Doc. # 1 at 22 ¶ 72). Although *Atkins* did not address a disputed onset issue, Morris contends that "the Supreme Court did not establish a rigid cutoff of 70." (Doc. # 1 at 33 ¶ 98). This assertion finds some support in *Hall v. Florida*, 507 U.S. 701 (2014), an Eighth Amendment opinion that postdates *Atkins* (and *Morris Direct II*). *See Hall*, 572

U.S. 719 ("*Atkins* did not give the States unfettered discretion to define the full scope of the constitutional protection."). However, *Hall* cannot be viewed as "clearly established Federal law" under (d)(1) because that decision does not predate "the last adjudication of [Morris's claim's] merits in state court." *Greene v. Fisher*, 565 U.S. 34, 36, 40 (2011); *id.* at 38 (explaining that "§ 2254(d)(1) requires federal courts to focu[s] on what a state court knew and did, and to measure state-court decisions against this Court's precedents *as of the time the state court renders its decision*") (internal quotation marks omitted) (alteration and emphasis in *Greene*). That is, for AEDPA purposes, the Alabama courts could not have considered *Hall* when deciding Morris's *Atkins* claim on direct appeal. Nevertheless, this court will consider the *Hall* opinion for the insight it may provide to understanding the clearly established law of *Atkins*.

In *Hall*, the petitioner sought relief under *Atkins* based on admissible IQ "scores between 71 and 80." *Id.* at 707. Under Florida's *Atkins* statutory structure, the state had treated petitioner's IQ over 70 "as a threshold matter" and "a strict cutoff." *Id.* at 707, 722. Consequently, the sentencing court denied the petitioner's *Atkins* claim without considering evidence of his deficits in adaptive functioning. *Id.* at 714, 724. The state supreme court "held that Florida's 70-point threshold was constitutional." *Id.* at 707.

The *Hall* Court struck down the Florida statute, concluding that the "rigid" framework "create[d] an unacceptable risk that persons with intellectually disability will be executed." 572 U.S. at 704; *see also id.* at 724 (concluding that the petitioner "may or may not be intellectually disabled, but the law requires that he have the opportunity to present evidence of his intellectual disability, including deficits in adaptive functioning over his lifetime.").

For several reasons, *Hall*'s guidance on the scope of *Atkins* does not demonstrate that the ACCA unreasonably applied *Atkins*'s onset prong. First, the petitioner's onset age "[wa]s not at issue" in *Hall*. *Id.* at 710. Second, the trial court did not treat Morris's first grade IQ score of 73 as a "strict cutoff." Nor did the trial court restrict Morris from presenting other evidence, such as testimony from one of his sisters and his school records, to substantiate his onset date based on his adaptive functioning. Unlike the petitioner in *Hall*, whose school records reflected "that his teachers [had] identified him on numerous occasions as '[m]entally retarded,'" 572 U.S. at 705, Morris's records described him as a slow learner but did not refer to mental retardation or special education classes. Considering the evidence that Morris offered at the *Atkins* hearing, and resolving questions of credibility, the trial court found that he had not carried his burden of proof on the onset prong.

Third, the court already made the point above that *Hall* could not have clearly established the law here. Relatedly, under AEDPA law, the Eleventh Circuit has clarified that *Hall* is not retroactive and that "before *Hall*, a state court could conclude that a petitioner failed to satisfy the intellectual functioning prong of *Atkins* when his scores were above 70 but below 75." *Clemons v. Comm'r, Ala. Dep't of Corr.*, 967 F.3d 1231, 1249 (11th Cir. 2020), *cert. denied sub nom. Clemons v. Dunn*, 141 S. Ct. 2722 (2021). Thus, even if the Alabama courts had relied strictly on Morris's IQ score of 73 as the basis for rejecting his ability to satisfy the onset prong, that pre-*Hall* conclusion would not have been an unreasonable application of *Atkins* under AEDPA. *Clemons*, 967 F.3d at 1249.

To be clear, the AEDPA (d)(1) question is not whether this court agrees with the ACCA's decision to affirm the trial court's *Atkins* judgment but whether there is room for fairminded

84

disagreement over the correctness of that state appellate decision. Here, that room exists. Thus, *Atkins*—even as clarified by *Hall*—does not support Morris's unreasonable application argument on any prong.

Nor do the remaining cases that Morris cites alter the court's (d)(1) determination on any prong. One of those cases is *Thomas v. Allen*, 614 F. Supp. 2d 1257 (N.D. Ala. 2009), *aff'd*, 607 F.3d 749 (11th Cir. 2010). (Doc. # 1 at 21, 32 ¶¶ 71, 95 n.1). The petitioner in *Thomas* pursued an *Atkins* claim in state court but did not succeed due to procedural and substantive reasons. 607 F.3d at 751. The district court determined on habeas review that the petitioner had carried his AEDPA burden under § 2254(d)(1) and (d)(2), and therefore "gave no deference to the state courts' opinions to the contrary," and analyzed the *Atkins* claim using pre-AEDPA "parameters." 607 F.3d at 751 & n.1. At the parties' request, the district court agreed to hold an *Atkins* hearing rather than remanding the capital case to state court for resentencing. *Id.*; *see Thomas*, 614 F. Supp. 2d at 1259 (explaining that the district court amended the original habeas judgment "to reflect that the [*Atkins*] claim would be litigated on the merits in [federal] court"). After the habeas evidentiary hearing, the district court "found [the petitioner] to be mentally retarded and ordered [the state trial court] [to] re-sentence him to a term of life imprisonment without the possibility of parole." *Thomas*, 607 F.3d at 751; *see Thomas*, 614 F. Supp. 2d at 1323 (similar).

The state appealed "the district court's findings that [the petitioner] [had] show[n] limited intellectual functioning and limited adaptive functioning during the developmental period." *Id.* at 756. The Eleventh Circuit affirmed. It reviewed the early onset aspect of the district court's *Atkins* decision for clear error. *Id.* at 752. As the circuit explained, to reverse a finding under that "highly deferential standard," a "reviewing court" must have a "definite and firm conviction that a mistake

has been committed." *Id.* (internal quotation marks omitted).

In reviewing for clear error, the Eleventh Circuit observed that "[t]he district court [had] conducted a comprehensive examination of the record evidence and assessed the credibility of the experts and acquaintances who testified at the *Atkins* evidentiary hearing." *Id.* at 760. The Eleventh Circuit highlighted the evidence which supported the district court's onset determination. This developmental-period proof included multiple IQ scores below 70, special education classes, "repetition before . . . retain[ing] information," job skills which experts testified were "consistent with individuals with mild mental retardation," social immaturity, and "adult . . . assist[ance] with his needs." *Id.* at 757, 759. The Eleventh Circuit commented that the district court had written "a very lengthy" and "detailed opinion" to explain the *Atkins* finding. Based on these circumstances, the Eleventh Circuit could not "say" that the district court made a "clearly erroneous" finding that the petitioner had proven his mental retardation and "ineligib[ility] for execution" by a preponderance of the evidence. *Id.*

In support of his *Atkins* claim, Morris points to a district court's adaptive-functioning finding in *Thomas* that favored the petitioner. As Morris summarizes, the petitioner in *Thomas* "could manage his car; arrive at work on time; maintain a neat and clean living environment; . . . work[] as a low-level drug dealer; . . . bargain with other inmates . . . ; and [be] . . . manipulative." (Doc. # 1 at 32 ¶ 95 n.3) (internal quotation marks omitted) (citing *Thomas*, 614 F. Supp. 2d at 1316-17, 1320); *see also Thomas*, 607 F.3d at 759 (observing that "[e]ven the [s]tate's expert . . . [agreed] that mentally retarded persons can drive cars and hold menial jobs.").

But the analytical differences between the district court and Eleventh Circuit habeas decisions in *Thomas* and Morris's *Atkins* claim are stark. A careful reading of *Thomas* shows that

the district court's use of a pre-AEDPA framework to evaluate the *Atkins* claim was not a part of the Eleventh Circuit's analysis in affirming. 607 F.3d at 751 n.1. Instead, the state left unchallenged the district court's decision not to apply AEDPA deference. *Id.* As a result, the Eleventh Circuit "consider[ed] the merits of the issue according no deference to any state court decision on th[at], or any tangentially-related, issue." *Id.*

Additionally, although the Eleventh Circuit held that the district court in *Thomas* did not clearly err in its *Atkins* finding, that falls far short of compelling a conclusion that the ACCA's review of Morris's claim was objectively wrong. First, the state did not challenge the district court's assessment in *Thomas* that the petitioner had met his burden of satisfying the first two *Atkins* prongs for the post-developmental period. *Id.* at 756. Second, the onset evidence which the petitioner offered in *Thomas* was more powerful than that presented by Morris. For example, unlike the situation with Morris, the petitioner in *Thomas* relied on two IQ scores below 70—68 and 64, a mean IQ score below 70 that included a result of "77 at age eighteen," and testimony from a high school special education teacher to satisfy the onset prong. Thus, the *Thomas* decision simply does not substantiate Morris's (d)(1) burden.

Morris also relies heavily upon the Eleventh Circuit's opinion in *Holladay v. Allen*, 555 F.3d 1346 (2009). (Doc. # 1 at 29-32 ¶¶ 88-89, 91, 93, 95). But like *Thomas*, AEDPA played no role in the Eleventh Circuit's decision to affirm the district court's *Atkins* judgment in *Holladay*. *See Holladay*, 555 F.3d at 1348 n.1 (explaining that AEDPA deference was inapplicable because the state had not appealed "the district court's decisions with respect to exhaustion, procedural bar, holding of evidentiary hearings in federal court, or deference"). Instead, in *Holladay* the Eleventh Circuit considered whether the district court's holding that the petitioner had "adduced sufficient

proof of his mental retardation and . . . manifest[ation] . . . before he turned eighteen" was clearly erroneous. *Id.* After reviewing the record of intellectual and functional evidence, the Eleventh Circuit concluded that the district court's *Atkins* finding "under the test utilized by the Alabama courts" was not clearly erroneous. *Holladay*, 555 F.3d at 1364.

Morris contends that, in light of *Holladay*, the ACCA's "reasoning [on his claim] squarely conflicts with *Atkins*." (Doc. # 1 at 32 ¶ 95). Morris notes that, unlike the Alabama courts' treatment of his *Atkins* claim, the district court in *Holladay* relied on the petitioner's record of failing grades in the adaptive assessment. (*Id.* at 30 ¶ 90). Morris also contrasts the state courts' reasons for discrediting his functional evidence with the *Holladay* court's decision to discount the functional value of the petitioner's menial employment, "petty thefts and assistance from his wives and family" for financial support, and "observe[d]" abilities within the restricted prison environment. (*Id.* at 31 ¶ 93). Morris argues that these district court adaptive findings in *Holladay* show that the state courts' treatment of his *Atkins* claim was unreasonable. (*Id.* at 31 ¶ 95). While the Eleventh Circuit's clear error assessment of the *Atkins* claim in *Holladay* may suggest a direction for this court to follow on de novo review, the question here is whether Morris meets the much narrower opening for relief under § 2254(d)(1). Morris has cited no decision in which the Eleventh Circuit relied on *Holladay* to embrace the detachment of AEDPA deference from an exhausted *Atkins* claim.

There is another problem for Morris. Under any measure, the petitioner's favorable functional evidence presented in *Holladay* carried more weight than that put forward by Morris. The former experienced a "tumultuous" childhood attributable to an abusive father and an alcoholic mother, parental abandonment, placement in foster care, and "early run-ins with the law,"

which led to two "stint[s]" at the Alabama Boys Industrial School. 555 F.3d at 1358-59. The *Holladay* petitioner's school records substantiated his "place[ment] in a special education class" in sixth grade and included comments such as "he was somewhat retarded," "definitely mentally retarded," "promot[ed]" to the next grade for "social" reasons, "a problem in the classroom," and "[unable] to learn on the level of an average child." *Id.* at 1359 (internal quotation marks omitted). In addition, the *Holladay* petitioner's off-topic interruptions of conversations, awkward interactions with females, arrests for sexual offenses, and admission of bestiality revealed his social deficits. *Id.* at 1361. Further, because of his functional illiteracy, he "us[ed] symbols" to communicate. *Id.* at 1360. Thus, *Holladay* is too different–both legally and factually–to show that the ACCA unreasonably rejected the adaptive-functioning portion of Morris's *Atkins* claim under AEDPA.

Citing *Winston v. Barnhart*, 421 F. Supp. 2d 1355 (N.D. Ala. 2006), Morris also argues that his "ability to deal drugs and gamble, which presumes some ability to do basic math, is not inconsistent with a mild intellectual disability." (Doc. # 1 at 31 ¶ 92). In *Winston*, a district court reviewed a plaintiff's claim for benefits under the Social Security Act. *Winston*, 421 F. Supp. 2d at 1356. In discussing whether the plaintiff could meet Social Security Listing 12.05, Judge Guin noted that the language of 12.05 closely tracts the language of DSM-IV-TR's definition of mental retardation. *Id.* at 1358. That definition provides that a person with mild mental retardation "[b]y their late teens [] can acquire academic skills up to approximately the sixth-grade level." *Id.* (internal quotation marks omitted). Linking this language from *Winston* to a State of Alabama website describing math standards for sixth graders, Morris challenges the trial court's adaptive functioning finding tied to his ability to deal drugs and gamble. (Doc. # 1 at 31 ¶ 92); (*see also*

Doc. # 15-32 at 4) ("I mean, anybody that can't add two and one but can go out here and sell marijuana on the streets like [Morris] told the probation officer he did can count and add better than that because otherwise he'd have starved to death selling marijuana on the streets.").

This district court quotation from a diagnostic source in a decision wholly unrelated to an *Atkins* claim is of no help to Morris in pressing his *Atkins* claim. To be sure, it falls far short of establishing clear law under AEDPA. Morris cannot meet his AEDPA burden simply because the trial court *could* have determined that he suffered from limitations in the adaptive area of academics despite his ability to deal drugs and gamble. Instead, to meet (d)(1), Morris must show that the ACCA unreasonably affirmed the trial court's adaptive functional finding with authority that substantiates an objective constitutional error in the application of *Atkins*.

In reply, Morris also relies on the Eleventh Circuit's AEDPA reversal of a judgment denying *Atkins* relief in *Burgess*, 132 F.3d at 1317, 1321. (Doc. # 27 at 30 n.9). Even assuming that parts of *Burgess* support Morris's *Atkins* argument under AEDPA, key differences in the record in that case and the record here preclude this court from concluding that the ACCA decided his *Atkins* claim unreasonably based on *Burgess*. In explaining why this is so, the court begins by summarizing *Burgess*.

In *Burgess*, a jury convicted the petitioner of capital murder for killing "his girlfriend and two of her children." 723 F.3d at 1311. In the penalty phase, which took place pre-*Atkins*, trial counsel "introduced some evidence regarding [the petitioner]'s mental health as part of [the] theory of mitigation." *Id.* A neuropsychologist testified that the petitioner suffered with "'cyclothymic disorder,' [a condition] less severe than [but similar to the fluctuating moods associated with] bi-polar disorder." *Id.* at 1312. The jury heard about petitioner's family history of mental illness, his

difficulties with communication, and his poor school performance, including "his need to repeat the first grade, . . . eventual placement into special education classes[,] . . . and [withdrawal from] school after the [end] of the ninth grade." *Id.* The jury learned that the petitioner's last report card reflected "all failing grades with the exception of one D." *Id.*

The neuropsychologist did not assess the petitioner's intellectual functioning or "administer[] [any] intelligence testing." *Id.* at 1312. However, the neuropsychologist testified about some mental-functioning information he obtained from two other examiners' reports concerning petitioner. According to these pretrial reports, the petitioner "was borderline mentally retarded" based on an underlying IQ result of 66, "may even be mildly mentally retarded," and had an "estimated . . . intelligence [that] was below normal probably in the borderline [IQ] range [of] . . . somewhere between 70 and 80." *Id.* at 1313 & n.2 (internal quotation marks omitted).

After hearing this mitigation evidence, the jury recommended that the petitioner receive life without the possibility of parole. *Id.* at 1311. But the trial court, exercising Alabama's former judicial override option, sentenced the petitioner to death. *Id.*

After losing on direct appeal, the petitioner sought Rule 32 relief. *Id.* One of the petitioner's arguments was "that his trial counsel was ineffective for failing to adequately investigate and present evidence relating to [his] mental health." *Id.* The pre-*Atkins* timing of the petitioner's Rule 32 petition meant that he did not assert an "Eighth Amendment claim [contending] that he could not be executed because he was mentally retarded." *Id.* But after the Supreme Court granted certiorari in *Atkins*, the petitioner sought to amend his petition and moved for "funds to retain a mental health expert" as well as permission to allow a mental health expert to examine him in prison. *Id.* The trial court denied the petitioner's motions, declined to hold an *Atkins* hearing, and

denied the Eighth Amendment claim on the basis of state procedural default. *Id.*

On appeal, the ACCA "reversed the trial court ruling on procedural default" because, as an exception to the nonretroactivity doctrine, an *Atkins* claim "applies retroactively." *Id.* (internal quotation marks omitted). But the ACCA did not "permit[] [the petitioner] to develop the record on [his] mental retardation." *Id.* at 1312 (internal quotation marks omitted) (some brackets added). The ACCA "denied [the petitioner]'s Eighth Amendment claim on the merits, based solely on the paper record derived from pre-*Atkins* proceedings, saying that he was not mentally retarded. *Burgess*, 723 F.3d at 1312.

In its ruling, the ACCA relied on the mental retardation framework in *Perkins* and referred to the "'finding' that [the petitioner]'s IQ was between 70 and 80." *Id.* at 1314. The ACCA pointed to other evidence such as the petitioner's "complet[ion] [of] the ninth grade . . . [and] one year at a training school; work[] as a welder while incarcerated . . . ; . . . cooperative . . . interview[] [with] a probation officer; . . . considerate, compassionate, and caring [qualities as a child]; . . . brother who was mentally retarded." *Id.* (internal quotation marks omitted). The Alabama Supreme Court denied certiorari. *Id.* at 1312.

On habeas review, the petitioner offered an affidavit from a different neuropsychologist, "containing new expert testimony related to his *Atkins* claim." *Id.* at 1315. This examining doctor administered an intelligence test which resulted in an IQ score of 66, *id.* at 1316 n.7, and diagnosed the petitioner as being mentally retarded "to a reasonable degree of psychological certainty," *id.* at 1315. Still, the district court neither "consider[ed] this affidavit, [n]or . . . grant[ed] [the petitioner] an evidentiary hearing on his *Atkins* claim." *Id.* The district court based its decisions on the petitioner's postconviction "argu[ment] that all of the evidence necessary to support his mental-

92

retardation claim was located in the trial court record" and his "fail[ure] . . . [to] present [the affidavit] in the first instance to the state court." *Id.* (internal quotation marks omitted) (some alterations added). The district court accepted the ACCA's "determination that [the petitioner] was not mentally retarded" as "not an unreasonable finding" under AEDPA based on the trial court evidence, which "placed him in the category of borderline intellectual functioning or borderline mentally retarded." *Id.* (internal quotation marks omitted).

On appeal, the Eleventh Circuit "disagree[d] with the district court" and declined to apply AEDPA deference. *Id.* at 1315-16. Instead, the Eleventh Circuit held that the ACCA's ruling on the petitioner's claim of mental retardation "was an unreasonable determination of the facts' under § 2254(d)(2). *Burgess*, 732 F.3d at 1316.

With respect to the petitioner's intellectual functioning, the Eleventh Circuit noted that the neuropsychologist in the penalty phase "saw no need to duplicate the testing" of another examiner "who had found [the petitioner] to be borderline mentally retarded." *Id.* The Eleventh Circuit observed that the ACCA's critical reliance on the petitioner's estimated IQ range of 70 to 80 was undermined by the lack of underlying "intellectual tests" to support (or other evidence to explain) the source of this range. *Id.* The circuit added that the examiner who had suggested the range outside of mental retardation actually reported a contrary view that the petitioner was potentially "mildly mental retarded," and that he had an "IQ . . . [of] 70 or below." *Id.* The Eleventh Circuit also referred to a "correctional record" that indicated that the petitioner had an IQ test result of 73. *Id.* Nevertheless, the appeals court rejected that evidence as unreliable in the absence of an "explanation of how the score was obtained, of who had obtained and recorded the score, or why." *Id.* Given that the record revealed "realistic indications that a defendant might be mentally

retarded," the Eleventh Circuit held that the ACCA had determined the facts unreasonably under § 2254(d) when it relied on an estimated IQ range, instead of a "concrete, verifiable IQ score." *Id.*

Turning to the second prong of *Atkins*, the Eleventh Circuit rejected the ACCA's "finding that [the petitioner] [had] failed to demonstrate significant deficits in adaptive behavior" as unreasonable. *Id.* at 1316. The Eleventh Circuit explained that the ACCA's rationale was "[ir]reconcilable with the record," in light of petitioner's failing grades, special education classes, and standardized test scores "in the lowest 3% or 4% nationally." *Id.* The circuit also observed that the ACCA's discussion of the petitioner's abilities lacked any clinical context—*i.e.*, how they "would or would not be consistent with mental retardation." *Id.* The Eleventh Circuit added that the ACCA's adaptive determination did not address the clinical observation that the petitioner "may even be mildly retarded," which "would be consistent with [the petitioner]'s poor adaptive skills" in school and employment. *Id.* at 1317 (internal quotation marks omitted). In sum, the court of appeals concluded that the evidence which the ACCA cited "either contradicted [the adaptive] finding" or arose "in such a different context that it [could not] meaningfully support the finding." *Id.*; *see Bobby v. Bies*, 556 U.S. 825, 836 (2009) ("Mental retardation as a mitigator and mental retardation under *Atkins* . . . are discrete legal issues.").

The Eleventh Circuit rejected several more of the state's arguments, including its position that the insufficiency of the mental retardation evidence "should be held against [the petitioner]." *Id.* at 1318. Based on "the narrow facts of th[e] case," the circuit concluded otherwise. *Id.* These narrow circumstances included the pre-*Atkins* history of the petitioner's case and his thwarted efforts to develop an Eighth Amendment claim collaterally based on *Atkins*. *Id.*

94

The Eleventh Circuit ended its AEDPA analysis by holding that the ACCA had based the mental retardation determination "upon a combination of erroneous factual findings directly contradicted by the record and a record that was insufficient to support its conclusions." *Id.* The court followed that holding with a conclusion that the petitioner met the requirements for an evidentiary hearing on remand. *Id.* at 1322.

In light of this review of *Burgess*, this court next compares the record of the *Atkins* claim in that case with Morris's claim here. First, unlike the petitioner in *Burgess*, Morris had access to an expert, had an unrestricted opportunity to develop his mental retardation evidence, and had an *Atkins* hearing after the remand in *Morris Direct I*. This places Morris's *Atkins* claim outside the narrow fact pattern that supported the Eleventh Circuit's decision not to penalize the petitioner in *Burgess* for failing to sufficiently develop evidence of mental retardation.

Another key difference in these two *Atkins* records is that malingering was a non-issue in *Burgess*. In contrast, the trial court in Morris's case found near the end of the *Atkins* hearing that "none of the[] experts c[ould] give . . . a true IQ score [for Morris] because he's malingering." (Doc. # 15-32 at 4). The trial court acknowledged that Dr. King gave an estimated range but that no expert provided "a clear cut answer as to [the] real functioning IQ score" for Morris. (Doc. # 15-32 at 5).

Although Morris's school records recorded that he had an early IQ score of 73 in first grade, Dr. Shealy, who testified at the *Atkins* hearing, described this group administered "primary abilities test" as less reliable than an individualized test under the Wechsler Intelligence or Stanford-Binet Scales. (Doc. # 15-29 at 11). Dr. King also stated that mental health examiners "don't rely a whole lot on IQ scores that are probably group administered scores but they give us

a general idea [*i.e.*, that Morris was] certainly not retarded." (Doc. # 15-31 at 35). Competing expert opinions on the meaning of an IQ score from a test administered in a group setting at school was not at issue in *Burgess*. In light of these distinguishing facts, the *Burgess* opinion does not show that the ACCA unreasonably affirmed the trial court's denial of his *Atkins* claim.

Generally, the way an Alabama court decides a federal constitutional claim is not clearly established law for AEDPA purposes. But, as outlined above, state law relates to the assessment of an *Atkins* claim. Given that state law component, Morris cites several Alabama Supreme Court cases in support of his *Atkins* claim. The court thus considers to what degree, if any, those Alabama authorities establish that the ACCA unreasonably rejected Morris's mental retardation claim. *See Holladay*, 555 F.3d at 1353 (recognizing that, in the absence of Alabama legislative response to *Atkins*, courts "must examine Alabama case[]law to determine [the] standards").

Citing *Tarver v. State*, 940 So. 2d 312, 318 (Ala. Crim. App. 2004), Morris argues that the ACCA "overlooked overwhelming evidence that [he] suffers from adaptive limitations in home living." (Doc. # 1 at 26 ¶ 85). In *Tarver*, the appellant sought postconviction relief from his death sentence on the basis of *Atkins*. The *Atkins* decision was issued by the Supreme Court while the appeal of the trial court's denial of the Rule 32 petition was pending. 940 So. 2d at 317. One of the experts testified during the Rule 32 hearing in *Tarver* that the appellant was "functionally illiterate" and had "never lived independently" or held "a job for any sustained period of time." *Id.* at 318 (internally quotation marks omitted). The expert concluded that these functional deficiencies "when taken in conjunction with [the appellant's] low IQ" of 76, met the "criteria" for "mental retardation." *Id.* (internal quotation marks omitted).

96

The ACCA acknowledged that those facts and other "compelling evidence" indicated the appellant was mentally retarded. *Id.* at 321. The ACCA never mentioned any question about whether the appellant was malingering. Still, the ACCA remanded for a determination of "whether [the appellant's] death sentence violate[d] the Eighth Amendment" because of his diminished mental capacity. *Id.* The ACCA instructed the circuit court "to conduct an evidentiary hearing," "consider the definition of mental retardation in § 15-24-2(3), Ala. Code 1975, as well as the guidelines set forth in *Atkins* and *Ex parte Perkins*," and "issue specific written findings of fact." 940 So. 2d at 321. On return to remand, the ACCA affirmed the circuit court's denial of postconviction relief. *Id.* Consequently, the ACCA's summary of the mental retardation evidence favorable to the appellant before the *Atkins* hearing in *Tarver* was inessential to the final *Atkins* outcome. For this and other reasons, *Tarver* is of no benefit to Morris related to his *Atkins* claim.

Likewise, the Alabama Supreme Court's decision to uphold the trial court's death sentence in *Perkins* does not help Morris. Reviewing for plain error, the *Perkins* court considered whether the appellant's mental status required a remand for the circuit court to conduct an *Atkins* hearing. 851 So. 2d at 455. The appellant in *Perkins* "had a full-score IQ of 76" as an adult, lacked an expert diagnosis of mental retardation, "earned a GED certificate . . . in prison," "completed college courses," held "a job as an electrician for a short period[,]" and had been married for a decade. *Id.* at 456. Given this evidence, the Alabama Supreme Court concluded that the appellant could not "establish the common requirements for mental retardation" and rejected his resentencing claim. *Id.* at 456-57. *Perkins* provides a structure for evaluating whether an Alabama capital defendant is eligible for the death penalty under *Atkins* in the absence of an applicable state statute. However, the Alabama Supreme Court's holding and affirmed death sentence in *Perkins* do not indicate that

the ACCA resolved Morris's *Atkins* appeal unreasonably.

Thus, because Morris has not overcome the AEDPA deference that attached to his exhausted *Atkins* allegations, this claim is due to be denied.

### D.   Claim E—Morris has not demonstrated a right to habeas relief because of unreliable DNA Evidence.

Morris next maintains that the trial court's admission of unreliable DNA evidence violated his due process rights. (Doc. # 1 at 82 ¶ 214). Specifically, he challenges the DNA testing results –which linked the blood found on his shoe to the victim and residue on an "unlit cigarette found at the crime scene" to him–as suspect because the state did not offer proof of methodology. (Doc. # 1 at 83 ¶ 217). Morris adds that the state "destroyed" the cigarette's filter and "failed to preserve" a bologna sandwich discovered during the investigation. *Id.* Morris argues that the narrow avenues under (d)(1) and (d)(2) afford him relief. (Doc. # 1 at 85 ¶ 222). Respondent answers that the ACCA denied this part of Morris's appeal "properly . . . . and certainly not . . . outrageous[ly]." (Doc. # 21 at 29 ¶ 80).

### 1.   State Court Proceedings

During his capital trial, Morris did not object to the state's DNA evidence as unreliable and never argued that the unavailability of crime scene samples for testing precluded him from independently verifying the forensic results. *Morris Direct II*, 60 So. 3d at 370. Rather, it was not until direct review that Morris contested the admission of the state's DNA evidence. (Doc. # 15-52 at 120). In his brief, Morris faulted the trial court for failing to hold an evidentiary hearing and allowing the state's DNA witness to testify without "identify[ing] the [forensic] method[ology]" behind the results. (Doc. # 15-52 at 121). According to Morris, the "[in]ability to conduct his own testing" "compounded" the harmful impact of the state's unreliable DNA evidence. *Id.*

98

Relying on Alabama cases and one federal decision, *Holdren v. Legursky*, 16 F.3d 57 (4th Cir. 1994), the ACCA determined that Morris's arguments were insufficient to show reversible error. *Morris Direct II*, 60 So. 3d at 370-72. First, the ACCA explained that admitting the DNA evidence without holding an evidentiary hearing did not warrant reversal because Morris never requested a hearing. *Id.* at 371. Second, consistent with its prior precedent, the ACCA determined that the absence of the state's methodology went to the weight to be given the evidence, not its admissibility. Indeed, nothing beyond "speculation" suggested that the testing results were unreliable. *Id.* Third, the ACCA rejected Morris's allegation that he could not test the cigarette butt independently based on the state expert's testimony that "DNA extract remain[ed] . . . . for future testing." *Id.* (internal quotation marks omitted). Consistent with that disputed testimony, the ACCA concluded that Morris could show no prejudice because "he could have tested the DNA using his own expert. *Id.*

The ACCA did not discuss Morris's allegation about the state's "inability to preserve the bologna for testing" (Doc. # 15-52 at 122), but it did cite *Holdren* as helpful authority. *Morris Direct II*, 60 So. 3d. at 371-72. In *Holdren*, the Fourth Circuit rejected a claim that the destruction of semen samples violated the petitioner's due process rights. *Holdren*, 16 F.3d at 60. As the *Holdren* court explained, without evidence of accompanying bad faith, the state's destruction of "potentially exculpatory evidence" does not violate the due process clause. *Id.* With the state court's disposition in mind, the court moves to the habeas analysis.

### 2. AEDPA deference precludes habeas relief on Morris's unreliable DNA evidence claim.

The court first assesses Morris's (d)(1) claim. Although Morris also invokes (d)(2), he points to no evidence, at all, that undermines the reasonableness of the ACCA's factual

determinations. Morris's conclusive approach is ineffective to prove that the ACCA's analysis of his DNA claim contained an unreasonable factual finding. So the court focuses on whether Morris can show that the ACCA's decision was contrary to or unreasonable based on Supreme Court precedent under (d)(1).

Morris must substantiate the validity of his due process claim with Supreme Court precedent. But the statutory structure of (d)(1) demands that Morris do more than cite a Supreme Court due process decision. He must also identify a contextually-relevant Supreme Court decision with indistinguishable facts that reached a result that is irreconcilable with the ACCA's decision or unreasonably applied the correct standard. Therefore, Morris must reference authorities that address due process claims involving DNA or unpreserved evidence. Morris has not done so.

Morris references several Supreme Court decisions in support of this claim. *Payne v. Tennessee*, 501 U.S. 808 (1991); *Zafiro v. United States*, 506 U.S. 534 (1993); *McDaniel v. Brown*, 558 U.S. 120 (2010) (per curiam); *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993); *California v. Trombetta*, 467 U.S. 479 (1984); and *Dist. Attorney's Off. for Third Jud. Dist. v. Osborne*, 557 U.S. 52 (2009). (Docs. # 1 at 82-85 ¶¶ 215-16, 218, 220-21; 27 at 66-67). However, the claims that the Supreme Court addressed in several of these opinions are unrelated to the interplay between the due process clause and DNA evidence.

For example, the *Payne* Court held that during the penalty phase of a capital case "the Eighth Amendment erects no *per se* bar" against the state's use of "victim impact evidence and prosecutorial argument on that subject." 501 U.S. at 827. In *Zafiro*, the Supreme Court concluded that severance in a non-capital case "when codefendants present 'mutually antagonistic defenses'" is not automatic but rather should be "le[ft] . . . to the sound discretion of the district courts." 506

U.S. at 535, 541. In *Daubert*, the Court determined that the Federal Rules of Evidence "displaced" the "'general acceptance' test . . . for determining the admissibility of novel scientific evidence at trial" and announced a more "flexible" replacement standard but provided no constitutional assessment. 509 U.S. at 585, 589, 594. Thus, the holdings in *Payne*, *Zafiro*, and *Daubert* do not establish that the due process clause requires a court to hold an evidentiary hearing on the admissibility of uncontested DNA evidence, review the methodology when there is no challenge to the DNA testing results, or preserve evidence for forensic testing. This analytical disconnect precludes Morris from showing that an extreme or unreasonable constitutional error occurred when the ACCA rejected his DNA due process claim based on these cases.

Two cases cited – *McDaniel* and *Osborne* – explore constitutional claims based on DNA evidence. Thus, the court reviews each of these decisions.

In the non-capital habeas case of *McDaniel*, the state prosecuted the prisoner for sexual assault. 558 U.S. at 124. The state's case included expert-tested "semen from [the victim]'s underwear and . . . rape kit," which DNA results matched the prisoner's. *Id.* at 123-24. A jury found the prisoner guilty, and he appealed that conviction claiming there was insufficient evidence to convict him. *Id.* at 124. After exhausting that claim on direct appeal, the prisoner petitioned for a writ of habeas corpus. *Id.* at 124, 126.

On habeas, the prisoner argued that the state supreme court ran afoul of AEDPA when it rejected his insufficiency of the evidence claim under *Jackson v. Virginia*, 443 U.S. 307 (1979). *McDaniel*, 558 U.S. at 126. The *Jackson* Court had held that a habeas challenge of a conviction is appropriate under the due process clause when the trial evidence is so deficient that "no rational trier of fact could have found proof of guilt beyond a reasonable doubt." 443 U.S. at 317-18, 324.

To support his *Jackson* claim, the prisoner in *McDaniel* relied on a new expert report, which purported to counter the DNA evidence that the state had introduced at trial. The prisoner pointed to "two specific inaccuracies in the [state expert's] testimony related to the DNA evidence." *McDaniel*, 558 U.S. 127. One problem – which has been called the "prosecutor's fallacy" – occurred when the state expert equated "the random match probability" with "the probability that the defendant was not the source of the DNA sample." *Id.* at 128. Another problem occurred when the state expert underestimated "the probability that one or more of [the prisoner's] brothers' DNA would match." *Id.* at 129. Given these discrepancies, the prisoner in *McDaniel* prevailed on his *Jackson* claim in the district court, and the Ninth Circuit affirmed. *Id.* at 126-27.

The Supreme Court reversed. The *McDaniel* Court determined that "those [federal] courts [had] misapplied *Jackson*" in light of a "trial record [which] include[d] . . . DNA . . . and other convincing evidence of guilt." 558 U.S. at 121. In other words, evaluating the evidence of guilt without giving the DNA trial evidence any weight was a mistake under *Jackson*. *See McDaniel*, 558 U.S. at 132 ("That DNA evidence remains powerful inculpatory evidence even though the State concedes [that its expert] overstated [the] probative value.").

After addressing the *Jackson* claim, the Supreme Court turned to the prisoner's request "to affirm on an alternative ground." *McDaniel*, 558 U.S. at 134. Under this theory, the prisoner relied on the same "two errors" that the state expert had made "'in describing the statistical meaning' of the DNA evidence." *Id.* But here the prisoner argued that the state expert's inaccurate DNA testimony "rendered his trial fundamentally unfair and denied him due process of law." *Id.* at 135. The prisoner based his due process claim on the Court's decision in *Brathwaite*. *McDaniel*, 558 U.S. at 139. The *Brathwaite* Court addressed the constitutional reliability of "a suggestive

eyewitness identification procedure," *McDaniel*, 558 U.S. at 134, and reversed the award of habeas relief tied to "the admission of the identification testimony," *Brathwaite*, 432 U.S. at 103. Although the prisoner in *McDaniel* centered his claim on *Brathwaite*, he did not rely on such a claim in his petition. *McDaniel*, 558 U.S. at 135. Instead, the prisoner raised this due process claim based on *Brathwaite* "for the very first time" in his brief on certiorari. *Id.* The Supreme Court "reject[ed] [the prisoner]'s last minute attempt to recast his [*Jackson*] claim under *Brathwaite*," *McDaniel*, 558 U.S. at 136, and denied relief because he "ha[d] forfeited th[e] [*Brathwaite*] claim," 558 U.S. at 135. Consequently, the *McDaniel* Court did not reach the merits of the prisoner's alternative due process argument.

For these reasons, the *McDaniel* decision does not help Morris. First, because Morris does not challenge as inadequate the state's overall evidence of guilt, the Supreme Court's discussion of the prisoner's *Jackson* claim in *McDaniel* is inapplicable to Morris's challenge. Second, the Supreme Court did not decide whether *Brathwaite*'s reliability framework could support a due process theory based on a trial expert's improper interpretation of DNA evidence. Therefore, the *McDaniel* opinion sheds no light on the AEDPA merits of Morris's DNA due process claim.

The Supreme Court's DNA opinion in *Osborne* does not establish a viable habeas due process claim either. The *Osborne* Court considered to what extent the due process clause requires "state officials under 42 U.S.C. § 1983" to provide a postconviction prisoner with "a constitutional right to access . . . DNA evidence." 557 U.S. at 60, 62. Although the *Osborne* Court acknowledged the important and evolving role that DNA evidence plays in the criminal justice system, 557 U.S. at 55, 74, the Court's due process holding is limited to post judgment access to DNA evidence, not the admission of DNA testing results unchallenged at trial, *id.* at 61, 75. Even if that contextual

distinction were not enough, the due process outcome holding (under § 1983) in *Osborne* shines no light on the application of AEDPA.

Without determining whether § 1983 was "the proper federal statute [to bring the] claim," 557 U.S. at 65, 67, the *Osborne* Court analyzed the merits of the prisoner's due process arguments both procedurally and substantively, *id.* at 72. From a procedural standpoint, the Supreme Court concluded that "the Court of Appeals went too far . . . in . . . [applying] certain familiar preconviction trial rights . . . to protect [the prisoner]'s postconviction liberty interest." *Id.* at 68. The *Osborne* Court observed that "[f]ederal courts may upset a State's postconviction relief procedures only if they are fundamentally inadequate to vindicate the substantive rights provided." *Id.* at 69. The Court concluded that the state's postconviction procedures revealed no facial inadequacies and that "without trying them," the prisoner had no basis to "complain that they d[id] not work in practice." *Id.* at 71. Thus, the prisoner did not satisfy his procedural due process burden in mounting his postconviction challenge to state law.[4]

As for substantive due process, the Supreme Court declined to "recognize a freestanding right to DNA evidence" under the prisoner's claimed circumstances. *Id.* The Court expressed "reluctan[cy] to enlist the Federal Judiciary in creating a new constitutional code of rules for handling DNA." *Id.* at 73. *Osborne* therefore does not clearly establish an extreme or unreasonable error in the ACCA's rejection of Morris's due process claim tied to the trial court's admission of the state's unchallenged DNA evidence.

---

[4] The Court also made clear that, even presuming a "constitutional right to be released upon proof of 'actual innocence'" on habeas review, the *Osborne* Court determined that the prisoner had no viable procedural due process claim based on postconviction federal law either. *Id.* (internal quotation marks omitted). Specifically, the prisoner was unable to "show that available discovery [wa]s facially inadequate, and . . . that it would be arbitrarily denied to him." *Id.* at 72.

The remaining Supreme Court case that Morris relies on for this claim is *Trombetta*. The *Trombetta* Court examined "whether the Fourteenth Amendment . . . demands that the State preserve potentially exculpatory evidence" for criminal defendants "stopped on suspicion of drunken driving." 467 U.S. at 481-82. In a consolidated review of this constitutional question, the California Court of Appeal concluded that the state's failure to preserve the defendants' breath samples violated their due process rights. *Id.* at 483. Accordingly, the state appellate court granted new trials for the convicted defendants and suppressed the breathalyzer results of the pretrial defendants. *Id.* at 484.

Rejecting that state court judgment, the *Trombetta* Court held that the due process clause does not "require[] law enforcement agencies to preserve breath samples of suspected drunken drivers in order for the results of breath-analysis tests to be admissible in criminal prosecutions." *Id.* at 481. In reaching this outcome, the Supreme Court contrasted the *Trombetta* record, which showed that "the officers . . . were acting in good faith and in accord with their normal practice," with police action that reflected an intentional destruction of "breath samples . . . to circumvent the disclosure requirements" of material exculpatory evidence. *Id.* at 488; *see also id.* ("The record contains no allegation of official animus towards respondents or of a conscious effort to suppress exculpatory evidence").

Morris appears to rely on *Trombetta* to support his allegations about the state's role in the destroyed cigarette butt and the unpreserved bologna sandwich. But, under *Trombetta*, merely identifying the potentially exculpatory breath samples that the state could have made available to the defendants for testing is wholly insufficient to state a cognizable due process claim. Rather, an essential element of any such claim requires a showing of bad faith because the exculpatory value

of the unavailable evidence was unknown. After *Trombetta*, the Supreme Court expressly stated, "that unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988); *see also Illinois v. Fisher*, 540 U.S. 544, 549 (2004) (per curiam) (recognizing that the "bad-faith requirement . . . depend[s] not on the centrality of the contested evidence to the prosecution's case or the defendant's defense, but on the distinction between material exculpatory evidence and potentially useful evidence") (internal quotation marks omitted).

Critically, Morris has made no assertion that the police or another state official handled the cigarette butt and sandwich in bad faith (or outside customary preservation practices, for that matter). That omission means that Morris's reliance on *Trombetta* is inadequate to show that the ACCA committed any (d)(1) error in the rejection of his DNA due process claim. Likewise, in the absence of any allegation of bad faith, the parties' disagreement about testing the DNA extract from the filter (which the state removed and preserved) versus extracting and testing the DNA evidence from the cigarette butt independently is moot. (Doc. # 27 at 67).

Besides Supreme Court decisions, Morris references an Alabama case – *Turner v. State*, 746 So. 2d 355 (Ala. 1998) – and an article on DNA typing. (Doc. # 1 at 83 ¶¶ 216, 219). Because neither authority is a Supreme Court decision, they do not clearly establish law under AEDPA.[5]

---

[5] Additionally, the Alabama Supreme Court analyzed the DNA issues in *Turner* under a new state statutory provision, not a constitutional framework. *See Turner*, 746 So. 2d at 316 ("We hold that if the admissibility of DNA evidence is contested, the trial court must hold a hearing, . . . and, pursuant to [Ala. Code] § 36-18-30, determine whether the proponent of the evidence sufficiently establishes affirmative answers to . . . two questions."); *see also Turner*, 746 So. 2d at 363 ("This is a case of first impression regarding the proper tests for admissibility under § 36-8-30."). Thus, *Turner* does not support Morris's DNA allegations, much less show a contrary to or unreasonable application of Supreme Court precedent.

Thus, Morris has not satisfied his AEDPA burden on this claim.

### E.  Claim G—Morris has not demonstrated a right to habeas relief because of a speedy trial violation.

Morris next asserts that the state violated his right to a speedy trial under the Sixth Amendment because the "first trial took place six years after his arrest." (Doc. # 1 at 87 ¶ 226). Morris also alleges that the state's conduct violated his rights under the Fifth, Eighth, and Fourteenth Amendments. (*Id.* at 92 ¶ 240). Morris invokes (d)(1) and (d)(2) as avenues to obtain habeas relief under AEDPA. (Doc. # 1 at 87, 89 ¶¶ 226, 232). Respondent counters that the ACCA's decision "is a perfect example of a reasonable decision under AEDPA." (Doc. # 22 at 111).

The court agrees with Respondent and begins by summarizing the state court proceedings applicable to Morris's Sixth Amendment claim, moves to the AEDPA analysis, and ends with a discussion of Morris's remaining habeas allegations.

#### 1.  State Court Proceedings

At trial, Morris did not assert a speedy trial violation. He did not raise that claim until his first appeal. *Morris Collateral*, 260 So. 3d at 352. There, "Morris argue[d] that the six-year gap between his arrest and his first trial was presumptively prejudicial." *Id.* Morris asserted that the state's negligence caused the delay, to which he did not agree. *Id.* Morris also claims he could prove actual prejudice "because the witnesses' memories may have been affected . . . and certain witnesses may have disappeared." *Id.*

The ACCA reviewed the claim for plain error under the Supreme Court's balancing framework announced in *Barker v. Wingo*, 407 U.S. 514 (1972). *Morris Collateral*, 260 So. 3d at 352. The *Barker* Court "identif[ied] . . . four such factors [relevant to the speedy trial constitutional

inquiry": Length of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." *Barker*, 407 U.S. at 530. The ACCA recognized that under *Barker*'s balancing approach, "a single factor is not necessarily determinative," and a court must weigh "the conduct of both the prosecution and the defense." *Morris Collateral*, 260 So. 3d at 352 (internal quotation marks omitted) (quoting *Barker*, 407 U.S. at 530). The ACCA evaluated "each factor in turn." *Morris Collateral*, 260 So. 3d at 352 (internal quotation marks omitted).

The ACCA referenced *Doggett v. United States*, 505 U.S. 647 (1992), in its analysis of the length of delay. The ACCA explained that, under *Doggett*, the time factor "is actually a double enquiry." *Morris Direct II*, 60 So. 3d at 352 (internal quotation marks omitted) (quoting *Doggett*, 505 U.S at 652); *see also Doggett*, 505 U.S. at 651-52 (comparing "a bare minimum" delay to "trigger" review with treating the "extent to which [a] delay stretches beyond the bare minimum" as a factor in the *Barker* balancing framework). The ACCA concluded that Morris had met the presumptively-prejudicial part of the speedy-trial time factor given the delay of six years. *Morris Direct II*, 60 So. 3d at 353.

The ACCA then moved "to the reasons for the delay." *Id.* (internal quotation marks omitted). The ACCA observed that "the [s]tate ha[d] the burden of justifying the delay." *Id.* (internal quotation marks omitted). The ACCA looked at the case's procedural history up to the first trial and "attribute[ed]" "almost four years of the delay . . . to determining Morris's competency to stand trial." *Id.* at 354. The ACCA highlighted Morris's motion to continue trial and request for a psychiatric evaluation in February 1999, Dr. Ackerson's competency opinion in May 1999, and the trial court's order on competency in February 2001. *Id.* at 353-54. The ACCA noted that after Morris attended outpatient competency training sessions in March 2001, Rhone

provided "a competency-evaluation report [which] indicat[ed] . . . h[is] belie[f] that Morris was purposefully giving false answers and malingering." *Id.* at 354. The ACCA recounted Morris's commitment to Taylor Hardin in December 2001 for an evaluation, Dr. Nagi's resulting competency report coupled with Dr. Nagi's malingering findings in January 2002, and the state's request for another competency hearing, which the trial court held in December 2002. *Id.* The ACCA acknowledged the trial court's order regarding Morris's competency in January 2003 and that jury selection began in March 2003. *Id.*

Referring to *Barker*, the ACCA discussed the "three categories of reasons for delay: (1) deliberate delay, (2) negligent delay, and (3) justified delay." *Morris Direct II*, 60 So. 3d at 354 (internal quotation marks omitted) (quoting *Barker*, 407 U.S. at 531). The ACCA recognized that "[d]eliberate delay is weighted heavily against the [s]tate." *Morris Direct II*, 60 So. 3d at 354 (internal quotation marks omitted) (quoting *Barker*, 407 U.S. at 531).

ACCA concluded that "the majority of the delays were the result of motions filed by Morris concerning his competency" and that the record did not "indicat[e] . . . unjustified delays or negligence . . . by the [s]tate." *Morris Direct II*, 60 So. 3d at 355. Accordingly, the ACCA weighed the reasons-for-delay factor against Morris. *Id.*

The ACCA acknowledged that "[a]n accused does not waive the right to a speedy trial simply by failing to assert it." *Id.* at 355 (internal quotation marks omitted) (citing *Barker*, 407 U.S. at 528). Still, the ACCA weighed this factor against Morris "[b]ecause [he] did not assert this right until the appeal from his first trial." *Morris Direct II*, 60 So. 3d at 356.

The ACCA also determined that "Morris ha[d] failed to show any prejudice as a result of th[e] delay." *Id.* The court observed that Morris had the burden to prove prejudice "because the

[s]tate [had] acted with due diligence in attempting to timely bring [him] to trial." *Id.* at 357 (citing *Doggett*, 505 U.S. at 647).

The ACCA pointed out that Morris "d[id] not present any specific example of . . . [witnesses with] diminished memor[ies]" because of the delay. *Id.* at 356. It took one of Morris's arguments head on and found that locating witnesses who had purportedly seen Morris at the Huddle House would "not negate his commission of the offense on the same night." *Id.* at 356. The ACCA also rejected as "conjecture based on more conjecture" Morris's assertion that he was prejudiced by difficulties related to access to Rochester's dog and an unidentified police witness, who may have had information to support Morris's blood-transfer-from-dog-to-shoe theory. *Id.* at 356-57. The ACCA concluded that Morris's statements of prejudice were "speculat[ive]" and inadequate to carry his burden. *Id.* at 357. The ACCA determined that conclusion that "no plain error" had occurred under the Sixth Amendment. *Id.*

> **2.     Even if AEDPA deference is inapplicable because of an unreasonable factual determination, Morris has not proven that the state violated his Sixth Amendment right to a speedy trial.**

To satisfy his AEDPA (d)(1) burden, Morris cites a mixture of federal and Alabama cases. He contends support his speedy trial claim. (*See generally* Docs. # 1 at 87-92; 27 at 69-71). But, the Supreme Court decisions that Morris cites share little similarity with the circumstances of his alleged speedy trial violation. (Doc. # 1 at 87-89 ¶¶ 226, 229, 231). *Barker*, *Doggett*, and *Strunk v. United States*, 412 U.S. 434 (1973), did not involve delays complicated by periods of the criminal defendant's incompetency to stand trial, treatment, evaluation, reevaluation, evidence of malingering, and restored competency. *Cf. Moore v. Arizona*, 414 U.S. 25, 26 (1973) (per curiam) (explaining, in vacating postconviction judgment denying speedy trial claim, that the *Barker*

110

assessment is not mechanical and, instead, requires a collective consideration of the "related factors . . . together with such other circumstances as may be relevant") (quoting *Barker*, 407 U.S. at 533).

Nor is *Barker* of any help to Morris. There, the Court rejected the petitioner's speedy trial claim because he did not want to be speedily tried. *See Barker*, 407 U.S. at 534 ("More important than the absence of serious prejudice, is the fact that *Barker* did not want a speedy trial."). The Supreme Court "emphasize[d] that failure to assert the right will make it difficult for a defendant to prove that he was denied a speedy trial." *Barker*, 407 U.S. at 532; *see also id.* at 536 (explaining that "barring extraordinary circumstances, [the Supreme Court] would be reluctant indeed to rule that a defendant was denied this constitutional right on a record that strongly indicates, as does this one, that the defendant did not want a speedy trial").

Although the Supreme Court recognized a speedy trial violation in *Doggett* (based on an over eight-year gap between the petitioner's indictment and arrest), unlike Morris, the petitioner there moved to dismiss the indictment before trial. *Doggett*, 505 U.S. at 650, 658. In *Struck*, the petitioner also sought speedy trial relief before the trial. *See Struck*, 412 U.S. at 435 ("Prior to trial, the [d]istrict [c]ourt denied a motion to dismiss the federal charge, in which petitioner argued that he had been denied his right to a speedy trial."). The record confirmed that the petitioner in *Doggett* was unaware of the indictment until his arrest. *See Doggett*, 505 U.S. at 653 ("The [g]overnment goes against the record again in suggesting that [the appellant] knew of his indictment years before he was arrested.").

Morris has also referenced district court cases involving speedy trial claims under AEDPA. (Docs. # 1 at 89-90 ¶ 233; 27 at 70). In one of those cases, *Rose v. Kirkegard*, No. CV 13-156-M-

111

DWM-JCL, 2015 WL 1912321, *report and recommendation adopted*, 2015 WL 1912321, at *4 (D. Mont. Apr. 27, 2015), the district court agreed with the magistrate judge's determination that AEDPA deference did not apply to the speedy trial claim. The magistrate judge recommended that the state supreme court's "resolution of the speedy trial claim was an unreasonable application of *Barker* . . . and was based at least in part on an unreasonable determination of the facts." *Rose*, 2015 WL 1912321, at *20; *see id.* at *21 ("Relief is not precluded on this claim because the standards of 28 U.S.C. § 2254(d)(1) and (2) are met."). The foundation of the AEDPA error in *Rose* was that the state court's "analysis omitted the trial court's responsibility for assuring that trial is held in a speedy manner," *id.* at *21 (citing *Barker*, 407 U.S. at 529), and "failed to account for . . . the prosecution and . . . trial court's share[d] responsibility for providing a speedy trial, *Rose*, 2015 WL 1912321, at *21. The district court agreed that "[f]urther proceedings" were necessary "to make a reliable de novo determination of" the speedy trial claim. *Rose*, 2015 WL 1912321, at *16; *see also id.* at *21 ("Because there was misattribution of delay and the record is silent on the reason for some lengthy periods of delay, and because the facts can significantly alter the 'difficult and sensitive balancing process' under *Barker*, further proceedings are required."). After a hearing and upon applying de novo review to a more developed record, the district court ultimately overruled the petitioner's objection and denied the speedy trial claim in a separate decision. *Rose v. Kirkegard*, No. CV 13-156-M-DWM-JCL, 2016 WL 3554962, at *2 (D. Mont. June 23, 2016), *aff'd*, 720 F. App'x 406 (9th Cir. 2018).

Morris argues that, similar to the AEDPA error identified in *Rose*, the ACCA disregarded the trial court's role in the speedy trial analysis. But *Rose* does not persuade this court that the ACCA unreasonably rejected Morris's Sixth Amendment claim. Even if the ACCA addressed the

reasons-for-delay factor unreasonably under Supreme Court precedent, fairminded jurists could debate the overall correctness of the ACCA's *Barker* balancing conclusion based on all the factors. For example, unlike the situation here, the petitioner in *Rose* expressed a desire to have a speedy trial. *See Rose*, 2015 WL 1912321, at *21 (D. Mont. Apr. 27, 2015) (The petitioner's "interest in a speedy trial despite his desire to defend himself was evidenced as early as July 12, 2002, contrary to the Montana Supreme Court's emphasis on [the] submissions to the trial court in the spring of 2003.") (citation omitted). And delay attributable to restoring and confirming the competency of the *Rose* petitioner to stand trial was not at issue in *Rose*.

Morris also cites *Nguyen v. Hoffman*, No. CV 13-6845 (MAS), 2015 WL 7306425 (D.N.J. Nov. 19, 2015), *aff'd sub nom. Nguyen v. Att'y Gen. of New Jersey*, 832 F.3d 455 (3d Cir. 2016). There, the speedy trial issue was the underlying basis for the petitioner's ineffective assistance claim. The district court denied that claim under AEDPA because the "petitioner [had] fail[ed] to establish the first prong of the [ineffective-assistance-of-counsel] test." *Nguyen*, 2015 WL 7306425, at *13. The district court's first-prong determination rested on a "reasonable" postconviction state court "conclu[sion], based on the trial court transcripts, that trial counsel did raise a speedy trial claim." *Id.* at *9.

Still, the district court in *Nguyen* was critical of the state courts' *Barker* analysis and described a "procedural history . . . fraught with delays . . . unexplained by the record, and . . . almost seven and a half years . . . [between] the indictment . . . [and] a conviction by guilty plea." *Nguyen*, 2015 WL 7306425, at *10; *see also id.* at *13 ("To conclude, had trial counsel been found to be ineffective in protecting [p]etitioner's speedy trial rights in the trial court, the [c]ourt might find that [p]etitioner was prejudiced by such ineffective assistance of counsel."); *id.* ("Indeed, if

this claim had been raised here as an independent sixth amendment speedy trial claim, the [c]ourt could very well find that a constitutional violation had occurred.").

Morris contends that the unexplained gaps in the *Nguyen* state procedural history resemble parts of the record in Morris's case and raise concerns that the ACCA applied the second factor unreasonably. But again, Morris's competency and malingering issues extended the period between his arrest and first trial, and he never expressed a speedy trial concern until direct review. The ACCA assessed these additional factors. The speedy trial dictum in *Nguyen* does not support an argument that the ACCA unreasonably rejected Morris's Sixth Amendment claim.

In a footnote, Morris references three Alabama decisions to support his argument that the six-year delay was presumptively prejudicial under *Barker*. (Doc. # 1 at 88 n.6). The ACCA determined that Morris met *Barker*'s triggering threshold. However, none of these authorities establishes that meeting the initial *Barker* step – without exception – equates to presumed prejudice under *Barker*'s fourth factor or a speedy trial violation. For example, in *Ex parte Walker*, 928 So. 2d 259 (Ala. 2005), a more than four-year delay between an indictment and the appellant's plea triggered the *Barker* analysis. *See Walker*, 928 So. 2d at 264 ("A finding here of presumptive prejudice is supported by Alabama case law."); *id.* at 265 ("[B]ecause the length of delay in [the appellant]'s case is presumptively prejudicial, we examine the remaining *Barker* factors."). Nonetheless, the Alabama Supreme Court rejected the contention that "because the first three *Barker* factors weighed in [the appellant's] favor, she did not have to prove the fourth factor—that she was prejudiced by the delay." *Walker*, 928 So. 2d at 262. The Alabama Supreme Court reached this conclusion even though, before her conviction, the appellant had moved for a speedy trial dismissal and reconsideration of the trial court's denial of that motion. *Id.* at 265.

114

Turning to the second factor, the Alabama Supreme Court weighed the delay against the state and categorized the conduct as negligent. *Id.* As for the third factor, the Alabama Supreme Court determined that the appellant's post-arrest pretrial motion weighed in her favor. *Id.* at 266. However, the Alabama Supreme Court discounted the strength of that weight because the record was unclear "whether [the appellant] knew of the pendency of the indictment during the three years between her indictment and her arrest." *Id.* As the state appellate court pointed out, "in determining whether to presume prejudice under the fourth *Barker* factor, courts have emphasized [the importance of] the accused's ignorance of outstanding charges during the period from indictment until arrest." *Walker*, 928 So. 2d at 266 (citing *Doggett*, 505 U.S. at 653-54). The Alabama Supreme Court noted that "in a case involving delay caused by negligence on the part of the state, the third factor usually will weigh more heavily in the accused's favor when there is affirmative proof of the accused's ignorance of the charges against her during the delay." *Walker*, 928 So. 2d at 266. Because of uncertainty within the *Walker* record about the appellant's prior notice, the Alabama Supreme Court did not weigh the third factor in her favor "as heavily as it would [have] if the record affirmatively showed that she did not know of the charges during the time from her indictment until her arrest." *Id.*

Assessing the fourth factor, the Alabama Supreme Court "examine[d] whether and to what extent the delay has prejudiced the [appellant]." *Id.* at 267. The appellant in *Walker*, similar to Morris's position here, argued that the "delay . . . caused her to suffer this third and most serious type of harm—the impairment of her defense." *Id.* She asserted that she was not required to show actual prejudice. *Id.* The Alabama Supreme Court acknowledged that "to prevail on a speedy-trial claim, not every accused must prove actual prejudice." *Id.* (citing *Doggett*, 505 U.S. at 655). But

the court disagreed with the appellant's contention that "any weighting of the first three *Barker* factors in her favor automatically relieve[d] her of the burden of demonstrating actual prejudice caused by the delay." *Id.* The court analyzed *Doggett* in detail and determined the appellant's "case occupie[d] th[e] middle ground between bad faith and reasonable diligence [as discussed in *Doggett*]—the [s]tate's negligence delayed her case for approximately 50 months." *Walker*, 928 So. 2d at 268 (internal quotation marks omitted).

The Alabama Supreme Court distinguished the conclusion of presumed prejudice reached in *Doggett* for several reasons. *Walker*, 928 So. 2d at 269. First, the appellant's three-year delay for arrest and four-year delay for a guilty plea were considerably less than the eight and a half years suffered in *Doggett*. *Walker*, 928 So. 2d at 269. Second, unlike the petitioner in *Doggett*, the appellant had not proven that she lacked knowledge of her indictment before her arrest. *Walker*, 928 So. 2d at 269. Third, though not committing to "a bright-line rule," the Alabama Supreme Court observed "that the four-year-and-two-month delay in [the appellant]'s case [wa]s well within the five-year time period generally established by federal cases for presuming prejudice" based on negligent delay. *Id.* at 270. Thus, the Alabama Supreme Court refused to presume prejudice under the *Barker* balancing test in part because of certain key circumstances in play in *Walker*, which it concluded distinguished *Walker* from the record supporting a finding of presumed prejudice present in *Doggett*.

There was a delay of six years in Morris's case, which falls outside the general range of five years identified in *Walker*. Nevertheless, Morris's competency issues significantly contributed to this delay. Morris also failed to assert a speedy trial right and that weighs heavily against him. *Walker* therefore does not persuade this court that the ACCA rejected Morris's speedy trial claim

unreasonably, under either *Barker* or *Doggett*.

In *Vincent v. State*, 607 So. 2d 1290 (Ala. Crim. App. 1992), the ACCA determined that a delay of "slightly over two and one-half years" triggered a speedy trial analysis. *Id.* at 1292. But the ACCA did not presume prejudice under the *Barker* fourth factor or resolve the speedy trial claim in the appellant's favor after "[w]eighing all of the *Barker* factors." *Id.* at 1294. Notably, the appellant's competency to stand trial was not a factor in the delay. *Vincent* therefore does not advance Morris's (d)(1) burden either.[6]

Thus, Morris's cited authorities do not establish that the ACCA committed AEDPA error in rejecting his speedy trial claim generally or declining to presume prejudice under *Barker*'s fourth prong specifically. Eleventh Circuit authority reinforces this court's conclusion that no (d)(1) error occurred with Morris's claim. *See Ringstaff v. Howard*, 885 F.2d 1542, 1544-45 (11th Cir. 1989) ("The courts should not lightly dispense with the actual prejudice requirement because to do so necessarily results in the 'severe remedy of dismissal of the indictment.'" (quoting *Barker*, 407 U.S. at 522)); *Ringstaff*, 885 F.2d at 1545 (declining to presume prejudice in the absence of "the three *Barker* factors . . . weigh[ing] *heavily* against the [g]overnment" and affirming denial of habeas relief for lack of actual prejudice); *cf. United States v. Ingram*, 446 F.3d 1332, 1338 (11th Cir. 2006) (dispensing with "the requirement . . . [of] demonstrat[ing] actual prejudice" because

---

[6] The remaining Alabama case, included by Morris in a footnote, offers little insight into the *Barker* analysis. (Doc. # 1 at 88 n.6); *see Mansel v. State*, 716 So. 2d 234, 237 (Ala. Crim. App. 1997) ("remand[ing] to the trial court with directions for that court to conduct an evidentiary hearing on the appellant's motion to dismiss the indictment based on the alleged violation of his right to a speedy trial"). Morris also mentions *Ex parte Blake*, 469 So. 2d 1301 (Ala. 1985), in his discussion of *Barker*'s fourth factor. (Doc. # 1 at 91 ¶ 238). In that case, the Alabama Supreme Court did not presume prejudice and dispensed with actual prejudice, despite there being an intentional delay longer than a year for the state "to perfect its trial strategy." *Blake*, 469 So. 2d at 1303; *see id.* ("Petitioner asks us to assume prejudice under the circumstances of this case. This we cannot do."). Like Morris's other cited authorities, in *Blake*, there was no issue of a delay associated with competency concerns in the speedy trial analysis.

"each of the first three factors in the *Barker* test weigh heavily against the [g]overnment").

In sum, Morris has not shown that the ACCA's determination that he had to establish actual prejudice was contrary to or an unreasonable application of *Barker* or *Doggett*. Likewise, Morris has not shown that the ACCA's overall balancing of the *Barker* factors amounted to clearly established error under (d)(1).

Morris's (d)(2) argument presents a closer call. Morris contends that "the state court unreasonably applied the evidence putting the blame on [Morris] for th[e] delay, particularly [given] the prosecution's own concession that it was at least partially responsible." (Doc. # 27 at 70) (emphasis omitted). Morris recounts that the case involved "at least eight different prosecutors and three different judges," "[t]he state failed to commit [him] for two weeks after the initial competency hearing, and [t]he trial court . . . did not hold a competency hearing until almost eleven months after [he] was diagnosed." (*Id.*). Based on this evidence, Morris contends that "[n]o reasonable jurist could reach [the ACCA's] . . . conclusion" that the record did not "'indicat[e] . . . unjustified delays or negligence'" by the state. (Doc. # 27 at 70) (quoting *Morris Direct II*, 60 So. 3d at 355). Morris adds that "the state court's unreasonable decision to blame . . . Morris for the delay . . . plagued its evaluation of prejudice" and prevented him from having the benefit of presumed prejudice under *Barker*'s fourth factor. (*Id.* at 71).

The court assumes without deciding that Morris's (d)(2) challenge to the *Barker* second factor is valid because of an unreasonable factual determination (and, if applicable, the clear and convincing evidence within the record, which overcomes the presumption of correctness under (e)(1)). The court also accepts for analysis purposes that Morris's (d)(2) challenge of *Barker*'s second factor removes AEDPA deference from the ACCA's entire analysis of his speedy trial

claim. However, even given these assumptions, and even applying de novo review, Morris's habeas claim still fails.

Under *Ringstaff* and *Ingram*, dispensing with the actual prejudice element is inappropriate unless the first three factors weigh heavily in Morris's favor. Reviewing de novo, the court finds only one of the first three factors weighs heavily in Morris's favor. The six-year delay weighs strongly in Morris's favor. But his failure to assert a speedy trial claim during that extended period weighs strongly against him. The court considers the weight assigned on the third factor to be neutral and, even if favorable to Morris, certainly not heavily in his favor given the pretrial competency proceedings within his capital case.

This neutral approach on this factor makes sense for several reasons. To the extent that the prosecutors and the trial court were negligent in moving too slowly, Morris contributed to the delay, too. He did not seek a trial continuance for psychiatric review until February 1999, which was one year after his arrest. And the time spent attributable to obtaining expert opinions, sending Morris for treatment at Taylor Hardin, and confirming Morris's competency to stand trial were, without question, constitutionally necessary. Thus, the court considers the delays associated within the substantive question of Morris's competency (rather than calendar gaps with the state's control) to favor the state.

Morris also maintains that the ACCA's assignment of four years to him to address his competency was excessive, and he has identified roughly one year of delay attributable to the state. Thus, even under Morris's requested recalculation of the third factor, he and the state would split the six-year delay into three years each.

As for the fourth factor, Morris's case is unlike the extraordinary circumstances in *Doggett*. He does not contend that presumed prejudice applies for some other extraordinary reason. *See Barker*, 407 U.S. at 536 ("There may be a situation in which the defendant was represented by incompetent counsel, was severely prejudiced, or even cases in which the continuances were granted ex parte."). So, under *Ringstaff* and *Ingram*, he must show actual prejudice for this factor to weigh in his favor. However, as the ACCA determined, Morris has merely speculated about possible prejudice; he has failed to prove actual prejudice. Therefore, the fourth factor weighs heavily in the state's favor and the overall *Barker* balancing does not support Morris's speedy trial arguments on habeas review. Even without factoring in AEDPA's deferential constraints, Morris has not proven a speedy trial violation.

### 3.    Morris's remaining allegations do not support habeas relief.

Having addressed the Sixth Amendment analysis, the court turns to the rest of Morris's speedy trial claim in which he asserts (without elaboration) that his allegations support a cognizable constitutional right under the Fifth, Eighth, and Fourteenth Amendments. (Doc. # 1 at 92 ¶ 240). Morris made similar assertions on direct review. (Doc. # 15-52 at 97). But the authorities he cited there focused on the Sixth Amendment, and he did not develop a right to relief legally or factually under the Fifth, Eighth, or Fourteenth Amendment (beyond the incorporation doctrine). (Docs. # 15-52 at 91-97; 15-53 at 32-36); *see Klopfer v. N. Carolina*, 386 U.S. 213, 223 (1967) (applying the Sixth Amendment's "fundamental" speedy trial right to the states through the Fourteenth Amendment).

This approach raises significant questions about whether Morris fairly presented his collateral allegations to the ACCA as a claim unrelated to the Sixth Amendment. If Morris did not

fairly present those other theories, and absent Respondent's express waiver on habeas review, then a dismissal of Morris's habeas claims under the remaining amendments is appropriate based on the principles applicable to unexhausted procedural default.

In addition to the exhaustion issue, Morris's conclusive allegations do not warrant relief under the heightened pleading rule applicable to habeas claims. *Hittson v. GDCP Warden*, 759 F.3d 1210, 1265 (11th Cir. 2014) ("generalized allegations [] do not satisfy Rule 2(c)'s requirements"); *see Reynolds v. Dunn*, No. 4:18-CV-00236-RDP, 2022 WL 895947, at *29 (N.D. Ala. Mar. 25, 2022) ("The mere assertion of a ground for relief, without sufficient factual detail, does not satisfy either the petitioner's burden of proof under 28 U.S.C. § 2254(e)(1) or the requirements of Rule 2(c)" (citing Rule 2(c), Rules Governing Section 2254 Cases in the United States District Courts)). Thus, the court denies Morris's habeas claim that the state's trial delay violated his rights under the Fifth, Eighth, or freestanding Fourteenth Amendment because it was inadequately pled.

Alternatively, Morris has the burden of establishing a right to habeas relief under these remaining amendments, and his bare allegations do not suffice. Therefore, the court denies Morris's attempt to obtain habeas relief tied to an alleged violation of any Fifth, Eighth, or freestanding Fourteenth Amendment right as abandoned, underdeveloped, or unproven. *See, e.g.*, *Tharpe*, 834 F.3d at 1323, *Krasnow*, 484 F. App'x at 427, *Jernigan*, 341 F.3d at 1273, and *U.S. Steel Corp.*, 495 F.3d at 1272. For all of these reasons, the court denies Claim G.

### F.    Claim H—Morris has not demonstrated a right to habeas relief due to the trial court's failure to hold a new competency hearing.

Morris next contends that the trial court's failure to hold a competency hearing regarding his ability to stand trial violated his due process rights under the Fourteenth Amendment. (Doc. #

121

1 at 93 ¶ 241). Morris argues that the state courts' denial of this postconviction claim was contrary to or unreasonable under AEDPA's (d)(1) and (d)(2) standards. (Doc. # 1 at 94-95 ¶ 246). Respondent answers that the Alabama courts reasonably denied this collateral claim because it was inadequately pled under Alabama Appellate Procedure Rule 32.6(b). (Doc. # 21 at 29-30 ¶ 82).

Again, Morris fails to satisfy his AEDPA burden. The court summarizes the state courts' assessment of Morris's competency claim and then addresses his claims under AEDPA.

### 1.      State Court Proceedings

In order to be competent to stand trial, a criminal defendant must have a "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding." *Dusky v. United States*, 362 U.S. 402, 402 (1960) (per curiam) (internal quotation marks omitted); *cf. also* Ala. R. Crim. P. 11.1 (defining a defendant's "mental incompeten[cy] to stand trial"). The competency standard asks "whether [the defendant] has a rational as well as factual understanding of the proceedings against him." *Dusky*, 362 U.S. at 402; *cf. also* Ala. R. Crim. P. 11.1 (defining a defendant's "mental incompeten[cy] to stand trial").

In his state court Rule 32 petition, Morris alleged that "[o]n information and belief, it appear[ed] that [he] may have met [Alabama's incompetency] standard, but was deprived of his right to [prove] so due to the [trial] [c]ourt's failure to solicit medical expert[] opinions on [his] competency . . . and . . . inability to assist . . . [counsel] during . . . [the] trial and sentencing." (Doc. # 15-57 at 10-11). Morris also asserted that because he "was potentially found guilty of capital murder and sentenced to death while he was incompetent to stand trial, . . . his conviction and death sentence [we]re invalid under the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution." (*Id.* at 11).

122

Citing Rules 32.3, 32.6(b), and 32.7(d), the Rule 32 court denied Morris's mental incompetency claim. (Doc. # 15-56 at 49-50). These state law rules address burden and pleading requirements for Alabama postconviction proceedings. Under Alabama Appellate Procedure Rule 32.3, "[t]he petitioner . . . ha[s] the burden of pleading and proving by a preponderance of the evidence the facts necessary to [obtain] . . . relief." Ala. R. App. P. 32.3. Alabama Appellate Procedure Rule 32.6(b) requires a petitioner to allege "a clear and specific statement of the grounds upon which relief is sought" for each claim and "includ[e] a full disclosure of the factual basis of those grounds." Ala. R. App. P. 32.6(b). And, Alabama Appellate Procedure Rule 32.7(d) permits a circuit court to "either dismiss . . . or grant leave to" amend a petition, which "is . . . [in]sufficiently specific[] or . . . precluded, . . . fails to state a claim, or [has] no material issue of fact or law[,] . . . which would entitle the petitioner to relief . . . [such] that no purpose would be served by any further proceedings." Ala. R. App. P. 32.7(d).

The Rule 32 court pointed to several deficiencies, including that Morris had alleged "at most, that he [wa]s potentially incompetent." (Doc. # 15-56 at 49 ¶ 114) (internal quotation marks omitted). The court explained that this type of speculation was inadequate to satisfy his "burden of persuading the court that a reasonable and bona fide doubt exist[ed]" regarding his competency in 2008. (*Id.* ¶ 115) (internal quotation marks omitted). The Rule 32 court also found that Morris's allegations about the need for "additional medical expert testimony" lacked specificity because he did not "identify the expert" or describe the unidentified expert's anticipated testimony. (*Id.* at 50 ¶ 117). The court noted the handwriting evidence from the 2007 *Atkins* hearing that substantiated Morris's ability to "prepare[] and file[] handwritten court documents" and undermined his incompetency allegations. (*Id.*). The Rule 32 court determined that Morris's reference to

123

"treatment with antipsychotic medication" without more detail could not establish his entitlement to an evidentiary hearing on the question of competency. (*Id.*). Given these findings, the Rule 32 court summarily dismissed Morris's incompetency claim and denied his request for an evidentiary hearing under Rule 32.7. (Doc. # 15-56 at 50 ¶¶ 117-18).

Morris appealed the Rule 32 court's summary disposition of his incompetency claim. *Morris Collateral*, 261 So. 3d at 1197. He "argue[d] . . . [that] he [had] ple[d] [the claim] with specificity [given the allegation] that at the time of the third trial he 'potentially met' the standard of incompetency to stand trial." *Morris Collateral*, 261 So. 3d at 1196. Morris also asserted "that the circuit court should have ordered a new competency hearing so that he could present evidence . . . [of his incompetency] at the time of . . . trial and sentencing." *Id.*

The ACCA agreed with the Rule 32 court that "[s]ummary dismissal of th[e] [incompetency] claim was proper." *Id.* at 1197; *see id.* ("The circuit court did not commit error when it dismissed this claim."). The ACCA revisited the court's findings that "Morris [had] failed to plead specific facts that, if true, would have established that he was entitled to a competency hearing, that he was actually incompetent, or that he was entitled to relief." *Id.* at 1196-97. The ACCA noted that "Morris alleged only that he might have been incompetent to stand trial and that he was 'potentially' incompetent to stand trial when he was convicted and sentenced to death." *Id.* at 1197. The ACCA also concluded that Morris's "bare allegation of potential error, unsupported by any factual basis," did not "satisfy either" Rule 32.3's pleading burden or Rule 32.6(b)'s specificity requirement. *Id.* Citing to Alabama case law, the ACCA explained that Rule 32.6(b) requires a petitioner to "disclose . . . facts," and not "conclusion[s,] which, if true," establish a right to collateral relief. *Morris Collateral*, 261 So. 3d at 1197 (internal quotation marks omitted). And,

124

"even accepting every allegation in [the] petition as true," the ACCA could not say that collateral

relief was appropriate given the "[un]disclos[ed] . . . factual basis of [Morris's] claim." *Id.* (internal

quotation marks omitted).

### 2. Morris has not satisfied his AEDPA deferential burden on his incompetency claim.

A state court summary dismissal of an inadequately stated Alabama collateral claim is due

deferential treatment under AEDPA. *See, e.g.*, *Powell v. Allen*, 602 F.3d 1263, 1273 (11th Cir.

2010) (per curiam) (recognizing that "AEDPA limits [the] review to whether the state court's

determination that [the petitioner] failed to plead sufficient facts in his Rule 32 petition to support

a [constitutional] claim . . . was contrary to or an unreasonable application of Supreme Court

precedent" and "review[ing] the Rule 32 court's rejection of [the petitioner's constitutional] claim

[under Rule 32.6] as a holding on the merits").

Given the AEDPA deference due on this claim, Morris relies on Supreme Court and

Eleventh Circuit precedent to meet his (d)(1) burden: *Pate v. Robinson*, 383 U.S. 375 (1966),

*Drope v. Missouri*, 420 U.S. 162 (1975), and *Wright v. Fla., Sec'y, Dep't of Corr.*, 278 F.3d 1245

(11th Cir. 2002). (Docs. # 1 at 93 ¶¶ 241-42, 244; 27 at 71). Importantly, only *Wright* involves a

competency claim reviewed under AEDPA deference. Thus, in *Pate* and *Drope*, the Supreme

Court did not discuss whether the state courts in these cases unreasonably denied a competency

claim. Still, the court examines each authority contextually to determine whether Morris's alleged

circumstances sufficiently overlap in assessing whether the ACCA unreasonably rejected his

incompetency claim under AEDPA.

In *Pate*, the Supreme Court began its habeas analysis by revisiting two core due process

principles: (1) "the conviction of an accused person while he is legally incompetent violates due

process," and (2) "state procedures must be adequate to protect this right." *Pate*, 383 U.S. at 378

(citing *Bishop v. United States*, 350 U.S. 961 (1956)). The *Pate* Court held that the trial court's

failure to hold a competency hearing in light of the "uncontradicted testimony of [the petitioner]'s

history of pronounced irrational behavior" deprived him "of his constitutional right to a fair trial."

*Id*. at 385-86; *see id.* at 386 (concluding that the petitioner's "failure to receive an adequate hearing

on his competence to stand trial" "abridged his constitutional rights" and entitled him to habeas

relief).

The evidence of the *Pate* petitioner's "long history of disturbed behavior" included him

hearing voices, receiving hospitalized psychiatric treatment, being in a "daze" and "com[ing] back

just as fresh," terrorizing his wife, shooting and killing his 18-month-old son, "attempt[ing] suicide

by shooting himself in the head," and engaging in other acts of physical violence. *Id.* at 378-82

(internal quotation marks omitted). Additionally, "[f]our defense witnesses expressed the opinion

that [the petitioner] was insane, and his counsel "throughout the proceedings insisted that [the

petitioner]'s present sanity was very much in issue." *Id.* at 383-84. Given this record, the *Pate*

Court rejected the state's determination that the petitioner had "intelligently waived th[e] issue by

his failure to request a hearing on his competence at the trial; and further, that on the basis of the

evidence before the trial judge no duty rested upon him to order a hearing sua sponte." *Id.* at 378.

In *Drope*, the Supreme Court faced the question of "whether [under the Fourteenth

Amendment] the proceedings [regarding the petitioner's mental competency] were consistent with

[his] right to a fair trial." 420 U.S. at 173. The Court reversed the state court postconviction

judgment that the petitioner had "fail[ed] to show that during trial[,] [he] had acted in a manner

that would cause the trial court to doubt his competence." *Id.* at 178, 183. Applying a non-

deferential habeas analysis, the Supreme Court determined that "the . . . [state courts had] fail[ed] to give proper weight to the information suggesting incompetence which came to light during trial." *Id.* at 179. This information included "the testimony of the petitioner's wife[,] that on the Sunday prior to trial he [had] tried to choke her to death" and "repeated and confirmed information contained in the psychiatric evaluation attached to petitioner's motion for a [trial] continuance," as well as the petitioner's absence in the courtroom after an attempted suicide with a firearm the morning following the first day of trial. *Id.* at 166, 178-79. The *Drope* Court held that a combination of the petitioner's psychiatric pretrial information, his wife's trial testimony, and his midtrial suicide attempt "created a sufficient doubt of [his] competence to stand trial to require further inquiry on the question." *Id.* at 180. The Supreme Court added that the "[s]tate [wa]s free to retry [the] petitioner, assuming, of course, that at the time of such trial he is competent to be tried." *Id.* at 183.

Neither *Pate* nor *Drope* are factually similar to this case. Morris was not found to have waived his right to raise competency. Indeed, his counsel raised the argument and he was evaluated, initially found incompetent, later restored, and then tried.

Nor is the Eleventh Circuit's decision in *Wright* of any help to Morris. In *Wright*, the Circuit affirmed the district court's denial of the petitioner's due process challenge under AEDPA based on the trial court's failure to hold a competency hearing. 278 F.3d at 1257. The petitioner did not request a competency hearing but did move to develop evidence of his incompetency to stand trial, but the state trial court denied that request. *Id.* at 1249. The petitioner did not succeed at trial in asserting an insanity defense to the armed robbery and felony murder charges. *Id.* at 1249, 1251.

The evidence supporting a finding that the petitioner was incompetent included a diagnosis of "schizophrenia, which in an earlier criminal case had caused him to be judged mentally incompetent" and "adjudicated not guilty by reason of insanity." *Id.* at 1257. On habeas review, expert testimony confirmed that the petitioner was "actively psychotic at the time of the crime," which had occurred five months before the trial. *Id.* However, the petitioner's habeas claim was undercut in part due to his "restored" competency following treatment in a hospital, several other trials in which there was not a finding (nor a suggestion) that he was mentally incompetent, his assistance of other inmates in the prison law library, his generally good behavior and normal interactions with others leading up to the felony murder trial, and the lack of expert testimony confirming his incompetent status at the time of the pretrial evaluation or at trial. *Id.* at 1250-51, 1257.

The Eleventh Circuit determined that "the state appellate court's rejection of [the petitioner]'s procedural due process claim implicitly reflect[ed] a conclusion that all of the facts considered together were not sufficient to raise a bona fide doubt as to the petitioner's competence to stand trial." *Id.* at 1257. The Circuit added that because the state court "conclusion [wa]s not objectively unreasonable, the district court did not err in denying habeas relief to [the petitioner] on this claim." *Id.*

The competency cases Morris cites do not support his assertion that the state courts unreasonably applied binding precedent in rejecting his speculative claim. For example, unlike the petitioners in *Pate* and *Drope*, Morris's claim of his incompetence to stand trial in 2008 lacks allegations of psychiatric or lay witness support, attempted suicide, violence against others, or information revealed during the trial that would have casted "a sufficient doubt" on his

competency.

Instead, expert testimony at the *Atkins* hearing refuted Morris's postconviction allegations of his potential incompetency in 2008. (Doc. # 15-28 at 194). Dr. Shealy, Morris's expert, acknowledged the prior "question" in the first trial about Morris's competency in 2003. (*Id.*). Still, Dr. Shealy gave an expert opinion that Morris was competent. (*See* Doc. # 15-28 at 194) ("I concluded that I believed that [Morris] was competent. In my opinion [Morris] had the psychological characteristics that would lead to a likely judicial finding of competency to stand trial.").

The *Wright* court's decision reinforces the point that the standards applicable to an incompetency claim under de novo review and those that apply under AEDPA are vastly different. *See Wright*, 278 F.3d at 1256 (Eleventh Circuit explaining that whether it "would have reached the same result as the state court if . . . deciding the issue in the first instance" was not the relevant inquiry; rather, the correct inquiry is whether "the state court's decision of the issue [wa]s objectively unreasonable"). Additionally, *Wright* makes it clear that a medical diagnosis which supported a prior period of incompetency does not mean that a state court's denial of claimed incompetency for a later time frame was unreasonable. *Id.* at 1257 ("There was plenty of unrebutted testimony indicating that, whatever may have been his condition on other occasions, [the petitioner] was mentally competent during the period immediately leading up to the trial.").

Thus, Morris has not satisfied (d)(1)'s unreasonable application clause. And given the ACCA's reference to *Dusky* in its due process analysis, *Morris Collateral*, 261 So. 3d at 1196, and the materially distinguishable facts in the authorities Morris cites, he has not met (d)(1)'s contrary to clause either. *See Wright*, 278 F.3d at 1256 ("The clearly established federal law on this issue,

as determined by the Supreme Court, is set out in *Drope*[,] . . . *Pate*[,] . . . and *Dusky*.").

Morris's attempt to detach AEDPA deference under (d)(2) is also off the mark. Granted, the state's handwriting expert, who testified at the *Atkins* hearing, ascertained only that Morris had signed a collection of documents filed in state and federal court. (Doc. # 15-30 at 79-80). As to the contents of those documents, the expert's analysis was "inconclusive." (*Id.* at 65) (internal quotation marks omitted). The expert testified that "[t]he reason [for that] was . . . [because] the handwriting standard provided to by . . . Morris was written in an unnatural and more deliberate than a natural manner." (*Id.* at 66) (internal quotation marks omitted). The expert was also able to confirm that the "same person" authored the documents. (*Id.* at 80) (internal quotation marks omitted). Thus, the evidentiary record does not support the circuit court's finding that a "handwriting expert testified that Morris had prepared and filed handwritten court documents." (Doc. # 15-56 at 50 ¶ 117).

But other evidence introduced at the *Atkins* hearing supports the finding. For example, (1) Morris's "malingering [on] his lack of legal understanding"—which the circuit court expressly referenced—and (2) the testimony of Dr. Shealy refuted Morris's collateral allegations of potential incompetency. Morris has not identified evidence in the record to counter Dr. Shealy's competency conclusion. Thus, Morris has not shown that the ACCA unreasonably affirmed the Rule 32 court's denial of this claim under (d)(2). Moreover, Morris has not met his AEDPA (d)(2) burden by pointing to clear and convincing evidence that rebuts the presumptively correct state court findings (again, to the extent that § 2254(e)(1) applies here). *See* 28 U.S.C. § 2254(e)(1) ("The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."). Alternatively, even accepting that Morris meets his AEDPA (d)(2) burden here, he

has not proven a de novo right to relief on the basis of incompetency.

Thus, Morris has not met his AEDPA burden on this claim.

### G.    Claim I—Morris has not demonstrated a right to habeas relief because of how the trial court treated him on the stand.

Morris maintains that the trial court admonished him unfairly during the guilt phase and in the jury's presence to avoid using inadmissible hearsay while testifying about his arrest. Morris asserts this misguided instruction "diminished [his] credibility with the jury" and violated his Fifth, Sixth, Eighth, and Fourteenth Amendment rights. (Doc. # 1 at 95 ¶ 247). And, Morris contends that the ACCA's rejection of this claim cannot be sustained under (d)(1) and (d)(2). (*Id*. at 100 ¶ 258). Respondent answers that the ACCA appropriately rejected this as harmless error. (Doc. # 21 at 32 ¶ 89).

#### 1.    State Court Proceedings

During the guilt phase of the third trial, the trial court sustained several hearsay objections and at other times interrupted Morris without an objection to prevent him from testifying about what the arresting officer told him. (Docs. # 1 at 96 ¶ 249; 15-23 at 18-21). During one of those instances, the trial court commented in the jury's presence that "[t]his is not an opportunity to get up here and make a speech." (Doc. # 15-23 at 20). The trial court and trial counsel reminded Morris to "[j]ust say what happened . . . not what was said." (*Id.*). Morris did not object to these admonitions at trial.

However, Morris raised the issue on appeal. Citing *United States v. Carter*, 491 F.2d 625 (5th Cir. 1974),[7] and *United States v. Sheldon*, 544 F.2d 213 (5th Cir. 1976), he argued to the

---

[7] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

ACCA that the trial court's actions "prejudiced [his] ability to receive a fair trial" in violation of his Fifth, Sixth, Eighth, and Fourteenth Amendment rights. (Doc. # 15-52 at 104-07). In *Carter* and *Sheldon*, the appellants argued that an error by the trial court required a reversal of their federal convictions. *Carter*, 491 F.2d at 626; *Sheldon*, 544 F.2d at 214. In both cases, the Fifth Circuit agreed. *See Carter*, 491 F.2d at 630 ("The trial court's exclusion of that account [as inadmissible hearsay] was reversible error."); *Sheldon*, 544 F.2d at 219 (concluding that the trial court's "interruptions by cross-examination and comment . . . . must necessarily have been understood by the . . . jury to indicate a belief by the trial judge that the defense was without merit or that the defendants and their witnesses were worthy of scant belief") (citation omitted).

Reviewing for plain error, the ACCA focused on whether the trial court's hearsay concerns about Morris's testimony were valid under Alabama law. The ACCA determined that any incorrect "omission" of what the arresting officer told Morris was harmless. *Morris Direct II*, 60 So. 3d at 360-61. The ACCA based its harmlessness conclusion on the lack of any "indication" that the trial court's instructions "limited [the substance of] Morris's testimony" or "probably affected" his substantial rights. In its analysis, the ACCA did not discuss any constitutional claims or federal decisions. With this state trial and direct appellate court history in mind, the court turns to the habeas record.

> **2.    Even if AEDPA deference is inapplicable because of a contrary application of Supreme Court precedent, Morris has not proven that the trial court's limited interruptions violated his constitutional rights.**

Morris asserts that the trial court's interruptions were unconstitutional under the Fifth, Sixth, Eighth, and Fourteenth Amendments. (Doc. # 1 at 95 ¶ 247). Morris maintains that the trial court's actions "created the [false] impression that [he] was uncooperative," led him to give

disjointed testimony, and that the actions diminished his credibility with the jury, "the key to his defense." (*Id*. at 96-97 ¶¶ 249-51). Morris argues that "the trial court's [conduct] w[as] particularly misleading" because of his "inability to fully understand the instructions . . . due to his intellectual disability." (*Id*. at 97 ¶ 250).

Comparing the records of his more recent capital cases, Morris contends that, because his second trial did not involve such "mistreatment," it "ended in a hung jury" (as opposed to the jury's guilty verdict in his third trial). (Doc. # 27 at 72-73). According to Morris, this undermines the ACCA's determination that "his substantial rights were not probably affected by the[] restrictions" on his testimony. (*Id*. at 72) (internal quotation marks omitted).

Morris also faults the ACCA for focusing on whether the hearsay interruptions were plain error under Alabama law and omitting a constitutional assessment. (*See* Doc. # 1 at 98 ¶ 253) ("[T]he state courts refused to even consider the impact of the trial court's admonitions on . . . Morris's credibility, instead opting to treat the argument as merely a claim about hearsay."). Morris claims that Respondent "does not even dispute this claim on the merits." (Doc. # 27 at 72). The thrust of Morris's AEDPA argument is that the ACCA did not address the constitutional claim and therefore its decision conflicts with (d)(1)'s first clause. Because of the ACCA's silence on the constitutional component of Morris's claim, the court assumes for purposes of its analysis that Morris meets (d)(1)'s contrary to clause and applies de novo review. *See Williams*, 529 U.S. at 406 (observing that if a state court reaches a contrary to outcome, then "a federal court will be unconstrained by § 2254(d)(1)"); *Romine*, 253 F.3d at 1365 (recognizing that a state court's "[f]ailure to apply . . . governing [federal] law (or the same rule in state law) is tantamount to applying a rule that contradicts governing law" under § 2254(d)(1) and applying de novo review);

*cf. Chapman v. California*, 386 U.S. 18, 22-23 (1967) (comparing state harmless-error rules "[i]n fashioning a harmless-constitutional-error rule").

"A federal court may not issue [a] writ [of habeas corpus] on the basis of a perceived error of state law." *Pulley v. Harris*, 465 U.S. 37, 41 (1984). Additionally, "[a] petitioner has the burden of establishing his right to federal habeas relief and of proving all facts necessary to show a constitutional violation." *Romine*, 253 F.3d at 1357 (citations omitted). To support the constitutional nature of his habeas claim, Morris references: *In re Murchison*, 349 U.S. 133 (1955); *Quercia v. United States*, 289 U.S. 466 (1933); *Rock v. Arkansas*, 483 U.S. 44 (1987); and *Carter*, 491 F.2d at 630. The court considers the context of each of these federal authorities below.

Morris cites *Murchison* for the core principle that "[a] fair trial in a fair tribunal is a basic requirement of due process." 349 U.S. at 136; (Doc. # 1 at 95 ¶ 248). But, the Supreme Court's due process holding in *Murchison* is unrelated to any alleged compromised testimony and credibility attributable to judicial interruptions over an evidentiary issue arising under state law. Rather, the *Murchison* Court held that the due process clause prohibits the same trial judge from both holding a secretive contempt proceeding and presiding over the later hearing on the contempt charges. 349 U.S. at 134, 139. Thus, *Murchison* does not substantiate the validity of Morris's constitutional claim.[8]

Similarly, in *Rock* the Supreme Court did not consider whether a trial court's exhortations were unconstitutional. Instead, the Court examined the constitutional impact of a "*per se* rule excluding all posthypnosis testimony" in relation to an accused's right to testify. *Rock*, 483 U.S.

---

[8] This also means that if AEDPA (d)(1) deference does apply to this claim, Morris would be unable to overcome that hurdle based on *Murchis*on.

at 62. The *Rock* Court recognized that "[t]he right to testify on one's own behalf at a criminal trial has sources in several provisions of the Constitution," including the Fifth Amendment, the Sixth Amendment, and the free-standing Fourteenth Amendment due process. *Id*. at 51-53; (Doc. # 1 at 95 ¶ 248). Without linking its holding to any specific amendment, the Court concluded that the state exclusionary rule "infringe[d] impermissibly on the right of a defendant to testify on his own behalf." *Id*. at 62 & n.20. Unlike *Rock*, Morris was not prevented from testifying about the events of his arrest at his trial. Rather, the way he could explain how the arrest unfolded to the jury was restricted to non-narrative, non-hearsay statements. Consequently, Morris's reliance on *Rock* does not establish a constitutional violation, much less to a right to habeas relief under AEDPA.

Morris also relies on several of the Court's statements in *Quercia*. For example, the *Quercia* Court recognized that a trial court has significant "influence on a jury" and "should not render vain the privilege of the accused to testify in his own behalf" through "hostile comment[s]." 289 U.S. at 470. The Supreme Court also cautioned in *Quercia* that "[i]n commenting upon testimony, [a trial court] may not assume the role of a witness." *Id.*

The facts of *Quercia* are vastly different than those here. There, the petitioner challenged his federal drug conviction on the basis of the trial court's jury instructions, not evidentiary rulings (or interpretations) during testimony. Also, unlike Morris's theory that the trial court indirectly compromised his credibility in making hearsay rulings, the *Quercia* trial court discredited much of the petitioner's testimony directly. During the jury charge, the *Quercia* trial court commented that the petitioner had "wiped his hands," described that conduct as "a curious thing, but . . . almost always an indication of lying," and stated its belief that the petitioner's testimony, "except when he agreed with the Government's testimony, was a lie." *Id*. at 468. The petitioner argued that these

135

instructions "exceeded the bounds of fair comment and constituted prejudicial error." *Id.* The *Quercia* Court agreed, concluding that the trial court had committed a "highly prejudicial" error which the other instructions did not "cure[]" and reversed the judgment. *Id.* at 472. The Court added that the trial court's "characterization of the manner and testimony of the accused was of a sort most likely to remain firmly lodged in the memory of the jury and to excite a prejudice which would preclude a fair and dispassionate consideration of the evidence." *Id.*

The *Quercia* Court did not reference a specific constitutional source for its analysis. Rather, the Court based its decision partially on *O'Shaughnessy v. United States*, 17 F.2d 225 (5th Cir. 1927). *Quercia*, 289 U.S. at 471. In *O'Shaughnessy*, the appellants challenged the trial court's "one-sided" jury charges, which focused on inculpatory evidence and improperly incorporated judicial "conclusions as to the guilt or innocence of the several accused." 17 F.2d at 225, 227 (internal quotation marks omitted). Among several errors, the appellants argued that the *O'Shaughnessy* trial court "deprived [them] . . . of due process of law, guaranteed . . . by the Fifth Amendment . . . and denied [them] . . . a trial by an impartial jury, guaranteed . . . by the Sixth Amendment." *Id.* at 227 (internal quotation marks omitted). The former Fifth Circuit determined that the appellants' "exceptions" to the jury instructions "were well taken" and reversed the convictions. *Id.* at 228.

As this summary makes clear, the constitutional concerns addressed in the *O'Shaughnessy* decision and the facts of unfair prejudice in *Quercia* and *O'Shaughnessy* are much more compelling than Morris's allegations here. To be sure, the trial court interrupted Morris based on Alabama's hearsay rule, but it did not comment on Morris's credibility or evidence of his guilt. These critical distinctions mean that Morris's reliance on *Quercia* is off the mark.

136

Morris's reference to *Carter* fails to establish the constitutional validity of this claim, much less why he is entitled to AEDPA relief. The appellant in *Carter* challenged his federal conviction for "receiving and concealing two stolen automobiles." 491 F.2d at 626. He argued that the trial court erroneously excluded his testimony "regarding a conversation with the party from whom [t]he [appellant] claim[ed] to have received one of the stolen automobiles" on hearsay grounds. *Id.* After explaining why the excluded testimony was not inadmissible hearsay, the Fifth Circuit "conclude[d] that the trial court's error . . . [could] []not be considered harmless." *Id.* at 629. Critical to the *Carter* court's harmless error assessment was that the jury did not hear the appellant's "uninterrupted account of the conversations he sought to present" in his defense. Instead, the appellant shared "piecemeal answers to intermittent questions, [which] was an inadequate substitute." *Id.* at 630 (internal quotation marks omitted).

Nevertheless, *Carter* contains no constitutional guidance. Even if the *Carter* opinion is implicitly tethered to an accused's due process right to present a defense, the interruptions about which Morris complains did not interfere with his factual defense to murder. For example, the trial court did not interrupt Morris when he told the jury about Rochester's small dog, who "sudden[ly] appeared" and came to his feet while he was in handcuffs. (Doc. # 15-23 at 22).

Thus, even assuming that de novo review applies, Morris has not established that the trial court's hearsay interruptions violated his constitutional rights under *Murchison*, *Quercia*, *Rock*, or *Carter*. Additionally, Morris has neither mentioned nor shown that any theoretical constitutional error had a "substantial-and-injurious-effect" on his trial.[9]

---

[9] Before AEDPA, "the Supreme Court held [in *Brecht*] that on federal habeas, courts must assess the prejudicial impact of constitutional error in a state criminal trial under the 'substantial-and-injurious-effect' standard." *Wellons v. Hall*, 554 F.3d 923, 939 (11th Cir. 2009), *judgment vacated on other grounds*, 558 U.S. 220 (2010). Under

To meet this habeas harmless-error standard, Morris must establish that the constitutional error "'substantial[ly] . . . influence[d]' the jury's verdict," despite the state's "weighty" guilt-phase case against him. *Brecht*, 507 U.S. at 639 (second alteration added).

Additionally, as none of the cases which Morris relies on mention the Eighth Amendment, the court denies habeas relief based on any Eighth Amendment claim because it is abandoned, undeveloped, or unproven on habeas review.

For all of these reasons, the court denies Claim I.

### H.    Claim J—Morris has not demonstrated a right to habeas relief because of unduly prejudicial victim impact evidence.

Morris next argues that the state's introduction of victim impact evidence during the guilt phase of his trial resulted in fundamental unfairness under the Fourteenth Amendment's due process clause. (Doc. # 1 at 98 ¶ 254). Morris asserts that the ACCA's rejection of this claim was based on flagrant constitutional flaws under (d)(1), and unreasonable factual determinations under (d)(2). (*Id*. at 100 ¶ 258). Respondent answers (1) that the ACCA denied this claim reasonably and "certainly not so outrageous[ly]," and (2) that this is not an instance where no fairminded jurist could accept the outcome. (Doc. # 21 at 32 ¶ 91).

#### 1.    State Court Proceedings

Morris did not challenge the state's introduction of victim impact evidence during the guilt phase of his capital trial. Instead, referencing the Supreme Court's decision in *Payne v. Tennessee*,

---

the *Brecht* standard, "habeas petitioners may obtain plenary review of their constitutional claims, but they are not entitled to habeas relief based on trial error unless they can establish that it resulted in 'actual prejudice.'" *Id*. at 939-40 (internal quotation marks omitted) (quoting *Brecht*, 507 U.S. at 637). Although *Brecht* is a pre-AEDPA decision, the Court "confirmed the application of *Brecht*'s more deferential 'substantial-and-injurious-effect' standard when assessing the prejudicial impact of constitutional error on federal habeas review" post-AEDPA in *Fry v. Pliler*, 551 U.S. 112 (2007). *See Wellons*, 554 F.3d at 940.

138

501 U.S. 808 (1991), on direct review, Morris maintained that "the [s]tate introduced irrelevant evidence about Rochester and her family . . . . [which] was designed only to inflame the jury." (Doc. # 15-52 at 126). Under *Payne*, a sentencing jury may consider victim impact evidence under the Eighth Amendment unless that information is "unduly prejudicial" under the due process clause of the Fourteenth Amendment. 501 U.S. at 825.

According to Morris, the guilt-phase evidence at issue referenced Rochester's spiritual life, such as her "listen[ing] to 'church' music, . . . own[ing] religious jewelry," and using "a Bible that was 'torn up' during the offense." *Morris Direct II*, 60 So. 3d at 375; (Doc. # 15-52 at 126). The jury also heard that Rochester "had a son who was deaf, [and] . . . a granddaughter who [had] died of Hodgkin's disease." *Id.* Morris argued that the introduction of this evidence violated his rights under state law and the Fifth, Sixth, Eighth, and Fourteenth Amendments. (Doc. # 15-52 at 127).

Reviewing for plain error, the ACCA concluded that the challenged evidence "had no prejudicial impact on Morris's trial." *Id.* The ACCA relied on several Alabama Supreme Court cases and a "paraphrased portion of Justice Souter's opinion concurring in the judgment in *Payne*." *Morris Direct II*, 60 So. 3d at 375 (internal quotation marks omitted). It noted, referencing the Alabama Supreme Court's incorporation of Justice Souter's guidance, that an unfair trial based on victim impact evidence requires more than telling "jurors . . . what they probably had already suspected—that [the victim] was not a human island, but a unique individual" with family members and friends. *Id.* (internal quotation marks omitted) (quoting *Ex parte Rieber*, 663 So. 2d 999, 1006 (Ala. 1995)), (paraphrasing *Payne*, 501 U.S. at 838 (Souter, J., concurring)).

Although *Payne* addressed the constitutionality of victim impact evidence introduced during the sentencing phase, the petitioner in *Rieber*, like Morris has here, raised a guilt-phase

139

challenge in the absence of a trial objection. *Rieber*, 663 So. 2d at 1005-06.

During the guilt phase in *Rieber*, the jury learned from the victim's spouse that she had two young daughters from an earlier marriage who went to live with their grandparents after her death. 663 So. 2d at 1005. The Alabama Supreme Court agreed with the petitioner that permitting the jury to hear that testimony pre-penalty phase was "[ir]relevant . . . to the question of . . . guilt or innocence" and inappropriate. *Id.* The Alabama Supreme Court "caution[ed] . . . that the introduction of victim impact evidence during the guilt phase . . . can result in reversible error if . . . it probably distracted . . . and kept [the jury] from performing its duty of determining the guilt or innocence of the defendant based on the admissible evidence and the applicable law." *Id.* at 1006. Still, "after examining the record in its entirety . . . . [and] presum[ing] that jurors do not leave their common sense at the courthouse door," the Alabama Supreme Court determined that the inadmissible testimony admitted in *Rieber* "did not operate to deny [the petitioner] a fair trial." *Id.* The ACCA, relying on *Rieber*, extended that due process analysis in denying that the admission of victim impact evidence during the guilt phase caused Morris to have an unfair trial.

### 2. Morris has not overcome AEDPA deference on his due process challenge of the victim impact evidence under the Fourteenth Amendment.

There are differences in the allegations Morris made on direct appeal and the federal habeas allegations he presents here. First, Morris has limited the constitutional scope of his habeas claim to a due process violation under the Fourteenth Amendment. (Doc. # 27 at 73). Second, Morris alleges that Rochester's housemate (rather than Rochester) was the owner of the religious jewelry and torn Bible and that both of them "listened to church music at night." (Doc. #1 at 99 ¶ 256) (internal quotation marks omitted). Given these clarifications, the court moves to the AEDPA

analysis.

To establish a right to relief under AEDPA, Morris cites case law, but he has not articulated any purported unreasonable state-court factual determination. Without alleging a specific factual challenge, there is no conceivable basis for Morris to obtain relief under § 2254(d)(2). The court thus limits its AEDPA focus to his (d)(1) claim and asks whether Morris's cited authorities show that, in denying his due process claim on appeal, the ACCA ruled contrary to, or unreasonably in light of, Supreme Court precedent. Of course, Morris cannot prevail under either clause of § 2254(d)(1) unless he points to Supreme Court holdings that share a core resemblance to his constitutional basis for relief. This means that Morris must identify decisions in which the Supreme Court has encountered a fundamentally unfair capital trial because of the jury's consideration of unduly-prejudicial victim impact evidence.

Although Morris references several Supreme Court cases and a mixture of other decisions on habeas review, only *Payne* discusses victim impact evidence. (Docs. # 1 at 98-99 ¶¶ 255-57; 27 at 73). Further, Morris's cited authorities do not substantiate that the ACCA committed extreme constitutional error under (d)(1)'s nearly-impenetrable deferential standards.

For example, Morris's reliance on *Darden v. Wainwright*, 477 U.S. 168 (1986), lacks a suitable link to victim impact evidence to assist Morris here. The *Darden* Court faced the "question [of] whether [a] prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Id.* at 181 (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). And the *Darden* Court agreed with the district court's conclusion that while the petitioner's "trial was not perfect . . . neither was it fundamentally unfair." *Id.* at 183 (internal quotation marks omitted).

Although the Supreme Court considered "victim impact evidence and prosecutorial argument on that subject" in *Payne*, it did so in the context of a penalty-phase record. 501 U.S. at 827. Overruling prior Supreme Court precedent, the *Payne* Court held that "the Eighth Amendment erects no *per se* bar" to a state's use of information "about the victim and . . . the impact of the murder on the victim's family [a]s [evidence] relevant to the jury's [capital punishment] decision." *Id.* The Court referred to the availability of the due process clause as a "mechanism" for addressing victim impact evidence which creates a "fundamentally unfair" trial. *Id.* But due process considerations were not part of the *Payne* analysis because the "victim impact evidence [there] serve[d] [an] entirely legitimate purpose[]." *Id.* at 825. Thus, *Payne* addresses a constitutional claim much different from what Morris is pursuing on habeas review. That constitutional dissimilarity means that *Payne* fails to satisfy Morris's (d)(1) burden.

Morris cites to Eleventh Circuit authorities, but they do not bolster the (d)(1) merits of his claim. Like *Darden*, the Eleventh Circuit's capital habeas decision in *Romine* turned on unconstitutional prosecutorial error, rather than victim impact evidence. In *Romine*, the Eleventh Circuit explained that "[a] sentence proceeding is rendered unfair by an improper argument if, absent the argument, there is a reasonable probability that the result would not have been a death sentence, a reasonable probability being one which undermines [the] confidence in the outcome." 253 F.3d at 1368. Based on this due process standard, the Eleventh Circuit determined that the petitioner's penalty phase in *Romine* was fundamentally unfair.

"The circumstances [in *Romine*] include[d] a sentence stag[ing] trial saturated with evidence relating to religion," a judge whose comments encouraged a Biblical theme, and a closing argument that was "a hell fire and brimstone mini-sermon." *Id.* at 1369. The prosecutor's message

142

to the jury was to disregard "the law of Georgia" and instead "follow the law of God," which according to him left no room for "mercy." *Id.* The infusion of religion described in *Romine* easily eclipses the minimal religious references to Morris's victim and her housemate. Thus, *Romine* does not aid Morris in carrying his burden to show that the ACCA denied his due process claim unreasonably.

Morris also refers to the capital habeas decision in *Felker v. Turpin*, 83 F.3d 1303 (11th Cir. 1996). Although the petitioner pursued a due process habeas claim in *Felker*, the evidence underlying that challenge was supplied by an expert, not by victim impact testimony. *Id.* at 1311. The Eleventh Circuit observed that the standard for habeas relief based on "evidentiary errors" is "narrow." *Id.* Considering all the evidence, the Eleventh Circuit concluded that the expert witness's "testimony did not so infuse the trial with unfairness as to deny [the petitioner] fundamental fairness and due process of law." *Id.* at 1312. Thus, neither the underlying evidence the court evaluated nor the outcome of the decision in *Felker* helps Morris here.

Morris also points to *Snowden v. Singletary*, 135 F.3d 732 (11th Cir. 1998). But *Snowden* is even less applicable than *Romine* or *Felker*. First, *Snowden* is not a capital case. Second, the Eleventh Circuit's due process holding is unrelated to victim impact evidence. *See Snowden*, 135 F.3d at 734, 739 (determining that "allowing expert testimony to boost the credibility of the main [child] witness against [the petitioner]—considering the lack of other evidence of guilt—violated his right to due process by making [the] criminal trial [for five counts of child abuse] fundamentally unfair").

Morris also relies on the Alabama Supreme Court's decision in *Ex parte Crymes*, 630 So. 2d 125 (Ala. 1993), for the general principle that "testimony . . . [with] no probative value on any

material question of fact or inquiry is inadmissible." *Id*. at 126. In *Crymes*, the Alabama Supreme Court clarified that victim impact statements "are admissible during the guilt phase of a criminal trial only if the[y] . . . are relevant to a *material issue* of the guilt phase." *Id.* (emphasis in original). Applying that principle to the petitioner's claim in *Crymes*, the Alabama Supreme Court explained that the trial court should not have admitted evidence of the victim's children's ages during the guilt phase. *Id.* at 127.

The Alabama Supreme Court evaluated whether that error was harmless under Rule 45 and concluded that the victim-impact evidentiary error did not prejudice the petitioner's right to a fair trial given the complete record, including "the overwhelming evidence of [his] guilt." *Id.* Thus, the outcome in *Crymes* does not undermine the ACCA's rejection of Morris's due process claim. Even if the Alabama Supreme Court had reached a different result in *Crymes*, that would be inconsequential to Morris's (d)(1) burden because state court decisions are not clearly established law under AEDPA.

In summary, Morris's referenced authorities do not overcome AEDPA's predominant bar against using a claim that lacked merit in state court to obtain habeas relief.

### I.    Claim K—Morris has not demonstrated a right to habeas relief because of improper prosecutorial comments in the guilt phase.

Morris next contends that the prosecutor made improper guilt-phase arguments that violated his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments. (Docs. # 1 at 105 ¶ 273; 27 at 74). He argues that the ACCA's decision cannot be upheld under § 2254(d)(1) and (d)(2). (Docs. # 1 at 105-06 ¶ 273; 27 at 74). Respondent counters that the ACCA's "determinations of law and fact were not so lacking in justification as to give rise to error beyond any possibility of fairminded disagreement." (Doc. # 22 at 123) (internal quotation marks omitted)

144

(quoting *Dunn*, 138 S. Ct. at 12).

To support his claim, Morris must show that the challenged comments "(1) . . . [were] improper, and (2) . . . prejudicially affect[ed] [his] substantial rights." *United States v. Thompson*, 422 F.3d 1285, 1297 (11th Cir. 2005) (alterations added) (internal quotation marks omitted). At issue are the following statements in the prosecutors' closing, which Morris contends were improper and prejudicial:

- "If you believe the defense and you believe Alfonso Morris you must also believe two additional things." (Doc. # 1 at 101 ¶ 262) (internal quotation marks omitted); (*see also* Doc. # 15-23 at 94) (internal quotation marks omitted) (same). "You must believe that Officer Smith and Officer Shirley Jackson conspired . . . and that they lied to you, both of them, on the stand." (Doc. # 1 at 101 ¶ 262) (internal quotation marks omitted); (*see also* Doc. # 15-23 at 94) (internal quotation marks omitted) (same). "The second thing that you have to believe in addition to this police conspiracy that he had eleven years to come up with is that fate and Rochester's dog somehow got involved in that conspiracy." (Doc. # 1 at 101 ¶ 262) (internal quotation marks omitted); (*see also* Doc. # 15-23 at 94) (internal quotation marks omitted) (same).

- "It is your oath to hold [Morris] responsible, hold him accountable for this vi[]l[e] crime, meaningless, pointless, brutal death of Miriam Rochester." (Doc. # 1 at 102-03 ¶ 266) (first alteration modified; second added) (internal quotation marks omitted) (emphasis omitted); (*see also* Doc. # 15-24 at 5) (internal quotation marks omitted) (similar).

- "There's no evidence other than the one liar in this case who says that he was taken back to the crime scene and that a little dog brushed blood up against his shoe. . . ." (Doc. # 15-23 at 70) (internal quotation marks omitted); (*see also* Doc. # 1 at 104 ¶ 270) (internal quotation marks omitted) (similar). "Nobody from the state's side – there's no question that Shirley Jackson didn't secure the evidence correctly, that Officer Smith didn't secure the evidence correctly, that Angelo Della Manna didn't do the DNA testing correctly. . . ." (Doc. # 15-23 at 72) (internal quotation marks omitted); (*see also* Doc. # 1 at 104 ¶ 270) (internal quotation marks omitted) (similar). "As [Morris's counsel] said, this case presents one clear question:    who's telling the truth? . . . There's no evidence that [the state's witnesses] have lied to you, misled you, no evidence at all. Or [is it] that man who is on trial for capital murder who has a real interest in this case and the outcome, that man, the admitted liar?" (Doc. # 15-23 at 95) (alterations added) (internal quotation marks omitted); (*see also* Doc. # 1 at 104-05 ¶ 270) (internal quotation marks omitted) (similar).

## 1.    State Court Proceedings

The ACCA reviewed this prosecutorial misconduct claim for plain error because Morris did not "object to any of these alleged improper remarks at trial." *Morris Direct II*, 60 So. 3d at 367. Citing mostly to Alabama law, the ACCA concluded that "[t]he prosecutors' references to Morris as being a liar were based on the evidence and were thus a proper argument to the jury." *Id.* at 370. In reaching this conclusion, the ACCA addressed each of the above-challenged areas separately on direct review.

The ACCA determined that Morris's plain-error challenge of the "you must also believe" argument that Officers Smith and Jackson had a cigarette "conspir[acy]" was inadequate. *Id.* at 367. The ACCA explained that "[t]his comment . . . was merely referring to certain conflicts in the evidence offered by the [s]tate and the evidence offered by the defense." *Id.* The ACCA noted that "[t]he officers referred to [had] testified that a cigarette found at the scene of the offense contained Morris's DNA," even though Morris "testified that at the time of his arrest the arresting officer took a cigarette from [Morris's] mouth." *Id.* The ACCA concluded that "[t]he prosecutor [had] properly argued his case to the jury, including referencing the evidence presented that contradicted th[e] [position] of the defense." *Id.*

The ACCA rejected Morris's contention that the "oath" reference was improper. *Id.* at 368. The ACCA observed that a prosecutor had the right "to argue to the jury that a defendant is guilty . . . based on the evidence." *Id.* (internal quotation marks omitted). The ACCA saw no basis for concluding that the prosecutor had overstepped impermissibly to "impl[y]" that the jury could "only reach a certain verdict, regardless of [the] duty to weigh evidence and follow the . . . instructions on the law." *Id.* (internal quotation marks omitted).

The ACCA disagreed with Morris that the "only one liar" comments were generally improper, specifically because "the prosecutor vouched for the credibility of [the] [s]tate's witnesses." *Id.* at 369. As for Morris's general objection to the prosecutor's remarks, which "impl[ied] deceit on Morris's part," the ACCA determined that the record substantiated those remarks. *Id.* As record support of Morris's lying, the ACCA pointed to his statements to the police that contained "contradictions," "[his] answers during his testimony suggesting that he did not

147

remember or did not know," "[his] use of a false identification" during his arrest, and "the conflicts between his testimony and that of [s]tate's witnesses." *Id.*

Turning to Morris's vouching objection, the ACCA relied on the Eleventh Circuit's decision in *United States v. Sims*, 719 F.2d 375 (11th Cir. 1983) (per curiam). In *Sims*, the Eleventh Circuit described "the test for improper vouching [a]s whether the jury could reasonably believe that the prosecutor was indicating a personal belief in the witness' credibility." *Id.* at 377. The Eleventh Circuit described two ways to prove improper vouching. *Id.* First, "the prosecution may place the prestige of the government behind the witness, by making explicit personal assurances of the witness' veracity." *Id.* Second, "a prosecutor may implicitly vouch for the witness'[s] veracity by indicating that information not presented to the jury supports the testimony." *Id.*

The ACCA observed that Morris had not identified examples in the record that satisfied either category of improper vouching. *See Morris Direct II*, 60 So. 3d at 369 ("Morris fails to cite to the record in support of this argument."). And, the ACCA determined that "the prosecutors did not vouch for the credibility of any witnesses in" their arguments. *Id.* at 370. Without specifying any improper comments, the ACCA rejected Morris's arguments applying a plain-error analysis. *Id.*; *cf. United States v. Eyster*, 948 F.2d 1196, 1208 (11th Cir. 1991) (describing "the second prong of the analysis" to require "a reasonable probability that but for the prosecutor's improper comments, the outcome of the proceeding would have been different").

### 2. Morris has not met his AEDPA burden on his improper prosecutorial comments claim.

Morris contends that the ACCA committed extreme constitutional error based on Supreme Court and Eleventh Circuit precedent and non-binding authority. The Supreme Court cases that Morris cites are *Berger v. United States*, 295 U.S. 78 (1935); *In re Winship*, 397 U.S. 358 (1970);

*Donnelly v. DeChristoforo*, 416 U.S 637 (1974); *United States v. Young*, 470 U.S. 1 (1985); and *Darden*, 477 U.S. at 181. (Docs. # 1 at 100-01, 103-05 ¶¶ 259-61, 266, 269, 271; 27 at 74-76). The court examines the context of these Supreme Court opinions before moving to the remaining cases that Morris cites.

Preliminarily, the court notes that the Supreme Court did not address AEDPA deference in any of these opinions. A review of the decisions shows that the Supreme Court either (1) faced challenged prosecutorial comments much stronger than Morris's allegations, (2) determined that no due process violation had occurred, or (3) addressed a wholly different federal issue. So these decisions do not demonstrate AEDPA error by the ACCA.

For example, the *Berger* Court observed that the record "clearly show[ed]" that "the United States prosecuting attorney overstepped the bounds of that propriety and fairness which should characterize the conduct of such an officer in the prosecution of a criminal offense." 295 U.S. at 84. The Supreme Court elaborated that "the prosecuting attorney's argument to the jury was undignified and intemperate[] [and] contain[ed] improper insinuations and assertions calculated to mislead the jury." *Id.* at 85. Specifically, the Supreme Court pointed to improper comments that "invited [the jury] to conclude that [a] witness . . . knew [the defendant] well but pretended otherwise; and that this [information about the familiarity of the defendant and witness] was within the personal knowledge of the prosecuting attorney." *Id.* at 88. The *Berger* Court explained that "the misconduct of the prosecuting attorney" was neither "slight [n]or confined to a single instance." *Id.* at 89. Instead, the "misconduct was pronounced and persistent, with a probable cumulative effect upon the jury which c[ould not] be disregarded as inconsequential," and the Supreme Court ordered a new trial. *Id.* Here, Morris's due process allegations – that the prosecutor

commented unfairly about guilt-phase evidence – do not come close to approaching the pattern of gross prosecutorial misconduct in *Berger*. Thus, *Berger* is of no help to him.

In *Donnelly*, the Supreme Court reversed a habeas judgment for the respondent because "certain . . . prosecutor[ial] remarks during closing argument deprived him of his constitutional right to a fair trial." 416 U.S. at 638. The "[r]espondent's claims of constitutional error focus[ed] on two remarks made by the prosecutor during the course of his rather lengthy closing argument to the jury." *Id.* at 640. The Supreme Court explained that the first challenged area "involved the [prosecutor's] expression of a personal opinion as to guilt." *Id.* The *Donnelly* Court noted that the First Circuit had "declined to rest its holding of a violation of due process on that remark." *Id.*

The second area that the respondent in *Donnelly* challenged "was directed at respondent's motives in standing trial: 'They (the respondent and his counsel) said they hope that you find him not guilty. I quite frankly think that they hope that you find him guilty of something a little less than first-degree murder.'" *Id.* The Supreme Court observed that after trial counsel objected to this argument, the trial court gave a curative instruction to the jury, including "'to disregard [the prosecutor's] statement.'" *Id.* at 641.

The *Donnelly* Court recognized a distinction between a state denial "of a specific provision of the Bill of Rights," in which the Court "ha[d] taken special care to assure that prosecutorial conduct in no way impermissibly infringe[d] [upon]," versus the due process clause of the Fourteenth Amendment. *Id.* at 643. The Supreme Court concluded "that the prosecutor's remark about respondent's expectations at trial by itself [did not] so infect[] the trial with unfairness as to make the resulting conviction a denial of due process." *Id.*; *see also id.* at 645 ("[T]he prosecutor's remark here, admittedly an ambiguous one, was but one moment in an extended trial and was

followed by specific disapproving instructions."). The Court made clear that what had occurred in the case was "ordinary trial error of a prosecutor and . . . [not] egregious misconduct . . . [that] amount[ed] to a denial of constitutional due process." *Id.* at 647. The circumstances and outcome in *Donnelly* strengthen (rather than weaken) the conclusion that the ACCA's rejection of Morris's due process claim was reasonable.

Like *Donnelly*, *Darden* does not aid Morris. In *Darden*, the Court considered "whether the prosecution's closing argument during the guilt phase of a bifurcated trial rendered the trial fundamentally unfair and deprived the sentencing determination of the reliability required by the Eighth Amendment." *Darden*, 477 U.S. at 170. The challenged remarks included a statement by the prosecutor that implied that the death penalty would be the only guarantee against a future similar act, an "incorp[ation] [of] . . . defense[] [counsel's prior] use of the word 'animal,'" and "several offensive comments reflecting an emotional reaction to the case." *Id.* at 180. The Court concluded that "[t]hese comments undoubtedly were improper." *Id.*

But revisiting *Donnelly*, the *Darden* Court clarified that the relevant question is not whether the prosecutors' comments were improper but whether they "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Id.* at 181 (internal quotation marks omitted). The Supreme Court noted that "[u]nder this standard of review, we agree with the reasoning of every court to consider these comments that they did not deprive petitioner of a fair trial." *Id.* "The prosecutors' argument did not manipulate or misstate the evidence, nor did it implicate other specific rights of the accused such as the right to counsel or the right to remain silent." *Id.* at 181-82. And, "[m]uch of the objectionable content was invited by or was responsive to the opening summation of the defense" and "[t]he weight of the evidence against petitioner was

heavy." *Id.* at 182. The *Darden* Court concluded that the comments did not result in a "fundamentally unfair" trial. *Id.* at 183 (internal quotation marks omitted).

Even if *Darden* had found a fundamentally unfair trial, the remarks Morris challenges here are not similar to those which were at issue in that case. He does not contend that the prosecutors "misstate[d] the evidence" or "implicated" his protections under the Bill of Rights. *Id.* at 182. As a result, *Darden* does not demonstrate clearly established constitutional error by the ACCA.

The Supreme Court did not review a due process claim in *Young*. Rather, the question was whether the prosecutor's comments to the jury, including that it should "do its job," were plain error under Federal Criminal Procedure Rule 52(b). *Young*, 470 U.S. at 6, 18. Similar to Alabama's plain-error approach, Rule 52(b) permits a federal court to address "[a] plain error that affect[ed] substantial rights . . . even though it was not brought to the court's attention," such as in a contemporaneous objection. Fed. R. Crim. P. 52(b).

Even though the prosecutor's remarks were deemed improper by the *Young* Court, allowing them was not "plain error" given their context in the entire trial. *Young*, 470 U.S. at 14 (internal quotation marks omitted); *see also id.* at 16 ("Especially when addressing plain error, a reviewing court cannot properly evaluate a case except by viewing such a claim against the entire record."). Critical to the Court's federal plain-error assessment was defense counsel's blameworthy contribution. *Id.* at 12-14. Specifically, by questioning the prosecutor's integrity and whether the prosecutor believed in the government's case, defense counsel had "invited" a rebuttal "in order to right the scale." *Id.* at 2, 12-13 (internal quotation marks omitted).

Having said that, the *Young* Court acknowledged that the prosecutor "went beyond what was necessary to" deflate "defense counsel's obvious misconduct." *Id.* at 14. Still, the Supreme

Court concluded that the prosecutor's reactionary statements had not seriously detracted from the "fundamental fairness of the trial." *Id.* at 16. The *Young* Court explained that the strength of the fraud case against the respondent was "overwhelming." *Id.* at 19. Thus, to the extent that *Young* clarifies Morris's habeas due process claim, the context and outcome do not advance his (d)(1) argument at all.

The Supreme Court did not address whether prosecutorial comments violated due process violation in *Winship*. Instead, the *Winship* Court decided "the single, narrow question [of] whether proof beyond a reasonable doubt is among the 'essentials of due process and fair treatment' required during the adjudicatory stage when a juvenile is charged with an act which would constitute a crime if committed by an adult." 397 U.S. at 359. The *Winship* decision is inapposite.

Morris fares no better in carrying his AEDPA burden based on the Eleventh Circuit cases he has cited. In several of those cases, the challenged comments were inadequate to establish a de novo constitutional violation, a state court AEDPA error, or plain error under federal law. *See, e.g.*, *Duncan v. Stynchcombe*, 704 F.2d 1213, 1215 (11th Cir. 1983) (per curiam) (rejecting a habeas claim that the prosecutor's comment "was an impermissible reference to [the petitioner's] failure to testify, and that it had the effect of shifting the burden of proof"); *Brooks v. Kemp*, 762 F.2d 1383, 1413, 1416 (11th Cir. 1985) (en banc) (concluding that the petitioner's sentencing phase was not fundamentally unfair, despite "four troubling segments of [the prosecutor]'s argument," including "expressions of personal belief in capital punishment," references to "prosecutorial expertise" and the "war on crime," and a suggestion to the jury that a death sentence "would save taxpayers money") (internal quotation marks omitted), *vacated on other grounds*, 478 U.S. 1016 (1986), *reinstated*, 809 F.2d 700 (11th Cir. 1987) (per curiam) (en banc); *Parker v.*

*Allen*, 565 F.3d 1258, 1272, 1275 (11th Cir. 2009) (concluding that the district court correctly held that the ACCA's due process "decision regarding the prosecutor's vouching for witnesses during the guilt-phase closing argument" was not unreasonable legally or factually); *United States v. Abraham*, 386 F.3d 1033, 1036 (11th Cir. 2004) (per curiam) (concluding "as a whole, . . . that the statements in question were not sufficiently prejudicial to warrant a mistrial"); *United States v. Hernandez*, 921 F.2d 1569, 1574 (11th Cir. 1991) (rejecting a vouching claim and concluding that the absence of "further restrictions on the prosecutor's summation and rebuttal d[id] not amount to plain error").

Morris's remaining federal cases cited in support of this claim are *United States v. Eyster*, 948 F.2d 1196 (11th Cir. 1991) and *United States v. Vargas*, 583 F.2d 380, 382 (7th Cir. 1978). Neither decision opens the door to habeas relief for Morris under (d)(1).

In *Eyster*, the Eleventh Circuit addressed a claim "that the district court erred in permitting the government to improperly vouch for the credibility of a key witness and misrepresent to the jury that extrinsic evidence would explain away the witness'[s] perjury." 948 F.2d at 1198. Unlike Morris's situation, defense counsel in *Eyster* objected to the vouching at trial, so the Eleventh Circuit engaged in plenary review. *Id*. at 1206. But even putting aside that difference, the record of improper vouching in *Eyster* well eclipses Morris's allegations. *Id.* at 1198. As the Eleventh Circuit summarized, "the prosecutor threw the weight of her office behind the witness'[s] testimony and implicitly vouched for the witness by indicating that information not before the jury supported [that witness]'s credibility." *Id.* at 1207. And, the prosecutor's improper vouching supported an incorrect "suggestion," helpful to the government's case, that the witness'[s] plea deal contained "a typographical error." *Id.* at 1204, 1207.

Unlike the situation in *Eyster*, Morris does not contend that the prosecution's comments "[i]mpl[ied] the existence of additional evidence not formally before the jury." *Id.* at 1207 (citing *Berger*, 295 U.S. at 88-89); *see also Eyster*, 948 F.2d at 1208 ("The prosecutor's improper vouching was an unfair and foul blow."). Accordingly, *Eyster* does not show that the ACCA's rejection of Morris's vouching allegations was contrary to, or an unreasonable application of, Supreme Court precedent.

Finally, the Seventh Circuit's reversal of a conviction in *United States v. Vargas*, 583 F.2d 380, 382 (7th Cir. 1978) does not alter this court's (d)(1) conclusion. Although the court determined that "the prosecutors' closing arguments [had] denied [the appellant] a fair trial," the unfair comments in *Vargas* were more far reaching than those involved here. 583 F.2d at 382. Indeed, the prosecutors' remarks included "an unsupported allegation that the defendant sold heroin on prior occasions" and made $10,000 daily in drug trafficking. *Id.* at 385. The government also made an improper legal argument that either all the federal agents had lied on the stand or the defendant was guilty as charged. *Id.* at 387. And given the wide gulf between the straightforwardly-improper statements in *Vargas* and those underlying Morris's allegations, *Vargas* does not persuade this court that the ACCA contravened, or unreasonably applied, Supreme Court precedent in the denial of Morris's due process claim.

Morris has shown no basis for challenging the ACCA's rejection of his prosecutorial allegations under (d)(1). Alternatively, although the ACCA did not address the question, even if this court were to apply a de novo standard, Morris has not shown that the prosecution's comments resulted in such an unfair conviction that due process demands he receive a retrial. Morris has

155

failed to explain how the prosecutors' comments rendered his conviction unfair given the state's introduction of blood and cigarette DNA that established his guilt.

Nor has Morris carried his (d)(2) burden. He contends that the prosecutors' remarks "plac[ed] the burden of proof on [him]; misle[d] the jury into believing it had an oath to convict [him]; and improperly vouch[ed] for the credibility of the [s]tate's witnesses." (Doc. # 27 at 76). But the trial transcript does not support those assertions. Morris has not pointed to any record evidence that shows an unreasonable factual error made by the state courts under AEDPA. Thus, Morris's habeas allegations do not overcome AEDPA deference.

### 3.     Morris's remaining allegations do not support habeas relief.

Morris also asserts, without elaboration, that his allegations under this claim support a cognizable constitutional right under the Fifth, Sixth, and Eighth Amendments. (Docs. # 1 at 105 ¶ 273; 27 at 74). The court disagrees.

Morris made similar assertions in the state courts on direct review. (Doc. # 15-52 at 114, 120). But the authorities he cited in his appellate brief focused on Fourteenth Amendment due process; he did not develop a right to relief legally or factually under the Fifth, Sixth, or Eighth Amendment. (*Id*. at 114-20). This minimalist approach raises significant questions about whether he fairly presented his collateral allegations as a claim unrelated to the Fourteenth Amendment to the ACCA. If Morris did not fairly present those other theories, in the absence of any express waiver on habeas review by Respondent, dismissal of Morris's habeas claims under the remaining amendments is appropriate due to his unexhausted procedural default.

But even putting aside the exhaustion requirement, Morris's conclusive allegations do not warrant relief under the heightened pleading rule applicable to habeas claims. *See* Rule 2(c), *Rules*

*Governing Section 2254 Cases.* Morris did not adequately plead those claims.

Alternatively, Morris has the burden of establishing a right to habeas relief under these remaining amendments, but his bare allegations do not suffice. For these reasons, the court denies Morris's claims based on the Fifth, Sixth, and Eighth Amendments as abandoned, underdeveloped, or unproven. *See, e.g.*, *Tharpe*, 2014 WL 897412, at *3 n.4; *Krasnow*, 484 F. App'x at 429; *Jernigan*, 341 F.3d at 1283 n.8; and *U.S. Steel Corp.*, 495 F.3d at 1287 n.13.

### J.    Claim L—Morris has not demonstrated a right to habeas relief because of improper reasonable doubt instructions in the guilt phase.

Morris next argues that the trial court's charge on reasonable doubt "shifted" the burden of proof onto him in violation of his Fifth, Sixth, and Fourteenth Amendment rights. (Doc. # 1 at 106 ¶ 274). He contends that AEDPA affords him habeas relief because the ACCA's rejection of this claim was contrary to, and involved an unreasonable application of, clearly established law under (d)(1) and included an unreasonable factual determination under (d)(2). (*Id.* at 109 ¶ 280). Respondent answers that because the ACCA's "decision was reasonable and certainly not so outrageous that no fairminded jurist could agree with it," Morris has no right to relief under AEDPA. (Doc. # 21 at 33 ¶ 95). Consistent with AEDPA's highly deferential framework, the court agrees with Respondent. Before turning to the habeas analysis, the court recounts the state court background on this claim.

### 1.    State Court Proceedings

During the guilt phase, the trial court charged the jury on reasonable doubt. Morris raised no objections to those instructions at trial. But, on direct review, Morris argued that some aspects of the jury charge lowered the constitutional level of proof necessary for the jury to find him guilty. (Docs. # 21 at 33 ¶ 95; 15-52 at 124-25 & n.22). Morris faults the trial court for defining the

157

criminal proof standard as "a sound and sensible reason as opposed to some imaginary or fanciful reason" and more than "a probability[,] . . . mere suspicion, . . . [or] mere possible doubt because everything relating to human affairs is open to some possible doubt." *Morris Direct II*, 60 So. 3d at 373 (internal quotation marks omitted). Morris challenged other language that he contends "distinguished" reasonable doubt from "a vague or arbitrary notion . . . [or] a doubt arising from mere possibility[,] . . . bare imagination[,] or . . . fanciful conjecture." *Id.* Finally, Morris argued that charging the jury with an instruction indicating that "to convict an innocent person or to acquit a guilty person damages the entire criminal justice system" created the false impression "that a wrongful conviction is no more harmful than a wrongful acquittal" under the reasonable-doubt framework. *Id.* at 373; *see also Pruitt v. State*, 270 P.2d 351, 362 (Okla. Crim. App. 1954) ("It has been said it is better that a hundred guilty men go free than one innocent man suffer an unjust conviction.") (quoted in *Morris Direct II*).

Because Morris did not contest the trial court's instructions until his direct appeal, the ACCA reviewed this guilt-phase claim for plain error under Rule 45A. Ala. R. App. 45A. Referencing *United States v. Chandler*, 996 F.2d 1073, 1085, 1097 (11th Cir. 1993), and *Boyde*, the ACCA explained that plain error occurs in jury instructions "only when there is a reasonable likelihood that the jury applied the instruction in an improper manner." *Morris Direct II*, 60 So. 3d at 373 (internal quotation marks omitted). The ACCA clarified that an analysis of whether a reasonable likelihood that a misapplication occurred required an evaluation of the jury instructions "as a whole, not in bits and pieces, and . . . [from] a reasonable juror['s] [viewpoint]." *Id.*

The ACCA excerpted several paragraphs from the trial court's reasonable-doubt instructions that contain most of the language that Morris contested on appeal:

Now, ladies and gentlemen, the burden of proof in this case is on the State of Alabama as it is in any criminal case. And you say, well, what does that mean. Well, it's almost a self-defining term. It means a doubt that you can give a reason for. *And the law means a sound and sensible reason as opposed to some imaginary or fanciful reason*. Sometimes efforts to define beyond a reasonable doubt don't always clarify it. *It's not a probability or a mere suspicion, it's not a mere possible doubt because everything relating to human affairs is open to some possible doubt*.

A reasonable doubt is a doubt of a fairminded juror honestly seeking the truth after careful and impartial consideration of all of the evidence. It's a doubt based upon reason and common sense. *It does not mean a vague or arbitrary notion*, but it's an actual doubt based upon the evidence, the lack of evidence, a conflict in the evidence, or a combination of all of those factors. It's a doubt that remains in your minds after going over the entire case and giving consideration to all of the testimony and evidence and *it's distinguished from a doubt arising from mere possibility, from bare imagination or from fanciful conjecture*.

If after considering all the evidence you're convinced of the defendant's guilt beyond a reasonable doubt, it would be your duty to convict the defendant and you should say so. However, after considering all the evidence in the case you have a reasonable doubt of the defendant's guilt, then you should acquit him and say so in that regard as well.

*Morris Direct II*, 60 So. 3d at 373-74 (emphasis added and internal quotation marks omitted). The ACCA concluded that the entire charge confirmed that the trial court "properly followed the legal guidelines and the Alabama Pattern Jury Instructions in instructing the jury" on the issue of reasonable doubt. *Id.* at 373. The ACCA distinguished the reasonable-doubt language rejected in *Cage v. Louisiana*, 498 U.S. 39 (1990) (per curiam), *overruled on other grounds by Estelle v. McGuire*, 502 U.S. 62, 72 n.4 (1991), and determined that the trial court's instructions "neither lowered the standard of proof nor was it confusing or deficient." *Morris Direct II*, 60 So. 3d at 374.

In *Cage*, the Court reversed a death sentence on due process grounds because "a reasonable juror could have interpreted the instruction to allow a finding of guilt based on a degree of proof below" the constitutional minimum. 498 U.S. at 41. The language that the Supreme Court reviewed

in *Cage*, "equated a reasonable doubt with a 'grave uncertainty' and an 'actual substantial doubt,'" and "refer[red] to 'moral certainty' [of the defendant's guilt,] rather than evidentiary certainty." *Id.*

The ACCA also rejected Morris's argument that the instruction language "impl[ied] that it is preferable to convict an innocent man than to free a guilty one." *Morris Direct II*, 60 So. 3d at 374. Instead, the ACCA concluded that the trial court had simply "instructed [the jury] as to the wrongfulness of both [outcomes]." *Id.*

With this history in mind, the court turns to the habeas analysis. The court starts with an examination of Morris's habeas allegations, turns to the requirement of exhaustion for part of his claim, and ends with a contextual evaluation of the cases that he cites to meet his intentionally-difficult burden under AEDPA.

> **2.    Morris has not overcome AEDPA deference on his claim that the trial court mischarged the jury on reasonable doubt.**

On habeas review, Morris seeks to, at the same time, both limit and add to the scope of the trial record that he asked the ACCA to review on appeal. (*Compare* Doc. # 1 at 107-08 ¶¶ 276-78, *with* Doc. # 15-52 at 124-26 & n.22). Morris based his reasonable-doubt habeas claim upon only two of the trial court's statements that he challenged on direct appeal. That is, he only addresses his arguments as to these phrases: "not a probability or a mere suspicion" and "to convict an innocent person or to acquit a guilty person damages the entire criminal justice system." (Doc. # 1 at 107 ¶¶ 276-77). But at the same time, Morris adds to this claim. He contends that the trial court's reasonable-doubt "statements seem even more troubling" when considering them "in the context of the rest of the trial." (*Id.* at 108 ¶ 278).

Morris points to two examples that he claims "exacerbated the trial court's prejudicial, burden-shifting instructions." *Id.* First, he asserts that during voir dire, the trial court overruled his objection and permitted "the prosecutor to tell the jury that '[t]he State of Alabama or any court could never prove anything . . . to a mathematical certainty or beyond a shadow of a doubt.'" *Id.* Morris mentioned the overruled objection in a footnote on direct review (Doc. # 15-52 at 125-26 n.22), but he did not suggest that the ACCA should consider that voir dire ruling in any context to bolster his reasonable-doubt charge claim. Second, Morris now observes that, similarly to the prosecutor's contested statement in voir dire, the trial court instructed the jury that "'beyond a reasonable doubt does not mean to a mathematical certainty or beyond all doubt.'" (Doc. # 1 at 108 ¶ 278). Before moving to the merits, the court considers the degree that Morris's additional habeas allegations alter the framework for reviewing his reasonable-doubt claim.

Respondent has not asserted a procedural defense based on Morris's failure to exhaust these other aspects of his claim. (Docs. # 21 at 33 ¶¶ 94-95; 22 at 123-25). Instead, Respondent answers that the ACCA "properly rejected this claim on direct appeal." (Doc. # 21 at 33 ¶ 95). At the same time, Respondent does not expressly state that Morris exhausted all habeas allegations he made in state court. Under these circumstances, Morris's additional allegations are not subject to this court's consideration on habeas review because of unexhausted procedural default.

Alternatively, the court treats Morris's new contextual allegations and argument as an amplification of the reasonable-doubt claim that he exhausted on direct appeal. That is, the court views the merits of Morris's added allegations through the lens of AEDPA deference.

Turning to the merits of this claim, Morris's burden under § 2254(d)(1) is two-fold. He has a constitutional hurdle and an (even more demanding) statutory hurdle. To meet his AEDPA

burden, Morris relies on a handful of cases. *Winship*, 397 U.S. at 364; *Sullivan v. Louisiana*, 508 U.S. 275 (1993); *Victor v. Nebraska*, 511 U.S. 1 (1994); *Cage*, 498 U.S. at 41; *Patterson v. New York*, 432 U.S. 197 (1977); and *Francis v. Franklin*, 471 U.S. 307 (1985). (Docs. # 1 at 106-08 ¶¶ 275, 277, 279; 27 at 77-78). Morris also relies on the non-binding authority, citing *Wansing v. Hargett*, 341 F.3d 1207 (10th Cir. 2003), to show that the constitutional error he claims the ACCA committed in rejecting his reasonable doubt claim was extreme enough to warrant relief under § 2254(d)(1). (Docs. # 1 at 106-07 ¶¶ 275-76; 15 at 77).

The court begins with this observation. Morris references case law without detailing an allegedly unreasonable factual determination made by the state courts under § 2254(d)(2). This means that the only conceivable statutory avenue available is § 2254(d)(1). The court scrutinizes the details of the cases Morris cites to determine whether he is entitled to habeas relief under § 2254(d)(1). The court begins with the Supreme Court authorities that Morris cites because holdings from those opinions are the sole source of clearly established federal law under AEDPA.

In *Winship*, the Supreme Court confirmed the longstanding assumption that "the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." 397 U.S. at 364. The *Winship* Court faced the question of what burden of proof to apply "during the adjudicatory stage" of a nonjury, juvenile delinquency proceeding. *Id*. at 359. The appellant in *Winship* contested the constitutionality of his conviction for stealing "$112 from a woman's pocketbook." *Id*. at 360. The appellant argued that the conviction violated his Fourteenth Amendment due process rights because the family court judge determined guilt based on a preponderance of the evidence standard, rather than a reasonable doubt standard. *Id*. at 360. After resolving "any doubt

about the constitutional stature of the reasonable-doubt standard" under the due process clause, *id.* at 364, the Supreme Court held that "juveniles, like adults, are constitutionally entitled to proof beyond a reasonable doubt when they are charged with violation of a criminal law." *Id.* at 365. Notably, *Winship* offers no insight on what the Constitution requires when a trial court charges a jury on reasonable doubt. Thus, while *Winship* explains core principles of due process, the constitutional inquiry and holding are too different to overcome the deference this court must afford to the ACCA's decision under AEDPA.

Morris misses the mark in his reliance on *Cage*. The ACCA distinguished this decision in its opinion denying appellate relief to Morris. As detailed above, the reasonable-doubt language on which Morris based his appeal does not even approach the unconstitutional wording that the *Cage* trial court incorrectly employed. The analysis in *Cage* does not show that the ACCA unreasonably applied Supreme Court precedent or applied it in a contradictory manner.

Further, the harmless-error holding in the capital case of *Sullivan* is similarly unhelpful to Morris. In *Sullivan*, the Supreme Court considered the constitutionality of applying the harmless-error rule to a trial court's undisputedly deficient reasonable doubt charge. 508 U.S. at 276. The *Sullivan* Court reversed the death penalty judgment under two avenues of constitutional analysis. *Id.* at 282. But, before addressing the specific *Sullivan* holdings, the court provides some background about that decision.

During the guilt phase of the *Sullivan* trial, "defense counsel argued that there was reasonable doubt as to both the identity of the murderer and his intent." *Id.* at 276. The trial court gave the jury a charge that was "essentially identical to the one held unconstitutional in *Cage*." *Id.* at 277. On direct appeal, the state acknowledged that the *Sullivan* trial court had used erroneous

language. *Id.* Still, the state supreme court held that the trial court's guilt-phase mistake "was harmless beyond a reasonable doubt." *Id.*

The *Sullivan* Court reversed the state supreme court's harmless-error judgment for two reasons. First, relying on the "interrelated[ness]" of the due process "requirement of proof beyond a reasonable doubt and the Sixth Amendment['s] requirement of a jury verdict," *id.* at 278, the Supreme Court concluded that "[t]he Sixth Amendment requires more than appellate speculation about a hypothetical jury's action." *Id.* at 280. Second, the Supreme Court determined that a deficient reasonable doubt charge is "unquestionably . . . 'structural [as opposed to harmless] error'" because the "consequences" of a constitutionally-compromised "right to a jury verdict of guilt beyond a reasonable doubt" are "unquantifiable and indeterminate." *Id.* at 281-82.

The constitutional underpinnings of Morris's reasonable doubt claim are dissimilar to *Sullivan*, which involved a concededly deficient reasonable doubt standard. Rather, the ACCA decided that the trial court's reasonable doubt instructions did not violate Morris's due process rights under Alabama's plain-error framework. Consequently, "appellate speculation about a hypothetical jury's action" played no role in Morris's adverse appellate outcome. Similarly, the trial court's charge to the jury on reasonable doubt did not offend any holding in *Sullivan*. For these reasons, the case fails to satisfy either one of § 2254(d)(1)'s clauses.

The *Victor* decision actually reinforces (rather than undermines) the reasonableness of the ACCA's decision. This is the case for at least two reasons. First, the *Victor* Court clarified that "the Constitution neither prohibits trial courts from defining reasonable doubt nor requires them to do so as a matter of course." 511 U.S. at 5. Underscoring this principle, the Court observed that *Cage* was the only decision in which it "held that a definition of reasonable doubt violated the Due

164

Process Clause." *Id.* As discussed above, the specific language in *Cage* that fell short—and which diminished the state's burden to prove guilt—was absent from the reasonable doubt instructions the jury received in Morris's capital case.

Second, some of the reasonable doubt wording that survived a constitutional challenge in *Victor* resembles Morris's objection to the trial court's definition of reasonable doubt as "'not a probability or a mere suspicion.'" (Doc. # 1 at 107 ¶ 276). One of the challenged charges in *Victor* "instructed the jury that a reasonable doubt is 'not a mere possible doubt'" and ended with a message that "everything 'is open to some possible or imaginary doubt.'" 511 U.S. at 17. After observing that "reasonable doubt, at a minimum, is one based upon reason" and weightier than "fanciful doubt," *id.* (internal quotation marks omitted), the *Victor* Court rejected the petitioner's due process claim because the complete context of the charge foreclosed any ambiguity and did not create "a reasonable likelihood that the jury . . . appl[ied] it" unconstitutionally. *Id.* at 6, 17.

Nor does Morris's reference to *Patterson* help him in shouldering his AEDPA burden. Morris argues that the *Patterson* Court's reasonable doubt comments confirm that the ACCA violated clearly established federal law. He focuses on the ACCA's conclusion that the trial court's remarks about "damages [to] the entire criminal justice system" from a wrongful conviction or acquittal were not plain error. (Doc. # 1 at 107-08 ¶¶ 27-78); *Morris Direct II*, 60 So. 3d at 373; *see, e.g.*, *Patterson*, 432 U.S. at 208 ("The requirement of proof beyond a reasonable doubt in a criminal case is 'bottomed on a fundamental value determination of our society that it is far worse to convict an innocent man than to let a guilty man go free.'" (quoting *Winship*, 397 U.S. at 372) (Harlan J., concurring)). Only Supreme Court holdings clearly establish federal law under § 2254(d)(1). The *Patterson* Court's restatement of Justice Harlan's concurring commentary about

reasonable doubt made in *Winship* is not a holding.

Moreover, the Supreme Court's holding in *Patterson* does not clearly establish the objective wrongfulness of the ACCA's decision. Instead, unlike a crime's elements (which a state must prove beyond a reasonable doubt), the *Patterson* Court determined that due process does not demand a state to "disprove beyond a reasonable doubt every fact constituting any and all affirmative defenses related to the culpability of an accused." 432 U.S. at 210. For the petitioner in *Patterson*, this meant that requiring him to show "that he had acted under the influence of extreme emotional disturbance" did not offend the due process clause. *Id.* at 200, 216. Thus, the binding portions of the *Patterson* opinion have no parallels that help Morris on habeas review.

*Francis* is the last Supreme Court decision referenced by Morris in relation to this claim. (Doc. # 1 at 107 ¶ 277). He cites *Francis* along with the "far worse to convict an innocent man" quote from Justice Harlan's concurrence in *Winship*, which was cited in *Patterson*. (*Id.* at 107 ¶ 272); *Francis*, 471 U.S. at 313 (internal quotation marks omitted). But just as in *Patterson,* the *circumstances,* and holding in *Francis* are beyond the scope of the ACCA's resolution of Morris's reasonable doubt claim.

The petitioner in *Francis* sought habeas review of his state court capital conviction. 471 U.S. at 312. The petitioner claimed that the trial court's jury instructions violated his due process rights "on the intent element of the offense" because he shifted the burden of persuasion to him. *Id.* The district court denied habeas relief. The Eleventh Circuit reversed that decision. But, the *Francis* Court held that a reasonable likelihood existed that the jury "[mis]understood the . . . instruction . . . as creating a mandatory presumption that shifted to the defendant the burden of persuasion on the crucial element of intent." 471 U.S. at 325. The Supreme Court also concluded

that "the charge read as a whole" did not clear up confusion about that presumption, *Id*. at 325, and that the error was not harmless. *Id.* at 325-26. Unlike *Francis*, Morris's reasonable doubt claim is unrelated to any presumptive-intent instruction. As a result, *Francis* fails to substantiate objective wrongfulness in the ACCA's plain-error rejection of his due process claim.

*Wansing*, the last case Morris cites on this question, involved a reasonable doubt challenge that arose under AEDPA. In *Wansing*, the Tenth Circuit confronted the issue of "whether the degree of certitude required to cancel a wedding at the last minute provides so flawed an analogy to the degree of certitude required to convict a defendant of manslaughter that a verdict rendered by a jury under the influence of such an analogy must be overturned on habeas review." 341 F.3d at 1208. The court concluded that upholding the petitioner's conviction, despite the trial court's misleading comments about reasonable doubt, "would be an unreasonable application of clearly established federal law, as interpreted in *Cage* and *Victor*." *Id.* at 1215. To better understand *Wansing*'s holding, some background is beneficial.

During voir dire, a prospective juror requested "more guidance as to the meaning of [the reasonable-doubt] standard." *Id.* at 1209. The trial court explained that in Oklahoma "it is error to instruct on a definition of reasonable doubt" but noted that some jurisdictions permitted definitions. *Id.* (internal quotation marks omitted). The trial judge cautioned the jury panel that he had not "intend[ed] to express or imply a definition of reasonable doubt." *Id.* (internal quotation marks omitted). The trial judge recounted an example of reasonable doubt that he had heard from a prosecutor in a federal kidnapping case. *Id.* The trial judge explained that the prosecutor had defined reasonable doubt as "the kind of serious doubt that causes you to act or not act in matters that are serious, like calling off a wedding at the last minute." *Id.* (internal quotation marks

omitted). Keeping with the wedding-based reference, the trial court expressed to the jury panel that some people with "the slightest bit of doubt, [would] stop a wedding" while others "wouldn't budge" to avoid "embarrassment" or "inconvenience," despite having serious doubts. *Id.* (internal quotation marks omitted).

The *Wansing* trial court continued that "[t]he fact of the matter was, that reasonable doubt is a subjective matter that has to be resolved by each person, and each person in the individuality of his or her own conscience and reason." *Id.* (internal quotation marks omitted). The trial court added that reasonable doubt would "vary [in] every case, because every case['s] . . . facts and . . . evidence are always different." *Id.* (internal quotation marks omitted). The trial court informed the prospective jurors that "[o]nly [they] c[ould] decide what is reasonable" given that they would use "reason . . . to decide the evidentiary issues in [a] case." *Id.* at 1209-10 (internal quotation marks omitted). After asking rhetorically, "[W]ho are we to tell you what is reasonable and what is not?," the trial court ended with the observation that the reasonable-doubt standard was "wholly within [the jury's] province." *Id.* at 1210 (internal quotation marks omitted).

Arguing that the trial court's reasonable-doubt discussion was misleading, the defense attorney in *Wansing* moved for a mistrial. *Id.* The trial court denied the motion and provided no additional instructions on reasonable doubt. *Id.* The trial lasted three days and ended with a guilty verdict of the charge of manslaughter. *Id.* The petitioner lost on his reasonable doubt claim in the state court, and then sought federal habeas review. *Id.* The district court denied the petition. The Tenth Circuit reversed that decision.

After resolving that AEDPA deference applied to the state court decision, the Tenth Circuit clarified that the problem with the trial court's discussion during voir dire was not that it had

"endors[ed] the 'wedding cancellation' definition" of reasonable doubt, but that "the reasons the trial court gave the jury for why th[at] definition was flawed were themselves misleading." *Id.* at 1214. These ambiguities included signaling "an extraordinarily broad range of possible meanings" and embracing an individualized approach "to resolve the definitional issue." *Id.* The Tenth Circuit added that "because of the Oklahoma rule [that reasonable doubt is self-explanatory], the jury instructions included no correct definition of 'reasonable doubt' that might have dispelled the misleading impression the jury received during voir dire." *Id.* at 1215.

The Tenth Circuit specified "two unconstitutional messages" from the trial court's "story, in combination with [the] emphasis on the subjective nature of each juror's decision regarding the meaning of the [reasonable doubt]." *Id.* First, "the reasonable doubt standard comprises as broad a range of burdens of proof as that suggested by the wedding analogy." *Id.* Second, "jurors have discretion to make their own subjective determination as to what that standard should be." *Id.*

The Tenth Circuit concluded that "given the sweeping nature of the judge's language, it would have been unreasonable for the [state appellate criminal court] to conclude otherwise-especially if it did so, as appears, solely because the remarks were not technically a definition." *Id.* at 1215. The court also determined that the state appellate criminal court "could not reasonably refuse to grant relief solely because the jury's misimpression was caused by . . . [a trial court's misleading] statement[s]" made during voir dire, rather than the formal-instruction phase. *Id.*

Given this backdrop, *Wansing* does not aid Morris in meeting his AEDPA burden. As a threshold matter, the decision is neither clearly established law for AEDPA purposes nor binding on this court. However, even if *Wansing* were controlling precedent, the AEDPA outcome does not establish that the ACCA unreasonably considered Morris's claim. The terminology that Morris

maintains that created a reasonable likelihood that the jury unconstitutionally convicted him simply does not overlap with the language reviewed in *Wansing*. Unlike the record in *Wansing*, the trial court in Morris's capital case did not offer any reasonable-doubt analogies, suggest to the jury a broader "latitude" in defining reasonable doubt than due process permits, *id.* at 1215, nor charge the jurors to subjectively define reasonable doubt. Accepting for analysis purposes that the trial court's remarks about systematic "damages" created some confusion for the jury, *Morris Direct II*, 60 So. 3d at 373, the ACCA did not unreasonably conclude that the complete context of the reasonable-doubt instructions – which, unlike *Wansing*, defined the standard – corrected any ambiguity.

As the summaries confirm, none of Morris's cited decisions substantiate the validity of his habeas claim under AEDPA. First, although the Fifth Amendment applies expressly to the federal government, a § 2254 proceeding may involve a constitutional claim based on an incorporated right arising under the Fifth Amendment, *e.g.*, the right against self-incrimination. But as *Winship* illustrates, the reasonable-doubt standard derives from the Fourteenth Amendment's due process clause directly—rather than indirectly through the incorporation doctrine. Thus, the Fifth Amendment is inapplicable here.

Second, although Morris claims a right to habeas relief under the Sixth Amendment, he has not proven one. Morris's circumstances are unlike the record of appellate speculation in *Sullivan*. And none of Morris's other cited decisions involve a Sixth Amendment holding.

Third, Morris has not overcome AEDPA deference with respect to the heart of his claim— a due process violation under the Fourteenth Amendment. He has not shown that the ACCA contradicted or unreasonably applied Supreme Court precedent in concluding that the trial court's

instructions did not create a reasonable likelihood that the jury convicted him based on a less-demanding standard of proof than beyond a reasonable doubt. *See Raheem v. GDCP Warden*, 995 F.3d 895, 932 (11th Cir. 2021) (explaining that a state court decision "could not have been contrary to or an unreasonable application of clearly established law because no Supreme Court case was on point").

This is true even when factoring the context of the prosecutor's statement during voir dire that the state "could never prove anything . . . to a mathematical certainty or beyond a shadow of a doubt" and the trial court's similar instruction that "'beyond a reasonable doubt does not mean to a mathematical certainty or beyond a doubt.'" (Doc. # 1 at 108 ¶ 278). Morris contends that the specific instructions he challenges combined with these other reasonable-doubt references – unasserted until habeas review – increased the reasonable likelihood that the jury applied an unconstitutional standard of guilt-stage proof. But critically, Morris offers no persuasive, much less binding, authority to back up this proposition. Therefore, the court denies Claim L.

### 3.    Morris's remaining allegations do not support habeas relief.

With Morris's exhausted Fourteenth Amendment due process claim analyzed under AEDPA, the court turns to the rest of Claim L. The court has explained already that Morris's cited cases do not establish habeas relief under the Fifth or Sixth Amendment. And Morris asserts without elaboration that his prosecutorial allegations support a cognizable constitutional right under the Eighth Amendment. (Doc. # 1 at 106 ¶ 274). Morris did so too on direct review. (Doc. # 15-52 at 152). So the court denies relief tied to these remaining amendments as unexhausted, abandoned, undeveloped, or unproven.

**K.      Claim M—Morris has not demonstrated a right to habeas relief because of improper penalty-phase instructions.**

Morris maintains in Claim M that the trial court improperly charged the jury during the penalty phase in violation of his Fifth, Sixth, Eighth, and Fourteenth Amendment rights. (Doc. # 1 at 112 ¶ 290). Morris argues that this court should require resentencing because the ACCA's rejection of this claim was egregious constitutional error under § 2254(d)(1) and (d)(2). (*Id.* at 112-13 ¶ 290). Respondent answers that Morris is without recourse under AEDPA because the ACCA's "decision was reasonable and certainly not so outrageous that no fairminded jurist could agree with it." (Doc. # 21 at 34 ¶ 97). Consistent with AEDPA's highly deferential framework, Respondent has the better argument. Before turning to the habeas analysis, the court recounts the record of the claim in state court.

**1.      State Court Proceedings**

During the penalty phase, the trial court charged the jury on aggravating and mitigating circumstances. Morris did not object to those instructions at trial. But he raised several arguments about those charges on direct review. (Docs. # 15-52 at 113-14; 15-53 at 40). Specifically, he faulted the trial court for not explaining to the jury that the aggravating findings had to be unanimous but that the unanimity requirement did not apply to mitigating circumstances. (Doc. # 15-52 at 113); *Morris Direct II*, 60 So. 3d at 364. Morris also challenged the trial court's "fail[ure] to instruct the jury that it should recommend a sentence of life imprisonment if the aggravating and mitigating circumstances weighed equally." (Doc. # 15-52 at 114); *Morris Direct II*, 60 So. 3d at 364.

Morris maintained that the trial court's penalty-phase mistakes violated his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments. (Doc. # 15-52 at 114). Morris supported his

172

appellate claim with *Ring v. Arizona*, 536 U.S. 584 (2002); *Mills v. Maryland*, 486 U.S. 367 (1987); and *Godfrey v. Georgia*, 446 U.S. 420 (1980). (Doc. # 15-52 at 113-14).

Because Morris did not contest the trial court's sentencing instructions until his direct appeal, the ACCA reviewed this claim for plain error under Rule 45A. Relying mostly on Alabama precedent that had foreclosed similar penalty-phase claims, the ACCA determined that the trial court had not plainly erred. *Morris Direct II*, 60 So. 3d at 364-67.

Turning to the first subpart about unanimous aggravating factors, the ACCA rejected Morris's contention that the trial court's instructions were constitutionally deficient. In reaching this conclusion, the ACCA relied largely on its decision in *Newton v. State*, 78 So. 3d 458 (Ala. Crim. App. 2009). *Morris Direct II*, 60 So. 3d at 364.

In *Newton*, the jury convicted the appellant of robbery-murder. *Newton*, 78 So. 3d at 472. The appellant asserted – similar to Morris – that the trial court's failure to include the unanimity requirement for aggravating findings violated his Eighth and Fourteenth Amendment rights. *Id*. at 472; *see Morris Direct II*, 60 So. 3d at 364. Reiterating its understanding that "*Ring* requires only that the jury unanimously find the existence of an aggravating circumstance in order to make the defendant death-eligible," the ACCA rejected the appellant's claim. *Newton*, 78 So. 3d at 472 (internal quotation marks omitted); *Morris Direct II*, 60 So. 3d at 365 (internal quotation marks omitted); *see also Ex parte McNabb*, 887 So. 2d 998, 1006 (Ala. 2004) ("The jury's unanimous finding of one aggravating circumstance is sufficient to satisfy *Ring*.") (internal quotation marks omitted) (quoted in *Morris Direct II*). Consistent with *Newton*, the ACCA reasoned that the trial court's instructions did not conflict with *Ring* because the robbery and murder circumstances contained in the jury's unanimous guilt-phase findings against Morris transferred to the penalty

173

phase. *Morris Direct II*, 60 So. 3d at 364.

Moving to the second subpart about nonunanimous mitigating factors, the ACCA relied again on *Newton* and concluded that the trial court committed no plain error in the charges. *Morris Direct II*, 60 So. 3d at 365. Critically, after considering the instructions, the ACCA determined that "no 'reasonable likelihood or probability' [existed] that the jurors might have believed that they were required to unanimously find the existence of any particular mitigating circumstance." *Id.*

As to the issue related to evidence in aggravation and mitigation weighing equally, the ACCA disagreed with Morris's argument that the trial court's failure to address this deliberative possibility plainly violated his substantial rights. *Id.* at 367. Instead, the ACCA concluded that a review of the "complete" charges reflected "no indication that the fairness of the sentencing proceeding was in any way affected." *Id.* at 367. With this history in mind, the court considers the merits of Morris's habeas claim.

### 2.   Morris has not overcome AEDPA deference on his claim that the trial court incorrectly charged the jury on the sentencing factors.

On habeas review, Morris divides Claim M into three subclaims which correspond with his arguments on direct appeal: (1) the trial court violated his constitutional rights because the instructions did not clarify that an aggravating finding requires unanimity; (2) a mitigating finding requires no unanimity; and (3) an equal-weight finding requires a recommended life sentence. (*Compare* Doc. # 1 at 109-13 ¶¶ 281-90, *with* Doc. # 15-52 at 113-14). Respondent counters that the ACCA considered "each alleged error" and appropriately denied relief. (Doc. # 21 at 34).

As with any exhausted claim, Morris's AEDPA burden is two-fold—he must show a constitutional violation and establish that the state-court outcome was egregiously wrong under §

2254(d)(1) or (d)(2). *See Richter*, 562 U.S. at 103 ("[I]f the state court denies the claim on the merits, the claim is barred in federal court unless one of the exceptions to § 2254(d) set out in §§ 2254(d)(1) and (2) applies."). To create an AEDPA opening, Morris references several authorities to show the clearly established law component of (d)(1) but identifies no factual determination which he contends was unreasonable under (d)(2). Consequently, because Morris has not developed a conceivable right to habeas relief under (d)(2), the court limits its remaining analysis of Claim M to whether he satisfies the requirements of (d)(1).

> **a.** **Morris has not overcome AEDPA deference on his unanimity requirement claim.**

To meet his (d)(1) burden, Morris must support his aggravation allegations in subclaim M.1 with contextually relevant Supreme Court precedent. At a minimum, this means that Morris must identify cases in which the Supreme Court has addressed the constitutionality of aggravating instructions or findings in a death penalty case. Otherwise, the scope of the cited decision's holding would be too removed to show that the ACCA's denial of Morris's aggravation-charge subclaim was contrary to or an unreasonable application of clearly established law.

The Supreme Court cases which Morris references to support subclaim M.1 are *Ring v. Arizona*, 536 U.S. 584 (2002); *Richardson v. United States*, 526 U.S. 813 (1999); *Ballew v. Georgia*, 435 U.S. 223 (1974); and *Burch v. Louisiana*, 441 U.S. 130 (1978). (Doc. # 1 at 109-10 ¶¶ 282-83). But scrutinizing the penalty phase of a death penalty case for constitutional error was not a part of *Richardson*, *Ballew*, or *Burch*. Instead, the Supreme Court addressed juror unanimity for convictions in *Richardson* and *Burch*. *See Richardson*, 526 U.S. at 815-16 (requiring "unanimity in respect to each individual violation" to support a conviction under a federal statute that prohibits a "'person' from 'engag[ing] in a continuing criminal enterprise'"); *Burch*, 441 U.S.

at 134 (holding that a "conviction by a nonunanimous six-member jury in a state criminal trial for a nonpetty offense deprives an accused of his constitutional right to trial by jury"). The *Ballew* Court held that a "five-member jury does not satisfy the jury trial guarantee of the Sixth Amendment, as applied to the States through the Fourteenth" in nonpetty-misdemeanor cases, regardless of an unanimity requirement. 435 U.S. at 228, 241.

This analysis leaves Morris with only the *Ring* decision to substantiate the merits of his subclaim contained in section M.1. As discussed in Claim L, the Supreme Court based its *Ring* decision upon the Sixth Amendment right to a jury trial. And because of *Ring*'s Sixth Amendment foundation, Morris has failed to develop or prove a violation of his Fifth, Eighth, or independent Fourteenth Amendment rights based on subclaim M.1's contents. Thus, the court's focus is on whether Morris has overcome the AEDPA deference tied to the state court's Sixth Amendment ruling.

Turning to (d)(1)'s first clause, Morris has not established a contrary to application of Supreme Court precedent because the Sixth Amendment underpinnings in *Ring* and his unanimity challenge are materially different. He asserts in subclaim M.1 that the trial court's incomplete instructions on aggravation led to his unconstitutional death sentence. But *Ring* is not a jury-instruction case. Instead, the constitutional question faced by the *Ring* Court was whether Arizona's capital sentencing framework – which lacked any unanimous jury finding in aggravation beyond a reasonable doubt – was structurally sound under the Sixth Amendment. Thus, the Sixth Amendment outcome in *Ring* is ineffective as a first-clause (d)(1) authority.

Just as *Ring* is inadequate to establish Morris's claims under (d)(1)'s first clause, it is similarly inadequate to establish his claims that the ACCA unreasonably applied Supreme Court

precedent under (d)(1)'s second clause. First, *Ring* does not speak to how the Sixth Amendment governs jury charges on aggravation. Second, Morris has offered no Eleventh Circuit or other binding authority that suggests that the ACCA unreasonably rejected his aggravation subclaim based on the *Ring* Court's critique of Arizona's capital-sentencing structure.

Third, even if *Ring* could be read to raise doubts about the ACCA's rejection of Morris's aggravation subclaim under the Sixth Amendment (and, to be clear, it cannot), under (d)(1)'s second clause, a petitioner must do more than merely cast doubt on an adverse state-court outcome. Instead, Morris must persuade this court that the ACCA's denial of his plain-error challenge was so objectively wrong that no room for disagreement among fairminded jurists exists. *See Richter*, 562 U.S. at 101 ("A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision.") (internal quotation marks omitted). Morris has not shown that *Ring* entitles him to any relief, particularly given that the jury was unanimous in making the findings necessary for the aggravating factors of robbery and burglary findings.

### b. Morris has not overcome AEDPA deference on his unanimity for mitigating circumstances claim.

Morris challenges the ACCA's denial of his mitigation-charge subclaim under (d)(1) based on the Eighth Amendment holdings in *Mills v. Maryland*, 486 U.S. 367 (1987) and *McKoy v. North Carolina*, 494 U.S. 433 (1990). (Doc. # 1 at 110-11 ¶ 284). Although Morris mentioned *Mills* in his appellate brief (Doc. # 15-52 at 113), the ACCA did not discuss that authority in its decision. In *Mills*, the Supreme Court agreed with the petitioner that his death sentence was arbitrary because the jury charges and the verdict form created "a substantial probability that reasonable jurors . . . well may have thought they were precluded from considering any mitigating evidence unless all

12 jurors agreed on the existence of a particular such circumstance." 486 U.S. at 384. Likewise, the *McKoy* Court held that "North Carolina's unanimity requirement [applicable to mitigation] impermissibly limit[ed] [the] jurors' consideration of mitigating evidence and . . . [was] contrary to [the] decision in *Mills*." 494 U.S. at 444. Because *Mills* and *McKoy* are unrelated to any Fifth, Sixth, or free-standing Fourteenth Amendment rights, the court denies habeas relief based on those constitutional grounds as abandoned, undeveloped, and unproven. The court dives deeper with respect to the Eighth Amendment and whether Morris has established a right to (d)(1) habeas relief based on *Mills* and *McKoy*.

In *Mills*, the jury convicted the petitioner "of the first-degree murder of his cellmate." 486 U.S. at 369. During the penalty phase, the jury found "one statutory aggravating circumstance" on account of the petitioner's "murder [of the victim] at a time when he was confined in a correctional institution." *Id.* at 370 (alteration added) (internal quotation marks omitted). Although the petitioner offered mitigating evidence, including his "relative youth, . . . mental infirmity, [and] . . . lack of future dangerousness, . . . . [t]he jury marked 'no' [on the verdict form] beside each referenced mitigating circumstance and returned a sentence of death." *Id.* The petitioner argued that his death sentence was unconstitutional because "even if *some* or all of the jurors were to believe some mitigating circumstance or circumstances were present, unless they could unanimously agree on the existence of the same mitigating factor, the sentence necessarily would be death." *Id.* at 371 (emphasis in original). The state appellate court acknowledged "that if the statute and form were read as petitioner suggested, jurors *would be* improperly prevented from giving due consideration to mitigating evidence." *Id.* at 372 (emphasis in original). Still, the state appellate court upheld the death sentence under a construction which "preserve[d] [the]

constitutionality but which may not have been evident . . . to the jury." *Id.* at 369. As the state appellate court explained this approach, when unanimity was lacking on the existence or non-existence of a mitigating circumstance, the jury should "leav[e] [the] answer to that circumstance blank" on the verdict form. *Id.* at 373. And during the balancing phase, "each juror [should] weigh the mitigating circumstances he or she found to be established and balance them against the aggravating circumstances unanimously found by the jury." *Id.*

Against this backdrop, the *Mills* Court focused on "whether petitioner's interpretation of the sentencing process [wa]s one a reasonable jury could have drawn from the instructions given by the trial judge and from the verdict form employed in this case." *Id.* at 375-76. As the Supreme Court explained, "[i]f the jury understood the verdict form as the [state appellate court] asserted it should have, then . . . [a] 'no' beside a mitigating circumstance . . . indicated [a] unanimous conclusion that petitioner had not proved the relevant facts by a preponderance of the evidence, and thus the court properly upheld the judgment." *Id.* at 376. Alternatively, "if the jury understood that it should mark 'no' when it failed to agree unanimously that a mitigating circumstance existed, then some jurors were prevented from considering factors which may call for a less severe penalty, and [the] petitioner's sentence cannot stand." *Id.* (internal quotation marks and citation omitted).

The Supreme Court reviewed the trial court's instructions about the verdict form in *Mills* and concluded that there was "a substantial risk" "that the jury was misinformed." *Id.* at 381. Gaps between the state appellate court's construction and the trial court's instructions included the "difficulty to read into [the relevant charges] a requirement that the 'no' answer, like the 'yes' answer, must be unanimous" and that there was no "suggest[ion] [that] the jury could leave an answer blank and proceed to the next stage in its deliberations." *Id.* at 378-79. Ultimately, the *Mills*

Court determined that "the possibility that [the] petitioner's jury conducted its task improperly certainly [wa]s great enough to require resentencing." *Id.* at 383.

Although the Supreme Court evaluated mitigation charges in *Mills*, the contextual similarities to Morris's subclaim end there. For example, the trial court's instructions in *Mills*, combined with the ambiguously worded verdict form, created a risk that a reasonable jury would have misunderstood that a mitigation finding had to be unanimous before weighing that circumstance against any aggravating factor. Here, Morris has not specified which portions of the trial court's mitigation charges caused any Eighth Amendment confusion over whether the jury's mitigating findings had to be unanimous. Morris does not raise any questions about the verdict form. Because of these critical differences, Morris's reliance on *Mills* does not show that the ACCA reached an Eighth Amendment conclusion that was contrary to or objectively unreasonable under Supreme Court precedent.

The Supreme Court's reasoning in *Mills* led inexorably to its holding in *McKoy*. *See McKoy*, 494 U.S. at 435 (referencing *Mills*). Under North Carolina's former capital sentencing framework, the *McKoy* jury could not consider "any mitigating factor that [it] d[id] not unanimously find." *Id.* The trial court's oral instructions and written verdict form included the unanimity requirement for mitigating circumstances. *Id.* at 435-36. The *McKoy* Court rejected "the state court's inventive attempts to distinguish *Mills*," *id.* at 439, and disagreed with the state's efforts to "save the unanimity requirement." *Id.* at 441. Accordingly, the Supreme Court vacated the petitioner's capital sentence under the Eighth Amendment. *Id.* at 435.

Like *Mills*, *McKoy* is inadequate to satisfy Morris's (d)(1) burden under either clause. The *McKoy* Court based its holding on a structurally-deficient sentencing process, which prohibited

jurors from properly weighing proven mitigation evidence in conflict with the Eighth Amendment. But a sentencing framework that endorses unanimity for mitigating factors is not part of Morris's subclaim. Morris does not argue that the ACCA committed extreme Eighth Amendment error under (d)(1) because the trial court instructed the jury – orally and in the verdict form – to only consider unanimously-proven mitigating circumstances. Instead, Morris asserts that the trial court's mitigation charges were deficient because the trial court did not instruct the jury that mitigating findings did not have to be unanimous. Given Morris's varying allegations, *McKoy* does not demand an opposite constitutional outcome or show that reasonable jurists could disagree about the correctness of the ACCA's decision.

### c. Morris has not overcome AEDPA deference on his outweighing claim.

Morris next asserts that the trial court's instruction that "in the case you determine that the mitigating circumstances outweigh any aggravating circumstances that exist or no aggravating circumstance does exist, your verdict would be to recommend punishment of life imprisonment without parole" was improper. (Doc # 1 at 111 ¶ 285) (internal quotation marks omitted). Morris contends that "[t]his instruction contravened a long line of Supreme Court cases." (*Id.* ¶ 286). Morris argues that the trial court should have clarified that a recommended death penalty requires a finding that the aggravating circumstances outweigh the mitigating ones to avoid any confusion over what the jury should propose if the aggravating and mitigating factors weigh equally. (*Id.*).

To support his equal-weight instruction subclaim, Morris relies on Supreme Court and Alabama court decisions. (Docs. # 1 at 11-12 ¶¶ 286-89; 27 at 78-79). The Supreme Court cases that Morris cites suggest that he is basing the constitutional merits of subclaim M.3 on the Eighth Amendment. Because Morris has not proven that the trial court's failure to give an equal-weight

instruction violated his Fifth, Sixth, or free-standing Fourteenth Amendment rights, the court denies habeas relief.

Several of the Supreme Court decisions that Morris references may help explain core constitutional-sentencing principles under the Eighth Amendment. But none of those cases hold that a trial court must instruct a jury on what to do "if the aggravating and mitigating circumstances weigh[] equally." (Doc. # 1 at 111 ¶ 285) (internal quotation marks omitted). This contextual gap means that Morris has not shown that the ACCA's rejection of this subclaim warrants habeas relief under either clause of (d)(1).

For example, in *Abdul-Kabir v. Quarterman*, 550 U.S. 233 (2007), the Supreme Court noted that its decisions "had firmly established that sentencing juries must be able to give meaningful consideration and effect to all mitigating evidence that might provide a basis for refusing to impose the death penalty on a particular individual." *Id.* at 246. But, the *Abdul-Kabir* Court's holding turned on the state's unconstitutional restraints that prohibited the jury from considering the petitioner's moral culpability as mitigation, not the trial court's obligation to instruct the jury on the possibility of mitigation and aggravation evidence weighing equally. *Id.* at 263-64. Thus, *Abdul-Kabir* is a decision addressing moral culpability, not equal weight.

Similar to *Abdul-Kabir*, in *Penry v. Lynaugh*, 492 U.S. 302 (1989), which was abrogated on other grounds by *Atkins*, and modified by *Boyde*, the Supreme Court did not encounter an equal-weight sentencing issue. Instead, the *Penry* Court reiterated that "the Constitution limits a State's ability to narrow a sentencer's discretion to consider relevant evidence that might cause it to decline to impose the death sentence." *Id.* at 327 (internal quotation marks and emphasis omitted). Consistent with this principle, the *Penry* Court reversed a death sentence because of a deficient

process that narrowed the jury's consideration of mitigating factors. The Court determined that "in the absence of instructions informing the jury that it could consider and give effect to the mitigating evidence of . . . mental retardation and [an] abused background . . . , the jury [had] . . . [no] vehicle for expressing [a] 'reasoned moral response' to that evidence in rendering [the] sentencing decision." *Id.* at 328.

In *Godfrey v. Georgia*, 446 U.S. 420 (1980), the Supreme Court did not face the issue of equal weight. Rather, the *Godfrey* Court reversed a death sentence because of arbitrariness. The state's reliance on the aggravating factor that the petitioner's offense was "outrageously or wantonly vile, horrible and inhuman," reflected "no principled way to distinguish [the petitioner's] case . . . from the many . . . in which" the punishment was not capital. *Id.* at 426.

Similarly, the Supreme Court did not evaluate whether the Eighth Amendment required a jury instruction on equally balanced sentencing factors in *Stringer v. Black*, 503 U.S. 222 (1992). Rather, the *Stringer* Court considered whether the habeas petitioner could challenge his death sentence based on an invalid aggravating factor even though he had not challenged two other aggravating circumstances. *Id.* at 222, 226.

The Alabama decisions that Morris references in his equal-weight instruction subclaim are *Ex parte Bryant*, 951 So. 2d 724, 727 (Ala. 2002), and *McNabb*, 887 So. 2d at 1004. State court authorities do not support Morris's AEDPA contention because they are not clearly established federal law under (d)(1). In any event, neither decision suggests that the outcome in Morris's appeal was contrary to Supreme Court precedent under (d)(1)'s first clause. And neither case suggests that the ACCA unreasonably denied Morris's equal-weight subclaim under (d)(1)'s second clause.

In *Bryant*, the Alabama Supreme Court held that the trial court committed plain error when its jury instructions permitted "the conclusion that the death penalty is appropriate even if the aggravating circumstances do not outweigh the mitigating circumstances." 951 So. 2d at 730. The record also lacked "other instructions . . . [or] . . . feature[s]" that cured the deficiently worded charges. *Id.* Unlike the compromised death sentence in *Bryant*, Morris has identified no instruction that authorized the jury to recommend capital punishment in his penalty phase if the aggravating and mitigating factors weighed equally.

*McNabb* actually reinforces, rather than undermines, the ACCA's decision. In *McNabb*, the Alabama Supreme Court considered a plain-error challenge much like that advanced by Morris. The petitioner argued that the *McNabb* trial court should have instructed the jury to recommend life if the aggravating and mitigating factors were equal in weight. 887 So. 2d at 1002. Considering the charges' complete meaning, including language that overlaps with Morris's subclaim, the Alabama Supreme Court disagreed. *Id.* at 1001 (instructing the jury to recommend life if "the mitigating circumstances outweigh any aggravating circumstance or circumstances that exist" or if "not convinced beyond a reasonable doubt that at least on aggravating circumstance does exist") (emphasis omitted).

In *McNabb*, the Alabama Supreme Court distinguished *Bryant* and observed that the *McNabb* trial court never implied that a recommended death sentence would be appropriate even if the jury found no aggravating circumstance. *Id.* at 1004 ("The charge in this case was not infected with the peculiar error present in *Bryant*, that is, the jury in this case was not invited to recommend a sentence of death without finding any aggravating circumstance."). Guided by the outcome in *McNabb*, the ACCA reviewed the sentencing instructions the trial court gave in

Morris's case and determined that no plain error had occurred. *See Morris Direct II*, 60 So. 3d at 366 ("The instructions given by the trial court in the present case were essentially identical to those" which were harmless in *McNabb*.). Nothing alleged by Morris in this subclaim undermines the ACCA's reliance on *McNabb*.

In reply, Morris references two Supreme Court cases: *Francis*, 471 U.S. 307 (1985) and *Adams v. Texas*, 448 U.S. 38 (1980). (Doc. # 27 at 78-79). Although *Francis* and *Adams* are both death penalty decisions, neither case affects this court's AEDPA analysis of Morris's penalty-phase subclaims. The *Francis* Court addressed deficiencies in guilt-phase jury instructions "that ha[d] the effect of relieving the [s]tate of the burden of proof" in violation of the petitioner's Fourteenth Amendment due process rights. *Francis*, 471 at 313. The *Adams* Court analyzed whether excluding prospective jurors who expressed that "they would be 'affected' by the possibility of the death penalty" but who were not "irrevocably opposed to capital punishment" violated the petitioner's *Sixth* Amendment rights. 448 U.S. at 49, 51. Because *Francis* and *Adams* are unrelated to capital sentencing, they do not show that the ACCA committed extreme constitutional error in the denial of Morris's instructional-based subclaims.

The authorities cited by Morris do not substantiate that the ACCA's rejection of his subclaims challenging the trial court's penalty-phase jury charges was contrary to or an unreasonable application of Supreme Court precedent. Accordingly, the court denies the relief sough in this claim.

L.   **Claim N—Morris has not demonstrated a right to habeas relief because the sentencer relied upon robbery and burglary convictions as independent aggravating factors.**

Morris maintains in Claim N that his death sentence violates the Eighth Amendment

185

because the jury and the trial court counted overlapping conduct for burglary and robbery twice in aggravation. (Doc. # 1 at 126 ¶ 319). In this portion of his arguments, Morris seeks relief under (d)(1) and (d)(2) of AEDPA. (*Id.* at 116 ¶ 296). Respondent answers that Morris has not shown a constitutional violation, much less a state-court determination involving an unreasonable application of Supreme Court precedent. (Doc. # 21 at 35). The court agrees that Morris has not carried his demanding AEDPA burden. The court summarizes the state-court record and follows with the habeas analysis of this claim.

### 1. State Court Proceedings

Morris maintained on direct review that the Eighth Amendment precluded the jury and trial court from treating his convictions for burglary and robbery "as two distinct aggravating circumstances" in the penalty phase. (Doc. # 15-52 at 86). Because Morris did not raise this claim until his appeal, the ACCA evaluated the claim for plain error.

On appeal, Morris primarily relied on *Powell v. State*, 631 So. 2d 289 (Ala. Crim. App. 1993), and *Harris v. Alabama*, 513 U.S. 504 (1995). (Doc. # 15-52 at 86, 89). The ACCA did not discuss those two decisions but instead rejected Morris's claim based on *Turner v. State*, 924 So. 2d 737 (Ala. Crim. App. 2002), *opinion on return to remand*, 924 So. 2d at 793 (Ala. Crim. App.), *opinion on return to second remand*, 924 So. 2d at 796 (Ala. Crim. App. 2003). Consequently, to understand the ACCA's reasoning, the court examines the details of *Turner*.

Similar to this case, a jury convicted the appellant in *Turner* "of two counts of capital murder for [killing the victim] during the course of a rape and . . . robbery." *Id.* at 745. The appellant "waived his sentencing hearing before a jury." *Id.* Weighing the factors in aggravation, including robbery and rape, the trial court sentenced the appellant to death. *Id.*

186

The appellant in *Turner* challenged the "constitutional[ity]" of the sentencing court's reliance on "robbery and rape . . . as two separate aggravating circumstances" under Ala. Code § 13A-4-49(4). *Id.* at 790. That code section specifies that "[a]ggravating circumstances" include a defendant's commission of a capital offense coupled with a "rape, robbery, burglary, or kidnapping." Ala. Code § 13A-5-49(4). The ACCA rejected the appellant's constitutional claim in *Turner*, reiterating that "[i]f the actions committed during the course of the murder support the finding that more th[a]n one of the enumerated underlying felonies was committed, then a trial court may apply § 13A-5-49(4) more than once." *Turner*, 924 So. 2d at 790 (internal quotation marks omitted).

Similar to the decision in *Turner*, the ACCA here concluded that, because the circumstances "supported a finding that [the] murder occurred during a burglary and robbery . . . each aggravating circumstance should apply to Morris's sentencing." *Morris Direct II*, 60 So. 3d at 350; *see also Stewart v. State*, 730 So. 2d 1203 (Ala. Crim. App.) ("We hold that the aggravating circumstance enumerated in § 13A-5-49(4) may apply more than once if the accused murders another while committing any variation of the four enumerated felonies contained in § 13A-5-49(4)."), *aff'd*, 730 So. 2d 1246 (Ala. 1997).

With this background in mind, the court considers Morris's overlapping-aggravation claim on habeas review. Consistent with Morris's other exhausted habeas claims, he must overcome the AEDPA deference this court must give to the ACCA's rejection of this claim through proof of extreme constitutional error.

  2.  **Morris has not demonstrated he is entitled to relief under AEDPA because Alabama treats burglary and robbery as separate aggravating factors.**

  Similar to his position in his appeal (Doc. # 15-52 at 8), Morris bases his overlapping-aggravation claim solely on the Eighth Amendment, citing several Supreme Court and Alabama cases. Although Morris makes bare reference to § 2254(d)(2), he has not developed how the ACCA unreasonably determined a fact in light of the evidence presented in the state court. And Morris cannot meet the (d)(2) standard without identifying a factual conflict reflected in the state court record. Thus, the court limits its AEDPA evaluation to whether Morris meets the disjunctive clauses of (d)(1).

  Identifying contextually relevant Supreme Court holdings is critical to satisfying either clause of § 2254(d)(1). This means that Morris must identify decisions in which the Supreme Court has addressed a claim that counted similar conduct as more than one aggravating circumstance violates the Eighth Amendment. Morris cites *Maynard v. Cartwright*, 486 U.S. 356 (1988); *Woodson v. North Carolina*, 428 U.S. 280 (1976); *Epinosa v. Florida*, 505 U.S. 1079 (1992) (per curiam); *Sochor v. Florida*, 504 U.S. 527 (1992); *Clemons v. Mississippi*, 494 U.S. 738 (1990); *Harris*, *supra*; *Stringer v. Black*, 503 U.S. 222 (1992), *holding modified by Brown v. Sanders*, 546 U.S. 212 (2006); *Barclay v. Florida*, 463 U.S. 939 (1983) (plurality opinion); and *Brown*. (Doc. # 1 at 113-16 ¶¶ 291-95); (Doc. # 27 at 80). But a claim of overlapping conduct counted twice in aggravation is not a constitutional issue addressed in any of these cases.

  For example, the *Maynard* Court upheld the Tenth Circuit's "holding that the aggravating circumstance [of "'especially, heinous, atrocious, or cruel'" as applied in Oklahoma] was unconstitutionally vague" under the Eighth Amendment. 486 U.S. at 359-60. In *Epinosa*, the

Supreme Court reaffirmed the sentencing principle that "the weighing of an invalid aggravating circumstance violates the Eighth Amendment." 505 U.S. at 1081-82. But like in *Maynard*, the Court's holding turned upon an unconstitutionally-vague aggravating factor rather than allegedly overlapping aggravating circumstances.

Nor did the Supreme Court address overlapping aggravating circumstances in *Barclay*. Rather, the Court considered whether upholding a death sentence based partly on an invalid aggravating factor violated the Eighth and Fourteenth Amendments. 463 U.S. at 951. In sentencing the petitioner to death, the *Barclay* trial court relied on his criminal record as an aggravating factor, which violated Florida law. *Id*. at 946. Applying a harmless-error analysis, the state supreme court upheld the death sentence. *Id*. at 946, 955. The *Barclay* Court concluded that the trial court's error did not "infect[] the balancing process created by the [state] statute" such that the state supreme court violated the Constitution by "let[ting] the sentence stand." *Id*. at 956.

Similarly, in *Sochor*, the Court concluded that the sentencing court had violated the Eighth Amendment because one of its aggravating findings lacked evidentiary support. 504 U.S. at 539. Given the Eighth Amendment violation, the constitutional question that the *Sochor* Court faced was whether the state supreme court had "cure[d] the error [adequately] under the rule announced in *Clemons*." *Id*. at 539-40. The *Clemons*' Court held that "the Federal Constitution does not prevent a state appellate court from upholding a death sentence that is based in part on an invalid or improperly defined aggravating circumstance either by reweighing of the aggravating and mitigating evidence or by harmless-error review." *Sochor*, 494 U.S. at 741. Because it concluded that the state supreme court's decision lacked confirmation of compliance with the *Clemons* rule, the *Sochor* Court vacated the death sentence and remanded the case. *Id*. at 755.

189

*Stringer* did not involve a death-sentence challenge related to overlapping aggravating factors that were unconstitutionally combined. In *Stringer*, the Court clarified that a habeas petitioner could challenge a death sentence as invalid under those authorities, just as death-penalty appellants did in *Maynard* and *Clemon*. But, those decisions did not "announce[] a new rule." 503 U.S. at 224-25, 237.

In *Brown*, the Supreme Court considered whether a capital sentence based partially on invalidated special circumstances was constitutional. *See* 546 U.S. at 214. The *Brown* Court reasoned that a constitutional violation did not occur. The *Brown* decision does nothing to advance Morris's Eighth Amendment argument about overlapping aggravating circumstances. *Id.* at 220 ("An invalidated sentencing factor . . . will render the sentence unconstitutional by reason of its adding an improper element to the aggravation scale in the weighing process *unless* one of the other sentencing factors enables the sentencer to give aggravating weight to the same facts and circumstances.") (footnote omitted).

*Harris* is of even less help to Morris. There, the petitioner did not challenge her death sentence because of aggravating circumstances but rather the trial court's override of the jury's imprisonment-for-life recommendation. 513 U.S. at 507-08 (internal quotation marks omitted). The *Harris* Court held that "the Eighth Amendment does not require the [s]tate to define the weight the sentencing judge must accord an advisory jury verdict." *Id*. at 512. Likewise, the *Woodson* Court did not face an overlapping-aggravation challenge but rather a claim that a mandatory death sentence statute violated the Eighth and Fourteenth Amendments. 428 U.S. at 305.

None of the Supreme Court cases Morris cites have held that an Eighth Amendment violation occurs when a sentencer relies on overlapping aggravating factors. *Cf. Jones v. United*

190

*States*, 527 U.S. 373, 398 (1999) ("We have never before held that aggravating factors could be duplicative so as to render them constitutionally invalid, nor have we passed on the 'double counting' theory."). And, without pointing to any clearly established law, Morris's efforts to meet his (d)(1) burden fail under both clauses.

Relying on an excerpt from *Powell*, Morris also asserts that Alabama law forecloses a sentencer from "find[ing] *two* aggravating circumstances based on the fact that the murder was committed during both a burglary and a robbery." 631 So. 2d at 293; (Doc. # 1 at 113 ¶ 292). Just as occurred during the guilt phase of Morris's capital trial, a jury convicted the *Powell* appellant of murder during a robbery and burglary. *Id*. at 290. During the state's penalty-phase closing, the prosecutor argued that the jury should give "the aggravating circumstance of murder during a robbery and murder during a burglary. . . . additional weight because [the state] proved both, robbery and a burglary." *Id.* at 293. The appellant criticized this language claiming that the prosecutor had "urged the jury to find two aggravating circumstances from the single aggravating circumstance outlined in [Alabama] Code 1975, § 13A-5-49(4)." *Id*. at 293.

In deciding that the prosecutor in *Powell* had done "nothing improper," the ACCA explained that penalty-phase deliberations require a jury to "weigh" the strength of the aggravating and mitigating circumstances and not perform some "numerical" assessment. *Id*. at 293-94 (internal quotation marks omitted). The ACCA noted that both the trial court and the prosecutor had discussed "the weighing process . . . [used] [to] determine[e] [an] advisory sentence." *Id.* The ACCA concluded that the prosecutor's "*more weight*" approach did not circumvent the jury's weighing process. *Id.* at 293. The ACCA contrasted that argument with a closing argument that "urge[d] [a] jury simply to count the number of aggravating circumstances or . . . to improperly

191

find two aggravating circumstances . . . [because] the murder was committed during both a burglary and a robbery." *Id.* at 293.

Given the ACCA's discussion in its *Powell* decision, Morris contends that the prosecutor should not have used the word "two" to describe the state's proven capital offenses and arguing the case in aggravation against him. (Doc. # 1 at 114 ¶ 292). Morris maintains that, contrary to *Powell*, the prosecutor's statements that "those two [factors] have been proven" caused the jury to rely separately on robbery and burglary as aggravating circumstances. (Doc. # 1 at 114 ¶ 292). Morris also contends that the trial court's instructions to the jury and sentencing order were also invalid under *Powell*. (Doc. # 1 at 114 ¶ 292). According to Morris, the prosecutor's statements, coupled with the invalidation of robbery and burglary as separate aggravating factors under *Powell*, violate his Eighth Amendment sentencing rights. (Docs. # 1 at 114 ¶ 292; 27 at 79-82).

But Morris's reliance on *Powell* to assert an Eighth Amendment violation is off the mark. First, a fair reading of *Powell* does not support the argument that the ACCA invalidated the option of relying on robbery and burglary separately to establish an aggravating factor under § 13A-5-49(4). Instead, the ACCA concluded that the prosecutor's argument – that the jury should consider giving more weight in aggravation because of the robbery-and burglary-murder capital convictions – was not improper. 631 So. 2d at 293. The ACCA's discussion of what the prosecutor did not do in *Powell* pointed to the difference between properly arguing aggravation (within the parameters of Alabama's weighing process) versus improperly inviting the jury to count, rather than weigh, the aggravating factors of robbery and burglary.

Second, even to the extent that the ACCA intimated in *Powell* that treating robbery and burglary as separate evidence in aggravation is improper under Alabama law (and to be clear, this

192

court concludes there is no reason to believe that was the case), that was not a holding. At most, it is non-binding dictum. (Doc. # 22 at 128-29 n.444); *see also Ex parte Patton*, 77 So. 3d 591, 596 (Ala. 2011) (referring to dictum as "[a] judicial comment made while delivering a judicial opinion, but one that is unnecessary to the decision in the case") (internal quotation marks omitted; alteration added). To be clear, Morris has not identified any Alabama case that has interpreted *Powell* in any way that would support Morris's arguments. Morris also has not cited an Alabama Supreme Court opinion which supports his position here. Consequently, Morris's arguments do not open the door to habeas relief under (d)(1).

Nor does Morris's reference to *Cook v. State*, 369 So. 2d 1251 (Ala. 1978) in his reply brief aid him. (Doc. # 27 at 82). While *Cook* is an overlapping-aggravation case, the Alabama Supreme Court considered the interplay of robbery and pecuniary gain, not the separate offenses of robbery and burglary. 369 So. 2d at 1256. In *Cook*, the Alabama Supreme Court found "repetitive" the sentencing court's reliance on robbery and pecuniary gain in aggravation under the particular facts in that case that "condemned the appellant twice for the same culpable act [of] stealing money." *Id.* ("[W]e do not think it appropriate to apply 'th[e] aggravating circumstance [of pecuniary gain]' to situations already condemned under [robbery] which by definition involve an attempt at pecuniary gain."). As the Alabama Supreme Court explained, the aggravating factor of pecuniary gain "cover[s] a variety of crimes committed with the hope of financial benefit, ranging from 'murder-for-hire' to an heir killing his benefactor to gain his inheritance." *Id.*

Morris presents an alternative argument to support this claim. He maintains that because robbery and burglary cover the same conduct, the consideration of them both in aggravation was "repetitive" and invalid. But that assertion ignores that the conduct involved in a robbery and a

burglary is not identical. For example, robbery requires using or threatening force against a victim to commit a theft. Ala. Code § 13A-8-43(a)(1)-(2). Burglary requires entering a building unlawfully "with [the] intent to commit a crime." Ala. Code 13A-7-7(a). Here, the ACCA explained how the evidence supported the jury's verdict on both capital-murder counts: Morris murdered Rochester while breaking "into her home with the intention of committing a theft inside" and "while overcoming her physical resistance and causing serious physical injury in order to commit the theft." *Morris Direct II*, 60 So. 3d at 381. While theft was a commonality as to the aggravating circumstances of robbery and burglary, other important aspects of those factors do not overlap. Consequently, *Cook*'s "situation[al]" invalidation of relying on robbery and pecuniary gain in aggravation does not demonstrate that the ACCA's denial of Morris's overlapping robbery and burglary allegations was objectively wrong.

In sum, Morris's cited authorities do not support his position that the ACCA's rejection of his overlapping-aggravation claim was contrary to or an unreasonable application of Supreme Court Eighth Amendment precedent. Accordingly, the court denies relief as to this claim.

### M.   Claim O—Morris has not demonstrated a right to habeas relief based upon Alabama's capital sentencing structure.

Morris next maintains that the trial court determined his sentence under an unconstitutional capital punishment structure in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendment rights. (Doc. # 1 at 124 ¶ 315). Morris primarily bases this constitutional challenge on three Supreme Court decisions: *Apprendi v. New Jersey*, 530 U.S. 466 (2000), *Ring*, and *Hurst v. Florida*, 577 U.S. 92 (2016). (Doc. # 1 at 117-18 ¶¶ 297-99). Morris argues that habeas relief under (d)(1) and (d)(2) of AEDPA is appropriate to correct the ACCA's rejection of this claim. (Doc. # 1 at 124 ¶ 315). Respondent answers that Morris received a proper death sentence in accordance

194

with the process in place in Alabama as of the time of his capital trial. (Doc. # 22 at 130). Morris's efforts to show that the ACCA committed extreme constitutional or factual error under AEDPA's highly deferential standard are unconvincing. To better understand the contours of this claim, the court begins with a discussion of *Apprendi*, *Ring*, and *Hurst*.

### 1. Overview of *Apprendi*, *Ring*, and *Hurst*

In *Apprendi*, the Court addressed the interplay between the Sixth Amendment's right to a jury trial and a court's sentencing in a non-capital case. Under *Apprendi*, except for a prior conviction, "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi*, 530 U.S. at 490.

Subsequently, in *Ring*, the Court revisited Arizona's former capital sentencing framework which had survived Sixth Amendment scrutiny in *Walton v. Arizona*, 497 U.S. 639 (1990), *overruled by Ring*, 536 U.S. at 609. Under Arizona's prior structure, a defendant "could not be sentenced to death, the statutory maximum penalty for first-degree murder," without a separate judicial finding of "at least one aggravating circumstance" and "no mitigating circumstances sufficiently substantial to call for leniency." *Ring*, 536 U.S. at 592-93 (internal quotation marks omitted); *see Walton*, 497 U.S. at 649 (concluding that the Sixth Amendment does not require a state "to denominate aggravating circumstances 'elements' of the offense or permit only a jury to determine the existence of such circumstances"). Thus, the jury played no role in the previously validated Arizona capital-sentencing process. *See Walton*, 497 U.S. at 643 (explaining that "[a]fter a person has been found guilty of first-degree murder . . . . the court alone" decides whether to impose the death penalty) (internal quotation marks omitted). Although this system was found

valid in *Walton*, upon reconsideration, and particularly in light of its decision in *Apprendi*, the *Ring* Court concluded that the Arizona structure violated the Sixth Amendment. *Ring*, 536 U.S. at 609.

The *Ring* holding led to the Supreme Court's invalidation of Florida's former capital-sentencing structure in *Hurst*. *Hurst*, 577 U.S. at 102; *see id.* at 97 ("We granted certiorari to resolve whether Florida's capital sentencing scheme violates the Sixth Amendment in light of *Ring*."). Under Florida's prior framework, "the maximum sentence a capital felon [could] receive on the basis of the conviction alone [was] life imprisonment." *Id.* at 95. After a guilt finding, a jury provided an advisory sentence based on an evidentiary hearing and a judge held "a separate hearing . . . [to] determine whether sufficient aggravating circumstances existed to justify imposing the death penalty." *Id.* at 94.

Following this format, a jury found the petitioner in *Hurst* guilty of "[f]irst-degree murder[,] . . . a capital felony" under Florida law, not the lesser charge of felony murder. *Id.* at 95. "A penalty-phase jury recommended [7 to 5] that . . . [the] judge impose a death sentence," and "[t]he judge independently agreed." *Id.* at 94, 96. The *Hurst* Court concluded that Florida's statutory structure violated the petitioner's "right to an impartial jury" consistent with *Ring* because "the maximum punishment [the petitioner] could have received without any judge-made findings was life in prison without parole." *Id.* at 99, 102. Importantly, as the *Hurst* Court clarified, "[a] jury's mere recommendation" in favor of the death penalty "is not enough" to satisfy the constitutional requirement that "a jury, not a judge, . . . find[s] each fact necessary to impose a sentence of death." *Id.* at 94; *see also id.* at 102 (overruling prior Supreme Court precedent "to the extent they allow a sentencing judge to find an aggravating circumstance, independent of a jury's factfinding, that is necessary for imposition of the death penalty"). With these Supreme Court

decisions in mind, the court reviews the ACCA's treatment of Morris's structural challenge to his death sentence under Alabama law.

### 2. State Court Proceedings

Morris did not challenge his punishment under Alabama's sentencing framework at the trial level. Instead, Morris maintained on direct review that his capital sentence conflicted with *Ring* because, as related to his death-penalty ineligibility claim under *Atkins*, the jury made no finding that he "was not mentally retarded . . . beyond a reasonable doubt." (Doc. # 15-52 at 109). Morris further argued that, unlike what occurred during his penalty phase, *Ring* required "a unanimous jury . . . [to] f[ind] th[e] aggravating circumstances" and precluded an instruction that the jury's verdict was a sentencing recommendation. (*Id.* at 110-11). As additional support, Morris cited *Caldwell v. Mississippi*, 472 U.S. 320 (1985), and *Adams*. (Doc. # 15-52 at 111-12). Morris did not reference *Hurst* and did not have the opportunity to do so. That decision postdated his appeal.

Applying plain-error review, the ACCA explained why Alabama's capital-sentencing structure and Morris's resulting death penalty did not suffer from any *Ring* deficiency. *Morris Direct II*, 60 So. 3d at 363. As to Morris's mental-functioning subclaim, the ACCA noted that nothing under Alabama law (or in *Atkins*, for that matter) "require[d] that a jury in a capital case make a determination of whether the defendant was mentally retarded." *Id.* at 364.

Citing several Alabama authorities, the ACCA denied Morris's subclaim based on the *Ring* "require[ment] . . . that the jury unanimously find the existence of an aggravating circumstance in order to make the defendant death-eligible." *Id.* at 363 (internal quotation marks omitted). As the ACCA explained, the jury's verdict on the capital counts of burglary- and robbery-murder

translated into jury's findings that those two aggravating factors under Ala. Code § 13A-5-49(4) existed beyond a reasonable doubt. *Id*. The ACCA also noted that "the trial court had instructed the jury that it could not vote on the death penalty unless it found the existence of at least one aggravating circumstance." *Id.*

As for Morris's objection to the instruction on the jury's sentencing role under Alabama's framework, the ACCA denied this subclaim for the same reasons it rejected similar claims in other decisions. *Morris Direct II*, 60 So. 3d at 364; *see also Smith v. State*, 213 So. 3d 255, 289 (Ala. Crim. App. 2007) ("*Ring* does not address the advisory nature of a jury's sentencing recommendation[;] [the] jury was properly informed that under Alabama law, its verdict was an advisory one.") (internal quotation marks omitted), *rev'd in part on other grounds and remanded sub nom. Ex parte Smith*, 213 So. 3d 313 (Ala. 2010).

### 3.    Morris has not overcome AEDPA deference on the structural challenge of his death sentence under the Sixth Amendment.

Morris divides his arguments in support of this claim into three Sixth Amendment subclaims, each tied to his right to a jury trial and what he claims to be an unconstitutional death sentence. (*Id.* at 119-20 ¶¶ 302). Specifically, he faults Alabama's sentencing structure because the jury did not decide whether: (1) his intellectual functioning precluded the death penalty under *Atkins*; (2) the aggravating evidence outweighed the mitigation evidence; and (3) "an aggravating factor existed that was sufficient to support a death sentence." (*Id.*).

Although Morris references Supreme Court and other federal cases, he has not identified any unreasonable state-court factual determination. Thus, the court focuses on whether Morris's cited authorities show that, in denying his appeal, the ACCA acted contrary to or unreasonably applied Supreme Court precedent under section (d)(1).

Morris must point to a Supreme Court holding that overlaps substantially with his subclaims. This means that Morris must identify decisions of the Supreme Court that are contrary to the ACCA's decision or which the ACCA unreasonably applied.

Although Morris references several Supreme Court and other federal decisions on habeas review, none of these clearly establish that he has stated a cognizable Sixth Amendment claim here. Even more importantly, Morris's cited authorities fail to show that the ACCA ruled contrary to or unreasonably under (d)(1)'s deferential clauses.

For example, two of the authorities Morris references in the introductory paragraphs to his subclaims are unrelated to the constitutionality of a death sentence. (Doc. # 1 at 117 ¶ 297); *See Apprendi*, 530 U.S. at 469 (describing the constitutional question as whether "increas[ing] . . . the maximum prison sentence for an offense from 10 to 20 years" is permissible without a jury finding "made . . . on the basis of proof beyond a reasonable doubt"); *Jones v. United States*, 526 U.S. 227, 229 (1999) (holding that the federal carjacking statute "defined three distinct offenses[, rather than] a single crime with . . . [some] sentencing factors exempt from the requirements of a charge and jury verdict"). Similarly, although *Caldwell* is a death penalty case (Doc. # 1 at 118 ¶ 299), the holding is unrelated to a jury's role in determining intellectual functioning or aggravating factors in the context of a reasonable doubt standard. *See Caldwell*, 472 U.S. at 323 (reversing death sentence under the Eighth Amendment after "a prosecutor [had] urged the jury not to view itself as determining whether the defendant would die, because" the state appellate court would review the penalty for "correctness"). Thus, neither *Apprendi*, *Jones*, nor *Caldwell* advances Morris's AEDPA burden on his structural subclaims, which contested the validity of his death sentence.

In the introductory section related to Claim O in his habeas papers, Morris references the capital cases of *Ring*, *Walton*, and *Hurst*. (Doc. # 1 at 117-18 ¶¶ 298-99). As the earlier discussion of these authorities confirms, none of those decisions recognize that a jury must determine the issue of intellectual disability beyond a reasonable doubt (consistent with Sixth Amendment Supreme Court precedent). These decisions do not establish that the ACCA's rejection of Morris's intellectual-disability challenge was egregious error under § 2254(d)(1). And in support of this subclaim, Morris cites only *Ring*. (Doc. # 1 at 120 ¶ 303). Thus, Morris has not shown a right to habeas relief under either clause of (d)(1) based on his intellectual-disability subclaim.

Similarly unpersuasive is Morris's reliance on *Ring*, *Walton*, and *Hurst*, and his efforts to substantiate his aggravation subclaims under AEDPA. To begin, Morris lacks a cognizable *Hurst* claim on habeas review because of the finality of his case on direct appeal. *See McKinney v. Arizona*, 589 U.S. __, 140 S. Ct. 702, 708 (2020) (confirming that "*Ring* and *Hurst* do not apply retroactively on collateral review"). Consequently, Morris's focus on *Hurst* is material "only to the extent [the opinion] reflects an application and explication of the Supreme Court's holding in *Ring*." *Waldrop v. Comm'r, Ala. Dep't of Corr.*, 711 F. App'x 900, 923 n.6 (11th Cir. 2017); (Doc. # 1 at 118 n.10).

Nevertheless, the holdings in *Ring*, *Waldrop*, and *Hurst* do not support Morris's aggravation subclaims under AEDPA. In *Ring*, the Supreme Court overruled *Waldrop* because Arizona's former sentencing structure did not incorporate a jury's finding on "the aggravating circumstance that makes the defendant death eligible." *McKinney*, 140 S. Ct. at 707; *Ring*, 536 U.S. at 608 ("overrul[ing] *Walton* to the extent that it allows a sentencing judge, sitting without a jury, to find an aggravating circumstance necessary for imposition of the death penalty"). Based

200

on *Ring*, the *Hurst* Court identified a similar Sixth Amendment death-eligibility flaw in Florida's former approach to capital sentencing. *McKinney*, 140 S. Ct. at 707.

Unlike the structural deficiencies present in *Ring* and *Hurst*, the Alabama sentencing format applicable to Morris required the jury to find him guilty of a capital offense beyond a reasonable doubt before he was eligible to be sentenced to death. Applying that threshold requirement, the jury convicted Morris of two capital crimes—murdering Rochester during a robbery and burglary. Those death-eligible convictions triggered a penalty phase during which the jury was called on to make findings about Morris's appropriate punishment. The jury's findings on robbery and burglary likewise qualified as aggravating factors for the sentencing process under Alabama law.

Turning to his subclaims regarding aggravation, Morris asserts that his death sentence violates the Sixth Amendment because a jury did not find beyond a reasonable doubt that the aggravating evidence outweighed the mitigation evidence. (Doc. # 1 at 120-21 ¶¶ 304-06). Morris mentions *Harris v. Alabama*, 513 U.S. 504 (1995), and other Alabama cases (Doc. # 1 at 120 ¶ 304), noting that Alabama gives "ultimate sentencing authority to the trial judge." *Harris*, 513 U.S. at 508-09. But, contrary to Morris's assertions, nothing in *Ring* or *Hurst* requires that a jury find beyond a reasonable doubt that the aggravating evidence outweighs the mitigation. (Doc. # 1 at 120-21 ¶¶ 304-06); *see McKinney*, 140 S. Ct. at 707 ("[A] jury (as opposed to a judge) is not constitutionally required to weigh the aggravating and mitigating circumstances or to make the ultimate sentencing decision within the relevant sentencing range."); *Lee v. Comm'r, Ala. Dep't of Corr.*, 726 F.3d 1172, 1198 (11th Cir. 2013) ("*Ring* does not foreclose the ability of the trial judge to find the aggravating circumstances outweigh the mitigating circumstances.").

Morris maintains that to the extent his death sentence is based on the jury's guilt-phase findings of robbery and burglary – which carried over into the penalty phase as evidence of aggravation – his sentence violates *Ring*. (Doc. # 1 at 121-24 ¶¶ 307-15). According to Morris, *Ring* requires an explicit jury finding "of one aggravating circumstance that would be sufficient to support death" (*id*. at 121 ¶ 307), and his capital convictions merely implied the existence of robbery and burglary as aggravating factors (*id*. at 122 ¶ 309). But, in making this argument, Morris fails to acknowledge key distinctions between the capital structure in *Ring* and that in Alabama. First, after the jury convicted the petitioner in *Ring* of first-degree murder, only the trial judge "determine[d] the presence or absence of the aggravating factors . . . for imposition of the death penalty." *Ring*, 536 U.S. at 588. Second, unlike the jury's determination beyond a reasonable doubt that Morris's murder of Rochester involved a robbery and burglary, the jury did not convict the petitioner in *Ring* of murdering his victim for pecuniary gain. *See Ring*, 536 U.S. at 594-95 ("[T]he judge determined that [the petitioner] committed the offense in expectation of receiving something of 'pecuniary value'" and weighed that as an aggravating factor."). Here, "a pecuniary gain finding was implicit in the jury's guilty verdict," and this unambiguous guilt-phase finding carried over into Morris's penalty phase. *Ring*, 536 U.S. at 609 n.7.

In sum, the authorities pointed to by Morris do not show that the ACCA committed extreme constitutional error under § 2254(d)(1) in rejecting the structural challenges to his death sentence, and Morris has not developed a basis for habeas relief under (d)(2). Thus, Morris has not carried his AEDPA burden in seeking habeas relief under the Sixth Amendment.

### 4. Morris's remaining allegations related to this claim do not support habeas relief.

Although Morris's *Apprendi*, *Ring*, and *Hurst* arguments relate to his Sixth Amendment

202

claims, they do not support his assertions that his Fifth, Eighth, or free-standing Fourteenth Amendment rights were violated. Thus, to the extent that Morris seeks Fifth, Eighth, or free-standing Fourteenth Amendment habeas relief, the court denies those claims for lack of exhaustion, proper pleading, appropriate development, and sufficient proof.

### N.   Claim P—Morris has not demonstrated a right to habeas relief based on the fact that his second capital trial ended in a hung jury.

Morris maintains that the death sentence in his third trial violates his rights under the Eighth and Fourteenth Amendments because the jury deadlocked during the guilt phase of his second trial. (Doc. # 1 at 126 ¶ 319). Morris argues that AEDPA affords him relief because the ACCA's rejection of his sentencing claim meets the requirements of § 2254(d)(1) and (d)(2). (Doc. # 1 at 126 ¶ 319). Respondent counters that Morris has not shown an unreasonable state-court resolution of this claim because "the Supreme Court has not squarely addressed" the right of a state to seek capital punishment on retrial after a guilt-phase mistrial because of a hung jury. (Doc. # 22 at 140). As discussed below, Respondent has the better argument. Before turning to the habeas analysis, the court recounts the state-court history of this claim.

### 1.   State Court Proceedings

The jury in Morris's second capital trial was unable to reach a unanimous guilt-phase verdict. The state elected to retry Morris a third time for capital murder (without objection). After his third trial resulted in a death sentence, Morris argued on direct review that "because his [second] trial [had] resulted in a hung jury," the state could not execute him under the Eighth Amendment. *Morris Direct II*, 60 So. 3d at 361; (Doc. # 15-52 at 108). Morris also maintained that executing him when the "prior mistrial raise[d] the possibility . . . [of his] innocen[ce]" would violate his rights under the Fifth, Sixth, and Fourteenth Amendments. (Doc. # 15-52 at 109).

Because Morris did not raise this death-sentence challenge until direct review, the ACCA evaluated the claim for plain error under Rule 45A.

To support this claim before the ACCA, Morris relied on the Eleventh Circuit's due process decision in the federal drug conviction case of *United States v. Rey*, 811 F.2d 1453 (11th Cir. 1987). (Doc. # 15-52 at 108). In his reply, Morris also cited the Supreme Court's decision in the death penalty case of *Kennedy v. Louisiana*, 554 U.S. 407, *modified on other grounds on denial of reh'g*, 554 U.S. 945 (2008). (Doc. # 15-53 at 92).

The ACCA did not discuss *Rey* or *Kennedy* in its decision but rather evaluated other authorities from Alabama, other states, and the Supreme Court. The ACCA determined that the Eighth Amendment does not "prohibit[] . . . a death sentence in a [subsequent] trial where a capital defendant's [earlier] trial resulted in a mistrial attributable to a hung jury." *Morris Direct II*, 60 So. 3d at 362. The death penalty case of *Sattazahn v. Pennsylvania*, 537 U.S. 101 (2003), is the only Supreme Court case (and the only federal constitutional authority) that the ACCA included in its decision. Consequently, the court examines *Sattazahn*.

In *Sattazahn*, the Supreme Court considered whether a death sentence during retrial violated the petitioner's Fifth or Fourteenth Amendment rights. There, the petitioner had two capital murder trials. 537 U.S. at 104-05. In the first, the jury convicted the petitioner but "deadlocked at 9-3 [in favor of] life imprisonment" during the sentencing phase. *Id.* at 104. The trial court discharged the jury and entered a non-discretionary life sentence consistent with state law. *Id.* The petitioner appealed the guilt-phase outcome. *Id.* at 104-05. The state appellate court concluded that the trial court had incorrectly instructed the jury, reversed the conviction, and remanded the case for a new trial. *Id.* at 105. But, in the retrial, the jury convicted the petitioner of

capital murder and "imposed a sentence of death." *Id.*

The petitioner appealed the penalty-phase outcome on Fifth Amendment double jeopardy and Fourteenth Amendment "freestanding" due process grounds. *Id.* at 105, 115. After losing in the state court, the petitioner sought certiorari review in the Supreme Court. *Id.* at 105. The *Sattazahn* Court denied relief on both grounds. The Court rejected the double jeopardy claim because the petitioner's "life sentence was [not] an 'acquittal' based on findings sufficient to establish legal entitlement to [that] sentence." *Id.* at 108; *see also id.* at 112-13 ("During the sentencing phase, the jury deliberated without reaching a decision on death or life, and without making any findings regarding aggravating or mitigating circumstances."). As for the petitioner's due process argument, the Supreme Court "decline[d] . . . [the] invitation to hold that the Due Process Clause provides greater double jeopardy protection than does the Double Jeopardy Clause" itself. *Id.* at 116.

Like *Sattazahn*, the other cases referenced by the ACCA in its rejection of Morris's death-sentence claim did not involve an Eighth Amendment analysis. Several authorities addressed whether the trial court committed state-law error in a retrial when the prior trial ended in a hung jury. *See, e.g.*, *State v. Woods*, 676 S.E.2d 128, 131 (S.C. 2009) (concluding that the trial court did not commit reversible state-law error in retrial after transferring jury selection to the county of the offense consistent with the state's "withdr[awing] . . . consent to change of venue" that had applied to jury selection in the first trial); *State v. Manning*, 495 S.E.2d 191, 192 (S.C. 1997) (addressing abuse-of-discretion venue challenge which arose in a third trial after "the jurors could not reach a verdict in the guilt phase" of the second trial). Other cases examined why a guilt-phase reversal does not create a double jeopardy bar to a capital sentence in a retrial or why a prosecutor's

comments about a death sentence reached in a prior trial is reversible error in a retrial. *See Hogan v. State*, 139 P.3d 907, 916, 926-30 (Okla. Crim. App. 2006) (explaining why double jeopardy did not preclude the state from seeking the death penalty in the retrial after a habeas reversal of the conviction on a guilt-phase instruction); *Hammond v. State*, 776 So. 2d 884, 892 (Ala. Crim. App.) ("We hold that at the sentencing phase of a second or subsequent capital murder trial, it is reversible error for the prosecution to comment on the result of a defendant's previous trial for the same offense."), *opinion modified on other grounds on denial of reh'g* (Ala. Crim. App. 1998).

Against this backdrop, the court considers Morris's death-sentence claim on habeas review. The court begins with an examination of Morris's habeas allegations, determines the appropriate AEDPA standard to use, and proceeds to a contextual evaluation of the cases that Morris relies on in an attempt to meet his demanding burden.

### 2.   Habeas Analysis

#### a.   Morris cannot rely on the Fourteenth Amendment's due process clause as an independent basis for habeas relief.

To begin, Morris did not make clear to the ACCA on appeal and does not clarify on habeas review to what extent due process under the Fourteenth Amendment serves as a freestanding basis to support his sentencing claim. Respondent treats Claim P as an Eighth Amendment violation incorporated through the Fourteenth Amendment without addressing an independent due process theory. (Docs. # 21 at 41 ¶¶ 109-10; 22 at 139-40). In reply, Morris does not object to Respondent's understanding of Claim P. Because of Morris's silence, waiver, or abandonment forecloses him from relying on the Fourteenth Amendment, beyond incorporation, to substantiate his habeas death-sentence claim. The court turns now to an AEDPA evaluation of Morris's death-sentence claim under the Eighth Amendment.

> **b.    Morris has not overcome AEDPA deference on his exhausted death-sentence claim under the Eighth Amendment.**

To satisfy his AEDPA burden on his exhausted Eighth Amendment claim, Morris relies on Supreme Court and other federal cases. But, he has not pointed to any unreasonable state-court factual determination. Because Morris relies on nothing concrete to trigger relief under § 2254(d)(2), the court will limit its AEDPA deferential analysis to whether Morris's cited authorities show that, in denying his appeal, the ACCA acted contrary to or unreasonably applied Supreme Court precedent under (d)(1).

To satisfy either clause of § 2254(d)(1), Morris must identify contextually relevant Supreme Court holdings. So one would expect Morris to cite to case law that (at least minimally) involved an Eighth Amendment challenge to a death sentence on retrial after a guilt-phase deadlocked jury. The Supreme Court decisions Morris points to include *Atkins v. Virginia*, 536 U.S. 304 (2002); *Lockett v. Ohio*, 438 U.S. 586 (1978); *Kennedy v. Louisiana*, 554 U.S. 407, *modified on other grounds on denial of reh'g*, 554 U.S. 945 (2008); and *Green v. United States*, 355 U.S. 184 (1957). (Docs. # 1 at 125 ¶¶ 317-18; 27 at 86-87). Yet, a review of these four opinions reveals that the minimal contextual overlap – which both clauses of § 2254(d)(1) demand – is missing. *See, e.g.*, *Atkins*, 536 U.S. at 321 (holding that the death penalty is an excessive punishment under the Eighth Amendment for offenders with a diminished mental capacity); *Lockett*, 438 U.S. at 606, 608 (concluding that the Eighth and Fourteenth Amendments require state death penalty statutes to "permit . . . individualized consideration of mitigating factors" without "limit[ing] [the] range of [relevant] . . . circumstances which may be considered"); *Kennedy*, 554 U.S. at 412 (determining that the Eighth Amendment precludes the state from imposing a death penalty based on a conviction for raping a child "where the crime did not result,

and was not intended to result, in death of the victim").

Although in *Green,* the last Supreme Court case that Morris references, the Court reversed a death sentence reached after a retrial, significant aspects of the case differ from Morris's claim. First, in *Green*, an appellate court's reversal of a second-degree murder conviction, rather than a deadlocked jury, was the reason for the second trial. 355 U.S. at 186. Second, the constitutional question was whether the petitioner's appeal of his second-degree murder conviction waived the defense of double jeopardy under the Fifth Amendment on the charge of first-degree murder. *See Green*, 355 U.S. at 185 ("This case presents a serious question concerning the meaning and application of th[e] [double jeopardy] provision of the Fifth Amendment to the Constitution."). Because the first jury had acquitted the petitioner on the capital murder charge, the Supreme Court concluded that the "second trial . . . placed [the petitioner] in jeopardy twice for the same offense in violation of the Constitution." *Id*. at 190. But unlike the petitioner's claim in *Green*, Morris does not have jury findings from the mistrial on which double jeopardy under the Fifth Amendment could attach. That said, because the Supreme Court's decision did not turn on the petitioner's Eighth Amendment rights, *Green* cannot satisfy Morris's (d)(1) burden.

The remaining cases which Morris references on habeas review are *Rey* and *Jones v. Hogg*, 732 F.2d 53 (6th Cir. 1984). (Doc. # 1 at 125 ¶ 318). Like Morris's cited Supreme Court authorities, Rey, and *Jones* are too factually and legally different to aid Morris in advancing his Eighth Amendment death-sentence claim under § 2254(d)(1). In *Rey*, the Eleventh Circuit considered whether the district court's instructions to a deadlocked jury were "coercive" to the point that they violated the appellant's due process rights under the Fifth Amendment. *Rey*, 811 F.2d at 1458, 1460. Unlike the petition in *Rey*, Morris does not base his death-sentence claim on a coercive

208

instruction but rather on the hung-jury outcome of his second trial. Additionally, because *Rey* is not a capital case, the opinion offers no insight into Morris's contention that his death sentence violates the Eighth Amendment.

Similar to Morris's claim, the *Jones* decision involved a murder retrial after a hung jury. But *Jones* was a Fifth Amendment decision and it sheds no light on his Eighth Amendment claim. *Jones* involved the "rather unusual . . . circumstances" of three hung juries. 732 F.2d at 57. There, petitioner objected that the fourth retrial violated his double jeopardy rights under the Fifth Amendment. *Id.* at 54. The petitioner lost on that claim in state court and the district court denied him habeas relief. *Id.* The Sixth Circuit remanded *Jones* because of an inadequately developed record without ever holding that a double jeopardy violation had occurred. *Id.* at 54, 58.

Referencing the Supreme Court's discussion of double jeopardy in *Swisher v. Brady*, 438 U.S. 204, 215-16 (1978), and *United States v. Dinitz*, 424 U.S. 600, 611 (1976), the Sixth Circuit observed that "[a] state is not free to engage in oppressive practices which subject an accused to repeated prosecutions in an attempt to gain a criminal conviction." *Jones*, 732 F.2d at 55. The Sixth Circuit added that "[a] contrary rule would violate the notions of fair play and substantial justice . . . and greatly increase the risk that innocent individuals will be found guilty." *Id.* (citations omitted). After describing "the standard for determining when a retrial of a [non-consenting] defendant is permissible after a mistrial," the *Jones* court found the record "wholly inadequate" as to what the trial court had considered before declaring a mistrial and scheduling the petitioner's fourth trial. *Id.* at 54. As a result, the court was unable to address the petitioner's Fifth Amendment habeas challenge. *Id.* The inadequate development of the record that precluded a merits-based review of the double jeopardy claim. *Id.* at 58 ("hold[ing] that the record . . . preclude[d] [a] finding

that sound discretion was exercised in accordance with constitutional principles when the mistrials were declared in [the petitioner's] prior three prosecutions").

When taken out of context, portions of the Sixth Circuit's analysis in *Jones* may appear to aid Morris. (Doc. # 1 at 125 ¶ 318). But, as detailed above, *Jones* is exclusively a double jeopardy opinion and is also not controlling in this court. Consequently, Morris's reliance on *Jones* does nothing to bolster his Eighth Amendment claim under § 2254(d)(1). Moreover, the news articles that Morris notes alongside *Jones* are unavailing. (Doc. # 1 at 125 n.12). Stories about eventually exonerated death-row prisoners, who had multiple trials because of hung juries, very plainly are not clearly established law for AEDPA purposes.

In sum, none of Morris's referenced authorities confirm a Supreme Court recognition that, following a guilt-phase mistrial because of a guilt-phase deadlock, the Eighth Amendment prohibits the penalty of capital punishment on retrial. Even more importantly, they do not show that the ACCA's rejection of Morris's death-sentence claim was contrary to or an unreasonable application of Supreme Court precedent. And, as mentioned earlier, Morris has not developed a (d)(2) basis for habeas relief on this claim. Accordingly, the court denies Claim P.

###### i.      *Rule 28(a) and Claims D, F, and Q*

The court next considers Morris's habeas allegations that correspond with his collateral claims, which the ACCA denied at least partially on Alabama procedural grounds. In rejecting these postconviction claims for non-substantive reasons, the ACCA cited Morris's failure to comply with Alabama Appellate Procedure Rule 28(a)(10). Rule 28(a) governs "[b]riefs of the appellant/petitioner" and requires certain contents organized in a specific order. Ala. R. App. P. 28(a) (italics omitted). Subpart 10 of Rule 28(a) requires that the argument section of a brief

"contain[ ] the contentions of the . . . petitioner with respect to the issues presented, and the reasons therefor, with citations to the cases, statutes, other authorities, and parts of the record relied on." Ala. R. App. P. 28(a)(10). Rule 28(a)(10) also refers also to acceptable sources for formatting citations and states that "[c]itations shall reference the specific page number(s) that relate to the proposition for which the case is cited." *Id.*

Claims D and F, and at least partially Claim Q of Morris's habeas petition correspond with his state collateral claim, which the ACCA denied on the basis of Rule 28(a)(10). Respondent maintains that state-barred procedural default precludes habeas relief on these claims. Morris replies that state-barred procedural default does not apply because Rule 28(a)(10) is not firmly established under Alabama law. (*See* Doc. # 27 at 34-39) (discussing, in the context of Claim D, the habeas requirement that a state procedural rule must be firmly established to support state-barred procedural default). Thus, the court turns to that overriding procedural issue before moving to any merits-based review.

As discussed above in the standards of review section, state-barred procedural default applies on habeas review when three requirements are met. Here, the parties dispute satisfaction of the doctrine's third requirement—whether Rule 28(a)(10) is "adequate, i.e., firmly established and regularly followed and not applied 'in an arbitrary or unprecedented fashion.'" *Ward*, 592 F.3d at 1157 (quoting *Judd*, 250 F.3d at 1313).

Citing *Ex parte Borden*, 60 So. 3d 940 (Ala. 2007), Morris maintains that the Alabama Supreme Court has recognized that not all applications of Rule 28(a)(10) are firmly established under Alabama law. (Doc. # 27 at 36). According to Morris, if the petitioner's brief gives adequate notice of his arguments, an appellate court's reliance on Rule 28(a)(10) to deny a collateral claim

will not support state-barred procedural default on habeas review. (Doc. # 27 at 36). To better understand Morris's position, the court contextually examines *Borden*.

In *Borden*, the petitioner sought postconviction relief based on ineffective assistance of counsel. 60 So. 3d at 944. The trial court summarily dismissed those Rule 32 claims and the petitioner appealed. *Id.* In his brief to the ACCA, the petitioner alleged "22 pages of facts addressing why the trial court [had] erred." *Id.* The petitioner also included "11 pages of argument . . . [and] some 25 citations to case[]law, along with explanations and quotations from the cited cases." *Id.* The ACCA rejected the petitioner's appeal on the basis that his brief did not comply with Rule 28(a)(10). *Borden*, 60 So. 3d at 944. The Alabama Supreme Court granted certiorari review on whether the ACCA had "correctly held that [the petitioner] failed to comply with Rule 28(a)(10) . . . , and thereby waived his ineffective-assistance-of-counsel claims." *Borden*, 60 So. 3d at 942.

The Alabama Supreme Court reversed the ACCA's judgment and held that the petitioner had complied with Rule 28(a)(10). *Borden*, 60 So. 3d at 944. As a result, the petitioner had "not waive[d] his claims of ineffective assistance of counsel." *Id.* In rejecting the ACCA's procedural rationale, the Alabama Supreme Court observed that "another attorney" may have briefed the argument in a different manner. *Id.* Still, the Alabama Supreme Court concluded that the petitioner's "brief [wa]s sufficient to apprise the [ACCA] of [his] contentions with regard to his ineffective-assistance-of-counsel claims." *Id.* The Alabama Supreme Court also noted that "waiver of an argument for failure to comply with Rule 28(a)(10) [was applicable] . . . to those cases" in which a petitioner presented "no argument" and provided "few, if any, citations to relevant legal authority" in the brief. *Id.* As the Alabama Supreme Court explained, with that type of

noncompliance, a petitioner's argument amounted to "undelineated general propositions," which thwarted meaningful appellate review. *Id.* (citing collected cases); *see also Davis v. Sterne, Agee & Leach, Inc.*, 965 So. 2d 1076, 1092 (Ala. 2007) (explaining that a "lone citation to a general principle of law without specific relevance to [a claim] does not meet the requirements of Rule 28(a)(10)").

Therefore, whether an appellate court's reliance on Rule 28(a)(10) is firmly established for habeas purposes will depend on how developed the petitioner's brief was on the applicable claim. Put differently, where an appellate court denied a claim because the petitioner's brief lacked argument or contextualized authority, that limited but firmly established application of Rule 28(a)(10) will support state-barred procedural default on habeas review.

However, when a petitioner gives adequate notice of his claim, an appellate court's reliance on Rule 28(a)(10) falls outside the firmly established range of application, and under those circumstances a habeas defense based on state-barred procedural default will fail. *See, e.g.*, *Gaines v. Price*, 2017 WL 2296962, at *21 (N.D. Ala. May 2, 2017) (declining to apply state-barred procedural default on habeas review because "the brief . . . sufficiently supplied facts and authority that would have allowed the [state] appellate court to address the issue on the merits"), *report and recommendation adopted by* 2017 WL 2289105 (N.D. Ala. May 25, 2017).

Having concluded that Rule 28(a)(10) may, in limited circumstances, support a denial of habeas relief because of state-barred procedural default, the court addresses Morris's remaining allegations.

### O.  Claim F—Morris has not demonstrated a right to habeas relief on his claim regarding DNA witnesses claim for procedural and substantive reasons.

Morris contends in Claim F that "the [s]tate violated [his] Sixth Amendment rights when

it failed to present all of the forensic technicians who tested the evidence used to convict [him]."

(Doc. # 1 at 85 ¶ 223) (emphasis omitted). Respondent answers that the state courts denied this

claim for different procedural reasons. (Doc. # 21 at 29-30 ¶ 82). The ACCA relied on Rule

28(a)(10), while the circuit court cited Rule 32.2(a)(3) and (5). (Doc. # 21 at 29-30 ¶ 82). Alabama

Appellate Procedural Rule 32.2(a)(3) and (5) preclude postconviction relief if a petitioner failed

to assert an available claim at trial or on direct review. Ala. R. App. P. 32.2(a)(3), (5).

In reply, Morris resists Respondent's reliance on state-barred procedural default on both

bases. (Doc. # 27 at 68-69 & n.38). Because the ACCA provided the last procedural denial of this

claim in state court, the court first examines whether the ACCA's application of Rule 28(a)(10)

supports state-barred procedural default on habeas review.

### 1.    State-barred procedural default under Rule 28(a)(10) precludes habeas relief on this DNA claim.

Examining Morris's brief on collateral appeal confirms that the ACCA's reliance on Rule

28(a)(10) to deny the claim was not a "manifestly unfair, arbitrary, and exorbitant" procedural

ruling. *Gaines*, 2017 WL 2296962, at *21. On collateral review, Morris supported his claim that

the state should have called all DNA technicians as trial witnesses by saying this:

> The circuit court dismissed the following claim in Mr. Morris's
> postconviction petition pursuant to Rules 32.2(a)(3) and (5) because the claim could
> have been, but was not raised at trial, and could have been, but was not raised on
> direct appeal.

> VI.    Mr. Morris's Claim that the State's Failure to Present All of
> the Forensic Technicians Who Performed Tests Deprived
> Mr. Morris of His Sixth Amendment Rights.

> The circuit court erred in dismissing all of the above claims because it failed
> to consider the claims in totality in making a determination about whether Mr.
> Morris['s] conviction and death sentence are in accord with the requirements of the
> Constitution. *See Strickland*, 446 U.S. at 695 (totality of the circumstances must be

considered to determine fairness of conviction and sentence).
Mr. Morris urges this Court to make that determination.

(Doc. # 15-62 at 81).

In rejecting this alleged Sixth Amendment claim procedurally because of Morris's abbreviated approach in his brief, the ACCA identified several areas of noncompliance with Rule 28(a)(10). *Morris Collateral*, 261 So. 3d at 1198-99. These deficiencies included Morris's failure to "set forth any facts," cite "relevant authority," or provide "legal analysis or discussion" establishing his entitlement to relief on that claim. *Morris*, 261 So. 2d at 1198.

As for Morris's reference to *Strickland v. Washington*, 466 U.S. 668 (1984), the ACCA explained why that ineffective assistance decision provided no relevant, much less clearly established, support for his Sixth Amendment challenge based on the state's failure to call all DNA witnesses. *Morris*, 261 So. 2d at 1198-99. Because his brief had these Rule 28(a)(10) deficiencies, the ACCA held that Morris had "waived the argument for purposes of appellate review." *Morris*, 261 So. 2d at 1199.

While, as recognized above, not all Rule 28(a)(10) state-based decisions will preclude habeas review, if an appellant lists a claim but omits any factual or legal support, state-barred procedural default will be appropriate. Consistent with the ACCA's procedural analysis and *Borden*, Morris's bare mention of this DNA testimonial claim in his brief without any factual or relevant legal development falls within Rule 28(a)(10)'s firmly established range. Stated another way, the ACCA did not overapply the customary scope of Rule 28(a)(10)'s brief-based waiver or deny substantive review of this claim arbitrarily. And because the ACCA did not exceed Rule 28(a)(10)'s firmly established ground on collateral review, state-barred procedural default applies to Claim F on habeas review.

215

### 2.    Alternatively, Morris has not proven a de novo right to constitutional relief.

As a general rule, denial of a claim pursuant to Rule 28(a)(10) constitutes a waiver, which is an adequate and independent state law procedural ground for denying a claim. So here, the ACCA "issue[d] a clear statement that its decision rest[ed] on an independent and adequate state ground." *Richardson v. Thigpen*, 883 F.2d 895, 898 (11th Cir. 1989) (per curiam). Nor did the ACCA offer an alternative merits-based reason to deny the claim. In that context, normally this court should refrain from substantively analyzing the defaulted claim. *See id.* (explaining that if state-barred procedural default applies, "then even if the state court issues an alternative ruling based on its interpretation of federal law, [the habeas] [c]ourt should not address the merits of the federal claim") (citing *Harris*, 489 U.S. at 260-61); *see also Alderman v. Zant*, 22 F.3d 1541, 1549 (11th Cir. 1994) (instructing that a "federal court should apply the state procedural bar and decline to reach the merits" when "a state court has [denied a federal claim] in the alternative" procedurally and substantively).

Here, even if the court deviates from that applicable habeas practice, and were to consider the merits of Morris's DNA testimonial claim de novo, his arguments still fail. The three Supreme Court cases that Morris cites in support of this claim are *Crawford v. Washington*, 541 U.S. 36 (2004); *Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009); and *Bullcoming v. New Mexico*, 564 U.S. 647 (2011). (Doc. # 1 at 85-86 ¶¶ 223-34). But, these decisions do not substantiate Morris's de novo burden for at least two reasons.

First, none of these cases hold that the Sixth Amendment requires that at trial the state call all forensic testers who may have inculpatory testimonial evidence. Instead, the *Crawford* Court distinguished between nontestimonial hearsay and testimonial evidence and reversed a petitioner's

state conviction under the confrontation clause when the jury considered an incriminating tape-recorded police statement without any opportunity for cross-examination of the witness. 541 U.S. at 38, 68-69. The Supreme Court recognized in *Melendez-Diaz* that "a forensic laboratory report stating that a suspect substance was cocaine ranked as testimonial for purposes of the Sixth Amendment's Confrontation Clause." *Bullcoming*, 564 U.S. at 651. And the *Bullcoming* Court held "the Confrontation Clause [does not] permit the prosecution" to rely on a witness's "in-court testimony" to prove a fact within "a forensic laboratory report," such as a defendant's blood-alcohol content, unless that witness "sign[ed] the certification or perform[ed] or observe[d] the test reported in the certification." *Bullcoming*, 564 U.S. at 652. Thus, these Supreme Court decisions establish that the state need not call every witness associated with the DNA testing process to satisfy the Sixth Amendment.

Second, even accepting arguendo that *Bullcoming*'s testimonial-witness holding applies to the state's DNA evidence used to convict Morris, a review of the trial transcript confirms that no *Bullcoming* error occurred. During the guilt phase of Morris's capital trial, the state called Angelo Della Manna, "a forensic scientist within the DNA unit of the Alabama Department of Forensic Sciences['] crime laboratory . . . in Birmingham." (Doc. # 15-21 at 49). Della Manna testified about the DNA evidence, which linked Morris to Rochester's murder. (Doc. # 15-21 at 49). According to Della Manna, he was one of the scientists involved in the DNA analysis. (*See* Doc. # 15-21 at 60) ("Q. Now, did you do the DNA analysis in the case involving the defendant Alfonso Morris and the victim Ms. Miriam Rochester? A. We did."). At trial, Della Manna identified several pieces of evidence "because . . . [of] [his] unique case number and item number as well as [his] initials across the seal." (*Id*. at 63, 65-67, 70, 72). Additionally, Della Manna testified that he

was the analyst who "was successful in developing the complete DNA profile from [the] [blood] stain on [Morris's] shoe" and provided the opinion that the DNA recovered from that source "matche[d] the DNA profile of Rochester." (Doc. # 15-21 at 86). Della Manna's active role in the analysis of the DNA evidence or indirect involvement as an "observer" distinguishes Morris's case from *Bullcoming*. To the extent that holding applies here, Morris has not established a *Bullcoming* violation.

Alternatively, the court explores the other state-barred procedural basis for denying habeas relief in light of the circuit court's reliance on Rule 32.2(a)(3) and (5) to deny this claim on collateral review. Under Alabama Criminal Procedure Rule 32.2(a)(3), a petitioner may not obtain postconviction relief on a claim "[w]hich could have been but was not raised at trial." Ala. R. Crim. P. R. 32.2(a)(3). Likewise, Alabama Criminal Procedure Rule 32.2(a)(5) precludes a postconviction remedy on the basis of an available but unasserted appellate claim. Ala. R. Crim. P. 32.2(a)(5).

Morris argues that because his DNA testimonial claim was novel at trial and on direct appeal, he has cause for not complying with these requirements of Rule 32. (Doc. # 27 at 69). Specifically, he explains that the source of his novel claim – that is, *Bullcoming* – postdated the end of his direct appeal. (Docs. # 27 at 69; 15-53 at 110). A habeas court may excuse a petitioner's procedural default and consider an unexhausted constitutional claim if he meets the cause and prejudice exception. *See Coleman*, 501 U.S. at 750 (recognizing that a petitioner may overcome the prohibition against habeas review if he "can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law"). Thus, the court examines whether Morris meets both prongs of that exception.

Morris cites two cases to support his contention that cause and prejudice excuse his state-barred procedural default. *Reed v. Ross*, 468 U.S. 1 (1984); *Ward v. Hall*, 592 F.3d 1144 (11th Cir. 2010); (Doc. # 27 at 69). Each case addressed the cause element related to procedural default. *Reed*, 468 U.S. at 16 (concluding that "a defendant has cause for his failure to raise the claim in accordance with applicable state procedures" when "a constitutional claim is so novel that its legal basis is not reasonably available to counsel"); *Ward*, 592 F.3d at 1147 ("A federal court may still address the merits of a procedurally defaulted claim if the petitioner can show cause for the default and actual prejudice resulting from the alleged constitutional violation.").

But, Morris's cause and prejudice argument is unpersuasive for several reasons. First, neither *Reed* nor *Ward* – both of which predate *Bullcoming* – establishes that *Bullcoming* falls within the so-novel-to-be-cause category. Second, Morris references no other authority to substantiate his assertion that *Bullcoming* is a legal novelty.

Third, *Bullcoming* is an extension of an earlier Supreme Court decision, which detracts from the argument that appellate counsel could not have reasonably anticipated that the state's DNA evidence presented a potential testimonial issue. In *Bullcoming*, the Supreme Court relied on its decision in *Melendez-Diaz. Bullcoming*, 564 U.S. at 651. Indeed, Morris references the 2011 *Melendez-Diaz* decision as additional support of this testimonial claim on habeas review. (Doc. # 27 at 68). As a result, *Bullcoming* is not sufficiently novel to support cause. Fourth, Morris had the opportunity to, but did not, cite *Melendez-Diaz* to build a Sixth Amendment testimonial argument about the state's DNA evidence in his reply brief or application for rehearing on direct review before the ACCA. (Doc. # 15-53 at 2-42, 43-109). Nor did Morris include *Melendez-Diaz* in his petition for a writ of certiorari filed with the Alabama Supreme Court. (Doc. # 15-54 at 2-133).

Fifth, even if Morris had substantiated cause under *Bullcoming* (and, to be clear, he did not), he has made no attempt to demonstrate prejudice or offer any other excuse for his procedural default under Rule 32. Accordingly, state-barred procedural default, based on Rule 32.2(a)(3) and (5), precludes habeas relief on Morris's claim to the extent that (1) the ACCA applied Rule 28(a)(10) more broadly than that rule's firmly established scope and (2) this court's de novo analysis of this Sixth Amendment claim is wrong.

For these reasons, the court denies Claim F.

### P.    Claim D—Morris has not demonstrated a right to habeas relief on his *Strickland* claims.

Relying on the Supreme Court's seminal Sixth Amendment decision in *Strickland* – which is briefly discussed above in Claim F – Morris asserts an ineffective assistance of counsel claim in Claim D. The court divides Claim D into two pretrial, nine guilt-phase, and four penalty-phase subclaims, as well as one combined *Strickland* subclaim. These subclaims are labeled D.2.h to D.2.i; D.2.a to D.2.g, D.2.j, and D.2.l; D.2.k and D.1.a to D.1.c; and D.3 in Morris's habeas petition. The court wraps up Claim D with a discussion of Morris's remaining allegations unrelated to the Sixth Amendment.

Morris seeks de novo review of his *Strickland* subclaims under (d)(1) and (d)(2) of AEDPA. (Doc. # 1 at 59 ¶ 152). Respondent answers that state-barred procedural default supports habeas denial here because the ACCA applied Rule 28(a)(10) in a firmly established manner. Alternatively, Respondent argues that the state courts reached a reasonable decision under *Strickland*—or, at a minimum, one that was not unreasonable. In reply, Morris contends Respondent's reliance on state-barred procedural default. (Doc. # 27 at 34-39). Because the ACCA primarily relied on Rule 28(a)(10) to deny Morris's claims, the court first considers that issue.

Unlike the procedural default analysis in Claim F, as to these claims the record casts doubt on whether the ACCA relied on Rule 28(a)(10) in a firmly established manner to deny Morris's *Strickland* subclaims. First, as the ACCA acknowledged, Morris's brief did not fit into the category of cases in which the petitioner had done little or nothing to develop his claim on collateral review. *See Morris Collateral*, 261 So. 3d at 1193 (recognizing that "Morris did not merely list or summarize the 19 claims of ineffective assistance of counsel that, he says, were improperly dismissed"). Nevertheless, the ACCA determined that applying Rule 28(a)(10) was appropriate because "the mere 'cutting and pasting' of each claim into the brief [from the petition] without providing any legal analysis, citation to authority, or argument supporting his assertion that dismissal was improper place[d] [Morris] in the same position as the appellants in the foregoing cases." *Morris Collateral*, 261 So. 3d at 1193.

Second, although Morris did recycle portions of his Rule 32 petition in drafting his collateral brief, Morris supported his *Strickland* subclaims with case law and citations to the record. Respondent bears the burden of showing that the ACCA's reliance on Rule 28(a)(10) falls within that rule's firmly established range. But, there is a substantial question about whether it has done so here. And, because it appears the ACCA's application of Rule 28(a)(10) to Morris's *Strickland* allegations extends into "unfirm" ground, the court addresses these issues as if state-barred procedural default does not apply to Claim D.

Before considering the ACCA's alternative merits-based denial arguments related to Morris's ineffective assistance allegations, the court reviews general *Strickland* principles. In *Strickland*, the Supreme Court established a two-pronged Sixth Amendment standard for evaluating the effectiveness of counsel who represent criminal defendants at trial or on direct

221

appeal. To prove that a conviction or sentence is unconstitutional because of ineffective assistance, "[f]irst, the defendant must show that counsel's performance was deficient." 466 U.S. at 687. "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed [to] the defendant by the Sixth Amendment." *Id.* "Second, the defendant must show that the deficient performance prejudiced the defense." *Id.* "This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* "[B]oth showings" are necessary for a petitioner to establish ineffective assistance — "a breakdown in the adversary process that renders the [conviction or sentence] unreliable." *Id.*; *see also Holladay v. Haley*, 209 F.3d 1243, 1248 (11th Cir. 2000) ("Because both parts of the test must be satisfied in order to show a violation of the Sixth Amendment, the court need not address the performance prong if the defendant cannot meet the prejudice prong, or vice versa.") (citation omitted).

A petitioner bears the burden of proving *Strickland*'s first prong "by a preponderance of competent evidence." *Chandler v. United States*, 218 F.3d 1305, 1313 (11th Cir. 2000) (en banc). In order to establish deficient performance, a petitioner "must show that counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. "[P]revailing professional norms" are the benchmarks for judging reasonableness. *Id.* Moreover, courts must be "highly deferential" in their "scrutiny of counsel's performance" and "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689.

Under the *Strickland* framework, a petitioner "must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* (internal

quotation marks omitted). The *Strickland* Court observed that "countless ways [of] . . . effective assistance [exist] in any given case" and that "[e]ven the best criminal defense attorneys would not defend a particular client in the same way." *Id.* The *Strickland* Court cautioned that "[i]t is all too tempting for a [petitioner] to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." *Id.* at 689. Consequently, an evaluating court must make "every effort . . . to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.*; *see, e.g.*, *Newland*, 527 F.3d at 1184 ("We review counsel's performance 'from counsel's perspective at the time,' to avoid 'the distorting effects of hindsight.'") (quoting *Strickland*, 466 U.S. at 689). Simply put, "a petitioner must establish that no competent counsel would have taken the action that his counsel did take" to overcome the presumption that counsel's conduct fell "within the wide range of competent assistance." *Chandler*, 218 F.3d at 1315, 1317.

Further, when assessing an adjudicated ineffective assistance claim on habeas review, "it is important to keep in mind that [i]n addition to the deference to counsel's performance mandated by *Strickland*, the AEDPA adds another layer of deference." *Williams v. Allen*, 598 F.3d 778, 789 (11th Cir. 2010) (internal quotation marks omitted) (alteration in *Williams*) (quoting *Rutherford v. Crosby*, 385 F.3d 1300, 1309 (11th Cir. 2004)). "Thus, [a petitioner] not only has to satisfy the elements of the *Strickland* standard, but he must also show that the [s]tate court applied *Strickland* to the facts of his case in an *objectively unreasonable manner*." *Williams*, 598 F.3d at 789 (internal quotation marks omitted) (emphasis in *Blankenship*) (quoting *Blankenship*, 542 F.3d at 1271, in

turn quoting *Rutherford*, 385 F.3d at 1309). Because *Strickland* and § 2254(d) incorporate "'highly deferential' [standards], . . . when the two apply in tandem, review is 'doubly' so." *Richter*, 562 U.S. at 105 (citations omitted). The focus of this doubly deferential inquiry is "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard" rather than "whether counsel's actions were reasonable." *Id.* at 101, 105 (comparing "whether the state court's application of the *Strickland* standard was unreasonable" under § 2254(d)(1) with "whether defense counsel's performance fell below *Strickland*'s standard" under the Sixth Amendment). Accordingly, this "[d]ouble deference is doubly difficult for a petitioner to overcome, and it will be a rare case in which an ineffective assistance of counsel claim that was denied on the merits in state court is found to merit relief in a federal habeas proceeding." *Evans v. Sec'y, Fla. Dep't of Corr.*, 699 F.3d 1249, 1268 (11th Cir. 2012) (internal quotation marks omitted) (alteration added).

Moving to *Strickland*'s second prong, the burden of proof is less demanding than the performance prong's preponderance of the evidence standard. 466 U.S. at 694. Instead, to satisfy the prejudice component, a habeas petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* "A reasonable probability is [one] sufficient to undermine confidence in the outcome." *Id.* Stated differently, "[a] finding of prejudice requires proof of unprofessional errors so egregious that the trial was rendered unfair and the verdict rendered suspect." *Johnson v. Alabama*, 256 F.3d 1156, 1177 (11th Cir. 2001) (internal quotation marks omitted). But the fact that counsel's "errors had some conceivable effect on the outcome of the proceeding" is insufficient to show prejudice. *Strickland*, 466 U.S. at 693. "[W]hen a [capital] petitioner challenges a death sentence, 'the [constitutional] question is whether there is a reasonable probability that, absent the errors, the

224

sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.'" *Stewart v. Sec'y, Fla. Dep't of Corr.*, 476 F.3d 1193, 1209 (11th Cir. 2007) (alterations added) (quoting *Strickland*, 466 U.S. at 695). If the state court has adjudicated the prejudice prong, then a petitioner must establish that the merits-based conclusion contains AEDPA error; otherwise habeas relief is unavailable. *See Cullen*, 563 U.S. at 197-98 ("Even if his trial counsel had performed deficiently, [the petitioner] also has failed to show that the [state court] must have unreasonably concluded that [he] was not prejudiced."). With these principles in mind, the court examines how the Alabama courts substantively treated Morris's *Strickland* allegations, and then analyzes each of the subclaims on the merits.

Consistent with the state's motion to dismiss, the circuit court reviewed Morris's ineffectiveness allegations for sufficiency under Rule 32. Based on Alabama Criminal Procedure Rules 32.3, 32.6(b), and 32.7(d), the circuit court summarily dismissed Morris's ineffective assistance claims. As discussed above, Rules 32.3 and 32.6(b) govern burden and specificity requirements on collateral review. A summary dismissal under Rule 32.7(d) means that postconviction relief is inappropriate even when accepting that the petitioner could prove every part of his claim.

For each subclaim, the ACCA adopted the circuit court's substantive analysis and rejected Morris's *Strickland* allegations. *See Morris Collateral*, 261 So. 3d at 1193 ("conclud[ing] that . . . [Morris's] claims of ineffective assistance of counsel . . . were insufficient . . . to satisfy the requirements in Rule 32.3 and Rule 32.6(b); therefore, summary dismissal of those claims was proper under Rule 32.7(d)"). As a result, on habeas review, the court evaluates the reasonableness of the circuit court's Rule 32 analysis to see if Morris has an opening under AEDPA. *See Wilson*,

138 S. Ct. at 1192 (explaining that a look-through presumption is applied to the last state court's merits-based reasoning).

In this *Strickland* section, the court considers Morris's pretrial and guilt-phase habeas allegations followed by his penalty-phase and combined assertions.[10] The court begins with the pretrial and guilt-phase discussions of Morris's speedy trial (D.2.h), incompetency (D.2.i), and one-man showup (D.2.a) subclaims. The court also reviews Morris's guilt-phase ineffectiveness allegations about DNA, alternative theory, preservation of evidence, forensic witnesses, state witness Mary McCombs, improper questioning, repeated interruptions (subclaims D.2.b-D.2.g, D.2.j), and concludes with his subclaim concerning the state's prejudicial comments (subclaim D.2.l).

### 1.    Pretrial Subclaim D.2.h—Trial counsel should have pursued a speedy trial.

Morris sought postconviction review because trial counsel failed to pursue Morris's right to a speedy trial. (Docs. # 15-56 at 100-01 ¶¶ 86-88; 15-62 at 59-60). The circuit court summarily dismissed this subclaim for inadequate allegations of deficient performance and prejudice. (Doc. # 15-56 at 37-39 ¶¶ 78-83).

As to performance, the circuit court noted that "Morris had failed to plead any facts that would show that his counsel was unreasonable for failing to move for a speedy trial and instead pursue a strategy of delaying trial to establish [his] competency." (Doc. # 15-56 at 37 ¶ 79). The

---

[10] On collateral review, the circuit court treated the initial allegations about ineffective assistance within Morris's Rule 32 petition as introductory and not independent claims. (Doc. # 15-56 at 10 ¶ 1). The circuit court also rejected Morris's reliance on the ABA Guidelines as the governing standards applicable to measure the deficiency of trial counsel's conduct. (Doc. # 15-56 at 11 ¶¶ 2-3). Morris challenges neither of these circuit court conclusions on habeas review. (Doc. # 1 at 34-35 ¶¶ 101-02). Thus, the court begins the habeas analysis with both thresholds in place.

circuit court explained that Morris had alleged the existence of "'adequate grounds' for objecting [to the trial delay]" but omitted the underlying "facts that . . . would establish that the strategy counsel did take was unreasonable." (Doc. # 15-56 at 37 ¶ 79).

On the issue of prejudice attributable to the unavailability of witnesses, the circuit court observed that Morris had omitted "the identity or expected testimony of the[] allegedly unavailable witnesses," including "potential alibi witnesses." (Doc. # 15-56 at 37-38 ¶ 80). Similarly, the circuit court found that Morris had claimed diminished memories as prejudice but identified just one witness, Patterson, who "lost [her] notes in a fire less than months after [his] initial arrest and before [his] indictment." (Doc. # 15-56 at 38 ¶ 80). As to the inadequacy of Morris's reference to Patterson as prejudice, the circuit court explained that Morris had not connected "a speedy-trial objection" to any alteration of Patterson's eyewitness testimony. (*Id.*).

The circuit court also referenced the ACCA's rejection of Morris's underlying speedy trial claim on direct appeal based on the *Barker* factors. (Doc. # 15-56 at 38-39 ¶¶ 81, 83). Relying on Alabama case law, the circuit court acknowledged that "a finding of no plain error on direct appeal is not automatically dispositive of" *Strickland* prejudice. (Doc. # 15-56 at 38 ¶ 82). But the circuit court also observed the "rar[ity]" of the two tests "result[ing] in different outcomes." (Doc. # 15-56 at 38 ¶ 82) (internal quotation marks omitted). Because Morris had not pled "any new facts" on collateral review, the circuit court concluded that "his claim d[id] not present one of the rare cases [of] . . . different outcomes under *Strickland* and plain-error review." (Doc. # 15-56 at 39 ¶ 83).

Morris has cited no authority, much less binding precedent, in which a court has held that trial counsel provided ineffective assistance in failing to assert a speedy trial right when a client's competency to stand trial was a reason, if not the reason, for the delay. Morris references several

cases – *Barker*, *Doggett*, *Mansel*, *Vincent*, *Hendrix*, *Strunk*, *Rose*, and *Nguyen* – that the court has already discussed and distinguished in its analysis of an alleged independent speedy trial violation (in Claim G). (Docs. # 1 at 71-72 ¶¶ 186-89; 27 at 60-61). None of the petitioners or appellants in those cases had moved to continue a trial for a psychiatric evaluation or received treatment to restore their competency to stand trial. And, absent that critical context, Morris has not shown clearly established error by the circuit court in rejecting the adequacy of his deficient performance allegations based on an unasserted speedy trial right.

The remaining cases – *Strickland*, *Premo*, and *Hendrix* – do not establish that the circuit court unreasonably rejected the adequacy of Morris's deficient performance or prejudice allegations under *Barker* or *Strickland* either. As discussed above within this section, the Supreme Court quite plainly did not analyze a speedy trial violation or guilt-phase ineffectiveness in *Strickland* or *Premo*. *See Strickland*, 466 U.S. at 698 (claiming ineffective representation in penalty phase); *Premo*, 562 U.S. at 118 (claiming ineffectiveness in context of plea bargain without attempting to suppress client's confession). Although the Sixth Circuit did address guilt-phase ineffective assistance in *Hendrix*, the underlying claim was not a speedy trial violation, but rather an "unreasonable . . . fail[ure] to move to suppress." 893 F.3d at 922. And, in any event, a Sixth Circuit decision does not clearly establish the law to be applied by this court. Thus, based on the cited case law, Morris has not shown a clearly established case law reason to detach AEDPA deference on this subclaim.

Moving to (d)(2), Morris maintains that the circuit court unreasonably determined that he had inadequately alleged deficient performance. Morris argues that the circuit court unreasonably disregarded the ACCA's "conce[ssion] [on direct review] that it took four years to determine [his]

competency." (Doc. # 27 at 61) (emphasis omitted). Morris also contends that "[c]ounsel had no reason for watching four years go by without any progress." (Doc. # 27 at 61) (emphasis omitted). But, even if Morris could detach AEDPA deference on the deficient performance prong of *Strickland* based on his unasserted speedy trial right, this *Strickland* subclaim fails still for at least two reasons.

First, consistent with the court's analysis of his Claim G, Morris's allegations fail to demonstrate a de novo speedy trial violation under binding Eleventh Circuit law. As previously noted, Morris's speedy trial allegations do not entitle him to bypass a showing of actual prejudice under *Barker*. To dispense with the actual prejudice requirement under *Ringstaff* and *Ingram*, Morris would have to show that the first three *Barker* factors all weigh heavily in his favor. Even accepting that both a delay of six years and his failure to assert a speedy trial right because of trial counsel's deficient performance heavily favor Morris, the third factor is not in his favor. That is, the reasons for the delay do not heavily favor Morris because he moved to continue the trial to determine his competency and spent time to restore his competency. Absent presumed prejudice under *Barker*'s fourth factor, Morris's allegations of prejudice based on unidentified missing witnesses and speculatively diminished memories are inadequate to show actual *Barker* prejudice. And, because Morris has not presented sufficient factual allegations to support a meritorious *Barker* violation, he has not made adequate allegations of deficient performance under *Strickland*.

Second, Morris's (d)(2) challenge fails to detach AEDPA deference from the circuit court's *Strickland* prejudice analysis. The circuit court did not unreasonably conclude that the speedy trial prejudice (that Morris claims trial counsel's inaction caused) was inadequate to show a reasonable probability that the outcome of his guilt phase would have been different without the delay. Again,

Morris's allegations about speedy trial prejudice include unidentified missing witnesses and speculatively diminished memories. Whether the state circuit court's *Barker* analysis deserves deferential treatment under *Strickland*'s deficient performance prong, it is clear that its assessment of *Strickland*'s prejudice prong – in the absence of any unreasonable factual determination – does deserve such treatment.

### 2. Pretrial Subclaim D.2.i—Trial counsel should have revisited the issue of Morris's incompetency.

On state postconviction review, Morris asserted that trial counsel ineffectively investigated and prepared his claim of incompetency to stand trial. (Docs. # 15-56 at 101-02 ¶¶ 89-90; 15-62 at 60-62). The circuit court summarily dismissed this claim because of inadequate allegations of deficient performance and prejudice under *Strickland*. (Doc. # 15-56 at 39-40 ¶¶ 84-87).

The circuit court determined that Morris's allegations about the first prong in *Strickland* lacked specificity regarding how trial counsel should have "followed up" on his incompetency after the "*Atkins* hearing prior to his trial." (Doc. # 15-56 at 39 ¶¶ 85-86) (internal quotation marks omitted). The circuit court noted that Morris's generic reference to a medical expert, without naming the witness or proffering the content of that witness's anticipated testimony, was insufficient to establish deficient performance. (Doc. # 15-56 at 39 ¶ 86).

The circuit court further found that Morris had not sufficiently pleaded *Strickland* prejudice because he did not allege "any facts that, if true, would establish that he was actually incompetent to stand trial." (Doc. # 15-56 at 40 ¶ 87). The circuit court also found that Morris's assertion that trial counsel were ineffective "for failing to present evidence of his mental illnesses" was insufficient to "establish his incompetence." (Doc. # 15-56 at 40 ¶ 87).

In his argument that the state court committed (d)(1) error under AEDPA, Morris cites *Drope*, *Ake*, *Strickland*, *Atkins*, and the American Bar Association's [Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases] ("ABA Guidelines").[11] (Docs. # 1 at 73-74 ¶¶ 190, 192; 27 at 62). But, these authorities do not establish that the circuit court committed clearly established constitutional error in rejecting the adequacy of Morris's ineffectiveness allegations. As discussed above, *Ake* relates to a defendant's competency at the time of the offense and is not a *Strickland* decision. 470 U.S. at 74. *Atkins* involved a defendant's mental ineligibility for the death penalty and contains no *Strickland* analysis. *Atkins*, 536 U.S. at 321. And, the contextual holding in *Strickland* is unrelated to ineffectiveness based on incompetency to stand trial. *Strickland*, 466 U.S. at 698.

In analyzing Morris's independent incompetency allegations (related to Claim H), the court has considered the Supreme Court's opinion in *Drope*. There, the Supreme Court concluded that habeas relief was appropriate under the due process clause. But, as this court explained above (again, related to Claim H), even if Morris's allegations of incompetency are accepted as true, the facts here do not approach the petitioner's status in *Drope* where the allegations "require[d] further inquiry." *Drope*, 420 U.S. at 180. And, consistent with the court's reasons for denying the claim in relation to Claim H, both under (d)(1) and (d)(2), Morris has not established that the circuit court unreasonably rejected the adequacy of his *Strickland* allegations in connection with his alleged trial incompetency in 2008.

---

[11] The Supreme Court has referred to the ABA Guidelines at times when analyzing deficient performance under *Strickland*. *See Williams v. Allen*, 542 F.3d at 1326, 1339 (11th Cir. 2008) ("[T]he Supreme Court has looked to the ABA Guidelines as standards for attorney conduct."). But Morris's references do not point to clearly established law. Only Supreme Court holdings can clearly establish law under AEDPA. *Williams*, 529 U.S. at 412.

### 3.     Guilt-Phase Subclaim D.2.a—Trial court should have challenged the reliability of Patterson's pretrial identification.

On state collateral review, Morris faulted trial counsel for their failure to challenge Patterson's eyewitness testimony as unreliable. (Docs. # 15-56 at 81-83 ¶¶ 40-45; 15-62 at 39-41). As detailed above (in relation to Claim A), Patterson was the paramedic who identified Morris in a single-suspect showup after Rochester's murder. Referencing Rules 32.3 and 32.6(b), the circuit court rejected the sufficiency of Morris's allegations under both *Strickland* prongs, and summarily dismissed this claim under Rule 32.7(d). (Doc. # 15-56 at 19-21 ¶¶ 27-33).

The circuit court pointed to several deficiencies in Morris's ineffectiveness allegations based on the one-man showup. First, regarding *Strickland*'s performance prong, the circuit court noted that Morris had failed to identify "what specific objections counsel should have made or how counsel could have objected more adequately." (Doc. # 15-56 at 19 ¶ 28). Second, the circuit court concluded that Morris's ineffective assistance claim failed because – as determined on direct review – his allegations about Patterson's testimony could not support a *Biggers* violation. (Doc. # 15-56 at 20-21 ¶¶ 30-33). Third, the circuit court observed that Morris's statement about *Strickland* prejudice lacked any factual allegation that would establish how trial counsel's unidentified objection could have "changed the outcome of his trial" but, instead, "contain[ed] nothing but a bare allegation of prejudice." (Doc. # 15-56 at 20 ¶ 29).

To support his claim for relief here, Morris references language from several Supreme Court decisions, including *Brathwaite*, *Biggers*, *Perry*, *Kyles*, *Dugger*, *Strickland*, and *Ake*. (Doc. # 1 at 60-61 ¶¶ 154-57). The court has already explained in relation to Claim A why *Brathwaite*, *Biggers*, *Perry*, *Kyles*, and *Dugger* do not demonstrate unreasonable error by the ACCA regarding Morris's claim that the admission of Patterson's testimony was unconstitutional. And, for those

same reasons, the ACCA did not unreasonably reject the underlying basis of Morris's *Strickland* subclaim, which was tied to trial counsel's failure to object to Patterson's testimony as an alleged *Biggers* violation. *See, e.g.*, *Sexton*, 138 S. Ct. at 2559 ("A fairminded jurist could conclude that counsel's performance was not deficient because counsel reasonably could have determined that the motion to suppress would have failed."); *Denson v. United States*, 804 F.3d 1339, 1342 (11th Cir. 2015) ("Failing to make a meritless objection does not constitute deficient performance.").

Morris's reliance on *Strickland* is also questionable because that decision focused upon ineffective assistance in the penalty phase. *Strickland*, 466 U.S. at 698. As a result, the contextual holding in *Strickland* does not aid Morris in carrying his burden to show a clearly established AEDPA error on these or his remaining guilt-phase allegations.

Morris cites *Ake* and an article on bias to support his allegation that trial counsel should have retained an expert witness "who could have testified to the unreliability of cross-racial eyewitness identifications." (Doc. # 1 at 60 ¶ 155). Although the state circuit court did not mention it in its analysis of this subclaim, Morris has not specified the name of an expert witness who would testify, or, for that matter, what would be the contours of any testimony on unreliable cross-racial identifications. Regardless, the Supreme Court's holding in *Ake* involves psychiatric expert assistance for indigent defendants, not eyewitness experts. *See Ake*, 470 U.S. at 74 ("[T]he Constitution requires that a State provide access to a psychiatrist's assistance on th[e] issue [of sanity at the time of the offense] if the defendant cannot otherwise afford one."). And, *Ake* is not a *Strickland* decision. Further, Morris's mention of an article on the unreliability of cross-racial identifications in conjunction with *Ake* is not clearly established law under (d)(1).

In reply, Morris cites *Ex parte Taylor*, 10 So. 3d 1075 (Ala. 2005), and argues that "a court cannot simply rely on a prior determination under the plain-error standard when determining whether to grant a Rule 32 petitioner relief on an ineffective assistance claim." (Doc. # 27 at 51). In *Taylor*, the Alabama Supreme Court clarified that "a determination on direct appeal that there has been no plain error does not automatically foreclose a determination of the existence of the prejudice required under *Strickland* to sustain a claim of ineffective assistance of counsel." 10 So. 3d at 1078. On remand, the Alabama Supreme Court instructed the ACCA to separately review for plain error and *Strickland* prejudice. *See id.* ("In determining whether to grant a Rule 32 petitioner relief on an ineffective-assistance claim, a court must examine both the plain-error and prejudice standards of review."). *Taylor* is a case dealing with *Strickland*'s second prong. As a result, that decision simply does not preclude reliance on a plain-error denial to support a determination that a petitioner's deficient performance allegations (*i.e.*, the first prong) are inadequate under *Strickland*.

Nevertheless, the principle addressed in *Taylor* is separate and distinct from whether the circuit court unreasonably determined that Morris, in advancing his *Strickland* prejudice claim, had failed to adequately allege factual support. Indeed, in *Taylor*, the Alabama Supreme Court did not address a *Strickland* claim grounded in a *Biggers* violation. So, *Taylor* does nothing to persuade this court that the Alabama courts committed a (d)(1) error in rejecting this subclaim.

Morris has offered no clearly established law which suggests that the circuit court unreasonably entered a summary dismissal of this subclaim under (d)(1). And, Morris's references to Patterson's testimony and other parts of the state court record do not establish that habeas relief is appropriate. That is, they do not show the state courts committed any unreasonable factual error

under (d)(2). (Doc. # 27 at 51-52). Even more fundamentally, Morris has not overcome the presumptively correct circuit court findings with clear and convincing evidence under § 2254(e)(1), if that factual provision extends to AEDPA challenges under (d)(2).

### 4. Guilt-Phase Subclaim D.2.b—Trial counsel should have objected to the DNA evidence.

Morris also presented a postconviction *Strickland* claim, contending that trial counsel were ineffective because they did not retain an expert to counter the state's DNA evidence taken from a cigarette butt. (Docs. # 15-56 at 76-78 ¶¶ 28-31; 15-62 at 34-36). Citing Rules 32.3 and 32.6(b), the state circuit court rejected the adequacy of these DNA allegations under both *Strickland* prongs and summarily dismissed the claim under Rule 32.7(d). (Doc. # 15-56 at 14-15 ¶¶ 13-16). The court found that Morris's performance-prong allegations were deficient because he "ha[d] failed both to identify an expert by name and to plead specific facts concerning the unnamed expert's expected testimony." (Doc. # 15-56 at 14 ¶ 15). The circuit court also rejected Morris's second-prong assertions as "bare allegation[s] . . . without specific facts indicating how . . . [he] was prejudiced." (Doc. # 15-56 at 15 ¶ 16).

Morris cites several Supreme Court decisions, but does not put any of the cases in context. *Ake*, *California v. Trombetta*, 467 U.S. 479 (1984); *Brady v. Maryland*, 373 U.S. 83 (1963); *Premo v. Moore*, 562 U.S. 115 (2011); *McDaniel v. Brown*, 558 U.S. 120 (2010) (per curiam). But, the Supreme Court did not address ineffective assistance in most of these cases, so the cases' holdings do not substantiate Morris's (d)(1) burden. *See Ake*, 470 U.S. at 74 (requiring a state to provide psychiatric experts to indigent defendants on "a preliminary showing that . . . sanity at the time of the offense is likely to be a significant factor at trial"); *Trombetta*, 467 U.S. at 491 ("conclud[ing] . . . that the Due Process Clause of the Fourteenth Amendment does not require that law

enforcement agencies preserve breath samples in order to introduce the results of breath-analysis tests at trial"); *Brady*, 373 U.S. at 87 ("hold[ing] that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution"); *McDaniel*, 558 U.S. at 127 ("consider[ing] two questions:  the proper standard of review for a *Jackson[ v. Virginia*, 443 U.S. 307 (1979)] claim on federal habeas, and whether such a claim may rely upon evidence outside the trial record that goes to the reliability of trial evidence"). Although *Premo* is a *Strickland* decision, the ineffectiveness claim "concern[ed] the adequacy of representation in providing an assessment of a plea bargain without first seeking suppression of a confession assumed to have been improperly obtained," *Premo*, 562 U.S. at 118, not challenging DNA evidence with a defense expert at trial.

Morris contends that *Price v. Warren*, 726 F. App'x 877 (3d Cir. 2018), confirms that the state courts unreasonably rejected his ineffective assistance allegations tied to the cigarette butt. (Doc. # 27 at 53). But *Price* involved a chain of custody *Strickland* claim not ineffectiveness based on trial counsel's failure to retain a DNA expert. *See Price*, 726 F. App'x at 879 (seeking habeas relief under the Sixth Amendment "because counsel failed to attack the chain of custody of the cigarette butt," which was "the sole piece of evidence squarely linking [the petitioner] to the robberies").

Morris cites *Hodges v. State*, 147 So. 3d 916 (Ala. Crim. App. 2007), *rev'd on other grounds sub nom. Ex parte Hodges*, 147 So. 3d 973 (Ala. 2011), to suggest that the circuit court "demanded pointless detail that the law does not require, and ignored all the facts that appeared in the petition." (Doc. # 27 at 53). In *Hodges*, the ACCA determined that the petitioner had stated his

*Strickland* mitigation claim adequately and reversed the circuit court's summary dismissal. 147 So. 3d at 964. *Hodges* does not speak to the reasonableness of the circuit court's summary dismissal of his ineffectiveness claim tied to trial counsel's failure to retain a DNA expert.

Morris also cites an excerpt on expert assistance from the ABA Guidelines to substantiate his AEDPA burden. But, as discussed above, the ABA Guidelines do not represent clearly established law. With his referenced authorities, Morris has not shown clearly established constitutional error by the Alabama courts with respect to his DNA expert witness allegations.

In an apparent attempt to show AEDPA (d)(2) error, Morris references a portion of the state's closing argument in which the prosecutor emphasized the DNA evidence linking Morris to Rochester's murder. (Doc. # 1 at 64 ¶ 162). But Morris does not connect this record citation to any unreasonable factual determination which the circuit court relied on in its summary dismissal of his DNA expert witness subclaim. Nor has Morris overcome the presumption of correctness attached to the circuit court's findings with clear and convincing evidence, to the extent that § 2254(e)(1) applies to his (d)(2) contention.

Morris correctly observes that the circuit court did not address the merits of the allegation that trial counsel should have requested an evidentiary hearing in its denial of his Rule 32 petition. (Doc. # 27 at 53); (*compare* Doc. # 15-56 at 77 ¶ 29, *with* Doc. # 15-56 at 14-15 ¶¶ 13-16). Because neither the circuit court nor the ACCA addressed this allegation, this court considers the merits of that allegation de novo.

Morris cites three Alabama cases to support the allegation that trial counsel should have "challenge[d] the [trial] court's failure to hold a DNA evidentiary hearing." (Doc. # 1 at 63 ¶ 161). *Ex parte Hutcherson*, 677 So. 2d 1205 (Ala. 1999); *Ex parte Gingo*, 605 So. 2d 1237 (1996);

*Simmons v. State*, 797 So. 2d 1134 (Ala. Crim. App. 1999). (Doc. # 1 at 63 ¶ 161). Two of these cases do not involve *Strickland* claims. *See Hutcherson*, 677 So. 2d at 1209 ("[T]he [s]tate's failure to comply with the [Alabama] standard . . . regarding DNA evidence[] [required a] . . . revers[al] [of] the [capital] judgment."); *Gingo*, 605 So. 2d at 1238 ("We granted certiorari review in this case to determine whether the State erred in destroying or allowing the destruction of samples of allegedly hazardous waste."). Thus, neither *Hutcherson* nor *Simmons* supports Morris's argument that trial counsel performed deficiently in failing to request a DNA hearing or that he suffered *Strickland* prejudice because of that failure.

In its review in *Simmons*, the ACCA addressed first whether the trial court had committed error under the state statutory framework "by admitting into evidence [the] testimony concerning the results of DNA testing." *Simmons*, 797 So. 2d at 1144-45. Plain-error review applied because the appellant had not contested the admission of the DNA evidence at trial. *Id.* at 1144. As to the DNA evidentiary hearing claim, the ACCA recognized, akin to the discussion here in Claim E, that no reversible error had occurred because the appellant had not requested that the trial court conduct one. *Simmons*, 797 So. 2d at 1145. Still, the ACCA remanded the case for a hearing because the trial court's consideration of "the reliability of the state's DNA population frequency statistical analysis evidence" was unclear. *Id.* at 1144, 1146.

In phase two of *Simmons*, the ACCA concluded that "[n]o error [had] occurred in the admission of the DNA evidence at trial." 797 So. 2d at 1150. Although the appellant in *Simmons* raised several *Strickland* claims, he did not base ineffective assistance upon any DNA issue. *Id.* at 1179-80. Thus, the context of *Simmons* does not suggest Morris's trial counsel's failure to request a hearing was unreasonable under *Strickland*. Likewise, *Simmons* does not suggest that a

238

reasonable probability existed that the outcome of the guilt phase would have been different in Morris's trial had trial counsel requested a DNA hearing. And the Supreme Court cases discussed above do not establish that Morris meets either *Strickland* prong. Consequently, Morris's cited authorities do not establish a de novo right to habeas relief based on trial counsel's failure to seek a DNA hearing.

The ACCA also determined on direct review that no plain error had occurred in the trial court's admission of the DNA evidence without a hearing, which as discussed in Claim E, Morris challenged as unreliable. Because the ACCA's decision on direct review was not unreasonable under AEDPA, Morris lacks a viable underlying allegation of deficient performance to support the hearing portion of this *Strickland* subclaim. *Cf. United States v. Winfield*, 960 F.2d 970, 974 (11th Cir. 1992) ("[A] lawyer's failure to preserve a meritless issue plainly cannot prejudice a client.") (citing *Strickland*, 466 U.S. at 692-93).

### 5. Guilt-Phase Subclaim D.2.c—Trial counsel should have presented an alternative theory to the state's blood evidence.

On collateral review, Morris asserted that his trial counsel were ineffective because they did not present an alternative theory of the state's evidence through an expert witness who could corroborate that Rochester's dog transferred her blood to his shoe. (Docs. # 15-56 at 79-81 ¶¶ 35-39; 15-62 at 37-39). Referencing deficiencies under Rules 32.3 and 32.6(b), the circuit court summarily dismissed this subclaim under Rule 32.7(d). (Doc. # 15-56 at 17-19 ¶¶ 23-27).

The circuit court noted that Morris's performance prong allegations were inadequate because he had not identified an expert witness or stated what an unidentified expert would say about blood-splatter. (Doc. # 15-56 at 18 ¶ 24). Additionally, the circuit court determined that summary dismissal was appropriate in light of trial counsel's cross-examination of Detective

Russell about possible containment of the crime scene. The circuit court observed that "trial counsel could not be ineffective simply for failing to present an expert witness and instead rely on cross-examination." (Doc. # 15-56 at 19 ¶ 26). The circuit court added that "Morris ha[d] failed to plead any facts that no competent counsel would have proceeded in this manner." (Doc. # 15-56 at 19 ¶ 26).

As for prejudice, the circuit court found that Morris's allegations fell short of "establish[ing] a reasonable probability that his trial would have been different had . . . trial counsel presented an unidentified expert to testify about the transfer of blood spatter." (Doc. # 15-56 at 18 ¶ 25).

To support his AEDPA (d)(1) burden, Morris cites *Ake*, the ABA Guidelines, and *Strickland*. (Doc. # 1 at 64-64 ¶¶ 165, 168). But, as explained above, none of these authorities confirm that the Alabama courts committed clearly established error under AEDPA in rejecting this guilt-phase subclaim. Additionally, Morris's references to the record do not establish a (d)(2) basis for habeas relief on this subclaim. They certainly do not overcome the presumption of correctness that must be afforded to the circuit court's findings. (Doc. # 27 at 54-55).

### 6. Guilt-Phase Subclaim D.2.d—Trial counsel should have challenged the state's failure to preserve evidence.

Morris argued on postconviction review that trial counsel were ineffective because they did not challenge adequately – including with expert testimony – the state's failure to preserve the partially eaten bologna sandwich recovered at the crime scene. (Docs. # 15-56 at 75-76 ¶¶ 23-27; 15-62 at 32-34). The circuit court summarily dismissed this claim because Morris had not identified an expert or described that unnamed expert's anticipated testimony. (Doc. # 15-56 at 12-13 ¶¶ 8-10). The circuit court found that Morris's allegations of prejudice based on trial counsel's

alleged deficient performance were speculative and inadequate. Specifically, the circuit court determined that Morris had not offered facts to show that a reasonable probability existed that "the result of his trial would have been different," if trial counsel had challenged the state's forensic procedures or if the state had tested the bologna sandwich as part of the criminal investigation. (Doc. # 15-56 at 13 ¶¶ 11-12).

In presenting his (d)(1) AEDPA arguments, Morris cites *Trombetta*, *Arizona v. Youngblood*, 488 U.S. 51 (1988), *Strickland*, and the ABA Guidelines. (Docs. # 1 at 66-67 ¶ 171; 27 at 55-56). As the court has explained, Morris's reliance on *Trombetta*, *Strickland*, and the ABA Guidelines misses the mark given (d)(1)'s "clearly established" requirement.

Likewise, in *Youngblood* the Supreme Court did not face a guilt-phase *Strickland* claim. *See Youngblood*, 488 U.S. at 58 ("We therefore hold that unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law."). Morris does not allege that the state acted in bad faith with respect to matters related to the bologna sandwich nor that trial counsel were ineffective in overlooking that due process violation. Therefore, Morris has not meet his (d)(1) burden with *Youngblood*.

Morris also argues in reply that the circuit court relied on an improper prejudice standard under *Strickland* in rejecting this subclaim. (*See* Doc. # 27 at 56) (observing that the circuit court did not incorporate *Strickland*'s "reasonable probability" terminology). But in addressing the prejudice component, the circuit court cited *Hyde v. State*, 950 So. 2d 344 (Ala. Crim. App. 2006), where the ACCA explained in detail the standards applicable to both *Strickland* prongs. *See Hyde*, 950 So. 2d at 355-56 (describing prejudice prong's reasonable probability test). Additionally, in its affirming collateral opinion, the ACCA recited *Strickland*'s reasonable probability standard.

241

*Morris Collateral*, 261 So. 3d at 1188. Thus, the court rejects Morris's contention that the Alabama state courts evaluated the sufficiency of his prejudice allegations incorrectly under *Strickland*. *See Woodford*, 537 U.S. at 24 ("This readiness to attribute error is inconsistent with the presumption that state courts know and follow the law."); (*see also* Doc. # 15-56 at 22 ¶ 36) (using "reasonable probability" terminology in the analysis of another guilt-phase *Strickland* subclaim).

Morris's assertion that the state court made an unreasonable factual determination under (d)(2) is also unconvincing. (Doc. # 27 at 55-56). An allegation that forensic testing of the bologna sandwich "could have identified the DNA of the true assailant" does not mean that the Alabama courts were unreasonable in rejecting Morris's allegations of prejudice. (Doc. # 27 at 55) (internal quotation marks omitted). Della Manna testified the sandwich "was not suitable for any kind of forensic testing." (Doc. # 15-21 at 390). But, even more critically, there was other DNA evidence that incriminated Morris. Further, fairminded jurists could debate the Alabama courts' conclusion that a speculative chance that there was *Strickland* prejudice (related to the state's alleged failure to follow forensic protocols with the bologna sandwich) is less than a reasonable probability. And, to the extent § 2254(e)(1) applies here, Morris has not overcome the circuit court's presumptively correct factual findings with clear and convincing evidence.

### 7. Guilt-Phase Subclaim D.2.e—Trial counsel should have challenged the state's failure to present all forensic witnesses.

On collateral review, Morris based a *Strickland* claim upon trial counsel's failure to challenge the state's decision to rely on only one forensic witness, Della Manna, at trial. (Docs. # 15-56 at 78-79 ¶¶ 32-34; 15-62 at 36-37). According to Morris, because Della Manna's testimony confirmed that "additional people in the lab worked on the [DNA] analysis" (Doc. # 15-56 at 78 ¶ 33), trial counsel should have required the state to call other witnesses who worked on the testing

processes.

The circuit court summarily dismissed this subclaim as "a bare, speculative allegation based on one comment, taken out of context." (Doc. # 15-56 at 15 ¶ 18). The circuit court noted that Morris had not "identif[ied] the name of any other forensic technician who [had] tested evidence in th[e] case other than [Della Manna]." (Doc. # 15-56 at 15-16 ¶ 18). The circuit court determined that Morris's allegations of prejudice failed in the absence of "what questions he would have asked of this unidentified witness or what testimony th[e] witness would have given." (Doc. # 15-56 at 16 ¶ 19).

The circuit court added that, unlike the testimonial cases on which he relies, Morris had not "pled any facts that show[ed] that a report or affidavit of another forensic technician's analysis" was a part of the state's guilt case. (Doc. # 15-56 at 16-17 ¶¶ 20-21). As the circuit court reasoned, in the absence of that material allegation, Morris had not sufficiently stated an underlying constitutional violation to support his ineffectiveness allegations. (Doc. # 15-56 at 17 ¶ 22).

To satisfy (d)(1), Morris cites *Bullcoming*, *Melendez-Diaz*, *Crawford*, *United States v. Gonzalez-Lopez*, 548 U.S. 140, 146 (2006), and *Osborne*, 557 U.S. 52 (2009). (Docs. # 1 at 67-68 ¶¶ 173, 175; 27 at 57-58). The court has analyzed the underlying basis of this *Strickland* claim in Claim F—the substance of which Morris raised as a trial error on direct review. In that habeas analysis, the court already explained why Morris's reliance on *Bullcoming*, *Melendez-Diaz*, and *Crawford* fail to show clearly established AEDPA error under either one of (d)(1)'s clauses. In other words, these cases left sufficient room about the question presented here: whether fairminded jurists could debate the correctness of the ACCA's decision to dismiss Morris's Sixth Amendment testimonial claim under plain-error review.

243

The court's (d)(1) reasoning in Claim F applies here to Morris's deficient performance allegations under *Strickland*. The Alabama courts did not unreasonably conclude that Morris's allegations of deficient performance were inadequately pled, particularly given this court's (alternative) conclusion that the ACCA's denial on direct review of Morris's Sixth Amendment testimonial claim was correct even applying de novo review. And, as stated earlier, Morris cannot show deficient performance based on trial counsel's failure to raise a meritless constitutional challenge. Because the Supreme Court never considered ineffective assistance claims, in these cases it follows that their holdings do not clearly establish anything about *Strickland*.

The court previously discussed *Osborne* (with respect to Claim E) related to Morris's contention that the trial court admitted unreliable DNA evidence. *Osborne* does not demonstrate that the Alabama courts committed any clearly established Sixth Amendment error related to testimonial evidence or ineffective assistance. Instead, the *Osborne* Court addressed a petitioner's attempt to obtain DNA evidence for independent testing postconviction. 557 U.S. at 55-56.

Nor does Morris's reference to *Gonzalez-Lopez* alter this court's (d)(1) assessment. There, the Court held that an "erroneous deprivation" of the Sixth Amendment right to counsel of choice is a "structural defect" and is "not subject to harmless-error analysis." 548 U.S. at 148, 152 (internal quotation marks omitted). In *Gonzalez-Lopez*, the Supreme Court rejected the argument that *Strickland* prejudice should apply to "the right to select counsel of one's choice." *Id.* at 147-48. That decision has nothing to do with assessing whether a petitioner has stated a cognizable Sixth Amendment claim based on testimonial evidence.

After careful review, the court also rejects Morris's (d)(2) argument for several reasons. (Doc. # 27 at 57-58). First, given Della Manna's entire trial testimony, the circuit court did not

unreasonably conclude that his reference to "we" does not support an assertion that he was uninvolved in the testing processes. (Doc. # 27 at 57) (emphasis and internal quotation marks omitted). And, even assuming § 2254(e)(1)'s application here, Morris has not overcome with clear and convincing evidence the circuit court's presumptively-correct determination that Della Manna's use of "we" was an out-of-context reference.

Second, the circuit court offered independent reasons to support its summary dismissal of this subclaim. The circuit court determined that Morris did not "plead facts that would establish that he was prejudiced by the failure to confront th[e] unidentified witness." (Doc. # 15-56 at 16 ¶ 19). Nor does Morris challenge that reason as one "based on an unreasonable determination of the facts in light of the [state] eviden[tiary] record." 28 U.S.C. § 2254(d)(2). Consequently, to the extent that the circuit court created a (d)(2) opening related to the meaning of "we" (and, again, this court concludes that it did not), the circuit court's rejection of Morris's prejudice allegations as inadequate is unaffected. This separate and independent circuit court determination is entitled to deferential treatment under AEDPA and forecloses this habeas subclaim, regardless of any unrelated factual finding. *See Strickland*, 466 U.S. at 700 ("[T]he prejudice question is resolvable, and hence the ineffectiveness claim can be rejected, without regard to the evidence presented at the [d]istrict [c]ourt hearing.").

### 8.    Guilt-Phase Subclaim D.2.f—Trial counsel should have challenged Mary McCombs's presence in the courtroom.

Morris also raised an ineffectiveness claim based on trial counsel's failure to challenge the testimony of one of the state's witnesses, Mary McCombs. (Docs. # 15-56 at 83-84 ¶¶ 46-48; 15-62 at 41-43). He contends that McCombs, the niece of Rochester, was in the courtroom "through all . . . [the] trials," despite "the importance of her testimony" about the location of Rochester's

dog. (Doc. # 15-56 at 83 ¶ 47).

The circuit court determined that Morris's allegations were inadequate related to both deficient performance and prejudice under *Strickland* and summarily dismissed the subclaim. (Doc. # 15-56 at 22 ¶ 35). The circuit court noted that Morris had not identified what objection trial counsel should have raised or what question trial counsel should have asked related to McCombs's testimony. (Doc. # 15-56 at 22 ¶ 35). As the circuit court noted, Alabama law permits "a relative of a capital murder victim" to remain in the courtroom, despite serving as a witness for the state. (Doc. # 15-56 at 22-23 ¶ 37).

As to prejudice, the circuit court found that Morris had not alleged "how there was a reasonable probability that his trial would have been different had his counsel objected to [her] testimony or impeached her." (Doc. # 15-56 at 22 ¶ 35). Additionally, the circuit court noted that while Morris speculated that McCombs's presence in the courtroom "likely" influenced her testimony, he did not allege any facts establishing an "actual[] influence[] or prejudice[]." Doc. # 15-56 at 22 ¶ 36) (internal quotation marks omitted).

To open the (d)(1) door to habeas relief, Morris refers to *Strickland* and Alabama Criminal Procedure Rule 9.3(a). (Doc. # 1 at 69 ¶ 179-80). The contextual holding in *Strickland* applies to ineffectiveness in the penalty phase, not the guilt phase. *See Strickland*, 466 U.S. at 698 ("The facts as described above make clear that the conduct of respondent's counsel at and before respondent's sentencing proceeding cannot be found unreasonable.") (citation omitted). Likewise, the *Strickland* Court did not analyze an ineffectiveness claim based on the effect of a state witness's testimony that went unchallenged on cross-examination as improperly influenced.

246

To be sure, Rule 9.3(a) allows an Alabama court to exclude witnesses from the courtroom until the "release" of "all witnesses." Ala. R. Crim. P. 9.3(a). But, habeas relief does not extend to allegations that turn solely upon state law principles. *Alston v. Dep't of Corr.*, 610 F.3d 1318, 1326 (11th Cir. 2010). Even if a violation of Rule 9.3(a) occurred because of McCombs's presence in the courtroom, that does not help Morris in shouldering his federal habeas burden on this subclaim. *Cf. Grygor v. Burke*, 334 U.S. 728, 731 (1948) ("We cannot treat a mere error of state law, if one occurred, as a denial of due process; otherwise, every erroneous decision by a state court on state law would come here as a federal constitutional question."). Thus, Morris has not shown that the state courts' decision incorporated a clearly established legal error under (d)(1).

Morris has not established a right to habeas relief under either (d)(2) or (e)(1). Morris references portions of his Rule 32 petition and notes the importance of McCombs's testimony. (Docs. # 1 at 69 ¶ 177; 27 at 58). He contends that he has adequately alleged deficient performance when he argued that trial counsel should have challenged McCombs's testimony "through a motion . . . or cross-examination." (Doc. # 27 at 59).

Morris also argues that on collateral review he pled prejudice because McCombs's "crucial" testimony about "an alternative location of her aunt's dog . . . undermined [his] explanation of the prosecution's [blood] evidence." (Doc. # 27 at 58). But, Morris has not identified "evidence presented in the [s]tate court proceeding" that establishes that the circuit court unreasonably determined the facts. 28 U.S.C. § 2254(d)(2).

That is the key question on AEDPA review: whether the circuit court unreasonably determined that Morris (1) stated inadequate facts in support of his claim of deficient performance and (2) did not show a reasonable probability of a different guilt-phase result if trial counsel had

acted differently. Here, substantial evidence other than the DNA blood evidence overwhelmingly supported the jury's guilty verdict. The state also presented evidence about the cigarette filter and the jewelry, and put on eyewitness identification testimony. Morris has not shown that the Alabama courts unreasonably rejected his claim of *Strickland* prejudice, which is tied to McCombs's guilt-phase testimony.[12]

### 9.      Guilt-Phase Subclaim D.2.g—Trial counsel should have objected to the rape question.

On postconviction review, Morris alleged that trial counsel were ineffective because they did not object to the prosecution's question "to its . . . forensic expert whether there was any evidence that Rochester had been raped the night she was killed." (Docs. # 15-56 at 85-86 ¶¶ 51-52; 15-62 at 44-45). Morris argued that this "inflammatory" and irrelevant question was prejudicial and that trial counsel's failure to challenge the question "permitted the jury to draw impermissible inferences about the possibility that [he] may have [raped] or had been suspected of raping Rochester." (Doc. # 15-56 at 85 ¶ 52).

The circuit court determined that Morris's allegations were inadequate to show that trial counsel "did not have a strategic reason for not objecting" to the question or the testimony that "the rape kit revealed no semen in the swabs taken from [Rochester.]" (Doc. # 15-56 at 25 ¶ 43). As the circuit court explained, trial counsel's guilt-phase position was "that Morris was not the person who [had] killed [Rochester]" and so the absence of his semen "could have been consistent with th[at] theme." (Doc. # 15-56 at 25 ¶ 43).

---

[12] Nor has Morris navigated past the fact that his theory conflicted with his defense at trial.

The circuit court also found that Morris's allegations of prejudice were inadequate. (Doc. # 15-56 at 25 ¶¶ 45-46). Specifically, the circuit court determined that Morris stated no facts that "would establish a reasonable probability that his trial would have been different had his trial counsel objected to this evidence." (Doc. # 15-56 at 25 ¶ 46).

To satisfy his (d)(1) burden under AEDPA, Morris cites *Payne v. Tennessee*, 501 U.S. 808 (1991), *Darden*, and Alabama Evidence Rule 403. (Doc. # 1 at 70 ¶ 183). Rule 403 does not help Morris. As explained earlier, Rule 403 is irrelevant to AEDPA review because only Supreme Court holdings are clearly established law under (d)(1). Further, neither *Payne* nor *Darden* establish that the circuit court's summary dismissal of this subclaim contained a contrary to or unreasonable application error.

In *Payne*, the Supreme Court considered a constitutional challenge to victim impact evidence and, in overruling prior precedent, held that such "evidence [does not] lead[] to the arbitrary imposition of the death penalty." 501 U.S. at 825. Citing *Darden*, the *Payne* Court explained that "[i]n the event that evidence is introduced that is so unduly prejudicial that it renders the trial fundamentally unfair, the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief." 501 U.S. at 825. Further, the *Payne* Court did not address a claim of ineffective assistance of counsel. Thus, the dissimilar evidentiary issue and the absence of any *Strickland* analysis means that *Payne* is too different to satisfy Morris's (d)(1) burden.

The *Darden* Court examined a due process claim tied to a prosecutor's improper remarks in closing arguments. *Darden*, 477 U.S. 181-82. Although the Supreme Court considered a *Strickland* claim in *Darden*, the issue of ineffective assistance arose only in the penalty phase context. *Darden*, 477 U.S. at 184.

Morris's factual challenge fails under both (d)(2) and (e)(1). (Doc. # 27 at 59-60). Morris does not dispute (much less point to record evidence indicating that) the circuit court's ruling accounted for his guilt-phase trial strategy. Nor does he dispute that an objection to the state's rape question as prejudicial could have detracted from his main trial theory that someone else murdered Rochester. Morris has not shown that the circuit court based its decision to summarily dismiss his subclaim for inadequate pleading of both *Strickland* prongs "on an unreasonable determination of the facts in light of the evidence. 28 U.S.C. § 2254(d)(2).

### 10.   Guilt-Phase Subclaim D.2.j—Trial counsel should have objected to interruptions.

On collateral review, Morris asserted that trial counsel were ineffective for failing to object to the trial court's interruptions of his testimony. (Docs. # 15-57 at 2-4 ¶¶ 106-08, 110; 15-62 at 69-71). The circuit court determined that Morris had not adequately pled either *Strickland* prong. (Doc. # 15-56 at 45-47 ¶¶ 102-04, 106).

As to the question of deficient performance, the circuit court found, among other things, that Morris never identified what objections trial counsel should have raised, and did not allege any facts that would "establish [that] no reasonable counsel would [have] with[e]ld an objection." (Doc. # 15-56 at 47 ¶ 106). The circuit court also noted that the ACCA had denied the underlying constitutional basis to support this *Strickland* subclaim on plain-error review. (Doc. # 15-56 at 46 ¶ 103).

On the question of prejudice, the circuit court acknowledged that a denial of a claim under plain error "is not dispositive of whether" a petitioner satisfies *Strickland*'s second prong. (Doc. # 15-56 at 46 ¶ 104). Still, the circuit court determined that this subclaim "d[id] not involve one of the rare cases" of "different outcomes" under the applicable state and federal standards. (Doc. #

15-56 at 46 ¶ 104). The circuit court added that Morris had "fail[ed] to plead any additional facts that, if true, would create a reasonable probability that any objection would have altered the result of the trial." (Doc. # 15 at 46 ¶ 104).

In support of his (d)(1) argument on this subclaim, Morris cites *Strickland* and revisits the same Supreme Court authorities (*Rock* and *Quercia*) that he cited in support of his Claim I. (Docs. # 1 at 74-76 ¶¶ 194, 196-97; 27 at 63). This court has already analyzed and denied Morris's allegations in Claim I after de novo review. Consistent with that court's prior analysis, the court concludes the circuit court did not commit clearly established constitutional error by rejecting Morris's allegations of deficient performance based on the trial court's interruptions. Further, the cases Morris cites do not establish that the Alabama courts' denial of his *Strickland* allegations under both prongs amounts to AEDPA (d)(1) error.

Morris also seeks habeas relief under (d)(2). (Docs. # 1 at 76 ¶ 198; 27 at 64). But, he has not substantiated (or otherwise made clear) what part of the circuit court's decision "was based on an unreasonable determination of the facts in light of the evidence." 28 U.S.C. § 2254(d)(2). Thus, the court rejects Morris's reliance on (d)(2) as undeveloped and unproven. Morris likewise has not carried his factual burden under (e)(1), to the extent that AEDPA provision applies to a (d)(2) challenge.

### 11. Guilt-Phase Subclaim D.2.l—Trial counsel should have objected to the state's prejudicial comments.

On collateral review, Morris argued that trial counsel provided ineffective assistance by not objecting to certain of the state's comments he contends were prejudicial. (Docs. # 15-56 at 107 ¶¶ 101-02; 15-57 at 1-2 ¶¶ 102-05; 15-62 at 66-69). The circuit court summarily dismissed this subclaim because of Morris's inadequate pleading of both *Strickland* prongs. (Doc. # 15-56 at

251

43-45 ¶¶ 96-101).

In exploring its summary dismissal, the circuit court observed that "a myriad of reasons" could explain why trial counsel decided not to object, including a prosecutor's right to comment on the meaning of conflicting evidence. (Doc. # 15-56 at 44-45 ¶¶ 99-101). As with other *Strickland* subclaims, the circuit court pointed out that Morris had not alleged facts to show that "no reasonable counsel would [have] withh[e]ld an objection." (Doc. # 15-56 at 44 ¶ 99).

The circuit court also noted that the ACCA considered the same contested comments – "the substance of his ineffective assistance claim" – on direct review and determined that the prosecutors' statements "did not rise to the level of plain error." (Doc. # 15-56 at 43 ¶ 97). The circuit court added that the ACCA's plain-error determination did not dispose of *Strickland* prejudice but "was a factor" which undermined those allegations on postconviction review. (Doc. # 15-56 at 43 ¶ 98). The circuit court added that Morris had not alleged facts which established that had trial counsel objected, a reasonable probability existed that the guilt-phase outcome would have been different. (Doc. # 15-56 at 43 ¶ 98).

To show clearly established constitutional error in the circuit court's Rule 32 ruling, Morris relies on *Darden*, *Donnelly*, *Berger*, *Vargas*, *Young*, *Winship*, *Brooks*, *Duncan*, *Eyster*, and *Hernandez*. (Docs. # 1 at 78-81 ¶¶ 204-07, 210; 27 at 65). As explained already, however, those cases do not substantiate (d)(1) de novo review of the prosecution's comments as an independent habeas claim. Likewise, these authorities fail to show that the circuit court's rejection of the same allegations to anchor his *Strickland* subclaim here was a contrary to or unreasonable application of Supreme Court precedent. The remaining authorities cited, *Osborne*, *McDaniel*, *Rock*, and *Strickland*, do not satisfy Morris's (d)(1) burden. (Doc. # 1 at 81-80 ¶¶ 208-210).

252

The court considered *Osborne* and *McDaniel* in Claim E and *Rock* in connection with Morris's claim that he was mistreated while on the witness stand. Consistent with its prior discussion, the court concludes that these Supreme Court decisions lack contextually-relevant holdings related to improper prosecutorial statements or ineffective assistance. *See Osborne*, 557 U.S. at 75 (declining to recognize a constitutional right to DNA evidence postconviction); *McDaniel*, 558 U.S. at 136 (concluding that "ample DNA and non-DNA evidence in the record adduced at trial supported the jury's guilty verdict"); *Rock*, 483 U.S. at 62 (rejecting state's blanket bar of "all posthypnosis testimony" as an improper "infringe[ment] . . . on the right of a defendant to testify on his own behalf"). And, as mentioned above, the *Strickland* Court's consideration of ineffective mitigation assistance pre-AEDPA is also not helpful in the context of assessing Morris's guilt-phase (d)(1) burden. *Strickland*, 466 U.S. at 698.

Consistent with the AEDPA court's analysis of Morris's claim of improper prosecutor statements, Morris's (d)(2) contention that an extreme factual error occurred in the circuit court's analysis of this subclaim and entitles him to habeas relief also fails. Although Morris invokes (d)(2) (Docs. # 1 at 81 ¶ 211; 27 at 65), he has not shown that any state courts based its decision on an unreasonable factual determination. At a minimum, fairminded jurists could agree with the circuit court's finding that the prosecutor's statements were "legitimate comments" about the guilt-phase evidence. (Doc. # 15-56 at 44 ¶ 100). However, even to the extent that AEDPA's (e)(1) provision could apply here, Morris has not met that demanding factual standard. Alternatively, even assuming that Morris meets (d)(2) and (e)(1) with respect to the circuit court's deficient performance analysis, habeas relief is still unavailable because AEDPA deference attaches to the Alabama courts' rejection of his prejudice allegations.

Morris's three penalty-phase subclaims are based on trial counsel's purported ineffectiveness in relation to mitigation, jury instructions, and aggravating circumstances (and are labeled as D.1.a, D.1.b, and D.1.c in his petition, respectively). (Doc. # 1 at 35-59 ¶¶ 103-152). The court discusses each subclaim in turn, beginning with those subclaims related to the Rule 32 proceedings.

### 12.  Penalty-Phase Subclaim D.2.k—Trial counsel should have objected to judicial bias.

On collateral review, Morris argued that trial counsel provided him ineffective assistance by failing to challenge the trial court's alleged expression of bias in the sentencing phase. (Docs. # 15-56 at 85-86 ¶¶ 51-53; 15-62 at 70-71). Outside the jury's presence, the trial court commented: "[I]t's probably cost the State of Alabama another twenty-five, thirty, forty thousand dollars to retry this case, [and] put everybody through the anguish of another trial, but that's not for me to decide. I'm just a lowly ol' trial judge." (Doc. # 15-24 at 50). Morris noted that the trial court made these remarks in trial counsel's presence "only weeks before sentencing [him] to death." (Doc. # 15-57 at 4 ¶ 109). Morris argued that the preparation of a written order sentencing him to death, before the sentencing hearing had begun, compounded the trial court's "possible bias." (Doc. # 15-57 at 4 ¶ 109); (*see also* Doc. # 15-26 at 2) ("I have prepared a written order that sets out all the aggravating factors as well as the mitigating factors and the [c]ourt's analysis and rationale for sentencing in this case and that's being provided to the parties at this time, and any other interested people who want one.").

The circuit court dismissed this *Strickland* subclaim under both prongs. (Doc. # 15-56 at 46-46 ¶¶ 105-06). As for deficient performance, the circuit court pointed out that, among other problems, Morris had not identified the objection that trial counsel should have made to the

remarks or the preparation of the sentencing order before the hearing. The circuit court also found that Morris's prejudice allegations were inadequate to "create a reasonable probability that an objection would alter the trial's outcome." (Doc. # 15-56 at 46 ¶ 105).

To support his argument, Morris cites *Bracy v. Gramley*, 520 U.S. 899 (1997), *Withrow v. Larkin*, 421 U.S. 35 (1975), *Gray v. Mississippi*, 481 U.S. 648 (1987), and Alabama Cannon of Judicial Ethics 3(C)(1)(a). (Doc. # 1 at 77 ¶¶ 200-01). As discussed below, none of these authorities detach AEDPA deference from the circuit court's merits-based denial of this ineffectiveness subclaim.

The bias claims the Supreme Court considered in *Bracy* and *Withrow* are very different from Morris's allegations. For example, the capital petitioner in *Bracy* sought discovery to prove a claim of judicial bias because the judge who had sentenced him to death "was later convicted of taking bribes from defendants in criminal cases." 520 U.S. at 901. The petitioner theorized that the trial court had treated him unfairly as compared to those capital defendants who paid a judge to "'fix[]' [their] murder cases." *Id.* at 901.

The *Bracy* Court recognized that "most questions concerning a judge's qualifications to hear a case are not constitutional ones, because the Due Process Clause of the Fourteenth Amendment establishes a constitutional floor, not a uniform standard." *Id.* at 904. Still, setting aside any "difficulties of proof," the Supreme Court determined that "camouflaging bias on [the trial judge]'s part in petitioner's own case would violate the Due Process Clause of the Fourteenth Amendment." *Id.* at 905. So, the petitioner had a right to (pre-AEDPA) habeas discovery on his bias claim. *See id.* at 901 ("hold[ing] that petitioner has made a sufficient factual showing to establish 'good cause,' as required by Habeas Corpus Rule 6(a), for discovery on his claim of

actual judicial bias in his case"). In *Withrow*, the Supreme Court revisited the core constitutional principle that a "fair trial in a fair tribunal is a basic requirement of due process." 421 U.S. at 46 (internal quotation marks omitted). The *Withrow* Court determined that a state medical board's "combination of investigative and adjudicative functions does not, without more, constitute a due process violation." *Id.* at 37, 58. And, unrelated to judicial bias, the *Gray* Court faced a wholly different question: whether an "improper excusal of a juror for cause" under the Sixth and Fourteenth Amendments was subject to harmless error review. 481 U.S. at 657. None of these Supreme Court decisions confirms that the circuit court's summary decision contained clearly established constitutional error under either the due process clause or *Strickland*.

Morris's reference to the Alabama Canons of Judicial Ethics does not help with his (d)(1) claim. Canon 3(C)(1)(a) addresses judicial disqualification and provides, for example, that "[a] judge should disqualify himself . . . [if] [h]e has a personal bias or prejudice concerning a party." Ala. Canon of Jud. Ethics 3(C)(1)(a). To begin, an Alabama ethical rule does not clearly establish any law under AEDPA. And, although that Alabama judicial guidance may run parallel with some of the due process issues discussed in *Bracy*, general constitutional principles do not help Morris here. *See Bracy*, 520 U.S. at 905 (explaining that due process guarantees "a judge with no actual bias against the defendant or interest in the outcome of his particular case"). Rather, to demonstrate a contrary to or unreasonable application of Supreme Court precedent, a habeas litigant must point to contextually relevant case law. Morris has not done so.

Morris's (d)(2) argument that an extreme factual error in the circuit court's analysis of this subclaim entitles him to habeas relief is off the mark. Although Morris invokes that AEDPA provision (Docs. # 1 at 77 ¶ 202; 27 at 64), he has not shown that the state courts based their

decisions upon an unreasonable factual determination. At a minimum, fairminded jurists could agree with the circuit court's finding that the trial court's comments about the "cost and anguish" of the retrial or the order drafted before the sentencing hearing do not reflect bias against Morris. (Doc. # 15-56 at 46 ¶ 105). And, even more significantly, Morris has not shown a factual basis for habeas relief under (e)(1) (even to the extent that AEDPA provision applies). Moreover, even accepting that Morris meets the (d)(2) and (e)(1) factual standards about *Strickland*'s first prong, he has not shouldered his burden on the second prong.

### 13.     Penalty-Phase Subclaim D.1.a—Trial counsel inadequately investigated and presented mitigation evidence.

In his Rule 32 petition, Morris alleged that trial counsel provided ineffective penalty-phase assistance with respect to his mitigation case. (Docs. # 15-56 at 86-99 ¶¶ 55-81; 15-62 at 45-58). Morris divided this subclaim as follows:  (1) the failure to substantiate "numerous mitigating factors"; and (2) the failure to retain a mitigation expert. (Doc. # 15-56 at 87, 98) (emphasis omitted).

With respect to the first area, Morris maintained that trial counsel failed to call witnesses who could have testified about his childhood, the traumatic loss of both parents, his cognitive dysfunction throughout his schooling, and an adulthood plagued by unemployment and addiction. (Doc. # 15-56 at 86 ¶ 54). Morris identified "at least ten non-statutory mitigating circumstances," which he argued trial counsel failed to develop and present his: "(1) . . . low level of intelligence; (2) . . . poor educational history; (3) . . . psychiatric problems; . . . (4) history of alcohol and illicit drug abuse; (5) . . . intoxicat[ion] at the time of the crime; (6) . . . parents' divorce[] when he was a teenager; (7) . . . father['s] [death] in a house fire when he was a teenager; (8) . . . [lack] of premeditation for the crime; (9) . . . adapt[ation] to prison life; and (10) . . . sister['s] . . . [request]

for mercy on his behalf." (Doc. # 15-56 at 95-96 ¶ 81). Morris further argued that "after learning of all these mitigating factors," "a reasonable judge and jury . . . would have returned at most a sentence of life imprisonment without parole" and that "no reasonable factfinder . . . would have sentenced him to death." (Doc. # 15-56 at 87 ¶ 54). Morris contends that but for his counsel's failures, it is likely that a jury would not have convicted him of intentional murder. (Doc. # 15-56 at 87 ¶ 54).

Morris highlighted trial counsel's reasoning for not using a mitigation expert. (Doc. # 15-56 at 98 ¶ 82). Specifically, as trial counsel explained, "so [that] the record [would be] clear," they were not putting on a mitigation expert because, such evidence would contradict the Defendant's testimony and Dr. Shealy's interview. (Doc. # 15-24 at 48-49). Morris argued that trial counsel's explanation for not relying on a mitigation expert "demonstrated a fundamental misunderstanding as to the benefits of having such an expert [available], not only for developing and presenting evidence of mitigation . . . but also [for assisting in] the guilt[] phase." (Doc. # 15-56 at 98 ¶ 83). Morris also argued that if "aided" with a mitigation expert, trial counsel "would have been able to conduct a thorough investigation of . . . [his] history and would have . . . prepar[ed] a compelling mitigation case in . . . [his] defense." (Doc. # 15-56 at 99 ¶ 83).

The circuit court summarily dismissed Morris's mitigation subclaim as inadequate under both *Strickland* prongs. (*See* Doc. # 15-56 at 27-34 ¶¶ 50-68) (analyzing allegations of undeveloped and unpresented mitigating factors); (*id.* at 34-35 ¶¶ 69-73) (discussing mitigation expert allegations). The circuit court rejected the unpresented-factors portion of Morris's mitigation subclaim under *Strickland*'s first prong based on his failure "to specifically plead the name of any additional witness who could have testified during the penalty phase." (Doc. # 15-56

at 28 ¶ 52). The circuit court also noted that Morris had not specified the anticipated testimony of each witnesses. (*See id.* ¶ 53) ("Morris lists various [areas of] evidence he contends should have been presented and then generically asserts that those unidentified family members, friends, and experts could have testified about th[e] evidence").

The circuit court also found that Morris's nonspecific allegations were inadequate to establish deficient performance (*see id.* at 28-29 ¶ 54) and gave reasons why Morris's allegations of new mitigation did not satisfy *Strickland*'s first prong. (*See id.* at 29-30 ¶ 57) (describing Morris's failure to identify a mitigation expert or specify the anticipated testimony of the "unnamed expert" who, allegedly, "could have provided a 'complete picture' of his life"); (*id.* at 30 ¶ 59) (referencing Morris's failure to describe what facts established "'a complete lack of premeditation'" on his part); (*id.* at 31 ¶ 60) (noting Morris's failure to identify "what witnesses could have" testified that "he developed slower than other children, did not learn to talk until age 3, had difficulty playing with other children, and had to repeat certain grades of school"); (*id.* at 31-32 ¶ 62) (observing Morris's failure to identify witnesses "with personal knowledge of his behavioral traits," who could have testified about his employment issues, inability to live alone, and difficulties in "manag[ing] money," "fill[ing] out a prescription," and "tak[ing] medicine); (*id.* at 32 ¶ 63) (pointing to Morris's failure to identify witnesses who would have had "sufficient knowledge" "that he came from a loving household but that his life changed when his parents divorced and eventually died"); (*id.* at 32-33 ¶ 64) (detailing Morris's failure to identify a "mental-health professional . . . available to testify" or the contents of that expert's testimony, such as any applicable diagnoses, medications, or medicinal doses); (*id.* at 33 ¶ 65) (mentioning Morris's failure to identify "who . . . had sufficient knowledge of []his alleged abuse [of alcohol and drugs],"

including "dr[i]nk[ing] daily after the age of 18 and us[ing] marijuana [and] cocaine" or explain "the effects [that] . . . substance abuse" had on him); (*id.* ¶ 66) (discussing Morris's contention that trial counsel should have "prepare[d] medical professionals . . . to corroborate his testimony that he was drinking on the day of the crime" and finding that he "ha[d] failed to . . . show that his alleged drinking had any effect on his commission of the crime"); (*id.* at 33-34 ¶ 67) (rejecting allegations that a person "with [Morris's] addictions and mental retardation would have [had] difficulty in appreciating how his actions could have led to the death of the victim" because he had failed to plead what "trial counsel could have presented [to] support" that claim).

The circuit court pointed out that trial counsel had actually called one of Morris's sisters, Faye Morris, to testify in the penalty phase with the intention to ask her questions "about Morris's life." (*Id.* at 29 ¶ 55). But, as the circuit court explained, Faye Morris "became emotional" on the stand "and was only able to ask the jury to spare [Morris's] life." (*Id.*). The circuit court added that trial counsel had also scheduled Morris's "other sister, Debra Morris" to testify, but as reported to the trial court "she too was too emotional to testify." (*Id.*).

The circuit court found that "Morris ha[d] not identified any family members or friends who were closer to [him] or could have provided more helpful information." (*Id.*). And, as to the contention that trial counsel did not prepare Faye Morris for her testimony adequately, the circuit court noted that Morris had not alleged what "more" trial counsel could have done or "what specific testimony about his life" she could have shared with "more adequate[] prepar[ation]." (*Id.*).

As to *Strickland*'s second prong, the circuit court determined that Morris had not pled "specific facts concerning how this evidence would have led to a reasonable probability that the

outcome of his penalty phase would have been different." (*Id.* ¶ 56). The circuit court noted that Morris could not demonstrate prejudice based on his alleged lack of premeditation because "the prosecution [had] admitted during closing arguments in the guilt phase that the evidence indicated that [he] initially thought [that] he was going into an empty house." (*Id.* at 30 ¶ 59). The circuit court observed that Morris had not explained how evidence about his childhood difficulties "would have been compelling or would have led to a reasonable probability that the penalty phase would have been different given that [he] was 36 at the time of the murder and 47 at the time of trial." (*Id.* at 31 ¶ 61).

The circuit court reached a similar conclusion about Morris's family environment. The court concluded he had not shown how the change in his family environment because of divorce or death had "affected" him nor had he "establish[ed] a reasonable probability that the outcome of the penalty phase would have been different with a presentation of that evidence." (*Id.* ¶ 63). The circuit court found that Morris's mental-health allegations lacked supporting facts to "establish that he was prejudiced" by the omission of this information. (*Id.* ¶ 64). The circuit court recognized (again) that Morris "ha[d] failed to plead any facts that, if true, would establish a reasonable probability that had this additional evidence been presented, the outcome of his penalty phase would have been different." (*Id.* at 34 ¶ 68).

Moving to the mitigation-expert allegations, the circuit court found that Morris failed to identify an available witness or explain how any such witness's anticipated testimony would have made a difference. (Doc. # 15-56 at 34 ¶ 70). The circuit court noted that under Alabama law, trial counsel "ha[d] no absolute duty to hire expert assistance during the penalty phase." (*Id.* at 35 ¶ 72). The circuit court found that trial counsel had adequately explained their concern that testimony

from a mitigation expert "would be inconsistent with Morris's testimony[,] Dr. Shealy's interview[,] and would not look good to a jury." (*Id.* at 35 ¶ 73). The circuit court explained that Morris had done nothing to "question" "trial counsel's strategic decision." (*Id.*).

The circuit court also determined that Morris's allegations of prejudice were inadequate. (Doc. # 15-56 at 34 ¶ 71). As the circuit court explained, Morris omitted "facts concerning what additional information" a mitigation expert could have provided in the penalty phase and failed to explain how that new evidence "would have benefited his case." (*Id.* at 35 ¶ 71).

Given this background, the court turns to subclaim D.1.a. of Morris's habeas petition. Morris has divided this subclaim D.1.a into allegations of deficient performance and prejudice. (Doc. # 1 at 35-55 ¶¶ 103-36; *id.* at 52 -55 ¶¶ 137-42). Similar to his assertions in his Rule 32 petition, Morris alleges that trial counsel's deficiencies in investigating and presenting mitigation evidence prevented the sentencer from hearing several factors including his intellectual disability, mental illness, and treatment with antipsychotic medicine, parents' divorce and deaths, substance abuse, and intoxication at the time of the offense, lack of premeditation, and adaptation to prison life. (*Id.* at 45-52 ¶¶ 120-36).

In assessing a trial counsel's duty to investigate, develop, and present mitigating evidence, the Eleventh Circuit follows a three-part analysis. *Porter v. Singletary*, 14 F.3d 554, 557 (11th Cir. 1994). The initial question is "whether a reasonable investigation should have uncovered such mitigating evidence." *Id.* "If so," the next question is "whether the failure to put this evidence before the jury was a tactical choice by trial counsel." If it is determined that the failure was not tactical, the last question is "whether there is a reasonable probability that, but for [the unpresented mitigating evidence,] the result of the proceeding would have been different." *Id.*

These questions are not answered in a vacuum. AEDPA requires Morris to show that the Alabama courts committed an objectively unreasonable error by concluding that his allegations failed to present cognizable deficient performance and prejudice based on Supreme Court precedent. *See Powell*, 602 F.3d at 1273 ("Thus, we look only to the allegations in [the petitioner]'s Rule 32 petition and whether those allegations sufficiently state a claim for ineffective assistance of counsel"); *see also Shinn*, 141 S. Ct. at 522 (referencing "a dissent from the denial of en banc review," which criticized "the panel majority['s] [opinion as one which] applied a 'de-novo-masquerading-as-deference approach' that the 'Supreme Court has repeatedly condemned'").

Respondent flags a new allegation in Morris's habeas petition – one that was not included on state collateral review to support this subclaim. (*See* Doc. # 22 at 74) ("Throughout this and other sections, Morris adds additional allegations that were not present in his initial Rule 32 petition."). Morris contends that trial counsel "should have asked for 'a longer recess to permit [Faye] Morris and [Debra] Morris to collect themselves.'" (Doc. # 22 at 74) (quoting Doc. # 1 at 41 ¶ 114). Respondent argues that "[t]his and other new allegations were not properly adjudicated in state court and, thus, are not properly before this [c]ourt," and that "[t]o the extent that Morris attempts to add new factual support for any claim in his petition, the new factual allegations are unexhausted and procedurally defaulted." (*Id.*).

Although Morris asserts that his new contention is permissible, in making this assertion he does not refer to AEDPA. (Doc. # 27 at 46). AEPDA precludes a habeas petitioner from relying on new factual allegations. The petitioner in *Powell* "made additional allegations and submitted more evidence in support of his claim of ineffective assistance of counsel in his federal habeas petition." 602 F.3d at 1274 n.10. As the Eleventh Circuit explained, "consider[ation] of such

supplemental allegations or evidence when reviewing the reasonableness of the state court's resolution of this claim" under AEDPA is inappropriate. *Id.* Instead, AEDPA limits habeas review to those allegations made in the state court. *Id.* That same AEDPA principle applies here. So, the court does not consider this new "longer recess" allegation that Morris belatedly offers to support his *Strickland* mitigation claim.

To substantiate his argument that the state courts' rejection of his exhausted mitigation allegations contained clearly established constitutional error under (d)(1), Morris cites several cases but offers little or no context for comparison. (*See generally* Doc. # 1 at 35-37, 38, 44-54 ¶¶ 103-04 106, 108, 110, 118-19, 121, 125-28, 130-33, 135-41). Consequently, the court will review these decisions in assessing whether he has established extreme constitutional error under both *Strickland* prongs. The court begins by summarizing *Strickland*.

As noted above, *Strickland* is a pre-ADEPA habeas case in which the Supreme Court reviewed a claim of ineffective mitigation assistance. *See Strickland*, 466 U.S. at 675-76 (summarizing collateral claims and evidence). The respondent in *Strickland* participated in a series of crimes over a ten-day period with two accomplices. *Id.* at 671-72. After surrendering himself to the police, and contrary to his counsel's advice, he pleaded guilty to "three counts of first-degree murder and multiple counts of robbery, kidnaping for ransom, breaking and entering and assault, attempted murder, and conspiracy to commit robbery." *Id.* at 672. Also against his counsel's advice, he waived his right to a jury sentencing recommendation. *Id.* After weighing "numerous aggravating circumstances and no (or a single comparatively insignificant) mitigating circumstance," the trial court sentenced the respondent to death for the three murder convictions. *Id.* at 675.

After unsuccessfully challenging his convictions in state court, the respondent in *Strickland* sought federal habeas relief. *Id.* at 678. The habeas district court "held an evidentiary hearing to inquire into trial counsel's efforts to investigate and . . . present mitigating circumstances." *Id.* at 678. The district court denied the petition because "although trial counsel made errors in judgment in failing to investigate nonstatutory mitigating evidence further than he did, no prejudice to respondent's sentence resulted from any such error in judgment." *Id.* at 678-79. After vacating an earlier panel opinion, the recently formed Eleventh Circuit, sitting en banc, reversed the denial of habeas relief "and remanded the case for new factfinding under [its] newly announced standards." *Id.* at 679.

The Supreme Court reversed. After formulating its two-part ineffective assistance framework, the *Strickland* Court examined the first prong and determined that counsel's conduct was not unreasonable. *Id.* at 698. As the Supreme Court explained, "respondent's counsel made a strategic choice to argue for the extreme emotional distress mitigating circumstance and to rely as fully as possible on respondent's acceptance of responsibility for his crimes." *Id.* at 699. The *Strickland* Court added that "[c]ounsel's strategy choice was well within the range of professionally reasonable judgments, and the decision not to seek more character or psychological evidence than was already in hand was likewise reasonable." *Id.* The Supreme Court also noted that "[r]estricting testimony on respondent's character to what had come in at the plea colloquy ensured that contrary character and psychological evidence and respondent's criminal history, which counsel had successfully moved to exclude, would not come in." *Id.* at 699.

The Supreme Court described the respondent's evidence of prejudice as "even more stark." *Id.* The *Strickland* Court observed that the new mitigating evidence "would barely have

altered the sentencing profile presented to the sentencing judge." *Id.* at 700. Thus, the Court concluded that "the [d]istrict [c]ourt [had] properly declined to issue a writ." *Id.* at 701.

*Strickland* helps us to understand the constitutional contours of a penalty-phase ineffective assistance claim. But there, the Supreme Court applied both the deficient performance and prejudice prongs under a less demanding de novo review standard and, nevertheless, concluded that the petitioner did establish ineffective assistance. *Strickland* is of no help to Morris in arguing that the Alabama courts erred under AEDPA in rejecting his mitigation subclaim.

Morris cites several other authorities where the Supreme Court analyzed *Strickland* mitigation claims: *Williams*; *Wiggins v. Smith*, 539 U.S. 510 (2003); *Rompilla v. Beard*, 545 U.S. 374 (2005); and *Porter v. McCollum*, 558 U.S. 30 (2009) (per curiam). Although the court addresses each decision in turn, none of these cases help Morris.

In *Williams*, a jury convicted the petitioner of robbery and capital murder based partially on several pretrial confessions he made to authorities. 529 U.S. at 367-68. Before his confessions, "local officials [had] determined that the cause of [the victim's] death was blood alcohol poisoning" and "considered" the criminal investigation "closed." *Id.* at 367. Nevertheless, the petitioner confessed that after the victim had refused to lend him some money, he looked for a weapon, found a mattock, and killed the victim with two blows. *Id.* at 367-68 & n.1.

The state's penalty-phase case included proof of the petitioner's prior convictions, descriptions of additional crimes, which he had mentioned in his confessional statements, and expert testimony from two state witnesses opining that he "would pose a serious continuing threat to society." *Id.* at 368-69. Based on this evidence, "[t]he jury found a probability of future dangerousness and unanimously fixed [the] punishment at death." *Id.* at 370. The trial court agreed

and "imposed the death sentence." *Id.*

After an unsuccessful direct appeal, the petitioner sought collateral relief in state court. *Id.* The petitioner "contend[ed] that he was denied his constitutionally guaranteed right to the effective assistance of counsel when his trial lawyers failed to investigate and to present substantial mitigating evidence to the sentencing jury." *Id.* at 390. Although the state circuit court awarded the petitioner resentencing relief based on *Strickland*, the state appellate court reversed that judgment. *Id.* at 370-72. On federal habeas review, the district court agreed with the state circuit court's conclusion, but the Fourth Circuit reversed that judgment. *Id.* at 372-74.

On certiorari review, the Supreme Court determined that granting habeas relief on the petitioner's *Strickland* mitigation claim was appropriate under AEDPA. *Id.* at 374. Because the state appellate court had assumed without deciding that the petitioner had shown deficient performance, the Supreme Court's analysis addressed *Strickland*'s prejudice prong. *Id.* at 371. The Supreme Court determined that the available (but omitted) evidence "viewed as a whole and cumulative of mitigation evidence presented originally, raised a reasonable probability that the result of the sentencing proceeding would have been different if competent counsel had presented and explained the significance of all the available evidence." *Id.* at 396, 399 (internal quotation marks omitted).

The mitigating evidence collaterally developed in *Williams* included the petitioner's "mistreatment, abuse, and neglect during his early childhood, as well as testimony that he was borderline mentally retarded, had suffered repeated head injuries, and might have mental impairments organic in origin." *Id.* at 370 (internal quotation marks omitted). Trial counsel failed to introduce the petitioner's "prison records recording . . . commendations for helping to crack a

267

prison drug ring and . . . returning a guard's missing wallet." *Id.* at 396. Additionally, prison officials testified postjudgment that the petitioner was "among the inmates least likely to act in a violent, dangerous or provocative way." *Id.* (internal quotation marks omitted).

The jury did not hear from another witness who had often visited the petitioner as a part of a prison ministry program. *Id.* According to that witness, the petitioner "seemed to thrive in a more regimented and structured environment, and . . . was proud of the carpentry degree he earned while in prison." *Id.* at 396 (internal quotation marks omitted). Those observations echoed the mitigating post-judgment opinions of the same state trial experts who opined that if kept in a structured environment, the petitioner would not pose a future danger to society. *Id.* at 371 (internal quotation marks omitted). The Supreme Court explained that the omitted mitigating evidence in *Williams* cast doubt on the jury's finding of future dangerousness. *Id.* at 398. The *Williams* Court also determined that the petitioner's diminished mental capacity and lack of moral culpability established a reasonable probability of a different penalty-phase result, regardless of his future dangerousness. *Id.*; *see also id.* at 396, 398 (detailing the complete body of mitigating evidence, including the petitioner's confession, "remorse," and "cooperati[on]" with the authorities).

The *Williams* Court concluded under AEDPA that the state appellate court's prejudice analysis was unreasonable in at least two respects. *Id.* at 397. First, the "decision turned on [an] erroneous view that a 'mere' difference in outcome is not sufficient to establish constitutionally ineffective assistance of counsel." *Id.* "Second, the . . . prejudice determination was unreasonable insofar as [the state supreme court] failed to evaluate the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding in reweighing it against the evidence in aggravation." *Id.* at 397-98.

Unlike the record in *Williams*, which showed mitigation evidence was not presented, Morris's allegations about missing mitigating circumstances are not concrete. For example, although Morris alleges that trial counsel should have presented mitigation testimony about his mental illness, he offers no corresponding diagnosis or associated symptoms that should have been proffered. This speculative approach persists throughout his mitigation arguments. Properly analyzed, any new mitigation evidence he claims should have been added to his sentencing profile is negligible.

Given the limited weight of Morris's mitigation allegations, the legitimacy of the three aggravating factors, which the trial court found the state had proven to support his death sentence, remains intact. The court also notes that the prosecution's aggravating case in *Williams* was less compelling than the state's sentencing case presented in the trial court against Morris, who applied blunt force to an elderly victim's head, murdered her in her home as part of a robbery and burglary. *Morris Direct I*, 956 So. 2d at 435. In addition, Morris had a prior felony conviction involving violent conduct. In comparison to the petitioner in *Williams*, the aggravating evidence against Morris was much more substantial and the mitigating evidence was much less compelling.

Nor can Morris overcome AEDPA deference here. In *Williams*, because the state court did not consider the totality of mitigating evidence, the Supreme Court overturned a Fourth Circuit decision requiring deference to the state habeas court's dismissal of the petitioner's ineffective assistance of counsel claim. Morris has identified no objective error in the Alabama courts' understanding of the prejudice standard or *Strickland*'s formula for reweighing the sentencing circumstances. Thus, the sentencing circumstances underlying the prejudice outcome in *Williams* are substantially different than those presented here.

Nor can Morris rely on *Wiggins* to demonstrate that the Alabama courts unreasonably applied *Strickland*. Moreover, even to the extent that *Wiggins* can be read to support Morris's deficient performance allegations under AEDPA, he cannot show prejudice prong. The petitioner in *Wiggins* "argue[d] that his attorneys' failure to investigate his background and present mitigating evidence of his unfortunate life history at his capital sentencing proceedings violated his Sixth Amendment right to counsel." *Id.* at 514. The Supreme Court agreed. 539 U.S. at 534, 538. Analyzing the constitutional merits of deficient performance first, the Supreme Court determined that "counsel abandoned their investigation of petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources" and failed to follow up on mitigating leads "actually discovered in [some of the petitioner's] records." *Id.* at 524-25; *see id.* at 525 (agreeing with the district court's assessment that "any reasonably competent attorney would have realized that pursuing these leads was necessary to making an informed choice among possible defenses, particularly given the apparent absence of any aggravating factors in petitioner's background"). The *Wiggins* Court determined that the record from the sentencing hearing, which reflected "a halfhearted mitigation case," conflicted with the state court's finding that the limited pursuit of mitigating evidence was a strategic decision. *Id.* at 526.

The *Wiggins* Court faulted the state court for assuming that trial counsel's possession of "*some* information with respect to the petitioner's background" was sufficient to show that they made "a tactical choice not to present a mitigation defense." *Id.* at 527 (emphasis in original). As the Supreme Court observed, the evaluation of an investigation under *Strickland* includes "not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Id.* And, the Supreme Court added, even

270

accepting that trial counsel had "limited the scope of their investigation for strategic reasons, *Strickland* does not establish that a cursory investigation automatically justifies a tactical decision with respect to sentencing strategy." *Id.* The Court identified "the reasonableness of the investigation [offered] to support that strategy" as a mandatory part of the deficient performance assessment. *Id.*

After analyzing the first prong, the Court concluded that the state court unreasonably applied *Strickland*'s deficient performance prong. The Court explained that AEDPA legal error had occurred because, even though it had agreed with the petitioner that the "failure to prepare a social history 'did not meet the minimum standards of the profession,'" the state court stopped the *Strickland* analysis prematurely. *Id.* at 527 (quoting state court opinion). Specifically, the state court did not assess whether the decision to cease all investigation upon obtaining the presentence investigation and social services records demonstrated reasonable professional judgment. *Id.* As the Court noted, "[t]he state court merely assumed that the investigation was adequate" even though trial counsel's "abandonment [of] their investigation at an unreasonable juncture[] ma[de] a fully informed decision with respect to sentencing strategy impossible." *Id.* at 527-28. The Supreme Court concluded also that the state court unreasonably "defer[red] to counsel's strategic decision not 'to present every conceivable mitigation defense,' [because] counsel based this alleged choice on . . . an unreasonable investigation." *Id.* at 528 (quoting state court opinion). In assessing deficient performance, the *Wiggins* Court flagged as "clearly erroneous" the state court's assumptions under § 2254(d)(2) and (e)(1) about the contents of the social services records. *Id.* at 528-29. The Court explained that "[t]his partial reliance on an erroneous factual finding further highlight[ed] the unreasonableness of the state court's decision." *Id.* at 528.

In *Wiggins*, neither of the state courts reached the prejudice element of the *Strickland* analysis. 539 U.S. at 534. AEDPA deference did not apply to that *Strickland* prong, and the Supreme Court evaluated prejudice de novo. Consistent with that review, the Supreme Court "conclude[d] that the available mitigating evidence, taken as a whole, 'might well have influenced the jury's appraisal'" of *Wiggins*' moral culpability." *Id*. at 538 (quoting *Williams*, 529 U.S. at 398). The Court based this conclusion on the petitioner's "powerful" mitigating circumstances that the jury did not hear, including severe abuse in the first six years of his life while in the custody of his alcoholic, absentee mother; physical torment, sexual molestation, and repeated rape during his subsequent years in foster care; and both homelessness and diminished mental capacities. *Id*. at 534-35. Although the Court did not describe the aggravating factors, it agreed with the district court's finding that "the [s]tate's evidence in support of the death penalty [was] far weaker, than in *Williams*." *Wiggins*, 539 U.S. at 538.

Morris relies on *Wiggins* to argue that this court should detach AEDPA deference from the Alabama courts' rejection of his deficient performance allegations because trial counsel did not (1) retain a mitigation expert, (2) interview numerous unidentified witnesses, nor (3) consider the mitigating impact of what the witnesses might know about Morris. The court disagrees. Morris's mitigation subclaim differs from the claim in *Wiggins* in material ways.

First, the *Wiggins* decision concerned trial counsel's professional misjudgment in prematurely ending a mitigation investigation when the preliminary results of their efforts were promising. But, unlike the assertions in *Wiggins*, Morris has not directly alleged that trial counsel prematurely ended their investigation. Rather, the gist of his subclaim is that, guided by a mitigation expert, trial counsel would have been more effective in their penalty phase presentation.

No portion of the holding in *Wiggins* supports that type of clearly established principle.

Second, Morris has not specified what records trial counsel overlooked or which witnesses they neglected to interview. Although Morris suggests that trial counsel could have called his second sister, Ms. D. Morris, to testify in the penalty phase, the record shows that trial counsel had prepared her to be a witness but that she—like her sister, Ms. F. Morris—became too emotional to take the stand. (Doc. # 27 at 43); (Doc. # 15-56 at 70 ¶ 13).

Morris suggests trial counsel could have called a psychiatrist to testify in the penalty phase. (Doc. # 27 at 43); (Doc. # 15-56 at 70 ¶ 13). Accepting that Morris is referring to Dr. Shealy, he has not shown that the Alabama courts unreasonably rejected his deficient performance allegations relating to that expert. Specifically, Morris has not explained how trial counsel's strategic concern that calling Dr. Shealy as a mitigation witness could backfire with the jury was unreasonable. As discussed on the record, trial counsel was concerned that because Morris testified without "giv[ing] any indication that he was mentally retarded" in the guilt phase, presenting Dr. Shealy's testimony confirming that type of mental diagnosis for Morris in the penalty phase would be conflicting and "not look good to the jury." (Doc. # 15-24 at 49-50). Nor has Morris demonstrated that trial counsel's strategic choice was objectively deficient. And, Morris does not allege how trial counsel's strategic decision not to call Dr. Shealy was objectively deficient given the added drawback of the state's opportunity to raise issues about Morris malingering in its rebuttal to Dr. Shealy's testimony.

Morris also suggests also that trial counsel could have called "a social worker who had interacted with [him] while he was incarcerated." (Doc. # 27 at 43); (Doc. # 15-56 at 70 ¶ 13). But, without alleging that trial counsel unreasonably overlooked the opportunity to interview this

unnamed witness and without showing how that anticipated testimony would have helped Morris in the penalty phase, Morris has not established any (d)(1) error. Thus, unlike *Wiggins*, Morris has not shown that a broader or longer investigation, with or without a specialist, would have generated specific names of available witnesses with personal knowledge of the mitigating factors. For these reasons, Morris's reliance on *Wiggins* fails to establish that the Alabama courts committed clearly established constitutional error in their evaluation of his deficient performance allegations.

But even if it could be said that the Alabama courts unreasonably rejected Morris's first-prong allegations in light of *Wiggins*, Morris has not shown a (d)(1) error. The minimal weight underlying Morris's vague allegations about unpresented mitigation evidence simply does not compare with the situation in *Wiggins*. There, the petitioner specified the names of witnesses who had new and then-available information, which trial counsel overlooked.

Nor does *Rompilla* aid Morris here. In *Rompilla*, a jury found the petitioner guilty of torturing and murdering the victim during another felony. *Rompilla*, 545 U.S. at 378. At the penalty phase, the state proved three aggravating factors, corresponding with the jury's two guilt-phase convictions and the petitioner's "significant history of felony convictions indicating the use or threat of violence." *Id.*

Trial counsel presented a "relatively brief" case of mitigation. *Id.* Specifically, "five of [the petitioner's] family members argued in effect for residual doubt, and beseeched the jury for mercy, saying that they believed [that the petitioner] was innocent and a good man." *Id.* The petitioner's "son testified that he loved his father and would visit him in prison." *Id.* The jury found the petitioner had proved two mitigating factors—his son's willingness to testify in the penalty phase and the potential for rehabilitation in prison. *Id.* Still, "the jurors assigned the greater weight to the

aggravating factors, and sentenced [the petitioner] to death." *Id.*

After losing on direct appeal, the *Rompilla* petitioner sought postconviction review in state court. *Id.* The petitioner proffered new mitigation evidence, including significant information about his childhood, mental capacity, and health, and alcoholism. *Id.* The state appellate court agreed with the collateral court's finding "that trial counsel had done enough to investigate the possibilities of a mitigation case" and affirmed the judgment denying relief. *Id.* The petitioner then sought federal habeas review. *Id.* at 379.

At the district court, the petitioner prevailed on his ineffective assistance claim. *Id.* Specifically, the district court determined "that in preparing the mitigation case the defense lawyers had failed to investigate 'pretty obvious signs that [the petitioner] had [experienced] a troubled childhood and suffered from mental illness and alcoholism, and instead had relied unjustifiably on [the petitioner]'s own description of an unexceptional background." *Id.* The Third Circuit Court reversed, concluding that the state courts had not applied *Strickland* unreasonably "given defense counsel's efforts to uncover mitigation material, which included interviewing [the petitioner] and certain family members, as well as consultation with three mental health experts." *Id.* The Third Circuit acknowledged that trial counsel had failed to "unearth the 'useful information' . . . in [the petitioner]'s 'school, medical, police, and prison records.'" *Id.* Still, the Third Circuit distinguished the case from *Wiggins* and "thought the lawyers were justified in failing to hunt through these records when their other efforts gave no reason to believe the search would yield anything helpful." *Id.*; *see also id.* (determining that "counsel [had] . . . reason for thinking further efforts would not be a wise use of the limited resources they had").

In reversing the Third Circuit's judgment, the Supreme Court discussed the trial counsel's efforts to uncover mitigation and discussed several aspects of the petitioner's new evidence that counsel could have uncovered had they performed a more thorough investigation. *Id.* at 381-82. But, in *Rompilla*, the Court's deficient performance conclusion under AEDPA boiled down to one unexplored source: "the lawyers were deficient in failing to examine the court file on [the petitioner]'s prior conviction." *Id.* at 383. The Supreme Court struggled to understand "how counsel could have failed to realize that without examining the readily available file they were seriously compromising their opportunity to respond to a case for aggravation," given "the dramatic facts of a similar prior offense" underlying the earlier conviction. *Id.* at 385; *see id.* ("Without making reasonable efforts to review the file, defense counsel could have had no hope of knowing whether the prosecution was quoting selectively from the transcript, or whether there were circumstances extenuating the behavior described by the victim.").

As the Supreme Court explained, "[w]ithout making efforts to learn the details and rebut the relevance of the earlier crime, a convincing argument for residual doubt was certainly beyond any hope." *Id.* at 386. The *Rompilla* Court observed that trial counsel's obligation to "obtain [the] information," which they knew the state would introduce against their client, "[wa]s not simply a matter of common sense," but also consistent with the ABA Guidelines "to secure information in the possession of the prosecution and law enforcement authorities." *Id.* at 387 (internal quotation marks omitted). The Supreme Court added that instead of "looking for needle in a haystack," reviewing "a file the prosecution says it will use is a sure bet: whatever may be in that file is going to tell defense counsel something about what the prosecution can produce." *Id.* at 389.

After analyzing deficient performance under AEDPA, the Supreme Court reviewed the prejudice prong de novo. *Id*. at 390. The Court determined that the petitioner "ha[d] shown beyond any doubt that counsel's lapse was prejudicial." *Id.* at 390. The Supreme Court explained that "[t]he prison files pictured [the petitioner]'s childhood and mental health very differently from anything defense counsel had seen or heard." *Id.* Those records revealed that the petitioner grew up "in a slum environment"; "came to [the ] attention of juvenile authorities" at an early age; "quit school at 16"; "started a series of incarcerations [that were] often of [an] assaultive nature and commonly related to over-indulgence in alcoholic beverages"; and had test results that "point[ed] to schizophrenia and other disorders" and "a third grade level of cognition after nine years of schooling." *Id.* at 390-91 (internal quotation marks omitted).

Other mitigating information in *Rompilla* that postconviction counsel uncovered included evidence that the petitioner had severe alcoholic parents "who drank constantly" and "fought violently"; a mother who drank while pregnant with the petitioner; the petitioner and his brothers' "develop[ing] serious drinking problems"; a father "who had a vicious temper, frequently beat [the petitioner's] mother, leaving her bruised and black-eyed, and bragged about his cheating on her"; an abusive father "who beat [the petitioner] when he was young with his hands, fists, leather straps, belts and sticks" and "locked [him] and his brother . . . in a small wire mesh dog pen that was filthy and excrement filled"; parents who expressed "no . . . love, affection, or approval"; an "isolated background" with restrictions against "visit[ing] other children or . . . speak[ing] to anyone on the phone"; a home without indoor plumbing; a place to sleep in the attic without heat; and no clothes to wear other than "rags." *Id.* at 391-92 (internal quotation marks omitted).

Additionally, after undergoing testing, mental health experts determined that the petitioner had organic brain damage and cognitive difficulties that traced "back to his childhood" and identified fetal alcohol syndrome as the "likely cause[]." *Id*. at 392 (internal quotation marks omitted). Based on the petitioner's postconviction medical evaluation, the experts believed that his "capacity to appreciate the criminality of his conduct or to conform his conduct to the law was substantially impaired at the time of the offense." *Id.* (internal quotation marks omitted).

The Supreme Court determined that this complete body of undiscovered evidence "add[ed] up to a mitigation case that b[ore] no relation to the few naked pleas for mercy actually put before the jury." *Id.* at 393. In light of that wide divide, the *Rompilla* Court concluded that the new mitigating evidence "might well have influenced the jury's appraisal of . . . culpability" and "undermined confidence in the [death sentence] outcome." *Id.* at 393 (internal quotation marks omitted).

Morris suggests that his mitigation case somewhat resembles the petitioner's in *Rompilla*— a brief closing with an implicit plea for mercy as both his sisters became too upset to testify about some of his personal history. But, unlike in *Rompilla*, trial counsel had intended to call Morris's sisters to advance arguments about mitigation. The record explains why that did not occur. Therefore, properly analyzed, *Rompilla* lends no support to this type of backwards-looking deficient performance approach.

Morris does not contend that trial counsel unreasonably failed to review an available state file filled with a wealth of mitigating evidence about him. Likewise, Morris does not allege that trial counsel's failed to review the state's evidence about his prior felony conviction for assault in the second degree resulted in the pursuit of an unreasonable residual doubt strategy because of a

factual overlap with the circumstances of another murder. And, unlike *Rompilla*, Morris's prejudice claim is not reviewed de novo. Because of these key differences between *Rompilla* and this case, fairminded jurists could defend the correctness of the Alabama courts' decision that Morris's statement of deficient performance was inadequate under *Strickland*.[13]

Morris also points to *Porter*, but that case does not support his argument. In *Porter*, the petitioner was a "decorated" Korean war veteran. *Porter*, 558 U.S. at 30, 44. A jury convicted him "of two counts of first-degree murder for the shooting of his former girlfriend . . . and her boyfriend." *Id.* at 31. He received a death sentence "on the first count but not the second." *Id.* The petitioner had threatened to kill his former girlfriend and visited her at her home "the night before the murder." *Id.* After the girlfriend called the police, the petitioner left her home and "went to two cocktail lounges." *Id.* After drinking, he "spent the night with a friend, who testified [that the petitioner] was quite drunk by 11 p.m." *Id.* "Early the next morning, [the petitioner] shot [his girlfriend] in her house," and after a struggle, shot her new boyfriend outside. *Id.* at 31-32.

The petitioner pleaded guilty, and the trial court appointed standby counsel to represent him at the penalty phase. *Id.* at 32. "The [s]tate attempted to prove four aggravating factors: [the petitioner] had been 'previously convicted' of another violent felony [under the circumstances the double murder]; the murder was committed during a burglary; the murder was committed in a cold, calculated, and premeditated manner; and the murder was especially heinous, atrocious, or cruel." *Id.* at 32 (footnote omitted).

---

[13] And, like *Wiggins*, the strength of new mitigation uncovered in *Rompilla* eclipses the weight of Morris's nebulous references to topics of mitigation with no corresponding witness or anticipated testimony. Those deficits in Morris's allegations of new mitigation evidence leave room for fairminded debate over the reasonableness of the Alabama court's rejection of his statement of prejudice. Morris therefore does not satisfy AEDPA's unreasonable application standard.

The mitigation case consisted of testimony from the petitioner's ex-wife and "an excerpt from a deposition" transcript. *Id.* "The sum total of the mitigating evidence was inconsistent testimony about [the petitioner]'s behavior when intoxicated and testimony that [he] had a good relationship with his son." *Id.* Trial counsel referred to (but did not introduce) evidence of the petitioner's mental health. *Id.* The jury recommended capital punishment as to both murders. However, "the trial court found that the [s]tate had proved all four aggravating circumstances for the murder of [the girlfriend] but that only the first two were established with respect to [her boyfriend]'s murder." *Id.*

Petitioner's capital conviction was affirmed on direct appeal. He then sought collateral review in state court, which included an evidentiary hearing on his unpresented mitigating evidence. When that did not succeed, the petitioner sought federal habeas relief. *Id.* at 38.

Because the state courts had reserved judgment on deficient performance, the district court considered that claim de novo and "determined that . . . penalty-phase counsel did little, if any investigation . . . and failed to effectively advocate on behalf of his client before the jury." *Id.* (internal quotation marks omitted). The district court also concluded that the state courts's application of the prejudice prong was contrary to clearly established law, in part because they had not considered the entirety of the evidence when reweighing the evidence in mitigation. *Id.* In support of that AEDPA conclusion, the district court referenced "the trial evidence [, which] suggest[ed] that 'this was a crime of passion, that [the petitioner] was drinking heavily just hours before the murders,'" and "that [he] had a good relationship with his son.'" *Id.* (alterations added and modified).

The Eleventh Circuit reversed. It determined that "the [d]istrict [c]ourt had failed to appropriately defer to the state court's factual findings with respect to [the petitioner]'s alcohol abuse and his mental health." *Id.* The circuit court "then separately considered each category of mitigating evidence and held it was not unreasonable for the state court to discount each category as it did." *Id.* at 38.

The Supreme Court reversed. *Id.* at 44. Citing *Williams*, the Court determined that the petitioner's counsel had "not satisfied th[e] norms" of "conduct[ing] a thorough investigation of the defendant's background." *Id.* at 39 (internal quotation marks omitted). The Court highlighted several pieces of evidence from the state collateral hearing, including the petitioner's counsel's lack of experience and failure to "obtain any of [the petitioner]'s school, medical, or military service records or interview any members of [his] family." *Id.* at 39. And, the Court explained that the petitioner's counsel had "ignored pertinent avenues for investigation of which he should have been aware." *Id.* at 40. For example, the Court pointed to "[t]he court-ordered competency evaluations, [which] reported [the petitioner]'s very few years of regular school, his military service and wounds sustained in combat, and his father's 'over-disciplin[e].'" *Id.* The Supreme Court determined that "[c]ounsel . . . had failed to uncover and present any evidence of [the petitioner]'s mental health or mental impairment, his family background, or his military service." *Id.* And, despite the petitioner's lack of cooperation, the Supreme Court concluded that counsel's "decision not to investigate did not reflect reasonable professional judgment." *Id.*

Regarding prejudice, the Court explained that the case did not involve "new evidence [which] would barely have altered the sentencing profile presented to the sentencing judge." *Id.* at 41 (internal quotation marks omitted). It noted that the judge and jury did not hear about the

281

petitioner's: (1) heroic military service in two horrific battles of the Korean War, (2) struggles after his return from war, (3) childhood history of physical abuse, and (4) brain abnormality (that had impulse and violence control implications), difficulty reading and writing, and limited education. 558 U.S. at 41.

Related to aggravation, although the petitioner murdered two victims, the Florida Supreme Court described the circumstances as more consistent with a "crime of passion" than one "meant to be deliberately and extraordinarily painful" and "struck the heinous, atrocious, or cruel aggravating factor" on direct appeal. 558 U.S. at 33 (quoting *Porter v. State*, 564 So. 2d 1060, 1063 (1990) (per curiam) (internal quotations omitted)). The Supreme Court also observed that "[t]wo dissenting justices would have reversed the penalty because the evidence of drunkenness, 'combined with evidence of [the petitioner's] emotionally charged, desperate, frustrated desire to meet with his former lover, [wa]s sufficient to render the death penalty disproportional punishment in this instance.'" 558 U.S. at 33 (quoting *Porter*, 564 So. 2d at 1065-66) (Barkett, J., concurring in part and dissenting in part). The Supreme Court concluded that "the weight of evidence in aggravation [wa]s not as substantial as the sentencing judge thought." 558 U.S. at 41.

As the *Porter* Court explained, the addition of petitioner's "life history [had increased the weight] on the mitigating side of the scale" and a reduction of the aggravating factors from four to three had decreased the weight on the state's side. *Id.* at 42. Upon reweighing, the Supreme Court concluded that "a reasonable probability that the advisory jury—and the sentencing judge—would have struck a different balance, and it [wa]s unreasonable to conclude otherwise." *Id.* (internal quotation marks and citation omitted). The state court's AEDPA errors, which the Supreme Court identified, included either a failure to consider or an unreasonable discounting of the mitigation

evidence adduced in the postconviction hearing. *Id.* Additionally, the state supreme court had misapplied a "more likely than not" standard to the petitioner's prejudice burden instead of the more lenient test of "a probability sufficient to undermine confidence in [the penalty-phase] outcome." *Id.* at 44 (internal quotation marks omitted) (alteration modified). But, *Porter* is of no help to Morris here.

Unlike the petitioner in *Porter*, Morris does not assert that trial counsel did little or no investigation into mitigation. Rather, Morris contends that trial counsel should have retained a mitigation expert independent of a mental health expert to present a more effective mitigation case. But, *Porter* did not address trial counsel's use of or reliance on a mitigation expert.

The record may be less than clear as to whether trial counsel intended to call Morris's sisters to testify in the third trial about his loving family and the life challenges he had endured. But, regardless, whether there was a plan going into trial, or a decision during trial to explore putting them on the stand, the move collapsed when his sisters became too upset to testify. So, in *Porter*, the Supreme Court simply did not face this type of fluid penalty-phase situation. The *Porter* decision in no way suggests that the ACCA unreasonably rejected Morris's allegations that his trial counsel deficiently performed after their mitigation strategy collapsed – without any warning.

Morris also argues that trial counsel should have presented evidence of non-statutory mitigation through other witnesses. But, Morris's non-specific allegations of unidentified witnesses who may have presented some undisclosed testimony simply do not approach the new and substantial mitigating evidence developed on postconviction review in *Porter*. Fairminded jurists could debate the correctness of the Alabama courts' decision that Morris's allegations were inadequate to show deficient performance at the penalty-phase strategy.

And, there is more. Turning to the second prong, the insubstantial weight of Morris's uncertain mitigating allegations show that the Alabama courts' assessment of prejudice was not unreasonable. Further, unlike in *Porter*, the Alabama courts applied the correct prejudice standard.

Morris cites several other decisions, but in those cases the Supreme Court addressed claims where ineffective assistance was not the focus. Because of that missing contextual component, the holdings from these cases do not clearly establish there was a *Strickland* error in the state court. *See, e.g.*, *Gideon v. Wainwright*, 372 U.S. 335, 342 (1963) (holding that the Sixth Amendment's guarantee of counsel "is fundamental and essential to a fair [felony] trial" and "made obligatory upon the States by the Fourteenth Amendment") (internal quotation marks omitted); *Lockett*, 438 U.S. at 593 (striking down a state statute which precluded individualized consideration of mitigating evidence with limited exceptions); *Eddings v. Oklahoma*, 455 U.S. 104. 113, 115 (1982) (concluding that a death sentence violated the petitioner's Eighth Amendment rights under *Lockett* because the trial court had determined that it could not consider mitigating "evidence of a turbulent family history, of beatings by a harsh father, and of severe emotional disturbance"); *Woodson*, 428 U.S. at 305) (holding that death sentences "under North Carolina's mandatory death sentence statute violated the Eighth and Fourteenth Amendments"); *Skipper v. S. Carolina*, 476 U.S. 1, 3 (1986) (determining whether the trial court's exclusion of several witnesses' testimony about the petitioner's good behavior pending trial violated the Eighth and Fourteenth Amendments under *Lockett* and *Eddings*).

Morris points to numerous Eleventh Circuit decisions in which ineffective mitigation assistance was the basis for habeas relief. However, the circumstances in those decisions substantially differ from Morris's penalty-phase case in several material ways.

First, Morris has identified no Eleventh Circuit authority where trial counsel's plan to call witnesses in the penalty phase collapsed because those witnesses would or could not testify. As a result, the Eleventh Circuit has not addressed the type of unusual circumstances – and unintentional from counsel's perspective – that were present here in Morris's penalty-phase challenge. Based on this material difference, fairminded jurists could defend the correctness of the ACCA's rejection of Morris's deficient performance allegations, and the numerous cases he cites does not change this point. *See, e.g.*, *Daniel v. Comm'r, Ala. Dep't of Corr.*, 822 F.3d 1248, 1264 (11th Cir. 2016) ("Although there is no required number of meetings a trial attorney must have with his client and family members before trial, trial counsel's failure to conduct any timely and meaningful mitigation interviews with [the petitioner] and his family was objectively unreasonable under the circumstances of this case."); *Debruce v. Comm'r, Ala. Dep't of Corr.*, 758 F.3d 1263, 1272 (11th Cir. 2014) ("This postconviction evidence, combined with the minimal mitigation evidence actually presented during the original sentencing proceeding, suggests trial counsel's failure to investigate and present available and compelling mitigating evidence was the result of inattention, not reasonable professional judgment."); *Cooper v. Sec'y, Dep't of Corr.*, 646 F.3d 1328, 1352 (11th Cir. 2011) ("Other than the difficulties they experienced in reaching potential unnamed witnesses, the attorneys offered no explanation for not broadening their mitigation investigation."); *Williams*, 542 F.3d at 1340 ("Given that counsel's sentencing case focused on establishing that [the petitioner] had a troubled background, they had every incentive to develop the strongest mitigation case possible."); *Collier v. Turpin*, 177 F.3d 1184, 1202 (11th Cir. 1999) ("Given the overwhelming evidence of guilt, [trial counsel] presented almost none of the readily available evidence of [the petitioner]'s background and character that would have led the jury to eschew the

285

death penalty."); *Brownlee v. Haley*, 306 F.3d 1043, 1069 (11th Cir. 2002) (explaining that the district court had rejected the residual doubt argument because transcript reflected that trial counsel had raised an 'emotional and personal' appeal that [the petitioner] was a 'living, breathing human being'"); *Brownlee*, 306 F.3d at 1069 ("As the district court found, such a strategy would have benefitted from evidence of [the petitioner]'s background and character."); *Ferrell v. Hall*, 640 F.3d 1199, 1231 (11th Cir. 2011) (determining that the absence of "any reasonable investigation into the defendant's background and upbringing," completely undermined defense counsel's post-hoc justification for their residual doubt defense—that they could find no alternative sentencing strategy); *Hardwick v. Crosby*, 320 F.3d 1127, 1164 (11th Cir. 2003) ("When mental health mitigating evidence was available, and absolutely none was presented [by counsel] to the sentencing body, and . . . no strategic reason [w]as . . . put forward for this failure, our court determined that this omission was objectively unreasonable.") (internal quotation marks omitted); *Hardwick*, 320 F.3d at 1164 (recognizing when mitigation is the "sole defense," a "failure to present mitigation evidence as to a defendant's family background or alcohol and drug abuse at the penalty phase of a capital case constitutes ineffective assistance of counsel") (emphasis omitted); *Harris v. Dugger*, 874 F.2d 756, 763 (11th Cir. 1989) ("Here, counsel's failure to present or investigate mitigation evidence resulted not from an informed judgment, but from neglect."); *Dobbs v. Turpin*, 142 F.3d 1383, 1388 (11th Cir. 1998) (rejecting trial counsel's "justifications for failing to investigate [the petitioner]'s background and . . . present mitigating evidence at sentencing"); *Horton v. Zant*, 941 F.2d 1449, 1462 (11th Cir. 1991) (concluding de novo that trial counsel's "tactical decision was unreasonable" and that their "fail[ure] to do any investigation because of the mistaken notion that mitigating evidence is inappropriate is indisputably below

reasonable professional norms"); *Jackson v. Herring*, 42 F.3d 1350, 1367 (11th Cir. 1995) ("We agree with the district court's conclusion that counsel did not make a reasonable 'strategic decision' to forego presenting mitigating evidence, and did not even undertake a reasonable investigation into such evidence.") (emphasis omitted); *Blanco v. Singletary*, 943 F.2d 1477, 1500 (11th Cir. 1991) ("In this case, the attorneys failed to conduct a reasonable investigation, and this failure was not a result of a tactical choice.").

Second, unlike Morris's amorphous mitigation allegations, the new, post-conviction mitigation information uncovered in the various Eleventh Circuit cases he cites was specific and substantial. *See Daniel*, 822 F.3d at 1275 ("The Supreme Court has told us repeatedly that a failure to conduct a mitigation investigation is prejudicial under circumstances where . . . such an investigation would have uncovered an 'excruciating life history.'") (quoting *Wiggins*, 539 U.S. at 537); *see, e.g, Daniel*, 822 F.3d at 1254, 1276 (referencing the petitioner's "nightmarish" experiences as a child and his "substantial and compelling mitigation" allegations); *Daniel*, 822 F.3d at 1276 (summarizing the petitioner's new mitigation, including his mother's use of a shotgun to kill his father; "repeated" sexual abuse at the hands of his stepfather; placement in special education classes; "test scores . . . consistent with borderline intellectual disability"; "childhood dissociative disorder with psychotic features (related to daily sexual, physical, and emotional abuse)[;] and depression"); *Debruce*, 758 F.3d at 1270-71 (detailing that the petitioner had "experienced violence in his neighborhood, [including as a witness and a victim of gang attacks,] and severe abuse at the hands of his sister[;] . . . dropped out of school in the seventh grade[;] suffer[ed] from mental impairments and low intellectual functioning[;] and . . . [endured] a painful intestinal disorder[,]" including hospitalizations"); *Cooper*, 646 F.3d at 1354-55 (describing the

new mitigating evidence as support for the statutory grounds of age and substantial domination as well as non-statutory categories of severe domestic abuse; drug and alcohol use "to escape his family and the abuse"; neurological deficits; maternal abandonment; low IQ score of 75; and "history of depression and suicidal gestures"); *Williams*, 542 F.3d at 1342 ("The mitigation evidence that [the petitioner's] trial counsel failed to discover paints a vastly different picture of his background than that created by [the petitioner's mother's] abbreviated testimony."); *Williams*, 542 F.3d at 1342-43 (describing "near[ly] constant" "beatings [that] were in fact serious assaults, many of which involved the use of deadly weapons" and providing "inadequate food and clothing[;] neglect[ing] . . . basic hygiene and medical needs[;] permit[ing] [the petitioner] to roam the neighborhood unsupervised[;] and ignor[ing] his deteriorating academic performance"); *Collier*, ("failing to present . . . available evidence of [the petitioner]'s upbringing[;] his gentle disposition,[;] his record of helping family in times of need[;] specific instances of his heroism and compassion[;] and evidence of his circumstances at the time of the crimes—including his recent loss of his job, his poverty, and his diabetic condition"); *Brownlee*, 306 F.3d at 1070 (discussing "the powerful mitigating evidence of [the petitioner]'s borderline mental retardation, psychiatric disorders, and history of drug and alcohol abuse"); *Ferrell*, 640 F.3d at 1234 (emphasizing that "the 'new' mitigating evidence [wa]s consistent, unwavering, compelling, and wholly unrebutted," including "three mental health professionals [who] averred that [the petitioner] suffer[ed] from organic brain damage, bipolar disorder, an epileptic or seizure disorder, and borderline mental retardation"); *Hardwick*, 320 F.3d at 1167 ("[Trial counsel] failed to present the record evidence at the sentencing phase of [the petitioner]'s drunk and drugged condition resulting from the well-documented, long Christmas weekend binge of drugs and alcohol as well as expert testimony.");

288

*Harris*, 874 F.2d at 763 (explaining that the jury "did not know that family members would contend that [the petitioner] was a devoted father, husband and brother" or "that these relatives and a minister would describe [him] as a decent, loving man whose life was important to them"); *Dobbs*, 142 F.3d at 1388 (describing "[the petitioner]'s unfortunate childhood, including testimony that his mother would often not allow him to stay in the same house with her, and when she allowed him to stay with her, she ran a brothel where she exposed him to sexual promiscuity, alcohol and violence"); *Jackson*, 42 F.3d at 1369 ("Counsel could have presented to the jury and the court emotional and substantial testimony of [the petitioner]'s good character and devotion to her family despite a life of hardship and abuse."); *Horton*, 941 F.2d at 1463 (noting that the petitioner "ha[d] gathered the affidavits of ten individuals who claim[ed] they would have testified" that the petitioner "was a hard worker, . . . a good youth, and . . . able to provide for his common law wife and their daughter, and [that] he [had] successfully adjusted to previous stays in prison"); *Blanco*, 943 F.2d at 1501, 1505 (discussing the petitioner's available witnesses and "evidence . . . [of his] impoverished childhood, epileptic seizures, and organic brain damage").

Even if Morris's habeas allegations of deficient performance were enough to detach AEDPA deference under *Strickland*'s first prong (and, to be clear, they are not), Morris cannot show that this court should not defer to the state courts' resolution of prejudice prong under AEDPA. *See, e.g.*, *Boyd v. Comm'r, Ala. Dep't of Corr.*, 697 F.3d 1320, 1333-34 (11th Cir. 2012) (concluding that no unreasonable application of *Strickland* prejudice occurred in state court because the petitioner did not allege how the mitigating evidence would have changed the sentencing outcome, led to statutory mitigators, undermined the aggravating circumstances, or changed the portrait of the petitioner painted at trial).

Third, the Eleventh Circuit cases cited by Morris do not suggest that an ineffective assistance claim based on a lack of premeditation will overcome AEDPA deference. Indeed, at his trial, the prosecution acknowledged that point in its closing statement. (Doc. # 1 at 50 ¶ 132).

Fourth, the authorities relied upon by Morris do not support his argument that it was necessary for an investigator or specialist to present a constitutionally-acceptable mitigation case. (*See* Doc. # 21 at 11 ¶ 30) ("[N]o Eleventh Circuit case has held that it is necessarily unreasonable or even typically unreasonable to proceed without a mitigation expert.") (emphasis omitted). *Debruce* implies that, under the Sixth Amendment, trial counsel may hire an investigator to uncover "critical" mitigation evidence or personally do that work. *Debruce*, 758 F.3d at 1272. What the Sixth Amendment does not permit is "trial counsel's failure to investigate and present available and compelling mitigating evidence[, which] was the result of inattention, not reasonable professional judgment." *Id.* The cases Morris cites do not support the argument that the Alabama courts unreasonably failed to follow this clearly established mitigation principle.

Fifth, none of the cases Morris cites establishes that the ACCA's rejection of this *Strickland* subclaim was objectively unreasonable under Supreme Court precedent. *Cf. Powell*, 602 F.3d at 1274 ("In his state court habeas petition, he did not allege the existence of any testimony from a medical professional nor the existence of any medical records that addressed the relationship between his alleged head injuries and his subsequent behavior"). Morris maintains that his Rule 32 mitigation allegations mirror those in *Daniel*. (Doc. # 27 at 43). But, Morris has omitted any discussion about a number of material distinctions—in addition to those identified above— between his Rule 32 petition and the amended one presented in *Daniel*. The court explores these other contextual differences below.

290

The petitioner in *Daniel* attached exhibits to his amended petition, *Daniel*, 822 F.3d at 1261, and the Eleventh Circuit considered the contents of those exhibits in evaluating whether he had pled "enough specific facts that, if proven, amount to a valid penalty phase ineffective assistance of counsel claim." *Id.* & n.7. Also, unlike Morris, the *Daniel* petitioner alleged "that trial counsel ignored numerous efforts by his mother and sister to provide relevant background information," and importantly, provided several examples of those missed investigative opportunities. *Id.* at 1264. In *Daniel*, the petitioner also asserted "that trial counsel never afforded him or his family members a meaningful opportunity to tell trial counsel about his background." *Id.* at 1265 n.13. Morris does not include that degree of detail when claiming that trial counsel unreasonably limited the scope of their investigation.

After evaluating these and other specific allegations, the Eleventh Circuit determined that the ACCA had unreasonably decided *Strickland*'s first prong. *Id.* at 1272. As the Eleventh Circuit explained, the state appellate court had "not address[ed] whether trial counsel's investigation into [the petitioner's] background was reasonable under prevailing professional norms." *Id.* at 1272. Instead, the ACCA erred under AEDPA in making the "assum[ption] that trial counsel's investigation was adequate, without considering the reasonableness of [the] decision to limit the scope of their inquiry." *Id.* (alterations added) (internal quotation marks omitted) (quoting *Williams*, 542 F.3d at 1341). Thus, the Eleventh Circuit concluded that the ACCA had reached an unreasonable determination that the petitioner had "failed to plead sufficient facts to support a *Rompilla* claim." *Daniel*, 822 F.3d at 1272-73 (internal quotation marks omitted).

In contrast, Morris has merely made nonspecific allegations; he has not shown that the ACCA assumed unreasonably that trial counsel had conducted an adequate investigation. And, as

discussed above, Morris's allegations do not establish a *Rompilla* violation either. Thus, Morris's reliance on *Daniel* does not support an argument that the Alabama courts unreasonably rejected his mitigation allegations.

Morris also references *Henyard v. McDonough*, 459 F.3d 1217 (11th Cir. 2006), and *Ogle v. Johnson*, 488 F.3d 1364 (11th Cir. 2007) (citing *Francis v. Spraggins*, 720 F.2d 1190 (11th Cir. 1983), *modified from on other grounds as stated in Presnell v. Kemp*, 835 F.2d 1567, 1572 n.16 (11th Cir. 1988)), as support for this subclaim. (Docs. # 1 at 48 ¶ 128; 27 at 46). But, in the *Henyard* AEDPA decision, the Eleventh Circuit affirmed the district court's denial of habeas relief based on an ineffective mitigation assistance claim under *Strickland*. *Henyard*, 459 F.3d at 1245. And, the language from *Ogle* (and *Francis*), which Morris points to, relates to the exhaustion versus procedural default of constitutional claims in state court, not AEDPA deferential review. (*Compare* Doc. # 27 at 46, *with Ogle*, 488 F.3d at 1369, *and Francis*, 720 F.2d at 1193). Because of these important distinctions, Morris's reliance on these Eleventh Circuit cases is misplaced.

Morris also refers to the ABA Guidelines and Alabama law to support his deficient performance arguments. (Docs. # 1 at 36, 53 ¶¶ 104, 139; 27 at 42). But, none of these authorities supports a conclusion that the circuit court's decision contained clearly established constitutional error under (d)(1).

To be sure, Morris is correct that, under Ala. Code § 13A-5-46(f), only "[o]ne more vote against the death penalty would have switched the jury's advisory verdict from one of death to one of life imprisonment without the possibility of parole." (Doc. # 1 at 53 ¶ 139). But, the question under (d)(1) is whether the Alabama courts committed extreme constitutional error by rejecting Morris's prejudice allegations as inadequate to undermine the confidence in the jury's 10 to 2 vote.

*Cf. Shinn*, 141 S. Ct. at 526 ("[B]ecause the facts in each capital sentencing case are unique, the weighing of aggravating and mitigating evidence in a prior published decision is unlikely to provide clear guidance about how a state court would weigh the evidence in a later case."). Here, Morris has not carried his (d)(1) burden based on the cases he has cited.

Likewise, Morris's references to *Hodges v. State*, 147 So. 3d 916, 963 (Ala. Crim. App. 2007), *rev'd on other grounds sub nom. Ex parte Hodges*, 147 So. 3d 973 (Ala. 2011), and *Ex parte Land*, 775 So. 2d 847, 853-54 (Ala. 2000), *overruled on other grounds by State v. Martin*, 69 So. 3d 94 (Ala. 2011), do not directly address the problem Morris has here – reliance upon unnamed witnesses in a Rule 32 petition. (Doc. # 27 at 42). None of these authorities suggest that the Alabama courts unreasonably rejected Morris's allegations as inadequate.

Finally, although Morris makes a passing reference to a right to habeas relief under (d)(2) (Doc. # 1 at 55 ¶ 142), there was no Rule 32 evidentiary hearing on his *Strickland*'s allegations. Morris's citations to the trial transcript do not establish any unreasonable factual error. Simply stated, Morris has not met (e)(1)'s factual standard either to the extent that provision applies.

For example, Morris refers to an exchange between trial counsel and the trial court regarding a document entitled, "Defendant's Proposed Mitigating Circumstances." (Docs. # 15-24 at 46; 1 at 42-43 ¶ 116; 27 at 44-45). Trial counsel stated they "wanted [the trial court] to have [that document] to review [and] . . . consider" as part of the penalty phase. (Doc. # 15-24 at 46). The trial court clarified that trial counsel "would have to prove to the jury" the mitigating circumstances listed in the document. (*Id.* at 46-47). Trial counsel responded, "Right" and explained that the "inten[tion] [was] to give [the jury] a copy and [the trial court] a copy." (*Id.* at 47). The trial court reminded trial counsel that "to argue this to the jury," they would "have to have

293

evidence to support" those factors. (*Id.* at 47). Trial counsel elected to withdraw the document. (*Id.*).

That trial counsel did not have an expert witness to support the factor of Morris's "[in]ability to appreciate the criminality of his conduct or to conform his conduct to the requirements of [the] law," does not establish that they prematurely ended the mitigation investigation nor that the state courts unreasonably rejected this subclaim. (Doc. # 15-24 at 46). The same observation is true about Morris's vague reference to a witness who was available to testify about Morris's "ability to adapt to prison life." (Doc. # 15-24 at 46). Although Morris generally speculated that other penalty-phase witnesses were available, he did not identify who those witnesses were or allege why their testimony was important in the penalty phase.[14]

For all these reasons, Morris's (d)(2) arguments in support of his mitigation subclaim lack merit.

### 14. Penalty-Phase Subclaim D.1.b—Trial counsel should have objected to the jury instructions.

On collateral review, Morris argued that trial counsel provided ineffective assistance by not objecting to three issues with the trial court's jury instructions on aggravating and mitigating circumstances. (Docs. # 15-56 at 99-100 ¶ 85; 15-62 at 58-59). According to Morris, trial counsel should have required the trial court to clarify in the jury instructions that an aggravating finding requires unanimity, that a mitigating finding requires no unanimity, and that an equal-weight finding requires a recommended life sentence. (Doc. # 15-56 at 100 ¶ 85).

---

[14] Again, regarding the "testimony of family members" the court has explained already that Morris's sisters' inability to testify in the penalty phase does not mean that trial counsel conducted an incompetent investigation or that the state courts committed extreme constitutional error. (Doc. # 15-24 at 46).

The circuit court rejected these allegations under both *Strickland* prongs. (Doc. # 15-56 at 36 ¶ 76). As for deficient performance, the circuit court noted that "Morris [had] fail[ed] to plead any facts or cite any authority for his contentions that the trial court's instructions were improper" or that trial counsel had a valid basis to object to them. (Doc. # 15-56 at 36 ¶ 76). As to the second prong, the trial court found that Morris did not allege facts establishing "how he was prejudiced" by trial counsel's performance. (Doc. # 15-56 at 36 ¶ 76).

Morris relies on cases that he cited in support of another claim, including *Ring*, *Richardson*, *Mills*, *McKoy*, *Bryant*, and *McNabb*. (Docs. # 1 at 55-57 ¶¶ 144-45, 147-48; 27 at 47-49). As the court has already explained, these authorities do not detach AEDPA deference from Morris's independent habeas claim based on the same alleged problems with the trial court's penalty-phase instructions. And, consistent with that prior analysis, the court concludes these decisions are inadequate to show that the circuit court's rejection of Morris's deficient performance allegations suffered from clearly established constitutional error under (d)(1).

Again citing *McNabb*, Morris argues in this subclaim that if his trial counsel had objected to the penalty-phase instructions at trial he would have prevailed on direct appeal. (Doc. # 27 at 48); *see also McNabb*, 887 So. 2d at 1004 (distinguishing plain-error review from "error reversible only by a proper objection"). But, Morris misunderstands *McNabb*. Specifically, had the entire context of the penalty-phase instructions created concern about the fairness of the sentencing proceedings – as was the situation in *Bryant* – then the appellant in *McNabb* could have obtained a reversal on direct appeal, even in the absence of an objection. *McNabb*, 887 So. 2d at 1004. Put another way, the Alabama Supreme Court did not hold in *McNabb* that an appellant forfeits or waives a constitutional right to a fair sentencing process merely because trial counsel failed to

295

challenge the trial court's penalty-phase instructions.

Morris has also cited cases in connection with this contention that he did not rely on in his Claim M arguments. One of those decisions is *Strickland*. (Doc. # 1 at 57-58 ¶¶ 147-48). The Supreme Court's contextual holding in *Strickland* relates ineffective mitigation assistance in the penalty phase, rather than unchallenged jury instructions. Thus, *Strickland* does not support Morris's argument that there was extreme constitutional error in the circuit court's rejection of Morris's jury-charge subclaim.

The other cases Morris cites in support of his argument are *Bey v. Superintendent Greene SCI*, 856 F.3d 230 (3d Cir. 2017), *Jones v. Zatecky*, 917 F.3d 578 (7th Cir. 2019), *Ogle*, and *Taylor*. (Doc. # 27 at 47-49 & n.20).

Morris argues that, in *Bey*, habeas relief was found appropriate under AEDPA even though trial counsel failed to object to a jury instruction that was "not specifically prohibited" under state law. (Doc. # 27 at 47) (internal quotation marks omitted); *Bey*, 856 F.3d at 239. Actually, a closer look at *Bey* reveals that the Third Circuit reviewed the *Strickland* claim de novo after excusing the petitioner's procedural default. *See Bey*, 856 F.3d at 236 (explaining habeas circumstances which support AEDPA versus de novo review); *see also id.* at 244 ("Because [the petitioner] has shown cause and prejudice to overcome his procedural default, we now consider the merits of his claim."). Without applying any deference given to the *Strickland* analysis in the state court, the *Bey* court determined that "the trial court's deviation from the language [required under state law] was so problematic that any alert defense counsel should have immediately known that it raised serious constitutional issues." *Id.* at 239. So, not only is the *Bey* decision not binding here – *i.e.*, not one of the Supreme Court, the Eleventh Circuit, or the Alabama Supreme Court – it is also

distinguishable and lends no assistance to Morris in meeting his (d)(1) burden. Further, the problematic jury instruction in *Bey* involved eyewitness testimony, not any penalty-phase consideration. *See id.* ("Jurors were basically told that they had to accept the only eyewitness identification of the defendant as fact; they were not free to question it if they found Officer Taylor had a good opportunity to observe and was certain of his identification.").

*Zatecky* is not binding and, in any event, of no help to Morris. There, an AEDPA petitioner demonstrated extreme constitutional error and obtained habeas relief, but his underlying *Strickland* claim involved an added criminal charge. *Zatecky*, 917 F.3d at 582. Specifically, trial counsel failed to object to the state's untimely addition of "a new and highly consequential charge of criminal confinement" to an indictment. *Id.* at 580. In detaching AEDPA deference, the Seventh Circuit "conclude[d] that this was one of those rare cases in which counsel's performance fell below the constitutional minimum, and that the [state] appellate court's conclusion otherwise was an unreasonable application of Supreme Court precedent." *Id.* at 582 (internal quotation marks omitted). *Zatecky* dealt with a completely different set of facts.

The Eleventh Circuit addressed several *Strickland* claims in *Ogle*, but none of those were related to improper jury instructions. *See Ogle*, 488 F.3d at 1367-68 (listing petitioner's ineffectiveness claims). Moreover, the language Morris relies on from *Ogle* relates to the exhaustion of constitutional claims in state court, not AEDPA deferential review. (*Compare* Doc. # 27 at 49 n.2, *with Ogle*, 488 F.3d at 1369). Thus, *Ogle* misses the (d)(1) target.

Similarly, *Taylor* simply did not involve any analysis of a *Strickland* claim based on penalty-phase jury instructions. *See Taylor*, 10 So. 3d at 1077 ("grant[ing] certiorari review . . . [to determine] whether a determination on direct appeal that there was no plain error in the trial

297

proceedings necessarily forecloses a determination of the prejudice required under *Strickland* . . . for a claim of ineffective assistance of counsel raised in a postconviction proceeding"). For the reasons discussed in guilt-phase subclaim D.2.a, *Taylor* is inapplicable to the analysis of deficient performance. Consequently, even accepting that the circuit court violated *Taylor*'s holding with respect to its evaluation of prejudice (Doc. # 27 at 48) (and, to be clear, that is not the case here), the state circuit court's summary dismissal of Morris's deficient performance allegations and that court's determination of *Strickland*'s first prong is entitled to AEDPA deference.

Finally, the court rejects as undeveloped and unproven Morris's contention that he meets AEDPA's (d)(2) standard. (Doc. # 1 at 58 ¶ 148). Morris has not pointed to any evidence in the state court record that suggests that the Alabama courts based their decision to deny this subclaim on any unreasonable factual determination.

### 15. Penalty-Phase Subclaim D.1.c—Trial counsel should have challenged the counting of aggravating circumstances.

On postconviction review, Morris argued that his trial counsel should have objected to counting his convictions of robbery and burglary twice in aggravation. (Docs. # 15-56 at 99-100 ¶¶ 84-85; 15-62 at 58-59). The circuit court summarily dismissed this subclaim based on pleading inadequacies. (Doc. # 15-56 at 36-37 ¶¶ 74-75, 77).

As to deficient performance, the circuit court noted that Morris had "fail[ed] to plead what specific objection or argument his trial counsel was unreasonable [in] not making." (Doc. # 15-56 at 36 ¶ 75). The circuit court also identified a material issue deficiency, and explained that the "Alabama courts ha[d] rejected the precise issue" raised in Morris's petition, which made the subclaim "meritless." (Doc. # 15-56 at 36 ¶ 77). The circuit court also found also that Morris had not stated that "specific facts showing how he was prejudiced by" trial counsel's inaction. (Doc. #

15-56 at 36 ¶ 75).

In analyzing Claim N, the court considered the ACCA's decision in *Powell*, which Morris contends satisfies his (d)(1) burden under AEDPA here. (Docs. # 1 at 58 ¶ 150; 27 at 49-50). But no reading of *Powell* persuades this court that the circuit court rejected Morris's allegations of deficient performance in a manner contrary to or unreasonably under Supreme Court precedent.

Morris also cites *Strickland* and *Taylor*. (Docs. # 1 at 59 ¶ 151; 27 at 50). But, as discussed above, a constitutional evaluation of robbery and burglary as separate aggravating circumstances is not an issue analyzed in either decision. Additionally, even to the extent that *Taylor* triggers some constitutional concern about the circuit court's assessment of Morris's prejudice allegations (and, to be clear, it does not), AEDPA deference remains firmly attached to the circuit court's deficient performance analysis.[15]

Finally, Morris makes a passing reference to a (d)(2) (or (e)(1), if applicable) factual claim for habeas relief. (Doc. # 1 at 50 ¶ 152). But, he has not developed or proven that claim.

### 16.   Cumulative Subclaim D.3—Trial counsel's cumulative errors violated *Strickland*.

Morris next argues that the cumulative effect of trial counsel's errors established ineffective assistance even if, individually, he has not shown a Sixth Amendment violation. (Docs. # 15-57 at 6-8 ¶¶ 113-17; 15-62 at 72-75). The state circuit court summarily dismissed this subclaim because "Morris fail[ed] to plead any specific facts concerning . . . [trial] counsel's deficiencies or the way in which counsel's performance [had] prejudiced [him]." (Doc. # 15-56 at

---

[15] Although Morris references *Blockburger v. United States*, 284 U.S. 299 (1932) (Doc. # 27 at 50), that is unrelated to his (d)(1) argument. Indeed, Morris clarifies that he is not raising a double jeopardy issue based on *Blockburger* in this subclaim. (Doc. # 27 at 50).

48).

To meet his AEDPA (d)(1) burden on this subclaim, Morris cites these cases: *Strickland*; *Evitts v. Lucey*, 469 U.S. 387 (1985); *Williams*, *Dobbs v. Zant*, 506 U.S. 357 (1993); *United States v. Cronic*, 466 U.S. 648 (1984); and *Daniel*. (Docs. # 1 at 81-82 ¶¶ 212-13; 27 at 66). As discussed below, none of these decisions support Morris's argument that there is clearly established constitutional error by the state courts.

As the *Strickland* Court acknowledged, "it is not enough for the defendant to [merely] show that the errors had some conceivable effect on the outcome of the proceeding." 466 U.S. at 694; *see also id.* ("Even if a defendant shows that particular errors of counsel were unreasonable, therefore, the defendant must show that they actually had an adverse effect on the defense."). To be sure, Morris must show cause (*i.e.*, that his attorney performed below the minimum standard expected of defense counsel) and prejudice (his counsel's error made a difference in the outcome of an important part or issue in the proceeding). Suffice it to say that the *Strickland* Court's holding simply does not support Morris's subclaim under (d)(1).

In *Cronic*, the Supreme Court referred to, but did not analyze, an ineffective assistance claim under the *Strickland* framework. *See Cronic*, 466 U.S. at 657 n.20 (describing a *Strickland* claim and noting that "[s]ince this type of claim was not passed upon by the Court of Appeals, [the Court would] . . . not consider it here"). The Sixth Amendment claim that the *Cronic* Court reviewed and rejected was based on "circumstances surrounding the representation of respondent [which in the view of the Tenth Circuit] mandated an inference that counsel was unable to discharge his duties." *Id.* at 658. *Chronic* lends no aid to Morris here.

Neither *Evitts*, *Williams*, nor *Dobbs* addressed a cumulative error claim. *See Evitts*, 469 U.S. at 392 ("The question presented in this case is whether the appellate-level right to counsel also comprehends the right to effective assistance of counsel."); *Williams*, 529 U.S. at 399 ("[T]he entire postconviction record, viewed as a whole and cumulative of mitigation evidence presented originally, raised 'a reasonable probability that the result of the sentencing proceeding would have been different' if competent counsel had presented and explained the significance of all the available evidence."); *Dobbs*, 506 U.S. at 358 (concluding that law-of-the-case doctrine did not preclude revisiting *Strickland* habeas claim in light of an uncovered sentencing transcript, which flatly contradicted hearing testimony that supported prior denial).

In *Daniel*, the Eleventh Circuit faulted the ACCA for "br[eaking] up [the] penalty phase ineffective assistance of counsel claim into different subparts[] [and] then analyz[ing] them separately." *Daniel*, 822 F.3d at 1278. As our Circuit explained, the ACCA's divided approach was an unreasonable application of *Strickland* prejudice because the ACCA "never considered what would be the combined effect of all mitigating evidence in producing a different outcome at sentencing." *Id.* The uncombined allegations related to prejudice included "child abuse, sexual abuse, borderline intellectual disability, [the petitioner's] mother's murder of his father, poverty, depression, and other undiscovered and unpresented mitigating evidence." *Id.*

However, before discussing *Strickland* prejudice, the *Daniel* court determined that the ACCA had unreasonably rejected the petitioner's allegations of deficient performance for lack of specificity. Nowhere in *Daniel* did the court suggest that inadequately pled allegations could be combined to state a valid ineffective assistance claim under *Strickland*. (Compare Doc. # 1 at 81 ¶ 212) ("Even assuming for sake of argument that each such failure was not, on its own, sufficient

to warrant relief, the cumulative effect of all of those failures also constitutes ineffective assistance of counsel"). It follows that *Daniel* does not help Morris meet his AEDPA (d)(1) burden.

Finally, although Morris refers to (d)(2), he has neither developed any argument based on that subsection nor has he proven any right to habeas relief under that factual standard based on this subclaim.[16] (Doc. # 1 at 82 ¶ 212).

### 17. Morris cannot obtain habeas relief based upon his remaining allegations in Claim D.

*Strickland*'s holding is plainly based on the Sixth Amendment's right to counsel. Nevertheless, throughout Claim D, Morris alleges that he is entitled to habeas relief under the Fifth, Sixth, Eighth, and Fourteenth Amendments. As noted in other sections, Morris's reliance on the Fourteenth Amendment here is understandable in relation to the incorporation doctrine. But, Morris has not developed a freestanding basis for relief under the Fourteenth Amendment. The same is true for Morris's references to his rights under the Fifth, Sixth, and Eighth Amendments. Thus, to the extent Morris exhausted these remaining allegations in state court, this court denies them as abandoned, deficiently pled, undeveloped, and unproven.

For all these reasons, Morris is not entitled to relief in connection with Claim D.

### Q. Claim Q—Morris has not demonstrated a right to habeas relief based upon the cumulative effects of all alleged constitutional errors.

Morris asserts that the cumulative effects of constitutional errors on direct and collateral review afford him habeas relief. (Doc. # 1 at 126-27 ¶ 320) (citing *Chambers v. Mississippi*, 410 U.S. 284, 298 (1973); *Conklin v. Schofield*, 366 F.3d 1191, 1210 (11th Cir. 2004)); (Doc. # 27 at 87). Respondent contends that AEDPA precludes habeas relief on the portion of this claim tied

---

[16] Similarly, Morris has not developed any argument (or otherwise shown he is entitled to relief) under (e)(1).

to Morris's allegations of cumulative error on direct review. (Doc. # 21 at 41-42 ¶ 112). And, as to the alleged errors in the Rule 32 collateral proceedings, Respondent argues either Rule 28(a)(10) or Rule 32.6(b) bars Morris's claims for relief. (Doc. # 21 at 42 ¶ 113). As explained below, regardless of whether AEDPA deference applies to the ACCA's analysis on direct appeal, Morris is not entitled to habeas relief.

### 1. State-barred procedural default under Rule 28(a)(10) precludes habeas relief on the Rule 32 part of this cumulative claim.

Morris has developed no Rule 28(a) argument and he has cited no case law to support a cumulative-effects claim. (Doc. # 15-62 at 91). Instead, Morris has only stated that "[t]he cumulative effect of the errors of state and federal law alleged in this brief and in [the] Rule 32 petition violate[d] . . . [his] rights to due process and a fair trial protected by the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and Alabama law." (Doc. # 15-62 at 91). As a result, Morris may not rely on the cumulative effect of any alleged constitutional errors on collateral review to support this habeas claim.

### 2. Regardless of whether AEDPA deference precludes habeas relief on the direct appeal portion of this cumulative claim, Morris has not established a constitutional violation even under de novo review.

On direct appeal, Morris asserted a similar cumulative effect claim in which he alleged combined alleged errors of state and federal law. (*See* Doc. # 15-52 at 133) ("Individually and cumulatively, the state-law and federal-law errors described above violated . . . Morris's rights (1) to due process and a fair trial under Alabama state law, and (2) under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the U[nited] S[tates] Constitution."). But, Morris cited no cases to support this appellate claim. (Doc. # 15-52 at 133).

Citing Alabama case law and applying the plain-error standard under Rule 45A, the ACCA denied this claim. *Morris Direct II*, 60 So. 3d at 383-84; *see id.* at 383 ("review[ing] the record and the errors previously discussed, there is no indication that they affected Morris's substantial rights at trial"). The ACCA did not engage in any federal analysis. Consequently, whether AEDPA deference attached to the federal portion of this direct appeal claim is, at best, debatable. *Romine*, 253 F.3d at 1365. But, as with Claim B, the court need not resolve this AEDPA issue because Morris lacks even a de novo basis for habeas relief.

In advancing this habeas claim, Morris relies on *Chambers* and *Conklin*. Neither case helps Morris here, even when this court reviews the issue de novo.

The petitioner in *Chambers* argued that "the application of [Mississippi's] evidentiary rules rendered his trial fundamentally unfair and deprived him of due process of law." 410 U.S. at 289-90. The trial court's evidentiary rulings had precluded the petitioner from presenting evidence to the jury that another person "had repeatedly confessed" to the murder, including in a sworn statement (which the witness later repudiated at a preliminary hearing). *Chambers*, 410 U.S. at 288-89. The Supreme Court held that the trial court's exclusion of the confessions as hearsay and its "refusal to permit [the petitioner] to cross-examine [the witness], denied [the petitioner] a trial in accord with traditional and fundamental standards of due process." 410 U.S. at 302. As the Court explained, the *Chambers* petitioner's federal claim "rest[ed] on the cumulative effect of [the trial court's evidentiary] rulings in frustrating his efforts to develop an exculpatory defense." *Id.* at 290 n.3.

But, unlike Morris, the petitioner in *Chambers* "objected to each ruling individually" at the trial level. *Id.* Under those circumstances, the Supreme Court recognized that "the cumulative

impact of the rulings—could not have been raised and ruled upon prior to the conclusion of [the petitioner's] evidentiary presentation." *Id.* In contrast, here, Morris's direct appeal consisted of mostly claims reviewed for plain error, and his *Atkins* claim was the only one he developed at trial. The Supreme Court's holding in *Chambers* simply does not encompass a Fourteenth Amendment cumulative-effects claim based on alleged error that was clearly undeveloped at trial. Nor has Morris cited a decision in which the Supreme Court has recognized that errors raised for the first time on appeal can support a cumulative-effects claim under the Fourteenth Amendment.

In the pre-AEDPA *Conklin* decision, the Eleventh Circuit affirmed the district court's denial of the petitioner's cumulative-effects claim. 366 F.3d at 1199, 1210. The collective errors included the trial court's refusal to continue the trial date twice and the denial of three requests for expert funding. *Id.* at 1202 n.9, 1198. Although the Eleventh Circuit stated it could not "understand why a trial judge would refuse to grant a short continuance and afford a first-degree murder defendant $2,500 of available state funds to hire an expert crucial to his defense." *Id.* at 1210. Nevertheless, the Eleventh Circuit "c[ould] [not] say that [the petitioner]'s trial, as a whole, was fundamentally unfair and outside of the bounds of the Constitution." *Id.*

Again, unlike Morris, the petitioner in *Conklin* laid the groundwork for his cumulative-effects claim at the trial level. The *Conklin* decision does not indicate that a petitioner may support a Fourteenth Amendment cumulative-effects claim with alleged errors that a trial court never had the opportunity to cure. Thus, the *Conklin* holding does not support Morris's constitutional claim here.

Morris has not come close to demonstrating that, even under de novo review, that he is entitled to prevail on his free-standing Fourteenth Amendment claim based on the ACCA's alleged

cumulative errors on direct appeal. And, to the extent that Morris maintains that the ACCA's collective errors violated his rights under the Fifth, Sixth, or Eighth Amendment, the court rejects that position as abandoned, undeveloped, and unproven on habeas review.

For each of these reasons, Claim Q is due to be denied.

## IV.    REMAINING REQUESTS

As noted previously, Morris seeks an evidentiary hearing and to conduct discovery on his habeas claims. (*See* Doc. 1 at 127 § IV.b-c) (seeking the right to conduct discovery, serve subpoenas, and present new evidence at an evidentiary hearing); *see generally* Docs. # 28, 31-1; *see also* Doc. # 1 at 12 ¶ 42 (explaining that the circuit court denied Rule 32 relief "without ever conducting an evidentiary hearing [or] addressing . . . Morris's pending motions for discovery and for funds for experts."). Rule 8(a) of the *Rules Governing Section 2254 Cases* provides that "[i]f the petition is not dismissed, the judge must review the answer, any transcripts and records of state-court proceedings, and any materials submitted under Rule 7 to determine whether an evidentiary hearing is warranted." Rule 7 allows a habeas court to "direct the parties to expand the record by submitting additional materials relating to the petition." Under Rule 6(a), a habeas court "may, for good cause, authorize a party to conduct discovery under the Federal Rules of Civil Procedure." "A party requesting discovery must provide reasons for the request." Rule 6(b), *Rules Governing Section 2254 Cases*.

As the Eleventh Circuit has clarified, "[i]f . . . the petitioner was diligent [in state court], 'a federal court must consider whether [an evidentiary] hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief.'" *Ledford v. Warden, Ga. Diagnostic Prison*, 975 F.3d 1145, 1163 (11th Cir. 2020)

306

(quoting *Schriro*, 550 U.S. at 474). A non-diligent petitioner "must satisfy the conditions of § 2254(e)(2)" to obtain an evidentiary hearing. *Id.* The Eleventh Circuit has also explained that an abuse of discretion standard applies when a district court denies an evidentiary hearing on a procedurally defaulted claim. *Id.*

Even in a case where a panel of the Eleventh Circuit assumed that the petitioner had "exercise[d] appropriate diligence" in state court, it upheld the district court's denial of a habeas hearing because the record "either refuted" his habeas allegations or his allegations "d[id] not demonstrate" ineffective guilt-phase assistance. *Martinez*, 684 F. App'x at 926. As the *Martinez* panel also clarified, "'[b]ecause the deferential standards prescribed by § 2254 control whether to grant habeas relief, a federal court must take into account those standards in deciding whether an evidentiary hearing is appropriate.'" 648 F. App'x at 926 (quoting *Boyd*, 592 F.3d at 1304, in turn quoting *Schriro*, 550 U.S. at 474); *see also Cullen*, 563 U.S. at 182, 184 ("[l]imiting § 2254(d)(1) review to the state-court record" and precluding "evidence later introduced in federal court [a]s irrelevant" to the habeas analysis).

Here, the court easily concludes that Morris has failed to demonstrate AEDPA error under (d)(1) or (d)(2) and there is no support for his petition. Consequently, discovery and an evidentiary hearing are unwarranted. *See Martinez*, 648 F. App'x at 926 ("[T]he district court need not conduct an evidentiary hearing if the record refutes the petitioner's factual allegations, otherwise prevents habeas relief, or conclusively demonstrates that the petitioner was not denied effective assistance of counsel.") (citing *Schriro*, 550 U.S. at 474)).

## V.    CONCLUSION

For all these reasons, the Petition for Writ of Habeas Corpus By a Prisoner in State

Custody Under Death Sentence (Doc. # 1) is due to be denied or, alternatively, due to be dismissed. Rule 11(a) of the *Rules Governing Section 2254 Cases* requires the district court to issue or deny a certificate of appealability when it enters a final order adverse to the habeas applicant. This court may issue a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make such a showing, a "petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," *Slack v. McDaniel*, 529 U.S. 473, 484 (2000), or that "the issues presented were adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (internal quotation marks omitted). This court finds that Morris has not made a "substantial showing" under either of these standards. The court denies therefore a certificate of appealability on all his claims.

The court will enter a separate final judgment and order consistent with this opinion.

**DONE** and **ORDERED** this August 13, 2024.

**R. DAVID PROCTOR**
CHIEF U.S. DISTRICT JUDGE