## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **ALFONSO MORRIS, AIS #0000Z695,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **Case Number: 5:18-cv-1578-RDP** |
| | ) | |
| **PHILLIP MITCHELL, Warden of St.** | ) | |
| **Clair Correctional Facility,** | ) | |
| | ) | |
| **Respondent.** | ) | |

## MEMORANDUM OPINION

Petitioner Alfonso Morris is an Alabama state prisoner who has been convicted of capital murder and sentenced to death. In this court, Morris, through counsel, sought a writ of habeas corpus pursuant to 28 U.S.C. § 2254. (Doc. # 1). The court previously entered a memorandum opinion and an accompanying order of dismissal, denying Morris's claims for habeas relief and further denied him a certificate of appealability ("COA") under 28 U.S.C. § 2253(c)(2). (Docs. # 44, 45); *Morris v. Mitchell*, 2024 WL 3800386 (N.D. Ala. Aug. 13, 2024). The matter is now before the court on Morris's Motion to Alter or Amend the Judgment, pursuant to Fed. R. Civ. P. 59(e). (Doc. # 51). In his motion, Morris asks the court to reconsider its denial of both substantive relief and a COA. (Doc. # 51). For the reasons explained below, Morris's Rule 59 motion is due to be denied in its entirety.

## I.    REVIEW STANDARDS

Federal Rule of Civil Procedure 59(e) authorizes a party to file a motion to alter or amend a judgment no later than twenty-eight days after the entry of the judgment. Such a motion may be filed in a federal habeas corpus proceeding and is not barred as a "second or successive habeas corpus application" under 28 U.S.C. § 2244(b). *Banister v. Davis*, 590 U.S. 504, 507 (2020). Rule

59(e) "gives a district court the chance 'to rectify its own mistakes in the period immediately following' its decision. *Id.* (quoting *White v. N.H. Dep't of Emp. Sec.*, 455 U.S. 445, 450 (1982)). "In keeping with that corrective function, 'federal courts generally have [used] Rule 59(e) only' to 'reconsider[ ] matters properly encompassed in a decision on the merits.'" *Id.* (quoting *White*, 455 U.S. at 451). A Rule 59 motion "may not be used to relitigate old matters, or to raise arguments or present evidence that could have been raised prior to the entry of judgment." *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 485 n.5 (2008) (internal quotation marks omitted). Instead, "the only grounds for granting a Rule 59 motion are newly-discovered evidence or manifest errors of law or fact." *Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1344 (11th Cir. 2010) (emphasis added) (brackets and internal quotation marks omitted). Whether to grant relief is a decision committed to the discretion of the district court. *Am. Home Assur. Co. v. Glenn Estess & Assocs., Inc.*, 763 F.2d 1237, 1238–39 (11th Cir. 1985).

## II.     DISCUSSION

Morris's federal habeas petition raised some thirty-four claims for relief in total, seventeen of which alleged that his counsel was constitutionally ineffective. (*See* Docs. # 1; 44 at 3-8). His Rule 59 motion seeks reconsideration of three of his claims.[1] They are:

> (1)     a due process claim alleging that the state trial court improperly admitted evidence of what Morris argues was an unreliable, out-of-court "show-up" identification (*see* Docs. # 51 at 12-23; 44 at 3 (Claim A));
>
> (2)     a claim under the Sixth and Fourteenth Amendments alleging that the trial court improperly denied Morris's request to send the jury venire a questionnaire that allegedly included questions related to "racial bias screening" (*see* Docs. # 51 at 23-33; 44 at 2 (Claim B)); and

---

[1] Morris's Rule 59 motion also reserves for appeal each claim denied raised by his habeas petition and denied by the court's memorandum opinion and final order. (*See* Doc. # 51 at 10 n.1).

(3)     a claim alleging that Morris's trial attorneys were constitutionally ineffective because they inadequately investigated and presented mitigation evidence at the penalty phase of his trial (*see* Docs. # 51 at 33-49; 44 at 8 (Claim D(13))).

Morris's Rule 59 motion also takes issue with this court's denial of his claims without granting an evidentiary hearing.  (Doc. # 51 at 49-51).  The court discusses Morris's motion as it relates to each of the three contested claims for relief and his request for an evidentiary hearing below.

## A.     The *Biggers* Claim Based on the "Show-Up" Identification

Morris first asks the court to reconsider its denial of relief and a COA on his claim based on *Neil v. Biggers*, 409 U.S. 188 (1972).  The Supreme Court there recognized that the Due Process Clause of the Fourteenth Amendment may be violated by the admission at trial of a witness's prior, out-of-court identification that has been "tainted by police arrangement."  *Sexton v. Beaudreaux*, 585 U.S. 961, 965 (2018) (quoting *Perry v. New Hampshire*, 565 U.S. 228, 238 (2012)).  There are two prongs that must be satisfied before such an identification is due to be suppressed.  First, the identification procedure must be impermissibly suggestive and unnecessary.  *See Biggers*, 409 U.S. at 198; *Manson v. Brathwaite*, 432 U.S 98, 112-13 (1977); *Perry*, 565 U.S. at 238-39.  Second, improper police conduct must have also created a "substantial likelihood of misidentification."  *Boudreaux*, 585 U.S. at 966 (quoting *Biggers*, 409 U.S. at 201).  "'[R]eliability [of the eyewitness identification] is the linchpin' of that [latter] evaluation."  *Perry*, 565 U.S. at 239 (quoting *Brathwaite*, 432 U.S. at 114) (bracketed material supplied in *Perry*).  Specifically, courts are to assess "whether under the 'totality of the circumstances' the identification was reliable even though the confrontation procedure was suggestive."  *Brathwaite*, 432 U.S. at 106 (quoting *Biggers*, 409 U.S. at 199).  Factors in that analysis include: "[1] the opportunity of the witness to view the criminal at the time of the crime, [2] the witness' degree of attention, [3] the accuracy of his prior description of the criminal, [4] the level of certainty demonstrated at the confrontation,

3

and [5] the time between the crime and the confrontation." *Id.* at 114 (citing *Biggers*, 409 U.S. at 199-200).

Morris was tried three times based on the killing in this case.[2]  *See Morris v. State*, 60 So. 3d 326, 357-60 (Ala. Crim. App. 2010) ("*Morris Direct II*").  He raised a *Biggers* claim on direct appeal following his third trial.  *See id.*  That claim was based on the state trial court's admission of evidence stemming from what was acknowledged as a one-man "show-up" identification of Morris made by Juanita Patterson, a paramedic with the Birmingham Fire and Rescue Service. The Alabama Court of Criminal Appeals summarized the facts relevant to the claim as shown by the evidence generally, as follows, where it referred to Patterson as the "paramedic":

> [O]n February 24, 1997, Miriam Rochester, who was 85 years-old, used a walker, and weighed 92 pounds, was beaten to death in her home. Rochester had transformed her home into a duplex and had taken in a boarder, Elizabeth Russell, who was also elderly and in poor health. [That night, prior to Rochester's death, an emergency call was placed because Russell had become ill.] . . . .
>
> A rescue unit and fire engine arrived at the house at approximately 9:00 p.m. and [paramedics] were shown to Russell by Rochester. . . . After Russell was assessed and the ambulance called, the paramedic [who was the driver of the rescue unit, Patterson,] testified that she went outside to check on her truck. She testified that she saw someone "fooling around my rescue unit acting like he was looking in the windows, fooling with the doors." She then asked the person if there was a problem and if she could help him. The man, whom she identified in court as Morris, walked up to her and asked what was happening and who was sick; he insisted that he wanted to go inside the house. The paramedic testified that at one point Morris attempted to bypass her and enter the house, but she prevented him from doing so. He told her that "he lived in that area and he knew everybody and he had a right to go in there."

---

[2] Morris was first tried in April 2003.  That jury found him guilty of capital murder and recommended a sentence of death by a vote of 10 to 2, which the trial court imposed.  *Morris v. State*, 956 So. 2d 431, 433 (Ala. Crim. App. 2005) ("*Morris Direct I*").  On direct appeal, the Alabama Court of Criminal Appeals reversed, holding that the trial court had violated due process by denying Morris's request for funds to hire an independent mental health expert.  *See Morris Direct I*, 956 So. 2d at 435-51; *see also generally Ake v. Oklahoma*, 470 U.S. 68 (1985).  Morris was retried in April 2008, but that proceeding ended in a mistrial when the jury was unable to reach a verdict.  *See Morris Direct II*, 60 So. 3d 326, 336 (Ala. Crim. App. 2010).  Morris was tried a third time about a month later, in May 2008. That jury again convicted him of capital murder and recommended a sentence of death by a vote of 10 to 2, which the trial court again imposed.  *Id.*  The judgment entered following that third trial is the one for which Morris sought federal habeas relief.

Although Morris smelled strongly of alcohol, the paramedic testified that Morris understood what she was telling him and that his responses were appropriate. As the paramedic saw the rescue crew carrying Russell out to the ambulance, she also saw Morris finally turn and walk away. The paramedic thereafter stepped into the ambulance and through the opened back doors of the vehicle saw that Morris had returned. She informed her partner that Morris had been causing trouble previously, and her partner instructed him to leave. The paramedic testified that she saw Morris walk approximately half of a block away as the rescue crew left.

At approximately 10:00 p.m., Russell's son telephoned Rochester to update her on Russell's condition. He received a call from his brother about an hour later, informing him that the brother had been to Rochester's house at his mother's request and that the door was open and the house appeared to have been ransacked. Both of Russell's sons then went to the house and without entering determined that the house had been vandalized. They attempted to telephone Rochester and then telephoned the police.

The police and rescue units arrived around midnight, among them the same paramedic [Patterson] who had earlier cared for Russell. She testified that she originally believed that Russell was the deceased.  However, because of the number of police officers present, she determined that the death was not believed to be due to natural causes.  She informed the officers that she had been called to the house earlier on that night and that the house had not been in disarray. She also told them about Morris's presence and behavior. She did not know his name at that time but gave the officers his description.

The first officer who had arrived at the scene testified that there were "pry marks" on the door, indicating forced entry. He took a description from the paramedic of the man who had attempted to gain entry into the house and, after the scene was processed, he left at approximately 4:00 a.m. and resumed his patrol of the area. At approximately 5:00 a.m., he observed a man fitting the description of the person who had earlier attempted to enter Rochester's house. The man appeared to be intoxicated and was staggering down the middle of the street. The officer asked the man questions and he responded in a "slurred, but logical way."  The officer determined that it was not safe for the man to continue and arrested him for public intoxication. The officer identified Morris at trial as the man he had arrested. . . .

Before the officer left the scene of Morris's arrest, the paramedic was brought to that location to determine if she could identify him as the man she had seen earlier. The paramedic testified that she was certain that he was the man she had seen earlier at Rochester's house.

*Id*. at 336-37 (citations omitted).

In addressing the *Biggers* claim, the Alabama Court of Criminal Appeals supplemented the above with a summary of Patterson's testimony, as follows:

> The paramedic testified that, at approximately 9:00 p.m. during the initial emergency call, after she first began speaking with the man, he approached her on the walkway to the house. As they spoke, he attempted to walk around her, but she blocked him. At that time, they were standing "literally toe to toe." She estimated that their faces were less than 24 inches apart. After he had been instructed to leave and appeared to have done so, the paramedic again saw him when she had stepped down from the back of the ambulance. She testified that he was on the sidewalk within 10 feet of her when he was again instructed to leave. As to her ability to clearly see the man, she stated that there was lighting from the house, a street light, and lights from the fire and rescue vehicles called "scene lights." She also testified that "I'm fairly certain that it was a pretty good moon that night but it was very clear for me to be able to see him."
>
> After giving the police a description of the man and the clothes he was wearing during her second dispatch, which occurred around midnight, she was taken to the location where Morris was arrested for public intoxication, between 4:00 and 5:00 a.m., by police car. She was asked to view the man, but she testified that the officers "never said that it was the person or anything like that." She stated that "I looked at him and realized who he was, I knew who he was." She stated that she recognized him as the man she had confronted earlier, but that, out of an abundance of caution, she planned on requesting that the officers order him to speak. He began talking and "fussing" before she could do so, and she testified that "I knew when I saw him that it was him, but that was just a confirmation to me that it was him." The paramedic stated that she identified the man to the officers and told them that laceration on the man's forehead had not been there earlier. She again identified Morris at trial as the man that she had seen on those two occasions "without a doubt."

*Id.* at 357-58 (citations omitted).

The Alabama Court of Criminal Appeals recognized that Morris's claim based on Patterson's identification was governed by *Biggers* and Alabama caselaw applying it. *See id.* at 358-60. That court also assumed without deciding that the one-man, show-up was unduly suggestive and would thus meet the first prong of *Biggers*. *Id.* at 359. Nevertheless, the court concluded that the *Biggers* factors supported the reliability of Patterson's identification and that Morris's claim therefore failed, explaining as follows:

Here, even if the initial showup was unduly suggestive, the paramedic's testimony reveals that the circumstances surrounding her observing and hearing Morris support the reliability of her identification. She testified to the duration of the confrontation, her proximity to Morris during the confrontation, and the good lighting conditions. Her testimony clearly indicated a high degree of attention to him due to her role as a caregiver whose responsibilities, she testified, included protecting the equipment, especially in light of his aggressive and unruly behavior. She described Morris as approximately five feet and eight inches tall, medium build, dark complexion, and "not real clean shaven." She stated that he was wearing a baseball cap, a sateen jacket, and possibly a sweatshirt. She also described "what we would now call desert camo sand, the brown tones of the camouflage pants and tennis shoes." Further, her testimony confirms the certainty of this identification. Finally, all of these bases of her identification happened within approximately seven hours and were part of her single shift.

*Id.*

Morris reasserted his *Biggers* claim in his federal habeas petition. Because the Alabama courts adjudicated that claim on the merits, this court recognized that habeas relief is circumscribed by 28 U.S.C. § 2254(d). Under that statute, which is part of the Antiterrorism and Effective Death Penalty Act ("AEDPA"), where state courts have adjudicated a claim on the merits, federal habeas relief "shall not" be granted on the claim unless the state court's adjudication either:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The "contrary to" and "unreasonable application" clauses of § 2254(d)(1) articulate independent considerations a federal court must consider. *Smith v. Comm'r, Ala. Dep't of Corr.*, 924 F.3d 1330, 1336 (11th Cir. 2019) (citing *Maharaj v. Sec'y, Dep't of Corr.*, 432 F.3d 1292, 1308 (11th Cir. 2005)). The Eleventh Circuit has further explained:

A state court's determination is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court]

7

> on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Williams* [*v. Taylor*, 529 U.S. 362, 413 (2000)]. A state court's determination is "an unreasonable application" of clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* Reasonableness is objective, and a federal court may not issue a writ of habeas corpus simply because it concludes in its independent judgment that the state court was incorrect. *Id.* at 410.

*Smith*, 924 F.3d at 1336-37. "Instead, 'a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Mashburn v. Comm'r, Ala. Dep't of Corr.*, 80 F.4th 1292, 1299 (11th Cir. 2023) (quoting *White v. Woodall*, 572 U.S. 415, 419-20 (2014) (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011))).

A state court's findings of fact are presumed to be correct, and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." *Carruth v. Comm'r, Ala. Dep't of Corr.*, 93 F.4th 1338, 1353 (11th Cir. 2024) (quoting 28 U.S.C. § 2254(e)(1)). Again, a reviewing federal court "may not characterize … state-court factual determination as unreasonable 'merely because [it] would have reached a different conclusion in the first instance." *Brumfield v. Cain*, 576 U.S. 305, 314 (2015) (quoting *Wood v. Allen*, 558 U.S. 290, 301 (2010)). "If reasonable minds reviewing the record might disagree about the finding in question, on habeas review that does not suffice to supersede the [state] court's determination." (*Id.* (quoting *Rice v. Collins*, 546 U.S. 333, 341-42 (2006) (cleaned up)).

In its memorandum opinion, this court denied the *Biggers* claim, holding that habeas relief was barred because Morris had not established that the Alabama Court of Criminal Appeals' adjudication of the claim was contrary to, or involved an unreasonable application of, Supreme

Court precedent or was based on an unreasonable determination of the facts. (Doc. # 44 at 32-47). Acknowledging that the state appellate court had assumed that the one-man show-up procedure was unduly suggestive, this court concluded that the state court "did not reach an unreasonable result as to reliability." (*Id.* at 41). Indeed, this court recognized that it would reject the *Biggers* claim even under *de novo* review, which gives no deference to the state court's decision. (*Id.* at 47). As this court explained:

> Reviewing the ACCA decision under *Bigger*[*s*]'s totality-of-the-circumstances test reinforces (rather than detracts from) the reasonableness of the state appellate court's conclusion that Patterson's pretrial identification was reliable. Akin to the undercover officer in *Brathwaite*, Patterson as a paramedic, was trained to have attention to detail and had experience in emergency situations. Patterson saw Morris twice before Rochester's murder, described him to police within hours of the offense, and identified him in the single-suspect showup within twelve hours of their encounter on the sidewalk close to Rochester's home. Patterson's two observations of Morris before the murder included a close-up and "problem[atic]"' "toe-to-toe" exchange with him. Although Patterson saw Morris in the late evening, she stated that light from several sources aided in her ability to see him clearly both times. Patterson testified that she recognized Morris when she first saw him at the showup and that hearing his voice reinforced her certainty about her identification. Patterson described Morris to police—including his height, build, complexion, and clothing—roughly three hours after seeing him outside Patterson's house and identified him within six hours of that pre-identification report.

(*Id.* at 34 (citation omitted)).

Finally, this court recognized that, even assuming for the sake of argument that the admission of Patterson's identification might have violated due process, Morris might be entitled to habeas relief only if he was able to show that the violation had a "substantial and injurious effect or influence" on the jury's verdict under *Brecht v. Abrahamson*, 507 U.S. 619 (1993). (Doc. # 44 at 46-47). The court concluded that Morris could not make that showing given the strength of the other evidence connecting him to the murder, which included that (1) Morris was found in possession of the victim's jewelry, (2) blood matching the victim was found on Morris's shoe, and (3) Morris was a match to DNA found on an unsmoked cigarette recovered from inside Rochester's

house.  (*Id.* at 47).

Morris's Rule 59 motion seeks reconsideration of this court's denial of both habeas relief and a COA on his *Biggers* claim.  (Doc. # 51 at 12-23).  He argues that the one-man show-up identification was unduly suggestive and that the identification was unreliable.  Morris also challenges this court's determination that the admission of Patterson's identification was not prejudicial and he is not entitled to habeas relief.

### 1.    Suggestiveness of the Identification Procedure

Although he recognizes that both the Alabama Court of Criminal Appeals and this court assumed that the one-man show-up by which Patterson identified Morris was unduly suggestive, Morris starts by arguing at some length why that assumption was correct.  (*Id.* at 12-15; *see also* Doc. # 53 at 7-8).  However, both the state appellate court and this court rejected this claim while assuming that the "suggestiveness" element could be met.  Because Morris's Rule 59 motion can also be resolved while indulging that assumption, the court will not further consider the matter.

### 2.    Reliability Under the *Biggers* Factors

Morris argues that this court clearly erred in ruling that the Alabama Court of Criminal Appeals' holding that Patterson's identification was sufficiently reliable despite the suggestiveness of the procedure was not unreasonable under § 2254(d).  (Doc. # 51 at 15-21).  Morris's Rule 59 motion, however, largely rehash his arguments that he has made previously.

Morris's motion includes an introductory assertion that the state appellate court's conclusion that that Patterson's identification was sufficiently reliable under *Biggers* is based on an unreasonable determination of the facts.  (*Id*. at 15).  Morris bears the "burden . . . [of] showing by clear and convincing evidence that a particular state-court factual determination was wrong." *Pye v. Warden, Ga. Diagnostic Prison*, 50 F.4th 1025, 1035 (11th Cir. 2022) (en banc); *see also*

*Green v. Sec'y, Dep't of Corr.*, 28 F.4th 1089, 1145 (11th Cir. 2022). However, Morris does not identify any specific factual finding by the state court that he regards as having been decided unreasonably or why it was decided unreasonably. Accordingly, his Rule 59 motion fails to offer support that he is entitled to relief based on § 2254(d)(2).

Morris also argues that the state court's rejection of this claim involved an "unreasonable application" of clearly established Supreme Court caselaw under § 2254(d)(1).[3] (Doc. # 51 at 15). The Alabama Court of Criminal Appeals clearly identified *Biggers* as the governing Supreme Court authority. *See Morris Direct II*, 60 So. 3d at 358-59. Morris recognizes that the state court applied the five *Biggers* factors and found them to point to the reliability of Patterson's identification. He argues, however, that the state court's analysis of four of the five factors,[4] and its ultimate conclusion of reliability, amount to an unreasonable application of Supreme Court caselaw.

The relevant inquiry on habeas review is whether the Alabama Court of Criminal Appeals "could have reasonably concluded that . . ., 'under the "totality of the circumstances,"' [Patterson's identification was . . . 'reliable.'" *Beaudreaux*, 585 U.S. at 967 (quoting *Biggers*, 409 U.S. at 199). Morris, however, fails to show that the state appellate court applied Supreme Court precedent in a fashion that was even incorrect, much less objectively unreasonable under § 2254(d)(1). His Rule 59 motion does not identify any decision, from the Supreme Court or otherwise, holding, under facts materially similar to (or seemingly more supportive of reliability than those presented here)

---

[3] Morris does not contend that the Alabama Court of Criminal Appeals' rejection of his *Biggers* claim is "contrary to" any Supreme Court decision under § 2254(d)(1). Indeed, as recognized in *Beaudreaux*, 585 U.S. at 966, the Supreme Court has excluded an identification on the ground that it was unduly suggestive *and* unreliable only once, more than fifty-five years ago, in *Foster v. California*, 394 U.S. 440 (1969). This court's memorandum opinion explained why *Foster* is distinguishable (Doc. # 44 at 38), and Morris's Rule 59 motion does not take issue with that analysis or cite *Foster*.

[4] Morris's Rule 59 motion does not contest or discuss the "first" *Biggers* factor: "the opportunity of the witness to view the criminal at the time of the crime." 409 U.S. at 199.

either that: (1) that an identification had to be excluded as unreliable under *Biggers*; or (2) that a

state court's determination that an identification was sufficiently reliable under *Biggers* to be

admitted was unreasonable.  Instead, Morris continues to rely on cases that are inapposite because

they required exclusion of an identification where the totality of circumstances *very plainly*

exhibited *far* less reliability than Patterson's identification of Morris.  (*See, e.g.*, Doc. # 51 at 16

n.2 (citing *Raheem v. Kelly*, 257 F.3d 122 (2nd Cir. 2001)); *id.* at 20 n.4 (citing *Cossel v. Miller*,

229 F.3d 649 (7th Cir. 2000)).

In its memorandum opinion, the court rejected Morris's reliance on both *Cossel* and

*Raheem* as they were "non-binding" and they did "not persuade the court that he has met his

AEDPA burden."  (Doc. # 44 at 41).  The court also included extended parentheticals summarizing

the facts and holdings of these cases:

> *Cossel v. Miller*, 229 F.3d 649, 651, 655-56 (7th Cir. 2000) (reversing denial of a
> *Biggers*-based ineffective assistance claim under AEDPA based on a rape victim's
> unreliable in-court identification, including 'a ten-second window in which to view
> her assailant by the light of the moon and street light,' her conflicting 'pre[-]
> identification description,' an inability to identify her attacker in a photo array or
> single photograph, an inability to recognize her attacker's voice in a later lineup, and
> a six-year gap between the offense and the criminal trial); *Raheem v. Kelly*, 257 F.3d
> 122, 138 (2d Cir. 2001)) (reversing denial of a *Biggers* claim pre-AEDPA because
> of a suggestive lineup, in which only the suspect 'appeared in a black leather coat,'
> and circumstances that 'd[id] not suggest reliability independent of' that article of
> clothing); *see id.* (discounting the witnesses' degree of attention because they were
> 'chatting, drinking scotch, and watching a football game' leading up to the shooting
> and, after reviewing a photo array, misidentified a second 'gunman who had
> accosted them directly and taken their money and jewelry').

(*Id.*).  In his Rule 59 motion, Morris complains that this court's opinion did not "explain the basis

for the purported lack of persuasiveness" of either case.  (Doc. # 51 at 16 n.2; *id.* at 20 n.4).  The

court is perplexed. The detailed descriptions of the facts and holdings in *Cossell* and *Miller* make

it clear why the court found Morris's reliance on these cases to be misplaced.  But, because Morris

apparently did not draw the inference, the court will make the point crystal clear: The court regards

both *Cossel* and *Raheem* to be clearly and materially distinguishable from Morris's case on their facts.

What Morris's motion mostly does is to continue to quibble with the decision of the Alabama Court of Criminal Appeals, insisting that it should have found the *Biggers* factors to weigh in his favor. For example, Morris emphasizes that Patterson did not witness the crime, as did the rape victim in *Biggers* and that Patterson was not a professionally trained law enforcement officer, as in *Brathwaite*. Morris insists that Patterson's degree of attention during the initial encounter and the timing of her subsequent identification cannot support a finding of reliability. (Doc. # 51 at 16-17, 21). But, that is clearly not so. *See, e.g.*, *United States v. Burke*, 738 F.2d 1225, 1229 (11th Cir. 1984) (identification by waitress of defendant as man she had seen come into her restaurant months about two months earlier held reliable; court recognized that while the waitress "could not know that [the defendant] was a fugitive when he came [in]" but noted that she "was in his presence long enough for her to closely observe him" and that she "paid attention to [him] because he was one of the few customers in the restaurant"); *United States v. Baldwin*, 644 F.2d 381, 384-85 (5th Cir. 1981)[5] (where teller identified the defendant as a man who had come into her bank a few days before the robbery asking to see the manager, her identification six days later held reliable where she had "stood approximately three feet from [the man], devoting her full attention to him"); *Cronnon v. State of Alabama*, 587 F.2d 246, 248-50 (5th Cir. 1979) (identification reliable where witness claimed to have observed the defendant enter and exit convenience store, get in a car and drive down a nearby dirt road where murder victim found the next day; "It can be argued that [the witness] had no special reason for observing the then unknown male, but the fact remains that he did pay close attention to him"). It also should go without saying

---

[5] Decisions of the former Fifth Circuit rendered prior to the close of business on September 30, 1981, are binding precedent in the Eleventh Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (en banc).

that the time period between Patterson's identification and her prior interactions with the man outside the victim's house, which was only about six to seven hours, strongly favors reliability. *See, e.g., Brathwaite*, 432 U.S. at 115-16 (identification reliable where made "only two days" after the crime); *McGee v. Estelle*, 625 F.2d 1206, 1210 (5th Cir. 1980) (identification reliable where it occurred "only six weeks after the offense").

Morris also posits that the *Biggers* factor related to the "level of certainty demonstrated at the witness at the confrontation," 409 U.S. at 199, undercuts the reliability of Patterson's identification. (Doc. # 51 at 20). Specifically, he argues that "Ms. Patterson needed to hear Mr. Morris's voice *because* she was not entirely confident in her identification based on his physical appearance." (*Id.* (emphasis original)). But again, the Alabama Court of Criminal Appeals found that this factor supported reliability because Patterson's testimony was that, when police presented Morris at the show-up, she was, in fact, able to identify him immediately just by sight but that, just "out of an abundance of caution," she planned to ask to listen to his voice as well. *See Morris Direct II*, 60 So. 3d at 358. However, the state court recognized that before she could make such a request, Morris "began talking and 'fussing,'" which allowed Patterson to hear him and that was "just a confirmation" that Morris was the man she had seen earlier. *Id.* Morris does not challenge those findings with good reason – they are taken straight from the record. (*See* Doc. # 15-19 at 7). It is not unreasonable to construe such circumstances as supporting reliability under *Biggers*.[6] *See, e.g., Beaudreaux*, 585 U.S. at 967 (indicating that state court's determination that the identification was reliable was reasonable in part because the witness "demonstrated a high overall level of certainty in his identification," where he "chose [the defendant's] picture in both photo lineups, *and he was 'sure' about his identification once he saw Beaudreaux in person*" (emphasis added)).

---

[6] The single case that Morris cites in connection with the "level of certainty" *Biggers* factor is *Cossel*. (*See* Doc. # 51 & 20 & n.4). But the circumstances in *Cossel* relevant to that factor could not be more different. The victim

Morris also complains that Patterson's physical description to police offered "only general information about the individual's race, age, height, weight, and clothing, but no details about the suspect's face or features." (Doc. # 51 at 17). He also points out that Patterson told police that the man she saw at the scene was wearing a black jacket and a baseball cap, but when Morris was stopped a few hours later, he was wearing a red jacket with white stripes and no cap. (*Id.* at 18). And, Morris emphasizes that he and Patterson are of different races, which he says renders her identification less reliable. (*Id.* at 19). But these protests do not show that the Alabama Court of Criminal Appeals was *unreasonable* in holding that, under the *totality of the circumstances*, Patterson's identification exhibited sufficient reliability to pass due process muster. *See Beaudreaux*, 585 U.S. at 967 ("The state court could have reasonably concluded that [the petitioner] failed to prove that, under the totality of the circumstances, the identification was not reliable" despite that the witness admittedly "gave a vague initial description of the shooter"); *Williams v. Warden*, 814 F. App'x 477, 480 (11th Cir. 2020) (that the witness's initial description that burglar "wore a tan shirt, a black hat, and glasses" did not match the defendant's attire, "a white shirt and no hat or glasses," when stopped a few minutes later, was "insufficient to outweigh the remaining [*Biggers*] factors," especially where "other details [in the witness's] description – including the burglar's race, age, and physical build – were consistent with [the defendant's]

---

in *Cossel* was first asked to identify the defendant in a photo array over a year after she had been attacked, but she failed to recognize him. *Cossel*, 229 F.3d at 656. The defendant was later "singled out and presented to [the victim] as the police's favored suspect," but the victim again did not recognize him. *Id.* The victim did ultimately pick the defendant out of a lineup, but that only occurred three years after the attack, and the victim was still unable to recognize his voice. *Id.* Morris also cites *Cossel* to support that this *Biggers* factor "has little relevance" to his own case, on the theory that "the level of certainty a witness demonstrates is just as likely to be a product of a prior unduly suggestive identification as it is to be a product of an independent recollection of the crime." (Doc. # 51 at 20 (quoting 229 F.3d at 655-56 n.4)). It is not clear what Morris means by this. The cited principle might have applied in *Cossel* because even if the victim had expressed certainty about the challenged identification of the defendant, she had failed to recognize him in the two "prior … identification" attempts arranged by police. This principle has no application to Patterson's show-up identification here, however, because this was undisputedly her first attempt to identify Morris for police. Accordingly, Patterson's identification could not have been the "product of a prior unduly suggestive identification."

appearance").

Morris also argues that the state appellate court's rejection of the claim represents an unreasonable application of clearly established federal law based on considerations *apart from* the five *Biggers* factors. Specifically, Morris maintains that "Patterson's reliability is undermined by the absence of any corroborating identification" from the other paramedic who was working with Patterson at the scene. (Doc. # 51 at 21). However, the Supreme Court has never said that the reliability of one witness's identification might depend on whether it was corroborated by identification by another witness. (Doc. # 44 at 34). Indeed, Morris does not dispute that. Rather, he argues that other federal "courts assessing the reliability of an identification have examined corroborating evidence as relevant to the *Biggers* factors." (Doc. # 51 at 21 (citing *United States ex rel. Kosik v. Napoli*, 814 F.2d 1151 (7th Cir. 1987), and *Vasquez v. Poole*, 331 F. Supp. 2d 145 (E.D.N.Y. 2004)). "At the very least," Morris insists, the absence of a corroborating identification from Patterson's co-worker "is relevant under the 'totality of the circumstances'" and "cements [the] unreliability" of Patterson's identification. (*Id.*).

Morris's argument is flawed. For purposes of § 2254(d)(1), "clearly established Federal law" is only that "determined by the Supreme Court of the United States," not by lower federal courts. *See Renico v. Lett*, 559 U.S. 766, 779 (2010). Accordingly, even assuming such lower courts might have considered whether another witness's identification or other evidence of guilt corroborated the subject identification as a factor in assessing the reliability of the subject identification, those courts have no capacity to fix "clearly established Federal law" under § 2254(d)(1). *See id.* In any event, both cases Morris cites here *rejected* a *Biggers* claim on habeas review upon concluding that a state court's determination that an identification *was* sufficiently reliable was *not* an unreasonable application of clearly established Federal law. *See Kosik*, 814

16

F.2d at 1156-61; *Vasquez*, 331 F. Supp. 2d at 158-61.  Neither case held that a lack of corroborating extrinsic evidence might imply that an identification was unreliable.

The court further notes that all five factors enumerated in *Biggers* relate to the ability of the witness to have made an accurate identification, not to whether evidence extrinsic to the identification might have corroborated the identification or that the defendant was guilty of the crime.  *See Biggers*, 409 U.S. at 382-83; *see also Brathwaite*, 432 U.S. at 116 (characterizing the *Biggers* factors as "indicators of [the witness's] ability to make an accurate identification"). Indeed, the *Brathwaite* Court recognized that other evidence tending to support the defendant's guilt, namely, that he was arrested at the apartment where the crime had occurred and had acknowledged having been there frequently, "played no part in [its] analysis" of reliability under *Biggers*. 432 U.S. at 116; *see also id.* at 118 ("[I]n evaluating the admissibility of particular identification testimony it is sometimes difficult to put other evidence of guilt entirely to one side. [The majority] opinion for the Court carefully avoids this pitfall and correctly relies only on appropriate indicia of the reliability of the identification itself.") (Stevens, J., concurring). Accordingly, several federal courts of appeals have recognized that the better reading of *Biggers* and *Brathwaite* is that reliability depends on the totality of the circumstances related only to the witness's ability to make an accurate identification, not whether other evidence supports the defendant's guilt, even if that might also tend to support indirectly the correctness of the identification.  *See United States v. Green*, 704 F.3d 298, 310 (4th Cir. 2013); *Raheem v. Kelly*, 257 F.3d 122, 140-41 (2d Cir. 2001); *United States v. Rogers*, 126 F.3d 655, 659 (5th Cir. 1997); *United States v. Emanuele*, 51 F.3d 1123, 1128 (3d Cir. 1995); *but cf. Kennaugh v. Miller*, 289 F.3d 36, 47 (2d Cir. 2002) (suggesting in dicta that, given the absence of a definite pronouncement from the Supreme Court, a state court might act reasonably in considering other evidence of guilt

as part of the reliability analysis under *Biggers* and *Brathwaite*). Rather, the appropriate stage to consider the presence or absence of a corroborating identification from other witnesses or other extrinsic evidence of the defendant's guilt is when a court might assess whether any error in admitting an identification was harmless.[7] *See Green*, 704 F.3d at 310; *Raheem*, 257 F.3d at 140-41; *Rogers*, 126 F.3d at 659; *Emanuele*, 51 F.3d at 1128. Indeed, that is where the Eleventh Circuit has conducted such an analysis. *See, e.g., Blanco v. Singletary*, 943 F.2d 1477, 1509 (11th Cir. 1991); *Jones v. Kemp*, 794 F.2d 1536, 1540 (11th Cir. 1986); *Marsden v. Moore*, 847 F.2d 1536, 1546-47 (11th Cir. 1988). The Alabama Court of Criminal Appeals' determination that Patterson's identification is sufficiently reliable is not an unreasonable application of clearly established Supreme Court precedent on the theory that the determination is "undermined" by the lack of a corroborating identification from Patterson's co-worker, or otherwise.

### 3.    Substantial and Injurious Effect or Influence

Morris asks the court to reconsider its determination that the admission of Patterson's identification, even if violative of the Constitution, did not cause prejudice sufficient to authorize habeas relief. (Doc. # 51 at 22-23). Morris contends that consideration of the evidence of Patterson's identification was not harmless because: (1) there was "no direct evidence" against him; (2) he purportedly "refuted the indirect evidence" of guilt cited in the court's memorandum opinion, and (3) the state's remaining evidence of guilt is weak as shown by the hung jury in his second trial. (*Id*. at 23). Morris's arguments, however, do not merit reconsideration of the court's ruling.[8]

---

[7] Morris also argues in his Rule 59 motion that this court erred in holding that any potential error occasioned by the admission of Patterson's identification was harmless, *i.e.*, that it did not result in prejudice sufficient to authorize habeas relief. That claim is addressed below.

[8] The court reiterates that its denial of the *Biggers* claim did not depend on a determination that Morris failed to show the required prejudice. Although his claim does indeed fail on that separate basis, the court's prejudice analysis merely assumed for the sake of argument that the admission of the identification violated *Biggers*. But, as

Morris's *Biggers* claim is subject to harmless error review. *See Blanco*, 943 F.2d at 1509. For habeas relief to be granted, Morris would have to show that under *Brecht* the alleged error had a "substantial and injurious effect or influence" on the verdict. 507 U.S. at 631; *see also Fry v. Pliler*, 551 U.S. 112, 116-20 (2007) (affirming that the *Brecht* standard applies in § 2254 habeas cases after AEDPA, even if state courts did not review a constitutional error for harmlessness); *see also, e.g.*, *Williams v. Stewart*, 441 F.3d 1030, 1039 (9th Cir. 2006); *Satcher v. Pruett*, 126 F.3d 561, 567 (4th Cir. 1997); *Romanes v. Sec'y, Dep't of Corr.*, 621 F. Supp. 2d 1249, 1258 (M.D. Fla. 2008) (all applying the *Brecht* standard to habeas claims challenging witness identifications). The *Brecht* standard of harmless error imposes a higher burden on a habeas petitioner than does the standard for prejudice on direct appeal under *Chapman v. California*, 386 U.S. 18 (1967), which mandates relief for a constitutional trial error unless the government establishes that such was harmless beyond a reasonable doubt. *See Fry*, 551 U.S. at 116. "To show prejudice under *Brecht*, there must be more than a reasonable possibility that the error contributed to the conviction or sentence." *Mason v. Allen*, 605 F.3d 1114, 1123 (11th Cir. 2010). The inquiry into whether the erroneous admission of evidence had a substantial and injurious effect or influence on the verdict "is necessarily fact-specific and must be performed on a case-by-case basis." *Trepal v. Sec'y, Fla. Dep't of Corr.*, 684 F.3d 1088, 1114 (11th Cir. 2012).

Whether an evidentiary ruling is harmless in a particular case depends on a host of factors, including the importance of the subject evidence, whether it was cumulative, the presence or absence of corroborating or contradicting evidence, and the overall strength of the prosecution's case. *See Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986) (discussing factors used to assess

---

stated previously in the court's opinion, the claim also fails because the state appellate court's conclusion that Patterson's identification was sufficiently reliable to pass due process muster even assuming the show-up was suggestive is not unreasonable under AEDPA's highly deferential standard of review.

harmlessness of evidence admitted in violation of the Confrontation Clause of the Sixth Amendment); *Mansfield v. Sec'y, Dep't of Corr.*, 679 F.3d 1301, 1313 (11th Cir. 2012) ("[T]he erroneous admission of evidence is likely to be harmless under the *Brecht* standard where there is significant corroborating evidence or where other evidence of guilt is overwhelming." (citations omitted)); *see also Brecht*, 507 U.S. at 639 (holding that prosecution's improper references to the petitioner's post-*Miranda* silence did not have substantial and injurious effect because such references were "infrequent" and, "in effect, cumulative" of permissible references to pre-*Miranda* silence, and "the State's evidence of guilt was, if not overwhelming, certainly weighty" and "circumstantial evidence . . . also pointed to petitioner's guilt").

Patterson's identification was significant but not the linchpin of the State's case. Patterson did not claim, for example, to have seen Morris commit the murder or flee the scene. Instead, she identified Morris as a man she had merely seen outside the victim's house shortly after 9 p.m., sometime before the murder, which occurred between about 9:30 and 11:30 p.m. She further related that the individual smelled strongly of alcohol and was behaving strangely, and that she had stopped him from trying to enter the victim's house. Thus, Patterson's testimony constituted only circumstantial evidence placing Morris at the scene before, but generally around the time of the murder, and reported that he had tried to go inside the dwelling.

Morris emphasizes that the prosecution did not attempt to corroborate Patterson's identification with a second witness (for example, the other paramedic who was working at the scene with Patterson). (Doc. # 51 at 21). Even so, the fact that Morris was drunk and in the vicinity of the victim's house at the time Patterson says she saw him, around or shortly after 9 p.m., is, in fact, substantially corroborated by the testimony of Morris's own sister, Faye Morris ("Faye"). She testified that, at the time of the murder, she was living at 7005 Second Avenue South (Doc. #

15-23 at 42), less than two blocks from the victim's home at 6816 Second Avenue South.  Faye stated that she saw Morris at her house that night between about 8:30 and 8:45 p.m. and that he was drunk.  (*Id.* at 42-43).  That testimony was in conflict with Morris's own testimony that he did not see Faye that day or evening (*id.* at 29-30) and that, on the night of the murder, he had been at the house of a friend where he had been staying until sometime between 9:30 and 10:15 p.m.  (*Id.* at 8).  Faye's testimony supports that any potential error related to Patterson's identification is harmless.  *See Blanco*, 943 F.2d at 1509 (any error in admitting show-up identification was harmless beyond a reasonable doubt where such was cumulative to another witness's identification); *Marsden*, 847 F.2d at 1546 (improper identification of the petitioner was harmless where two other witnesses similarly identified petitioner as having been at the hospital on the day after the murder); *Landry v. State of Alabama*, 579 F.2d 353, 355 (5th Cir. 1978) (any error in admitting an identification was harmless beyond a reasonable doubt where other witnesses also identified petitioner as having been at the apartment where murder occurred at about the time of the crime).

Further, as stated in the court's memorandum opinion, the other evidence against Morris was "compelling."  (Doc. # 44 at 47).  Again, there was proof that: (1) around midnight, after the victim was found beaten to death inside her home, Patterson had provided to police a report and physical description of the man she had seen outside the victim's house, smelling of alcohol, around 9 p.m., (2) a police officer testified that, based on Patterson's report and description, he stopped Morris at about 5 a.m., staggering drunk in the middle of the street in the 7100 block of First Avenue North, only several blocks from the victim's home, and arrested him for public intoxication; (3) at that time, Morris was in possession of jewelry belonging to the victim, (4) there was blood on his shoe was a match to the victim, and (5) Morris's DNA was also a match to that

found on a cigarette recovered from inside the victim's house.

Morris argues that Patterson's identification was not harmless because he "refuted" the evidence regarding the victim's jewelry, the victim's blood on his shoe, and his DNA on the cigarette. (Doc. # 51 at 23). To be sure, Morris testified that he won the jewelry in a dice game on the night of the murder. He also claimed that, while he was detained by police outside in the morning, a small dog came up and rubbed on him, which he suggests was the victim's dog and that it must have transferred the victim's blood to Morris's shoe. Finally, Morris also said that the officer who arrested him that morning took a cigarette off of his person, which Morris says he believed was what the State had actually tested for his DNA. It is true that Morris told a story that, if credited, could conceivably explain some of the most damaging evidence against him. But to characterize Morris's own self-serving, uncorroborated, and at times purely speculative and implausible testimony as having "refuted" the State's case is wishful thinking.

Morris next contends that that Patterson's identification cannot be dismissed as harmless because the State's evidence is "circumstantial" rather than "direct." While there was admittedly no eyewitness to the murder, "it is a common tenet of modern American jurisprudence that indirect evidence (often called 'circumstantial' evidence) is not intrinsically less valuable or less reliable than direct evidence." *United States v. Register*, 182 F.3d 820, 830 (11th Cir. 1999); *see also Michalic v. Cleveland Tankers, Inc.*, 364 U.S. 325, 330 (1960) ("Circumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence."). Thus, an error may be harmless even if the remaining evidence of guilt is circumstantial, provided that it is sufficiently strong, as it is here. *See Miller v. Dugger*, 838 F.2d 1530, 1540-41 (11th Cir. 1988); *Zilka v. Estelle*, 529 F.2d 388, 392-93 (5th Cir. 1976); *see also Jones*, 794 F.2d at 1540 (even if victim's identification of the petitioner was tainted by the absence of defense counsel, any

error was harmless beyond a reasonable doubt where the petitioner "was found in possession of [the victim's] property a mere three hours after the robbery and offered no plausible explanation for this possession").

Morris also repeatedly emphasizes that his second trial ended in a hung jury, and insists this court did not give that proper account in considering prejudice.   (*See* Doc. # 51 at 9, 22, 23, 35, 48).  Indeed, Morris seems to take that mistrial as establishing that his case is necessarily such a close one that essentially any piece of evidence improperly admitted could have turned the tide and thus must be deemed to have had a substantial and injurious effect or influence on the verdict. The court disagrees.

The inability of a jury to reach a unanimous verdict in a prior trial may be relevant to whether an error resulted in prejudice authorizing habeas relief.  *See Christopher v. State of Florida*, 824 F.2d 836, 847 (11th Cir. 1987); *Clark v. Blackburn*, 632 F.2d 531, 535 n.3 (5th Cir. 1980).  That said, "while a prior hung jury may support a finding that an error committed with respect to a very close issue during a retrial is not harmless, it does not compel such a conclusion." *United States v. Newton*, 369 F.3d 659, 680 (2d Cir. 2004) (citations omitted); *cf. United States v. Harper*, 680 F.2d 731, 733 (11th Cir. 1982) (holding that the defendant convicted on charges related to three bank robberies failed to demonstrate "compelling prejudice" on claim that district court erred in denying separate trials for each robbery; while the court acknowledged that the jury hung in a prior trial on just one of the robberies, such did "not persuade [the court] that the jury in the second trial impermissibly cumulated the evidence" to find him guilty of all three).  As the Eleventh Circuit has explained, a "jury may not be able to reach a verdict for many reasons.  The different results reached by . . . two juries simply may reflect the honest, but differing, opinions of two groups of people, properly considering [the evidence] but making different credibility choices

concerning witnesses, etc." *Harper*, 680 F.2d at 733.  In fact, a "jury may hang [just because of] the idiosyncratic views of a single juror." *Newton*, 369 F.3d at 680 (quoted with approval in *Ford v. Wilson*, 747 F.3d 944, 954 (7th Cir. 2014); *Johnson v. Lamas*, 850 F.3d 119, 137 n.24 (3d Cir. 2017); and *Simon v. Epps*, 394 F. App'x 138, 150 (5th Cir. 2010)).  Thus, "[courts] need to be cautious 'in assigning critical significance to the failure of a different jury, which heard different evidence and argument, to reach agreement.'" *Ford*, 747 F.3d at 954 (quoting *United States v. Williams*, 212 F.3d 1305, 1311 n.10 (D.C. Cir. 2000)).  "As a result, only in close cases should the fact of a prior hung jury lead to a finding of prejudice." *Id.* (citing *Newton*, 369 F.3d at 680).

The transcript of Morris's second trial shows that, after the jury had been deliberating for less than four hours, the foreperson gave a message to the bailiff "that they were divided back there and there was one person that they weren't sure would ever change their mind."  (Doc. # 15-46 at 60).  The trial court then gave an *Allen*[9] charge, but a few hours later, the foreperson reported to the court, "We haven't budged," prompting the trial court to declare a mistrial.  (*Id.* at 64-65).  It might be assumed that the fact that the jury hung in Morris's second trial is worth *something* in the prejudice analysis, but in this context it does not amount to very much. Despite the mistrial, the evidence of Morris's factual guilt is objectively very strong.  Indeed, the jury in Morris's first and third trials came back with verdicts finding him guilty of capital murder after deliberating for less than an hour each.[10]  Further, the jury in the second trial also heard evidence of Patterson's identification. (*See* Doc. # 44 at 40 (citing Doc. #15-47 at 111, 113)). It appears likely from the record (*see* Doc. # 15-46 at 60 (foreperson reporting there is one person who may never change

---

[9] *See Allen v. United States*, 164 U.S. 492 (1896).

[10] The jury at Morris's first trial began deliberations at 10:04 a.m. on April 3, 2003, and returned with a guilty verdict at 11:03 a.m.  (Docs. # 15-7 at 201-02; 15-8 at 3-5).  At the third trial, the jury began deliberations at 4:25 p.m. on May 7, 2008; recessed at 5:00 p.m.; returned the next morning at 9:00 a.m.; and immediately informed the court that it had reached a verdict.  (Doc. # 15-24 at 38-39).

their mind)), that the jury in that trial hung just because of the "idiosyncratic views of a single juror." *Newton*, 369 F.3d at 680. Faye corroborated that Morris was drunk and less than two blocks from the victim's house just shortly before Patterson claims to have seen him at the victim's house smelling of alcohol. Given that evidence and the strength of the State's other evidence, the court again concludes that if there were any error related to Patterson's identification (and, to be sure, there was not), it did not have a substantial or injurious effect or influence on the verdict.[11]

## B.     Claim Based on the Denial of Morris's Proposed "Racial Bias Screening" Jury Questionnaire

Morris next asks this court to reconsider its denial of habeas relief and a COA on his claim asserting that the state trial court violated his constitutional rights by failing to ask potential jurors about their racial bias during *voir dire*. (Doc. # 51 at 23-33). However, after careful review, the court finds that this claim is even less meritorious than it appeared at first blush.

This claim is based on a motion that Morris filed in the state trial court in March 2007, before his second trial. (*See* Doc. # 15-15 at 150-62). There, Morris asked the court to mail a questionnaire to potential jurors along with the summons calling them to jury service, to be completed and mailed back to the court in advance of trial. Morris's motion stated it was based in part on various constitutional provisions, and it cited federal caselaw in support of the proposition that jury selection and *voir dire* procedures must be adequate to unearth "prejudice." (*Id.* at 150 (citing *Coleman v. Kemp*, 778 F.2d 1487 (11th Cir. 1985), and *Jordan v. Lippman*, 763 F.2d 1265

---

[11]As explained, Morris has argued that Patterson's identification was unreliable under *Biggers* based in part on the absence of a corroborating identification from Patterson's co-worker. As also discussed, however, several courts have recognized that, under *Biggers* and *Brathwaite*, the reliability of identification depends on circumstances related only to the witness's ability to have made an accurate identification, and not upon the presence or absence of extrinsic evidence of guilt. But to the extent that Morris has argued to the contrary, his claim that Patterson's identification was unreliable would be further refuted by the extrinsic evidence the court cites in support of its conclusion that any error in admitting Patterson's identification was harmless under *Brecht*, including Faye's corroborating identification and the prosecution's strong case otherwise. *See Kosik*, 814 F.2d at 1156 (reliability of identification under *Biggers* supported by corroborating identifications of other witness); *Vasquez*, 331 F. Supp. 2d at 161 (reliability of identification further supported by "corroborating evidence of guilt").

(11th Cir. 1985)).

Notably, however, Morris's motion itself did not reference juror bias based on *race* specifically; indeed, the motion did not mention race *at all*.  (*See id.* at 150-52).  Morris's motion did cite *Turner v. Murray*, 476 U.S. 28 (1986) (*see* Doc. # 15-15 at 151 ¶ 4), in which the Supreme Court recognized that, under the Sixth and Fourteenth Amendments, "a capital defendant accused of an interracial crime is entitled to have prospective jurors informed of the race of the victim and questioned on the issue of racial bias."  476 U.S. at 36-37.  The *Turner* Court had applied that principle to hold that a state trial court's refusal of the defendant's request to have the court advise during *voir dire* that the defendant was black and the victim white and to ask whether such circumstance would affect the jurors' ability to render an impartial verdict, required the reversal of the defendant's death sentence.  *Id.* at 37-38.  Morris's motion to send the questionnaire, however, did not say that *Turner* had anything to do with cases in which the defendant and victim were of different *races* or that the case related to *voir dire* into prejudice because of *race*.  Rather, Morris cited *Turner* only to support the more ambiguous proposition that "voir dire must be especially careful [in death penalty cases], and that the trial court's refusal to allow certain voir dire questions required reversal of the death sentence [in *Turner*]."  (Doc. # 15-15 at 151 ¶ 4).

Morris's motion also suggests that sending the questionnaire would minimize the likelihood of "*Batson* problems." (*Id.*).  Such is, of course, a shorthand reference to *Batson v. Kentucky*, 476 U.S. 79 (1986), the seminal Supreme Court decision prohibiting the use of peremptory strikes based on a venire member's race, which also happened to be handed down the same day as *Turner*.  *Batson* is well known to the bench and bar.  But unlike *Turner*, which relates to the racial bias of potential *jurors*, *Batson*'s focus is on the racial bias of *attorneys* in selecting jurors.  *See generally United States v. Greer*, 968 F.2d 433, 445 (5th Cir. 1992) ("Both lines of

cases mandate that racist views be eliminated from the jury selection process, both those of potential jurors and counsel deciding which prospective jurors to strike.").

Morris's motion also attached a copy of a proposed, seven-page questionnaire that included thirty-nine questions.  (Doc. # 15-15 at 154-60).  That document, however, did not reference the race of anyone in the case, nor did it propose to ask jurors about whether they held any racial bias. (*See id.*)  Rather, the questionnaire included only three questions that related to race at all, as follows:

4.  Your place of birth: _____  Age: ____ Race: _____

   ***

34.    Are most of the people you usually see in your neighborhood:

White____      Black____      Blacks and Whites____

   ***

38.    How often do people with whom you work make disparaging remarks about
       other racially [sic] groups?

___Very Often ___Often ___Occasionally ___Rarely ___Never ___ I don't know

(*Id.* at 154, 160-61).

On April 19, 2007, the trial court made a brief handwritten notation on the case action summary sheet denying Morris's motion to send the questionnaire, stating no reasons.  (*Id.* at 33). The trial court thereafter had to resolve an *Atkins*[12] claim by Morris, so the second trial did not commence until almost a year later, on April 7, 2008.  (*Id.* at 46).  At that time, the trial judge oversaw *voir dire*.  (Docs. # 15-47 at 126-201; 15-48 at 2-24).  He first asked some general questions and covered some basics about the case.  (Doc. # 15-47 at 126-61).  The trial judge

---

[12] *See Atkins v. Virginia*, 536 U.S. 304 (2002).

undisputedly did not, however, address anything about racial bias. (*See id.*). Nor did counsel for either side inquire about racial bias when the court permitted them to further inquire of the venire members, without limitation. (*Id.* at 162-201; Doc. # 15-48 at 2-24). After the jury was selected and the evidence presented, the second trial ended on April 11, 2008 with a mistrial when the jury was unable to reach a verdict.[13] (Doc. # 15-46 at 64-65).

The state court then set the case for a third trial, which commenced a few weeks later, on May 5, 2008. However, Morris did not renew his motion to have the questionnaire sent to potential jurors. Nor does he claim to have otherwise asked the trial judge at the third trial to inquire into racial prejudice on *voir dire*. It is similarly undisputed that, at the third trial, the trial judge again conducted some initial questioning of the venire and then allowed counsel for the parties to do the same, again without limitation; neither the court nor counsel asked about racial bias. (*See* Doc. # 44 at 54; *see also* Docs. # 15-16 at 179-201; 15-17 at 2-94). At the conclusion of the third trial, Morris was convicted of capital murder and sentenced to death.

On direct appeal, Morris raised a claim in the Alabama Court of Criminal Appeals based on the trial court's denial of his motion to send the jury questionnaire. (Doc. # 15-52 at 129). His appellate brief cited several provisions of the United States Constitution (*id.*), and it quoted a sentence from *Mu'Min v. Virginia*, 500 U.S. 415, 424 (1991): "[T]he possibility of racial prejudice against a black defendant charged with a violent crime against a white person is sufficiently real that the Fourteenth Amendment requires that inquiry be made into racial prejudice." (*Id.*).

_____

[13] This court's memorandum opinion stated that the state trial court "denied Morris's motion [to send the questionnaire] in a handwritten order [*after* the jury was unable to reach a guilt-phase verdict in his second capital trial.]" (Doc. # 44 at 54 (first bracketed material added, second brackets original) (emphasis added)). However, that is incorrect. The state trial court's entry on the case action summary sheet denying Morris's motion contains a handwritten date of "4-19-*07*" (Doc. # 15-15 at 33 (emphasis added)), which would have been almost a year *before* Morris's second trial began on April 7, *2008*. (*See id.* at 46).

The Alabama Court of Criminal Appeals addressed the claim solely on the merits.[14]  *See Morris Direct II*, 60 So. 3d at 378.  That court began by acknowledging both the federal nature of the claim and its relation to the fact that Morris is black and the victim white:

> Morris contends that the trial court deprived him of his constitutional right to ask jurors about their racial bias.  Specifically, Morris argues that, because he is a black man and the victim was a white woman, he should have been allowed to submit a written questionnaire to the prospective jurors to ascertain whether they had any racial bias. He argues that the trial court's decision to prevent him from doing so violated his Fifth, Sixth, Eighth, and Fourteenth Amendment rights under the United States Constitution.

*Id.*  Nevertheless, the state appellate court's subsequent analysis of the claim did not cite any federal caselaw, nor did it further mention any federal constitutional provisions.  *See id.*  Rather, the Alabama Court of Criminal Appeals began by noting that the record showed "a thorough voir dire examination of the venire" in which "the trial court did not limit the questioning."  *Id.*  The appellate court then rejected the claim, relying exclusively on Alabama state precedents, holding that the trial court had discretion to determine the method of *voir dire* examination, including specifically whether to use a questionnaire, and that the trial court had not abused that discretion. *Id.* (citing *Ex parte Land*, 678 So. 2d 224 (Ala. 1996); *Hodges v. State*, 856 So. 2d 875, 913 (Ala. Crim. App. 2001), *aff'd*, 856 So. 2d 936 (Ala. 2003); *Sneed v. State*, 1 So. 3d 104, 135 (Ala. Crim. App. 2007); and *Brown v. State*, 11 So. 3d 866, 885 (Ala. Crim. App. 2007)).  The Alabama Court of Criminal Appeals also found that "there was no indication of any racial prejudice by the

---

[14] It is more than arguable that Morris did not properly raise any claim in the trial court that the jury questionnaire had to be sent on the basis that Morris had a constitutional right to an inquiry on *voir dire* into potential juror bias based on *race* specifically.  However, the State did not argue that point in its brief on appeal; rather, it asserted that the claim was substantively groundless.  (Doc. # 15-52 at 192-93).  The Alabama Court of Criminal Appeals followed that lead and denied the claim on the merits.  Even had the state appellate court deemed Morris to have failed to properly raise his claim below, however, it still would have been subject to review for plain error under state law because of the death sentence.  *See Morris Direct II*, 60 So. 3d at 338.  Moreover, the fact that the state appellate court addressed the claim only on the merits would waive any procedural default.  *See Scott v. Sec'y, Fla. Dep't of Corr.*, 2025 WL 708612, at *2 (11th Cir. Mar. 5, 2025) (the "state court must actually have relied on the procedural bar as an independent basis for its disposition of the case." (quoting *Harris v. Reed*, 489 U.S. 255, 261-62 (1989)).  The State has never contended that this claim is procedurally defaulted.

potential jurors." *Morris Direct II*, 60 So. 3d at 378.

Morris asserted this claim in his federal habeas petition, relying primarily on *Turner*. This court's analysis began by recognizing that Morris had not shown that any associated factual determinations by the Alabama state courts that were unreasonable for purposes of § 2254(d)(2) or not entitled to a presumption of correctness under § 2254(e)(1). (Doc. # 44 at 56). The court then considered whether the state courts' rejection of the claim was entitled to deference under § 2254(d)(1). The court concluded that, because neither the state trial court nor the Alabama Court of Criminal Appeals had "provided a federal analysis" of the claim, it was at least arguable under *Romine v. Head*, 253 F.3d 1349 (11th Cir. 2001), that "AEDPA's deferential framework gives way to the de novo standard on habeas review." (*Id.* at 57). The court determined, however, that it "need not resolve that AEDPA question" and that any "dispute about what standard applies here is moot" (*id.*) because Morris's claim "is due to be denied even if AEDPA deference is inapplicable." (*Id.* at 62).

Addressing the merits, this court concluded, in short, that *Turner* was distinguishable. (*See id.* at 57-62). The court recognized that *Turner* both: (1) preserved the discretion afforded trial courts to determine how to conduct voir dire, including as to what form, the number of questions to pose, and whether to question the venire individually or collectively, and (2) recognized that a trial judge has no duty to inquire into the potential racial bias of jurors *sua sponte*, that is, absent a defense request. (*See id.* at 60 (citing *Turner*, 476 U.S. at 37 & n.10)). The court then determined that Morris had not established a "cognizable constitutional claim under *Turner*" because he "did not follow the procedure outlined in [that decision]," under which the defendant "must propose the relevant voir dire questions." (*Id.* at 61). Specifically, the court noted that, while the defendant in *Turner* had requested that the court ask a specific question at trial on voir dire advising of the

different races of the defendant and the victim and asking whether such would affect the juror's ability to render a fair verdict, Morris had proposed a pre-trial questionnaire that merely included "two general questions about race." (*See id.* at 58). The court found that such was not "equivalent to the proposed *voir dire* claim examined in *Turner*." (*Id.* at 61).

In his Rule 59 motion, Morris asks for reconsideration of the denial of habeas relief and a COA on this claim on two grounds. First, he contends that his "claim has not been reviewed under the applicable de novo review standard." (Doc. # 51 at 25). Second, he insists that his "claim is meritorious under any standard—including the deferential standard set by 28 U.S.C. § 2254." (*Id.*) Neither argument has merit.

Morris highlights that, in denying relief, this court's memorandum opinion recited that Morris had not "referenced a case, much less a *controlling decision of the Supreme Court*," that granted relief on a *Turner* claim on facts similar to those of Morris's own case. (Doc. # 44 at 61) (emphasis added). He argues that this implies that this court actually applied the deferential standard of § 2254(d)(1), not *de novo* review. It may be fair to say that the court's reference to a "controlling decision of the Supreme Court" could be taken as alluding to § 2254(d)(1). But that argument does not account for what the court actually said. This court expressly stated that it "need not resolve" whether the standard of review was that of § 2254(d)(1) or was *de novo* (*id.* at 57) because Morris's claim "is due to be denied even if AEDPA deference is inapplicable." (*Id.* at 62). That is precisely why this court held that the question of which standard applied was "moot." (*Id.* at 57). *See Berghuis v. Thompkins*, 560 U.S. 370, 390 (2010); *Trepal v. Sec'y, Fla. Dep't of Corr.*, 684 F.3d 1088, 1109-10 (11th Cir. 2012); *Ciaprazi v. Senkowski*, 2003 WL 23199520, at *6 (E.D.N.Y. Dec. 5, 2003) ("Because all of petitioner's claims fail under the *de novo* standard of review applied below, his challenge to the applicability of AEDPA in the instant proceeding is

moot."), *aff'd*, 151 F. App'x 62 (2d Cir. 2005). Because this court's prior opinion afforded Morris the benefit of an assumption that *de novo* review applied, his first contention is baseless.

Morris also asks this court to revisit the merits of this question, insisting that he is entitled to habeas relief under any standard of review. He is wrong. The court continues to assume review here is *de novo*. *Turner* makes clear "a defendant cannot complain of a judge's failure to question the venire on racial prejudice unless the defendant has specifically requested such an inquiry." 476 U.S. at 37. In its memorandum opinion, this court stated that "Morris raised the concern of racial bias with the trial court in the juror questionnaire motion." (Doc. # 44 at 57). On further consideration, however, this court notes (and clarifies here) that Morris has *not* shown that he "specifically requested" that the state trial court "question the venire members on racial prejudice" within the meaning of *Turner*.

Morris supposes that he made a sufficient request for the state trial court to examine the venire about racial bias by virtue of his motion to send the jury questionnaire. However, the text of that motion itself mentioned *nothing* about *race*. Morris included a citation to *Turner* in middle of the motion, but he did not say that the opinion related to questioning about *racial* prejudice or involved a defendant and victim of different *races*. Morris's motion also mentioned *Batson*, but that decision relates to the racial biases of attorneys in striking the jury, not the racial bias of jurors. Morris claims, however, that his "proposed questions for the venire [within the questionnaire] were plainly designed to probe the potential racial bias of the prospective jurors." (Doc. # 51 at 32). But that is simply not so. The proposed questionnaire also did not include any question asking the jurors about their own prejudices or attitudes about race. Instead, the only questions that touched on race at all asked about (1) the juror's own race; (2) the race of the juror's neighbors; and (3) how frequently the juror's *co-workers* expressed racial bias. The state trial court could not

reasonably have been expected to divine from Morris's filing that he was "specifically request[ing]" that the court inquire into the jurors' own racial bias. *See Detrich v. Ryan*, 392 F. App'x 580, 582 (9th Cir. 2010) ("Detrich's passing mention of race in his proposed jury questionnaire and citation to *Turner* . . . in his motion for individualized sequestered voir dire and for the jury to fill out a written questionnaire, were simply insufficient to alert the trial judge of the importance of asking questions related to racial prejudice as part of the jury voir dire."), *cert. granted, judgment vacated on other grounds*, 563 U.S. 984 (2011); *see also State v. Detrich*, 932 P.2d 1328, 1335 & n.5 (Ariz. 1997) (en banc).  Because Morris did not specifically request that the trial court inquire into the jurors' potential racial bias on *voir dire*, as required by *Turner*, his claim fails.

But even assuming for the sake of argument that the questionnaire motion did qualify as a "specific[ ] request" under *Turner*, the Morris's claim would still fail.  Contrary to his suggestion otherwise, *Turner* does not impose an affirmative duty on a trial court judge to *personally* question the venire about racial prejudice, even if the defendant requests the court to do so.  Rather, *Turner* establishes only that a capital defendant accused of killing a victim of a different race cannot be *denied* the opportunity to inquire on *voir dire* into the racial prejudice of jurors.  *See Lear v. Cowan*, 220 F.3d 825, 829 (7th Cir. 2000) ("[A]ll the [*Turner*] Court really held was that if the defense wants to quiz jurors on their reaction to the interracial character of the defendant's crime, the judge must permit this.").  Such a denial occurred in *Turner* because the trial judge had reserved to *himself* the privilege of asking all questions on juror *voir dire*, *see* 476 U.S. at 48 (Powell, J., dissenting); *Turner v. Commonwealth*, 273 S.E.2d 36, 40-42 (Va. 1980), and he then refused to ask the defense's proposed question about the racial prejudice of the jurors.  That had the effect of *precluding* that inquiry.  But *Turner* also expressly (1) recognizes that a trial court has no

obligation to conduct such an inquiry *sua sponte* and (2) preserves the traditional discretion of trial judges to determine the mode and extent of the inquiry. 476 U.S. at 37 & n.10. As a result, so long as the trial court affords defense counsel a fair opportunity to question the venire about racial prejudice directly, there is no constitutional violation. *See Bui v. Haley*, 321 F.3d 1304, 1307 n.2 (11th Cir. 2003) (affirming rejection of *Turner* claim on multiple grounds that included "that petitioner's counsel, themselves, had ample opportunity to examine the venire on the matter of racial bias"); *United States v. Jean-Charles*, 696 F. App'x 405, 407-08 (11th Cir. 2017) ("[T]he district court took reasonable steps to ensure that any [racial] prejudice would be discovered" where it "gave [the defendant's] counsel an opportunity to question the jury to discover whether the jurors would be fair and impartial"); *Fennie v. Crosby*, 2011 WL 17630, at *9 (M.D. Fla. Jan. 4, 2011) (habeas petitioner had no claim under *Turner* where his "counsel was not precluded from inquiring" about race on *voir dire* but instead "strategically chose to limit his questions about race to avoid alienating the jurors").

Unlike in *Turner*, the trial judge in Morris's case allowed counsel for the parties to pose *voir dire* questions to the venire directly, as provided by Alabama Rule of Criminal Procedure 18.4(c). It is also undisputed that neither the court nor counsel asked about race or racial prejudice. Nevertheless, there is no claim by Morris, nor any indication otherwise, that the trial court *prohibited* Morris's counsel from doing so.[15]  Because Morris's counsel was afforded an

---

[15] The court also notes that, while Morris highlights that the state trial court denied his motion to mail the juror questionnaire, that occurred in April 2007, prior to the *second* trial, not before his *third* trial in May 2008. Morris claims that such denial showed that it would have been futile to file a renewed motion to send a questionnaire before the third trial. Even granting that premise for the sake of argument, the question here is not whether Morris properly preserved a claim for appeal that the trial court erred in denying his motion to mail the questionnaire. Rather, the issue under *Turner* is whether the trial court *refused to permit* an inquiry into racial bias on *voir dire* at his third trial. Morris cannot plausibly assert that the court did so based solely upon its denial of the motion to send the questionnaire, which occurred more than a year earlier and without the court stating any reasons. *See Twardokus v. Sec'y, DOC*, 2015 WL 926035, at *7 (M.D. Fla. Mar. 4, 2015) (rejecting claim alleging that state court erred in not allowing adequate *voir dire* regarding pretrial publicity, noting that "the trial judge did not limit defense counsel's ability to determine whether the prospective jurors had been exposed to media coverage . . . concerning the case. Instead, the judge merely rejected

opportunity to ask about racial bias on *voir dire*, the claim fails on that ground.  *See Bui*, 321 F.3d at 1307 n.2; *Jean-Charles*, 696 F. App'x at 407-08; *Fennie*, 2011 WL 17630, at *9.

### C.    Ineffective Assistance Claim Alleging Inadequate Investigation and Presentation of Mitigation Evidence at the Penalty Phase

Morris's Rule 59 motion asks the court to reconsider its denial of habeas relief and a COA on his claim alleging that his trial counsel provided constitutionally ineffective assistance, *see Strickland v. Washington*, 466 U.S. 668 (1984), by failing to investigate and present mitigation evidence at the penalty phase of his trial.  (Doc. # 51 at 33-51).  As further explained below, Morris's motion is due to be denied as it relates to this claim as well.

The penalty phase of the third trial began on May 8, 2008, immediately after the jury found Morris guilty of capital murder.  (*See* Doc. # 15-24 at 38, 41).  Under Alabama law then in effect, at the penalty phase, the jury was to provide an advisory verdict, by which it would recommend to the trial court that it impose either a sentence of life imprisonment without the possibility of parole or a sentence of death.  *See* Ala. Code § 13A-5-46 (2008); *see also Brownlee v. Haley*, 306 F.3d 1043, 1049-50 (11th Cir 2002).  In that task, the jury first determined the existence of, and then had to weigh, any aggravating circumstances, *see* Ala. Code § 13A-5-49, and mitigating circumstances, *see* Ala. Code §§ 13A-5-51 and -52, against each other.  *See* Ala. Code § 13A-5-46 (2008).  If at least ten of the twelve jurors agreed that the aggravating circumstances outweighed any mitigating circumstances, the jury was to return an advisory verdict recommending a sentence of death.  Ala. Code § 13A-5-46(e)(3), (f) (2008).  If at least a majority of the jurors agreed that the aggravating circumstances did not outweigh any mitigating circumstances, the jury was to return an advisory verdict recommending a sentence of life imprisonment.[16]  Ala. Code § 13A-5-

---

defense counsel's proposed questionnaire that he wished to give to the jury.")

[16] If jury could not reach an advisory verdict on the sentence within the vote requirements established by Ala. Code § 13A-5-46(e) (2008), the court would declare a mistrial as to the jury's advisory verdict.  *Id.*, § 13A-5-46(g)

46(e)(1), (e)(2), (f) (2008); *see also Brownlee,* 306 F.3d at 1049-50.

The ultimate authority to pass the sentence at the time of Morris's trial, however, was vested in the trial judge. Ala. Code § 13A-5-47(a) (2008). Like the jury, the judge would determine the existence of aggravating and mitigating circumstances, considering the evidence presented plus the contents of a pre-sentence investigation report. Ala. Code § 13A-5-47(b), (c), (d) (2008). In weighing the aggravating and mitigating circumstances and in imposing the sentence, the trial judge was required to "consider" the sentence recommended by the jury's advisory verdict, but such was not binding.[17] Ala. Code § 13A-5-47(e) (2008); *see also Brownlee,* 306 F.3d at 1049-50.

When the penalty phase commenced, the State adopted by reference all evidence presented at the guilt phase to prove the aggravating circumstances found by virtue of the jury's verdict of guilt, namely, that Morris had committed the capital murder while engaged in the commission of a robbery and a burglary, *see* Ala. Code § 13A-5-49(4). (Doc. # 15-24 at 56). The State next presented a copy of Morris's prior conviction for assault in the second degree, to establish as an additional aggravating factor that he had committed a prior felony involving the use or threat of violence, *see id.*, § 13A-5-49(2). (*Id.* at 56-57). Finally, the State presented copies of seven other prior convictions, six for burglary in the third degree and one for theft in the second degree, to demonstrate that Morris was not entitled to the benefit of a statutory mitigating factor for a defendant with no significant history of criminal activity, *see id.* § 13A-5-51(1). (*Id.* at 57-59).

_____

(2008). While that would not affect the verdict of guilt, *id.*, the court then would either empanel another sentencing jury or the parties might agree, with the court's consent, to waive the right to have a jury render an advisory sentencing verdict, in which case the trial court would pass sentence without a jury recommendation. *Id.*

[17] Alabama has since amended its capital sentencing scheme. A jury's verdict at sentencing is now binding on the trial court. *See* Ala. Code § 13A-5-47(a) (2025); *Ferguson v. Comm'r, Ala. Dep't of Corr.,* 69 F.4th 1243, 1247 n.1 (11th Cir. 2023). However, that amendment applies only to defendants charged with capital murder on or after to April 11, 2017. *See* Ala. Code § 13A-5-47.1; *Gavin v. Comm'r, Ala. Dep't of Corr.,* 40 F.4th 1247, 1254 n.7 (11th Cir. 2022); *Sykes v. State,* 2024 WL 1947829, at *10 (Ala. Crim. App. May 3, 2024).

Morris's counsel ultimately called only one witness: Morris's sister Faye.  (*Id*. at 59-62).
She had previously testified at the penalty phase of the first trial (Doc. # 15-8 at 33-36), the *Atkins*
hearing prior to the second trial (Doc. # 15-29 at 48-58), and the guilt phase of the third trial, just
the day before.  (Doc. # 15-23 at 41-43).  However, at the penalty phase of the third trial, Faye was
on the stand for only about a minute.  (Doc. # 15-24 at 60-61).  She gave her name and address
and stated that Morris was her brother and the youngest of five children in their family.  After that,
however, she broke down and said she could not answer any more questions.  (*Id.*).  When asked
if there was anything else she wanted to say, Faye pleaded, "I just ask the jury to just find it in
their hearts to spare my brother's life."  (*Id.* at 61).  The judge asked if a break would help, and
Faye asked to "go out for just a minute," whereupon the court granted a "short recess"[18] and
excused the jury.  (*Id.*)  But when defense counsel returned, he told the court, outside the presence
of the jury, that Faye was still too emotional and could not continue.  (*Id.*)  The judge responded,
"Okay.  Well, I certainly couldn't or wouldn't make her.  Obviously if she's too emotional to do
it, I can understand."  (*Id*. at 62).

The judge asked whether the defense had any more witnesses, and counsel answered that
he had talked to Morris's other sister, Debera Morris ("Debera").[19]  (*Id.*).  She had also testified at
the penalty phase of Morris's first trial.  (Doc. # 15-8 at 36-39).  But defense counsel reported that
Debera was also saying that she was too emotional to testify.  (Doc. # 15-24 at 62).  The court
answered, "Well, I'm not going to make them.  I don't know what else you can do.  It's their
brother, so."  (*Id.*).  Defense counsel simply replied, "Yes, sir," and advised that Morris had no

---

[18] The duration of the recess is not disclosed in the transcript other than an indication that it was "short."
(Doc. # 15-24 at 61).

[19] The first name of this sister is spelled variously in the record as "Debera" (*e.g.*, Docs. # 1 at 36, ¶ 105; 15-
56 at 86, ¶ 54), "Deborah" (e.g., Doc. # 15-8 at 36), and "Debra" (*e.g.*, Docs. # 15-24 at 62; 44 at 263).  Morris's Rule
32 petition and his federal habeas petition each spell it "Debera," and that is also how her name is written on a Jefferson
County Jail Visitor's Registrar.  (Doc. # 15-43 at 154).  Accordingly, the court uses that spelling.

additional witnesses. (*Id.*). The parties gave closing arguments, and the court instructed the jury and submitted the case to it. Deliberating for a just over an hour, by a vote of 10 to 2, the jury returned with an advisory verdict recommending that Morris be sentenced to death. (*Id.* at 84-88).

On June 20, 2008, the court held a penalty-phase sentencing hearing, at which the parties were offered an opportunity to present evidence and argument to the court regarding aggravating and mitigating circumstances. (*Id.* at 90; Doc. # 15-25 at 6). The State adopted its prior presentation and relied on the same aggravating factors it had argued to the jury at the penalty phase. (Doc. # 15-25 at 8). When asked whether the defense was going to present any evidence, one of Morris's attorneys told the court that he had talked to "Mr. Morris' sister" the night before and that she had agreed to testify but that she had not appeared without further explanation. (*Id.* at 13). The court replied, "Well, I'm not really sure what to tell you, [counsel]. She broke down and couldn't testify in front of the jury in the sentencing phase." (*Id.*) Defense counsel then indicated that they had no other evidence and presented a brief statement asking the court to sentence Morris to life without parole. (*Id.* at 8-9). The court declined to do so, however, and instead followed the jury's recommendation and imposed a sentence of death. (*Id.* at 9; Doc. # 15-27 at 51-66). In its order, the court found the aggravating circumstances argued by the State and that there were no statutory or non-statutory mitigating circumstances. (Doc. # 15-27 at 62-66).

The capital conviction and death sentence were affirmed on direct appeal. *Morris Direct II*, 60 So. 3d at 385. Thereafter, Morris, through counsel, filed a petition for post-conviction relief in the state trial court pursuant to Rule 32 of the *Alabama Rules of Criminal Procedure*. (Docs. # 15-56 at 66-107, 15-57 at 2-34). That Rule 32 petition included various claims alleging that Morris's counsel had provided constitutionally ineffective assistance. To establish such a claim, a defendant must show two things: (1) counsel's performance was deficient and (2) the deficient

performance prejudiced the defense. *Strickland*, 466 U.S. at 687-88. Performance is deficient if it falls "below an objective standard of reasonableness." *Id.* at 688. In proving that counsel's actions were deficient, "the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* at 689 (internal quotation marks and citation omitted). Under the prejudice prong, the defendant must show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* Because a defendant must meet both *Strickland* prongs, once a court determines that one of them cannot be met, the court need not address the other. *Id.* at 697.

One of Morris's claims in his Rule 32 petition was based on his counsel's allegedly unreasonable failure to investigate and present a laundry list of mitigating circumstances at the penalty phase. (Doc. # 15-56 at 86-99 ¶¶ 54-81, 70-72 ¶¶ 12-16). This list included that Morris:

(1)     had "cognitive disfunction," "mental deficiencies," and "mental retardation," exhibited by not being able to speak until age three, difficulties playing with other children, and being labeled "slow" in school with testing as a child showing an IQ of 73 (*id*. at 70, 86, 87, 93, 97, 98 ¶¶ 14, 54, 68, 69, 81);

(2)     had "mental health difficulties," "untreated mental illness," "psychiatric problems" and having been prescribed antipsychotic medication while held at a mental health facility prior to his competency evaluation (*id*. at 70, 86, 87, 95, 97, 98 ¶¶ 13, 14, 54, 76, 81);

(3)     had failed academically, as shown by his sisters having to do his homework for him, repeating eighth grade, and dropping out of ninth grade after failing multiple subjects (*id*. at 70, 93, 94, 97, 98 ¶¶ 14, 70, 71, 81);

(4)     came from a "loving household" but with his parents divorcing when he was 15 years old, whereupon he went back and forth, living with one parent and then the other (*id*. at 94, 97, 98 ¶¶ 73, 74, 81);

(5)     experienced the traumatic death of his father in a house fire when Morris

was a teenager (*id.* at 70, 95, 97, 98 ¶¶ 14, 75, 81);

(6)    had a history of unemployment and poverty and never held a long-term job (*id.* at 86, 87, 94 ¶¶ 54, 72);

(7)    lacked the ability to live alone, manage money, fill a prescription, take medication as directed, wash clothes or vacuum properly (*id.* at 14, 94 ¶¶ 14, 72);

(8)    had a prolonged history of abuse of alcohol, marijuana, and cocaine (*id.* at 87, 96, 97, 98 ¶¶ 54, 77, 81);

(9)    became sober in 1995 until his mother died in October 1996, which traumatized Morris and saw him return to substance abuse in the months before the murder in February 1997 (*id.* at 70, 96 ¶¶ 14, 78);

(10)    spent most of the day of the murder drinking, which would limit his ability to form intent and appreciate the nature of his actions  (*id.* at 97, 98 ¶¶ 79, 81);

(11)    did not plan the murder (*id*. at 92, 97, 98 ¶¶ 66, 67, 80, 81); and

(12)    had adapted to prison life (*id.* at 95, 97, 98 ¶¶ 76, 81).

Morris claimed that evidence of these alleged mitigating circumstances was not presented at the penalty phase because his trial counsel had not "adequately prepared" Morris's sister Faye to testify before the jury and then failed to "ensure" her appearance at the sentencing hearing before the trial judge.  (*Id*. at 90, 91 ¶¶ 61, 62, 63).  Morris further asserted that his counsel should have "anticipated that [Faye] might be overwhelmed by the proceeding and adequately prepared" other witnesses to testify. (*Id.* at 70 ¶ 13). Thus, Morris alleged that evidence of mitigating circumstances was not offered because his trial counsel had "failed to call to testify any of Mr. Morris's teachers; childhood or adult friends; other family members, including Mr. Morris's other sister, Debera Morris; neighbors; counselors; doctors; acquaintances; or any of the medical experts who had previously determined that Mr. Morris was mentally retarded."  (*Id*. at 86-87 ¶ 54).  Morris similarly averred that his counsel should have called "mental health professionals" and "social

workers" to provide expert testimony addressing the effects that adverse events and circumstances might have had on Morris, especially given his "adaptive deficits and mental retardation." (*Id.* at 94-97 ¶¶ 74, 75, 77-79). He also maintained that, had such evidence and testimony of mitigation been presented, the result of his sentencing might have been different, highlighting that the jury could not recommended a death sentence if even one additional juror had been swayed to find that the aggravating circumstances did not outweigh the mitigating circumstances. (*See id.* at 86-88, 91, 92, ¶ 54, 56, 65).

The state trial court dismissed Morris's Rule 32 petition without a hearing, pursuant to Alabama Rule of Criminal Procedure 32.7(d).[20]  (*Id.* at 10-57). That court rejected the instant claim (*see id.* at 27-34 ¶¶ 49-68) for failure to meet the pleading and specificity requirements of Rule 32.3[21] and Rule 32.6(b).[22] (*Id.* at 28 ¶ 52). In particular, the trial court found that the claim did not identify the name of any witnesses who could have testified during the penalty phase, that they had been available, or the substance of their testimony. (*Id.* at 28 ¶¶ 52, 53). "Instead," the state trial court wrote, "Morris lists various evidence he contends should have been presented and then generically asserts that . . . unidentified family members, friends, and experts could have testified  about this evidence. But this bare allegation does not comply with the full-fact pleading requirement of Rule 32.6(b)." (*Id.* at 28 ¶ 53 (citing *Daniel v. State*, 86 So. 3d 405, 430 (Ala.

---

[20] Rule 32.7(d) provides in relevant part: "**(d) Summary Disposition**. If the court determines that the petition is not sufficiently specific, or is precluded, or fails to state a claim, or that no material issue of fact or law exists which would entitle the petitioner to relief under this rule and that no purpose would be served by any further proceedings, the court may either dismiss the petition or grant leave to file an amended petition."

[21] Rule 32.3 provides in relevant part: "The petitioner shall have the burden of pleading and proving by a preponderance of the evidence the facts necessary to entitle the petitioner to relief."

[22] Rule 32.6(b) provides: **"(b) Specificity**. Each claim in the petition must contain a clear and specific statement of the grounds upon which relief is sought, including full disclosure of the factual basis of those grounds. A bare allegation that a constitutional right has been violated and mere conclusions of law shall not be sufficient to warrant any further proceedings."

Crim. App. 2011)).

The state trial court further concluded that Morris had failed to plead any facts that would establish that his counsel's efforts during the penalty phase were unreasonable or deficient under *Strickland*, including as it related specifically to what actions Morris's attorneys supposedly should have taken to ensure that Morris's sisters, Faye and Debera, be able to testify about Morris's life at the penalty phase, despite their emotional breakdowns.  (*See id.* at 29, 30 ¶¶ 55, 58).  The state trial court then determined that Morris had also failed to plead specific facts establishing prejudice under *Strickland*, because he "simply lists general evidence he contends should have been presented without pleading specific facts concerning how this evidence would have led to a reasonable probability that the outcome of his penalty phase would have been different."  (*Id.* at 29 ¶ 56).

The Alabama Court of Criminal Appeals affirmed the summary dismissal of Morris's Rule 32 petition.  *Morris v. State*, 261 So. 3d 1181, 1202 (Ala. Crim. App. 2016) ("*Morris Collateral*"). With respect to his ineffective assistance claims, the state appellate court found that Morris's appellate brief did not comply with Alabama Rule of Appellate Procedure 28(a)(10), which requires that an argument contain "the contentions of the appellant/petitioner with respect to the issues presented, and the reasons therefor, with citations to the cases, statutes, other authorities, and parts of the record relied on."  *Morris Collateral*, 261 So. 3d at 1190.  The state appellate court also stated that even if Morris's brief had satisfied the requirements of the rule, he would not be entitled to relief because, the court determined, "all the claims of ineffective assistance of counsel . . . were insufficiently pleaded to satisfy the requirements in Rule 32.3 and Rule 32.6(b); therefore, summary dismissal of those claims was proper under Rule 32.7(d)."  *Id.* at 1195 (citing *Bryant v. State*, 181 So. 3d 1087, 1108 (Ala. Crim. App. 2011)).

Morris's federal habeas petition also asserted that his trial attorneys were constitutionally ineffective for allegedly failing to investigate and present mitigating evidence at the penalty phase. (Doc. # 1 at 35-51 ¶¶ 103-42). In addressing the claim, this court declined to recognize a procedural default based on the Alabama Court of Criminal Appeals' finding that Morris' brief on his collateral state appeal failed to comply with the requirements of Rule 28(a)(10). (*See* Doc. # 44 at 210-13, 215, 220-21). Nevertheless, this court recognized that the appellate court had also ruled that the state trial court had properly dismissed Morris's claims alleging ineffective assistance of counsel because they were insufficiently pleaded under Rule 32.3 and 32.6(b), which this court determined was an adjudication of such claims on the merits. (Doc. # 44 at 225 (citing *Morris Collateral*, 261 So. 3d at 1193). As a result, this court held that § 2254(d) deference applies and that this court must evaluate the state *trial court's* analysis of the claim as the last reasoned opinion. (*Id.* at 225-26 (citing *Wilson v. Sellers*, 584 U.S. 122, 125 (2018)). That, in turn, meant that "AEDPA requires Morris to show that the Alabama courts committed an objectively unreasonable error by concluding that his allegations [in his Rule 32 petition] failed to present cognizable deficient performance and prejudice based on Supreme Court precedent." (*Id.* at 262 (citing *Powell v. Allen*, 602 F.3d 1263, 1273 (11th Cir. 2010) (per curiam); *Shinn v. Kayer*, 592 U.S. 111, 117 (2020)).

This court rejected Morris's arguments within the framework of Supreme Court cases upon which he sought to rely to show that the Alabama state courts' determination that he had failed to plead specific facts necessary to state a claim: *Strickland* itself; *Williams v. Taylor*, 529 U.S. 362 (2000); *Wiggins v. Smith*, 539 U.S. 510 (2003); *Rompilla v. Beard*, 545 U.S. 374 (2005); and *Porter v. McCollum*, 558 U.S. 30 (2009). (Doc. # 44 at 264-84). The court also distinguished a number of Eleventh Circuit cases cited by Morris. (*Id.* at 285-89). In the end, the court held that

Morris had failed to show that the state court's ruling that the allegations of his Rule 32 petition were insufficient to show either deficient performance or prejudice was contrary to, or involved an unreasonable application of, Supreme Court precedent under § 2254(d)(1).  Nor had Morris shown, the court explained, that the state court's decision was based on an unreasonable determination of the facts under § 2254(d)(2).  (Doc. # 44 at 293-94).

In his Rule 59 motion, Morris acknowledges that this court's review of this claim is limited by § 2254(d).  He continues to argue that, under "clearly established Supreme Court precedent," his counsel's performance was deficient and resulted in prejudice under *Strickland*.  (Doc. # 51 at 34, 39).  He maintains that this court's determination to the contrary and denial of a COA constitutes "manifest error."  (*Id.* at 35).  The court disagrees.

Morris contends that his counsel "were constitutionally deficient in failing to investigate and present any evidence at the penalty phase."  (*Id.* at 36).  He highlights that counsel called only one witness at the penalty phase, his sister Faye, and that when she proved too emotional to provide anything beyond a short plea to spare Morris's life, counsel had "prepared no other mitigation, [and] the end result was that *no* evidence of Mr. Morris's mitigating circumstances was put before the jury."  (*Id.* at 38) (emphasis original).  In his Rule 59 motion,  Morris highlights multiple of areas of mitigation that he says his counsel failed to investigate and present.  These are that Morris: (1) "did not learn to talk until the age of three"; (2) "was a slow learner in school where records indicate that he received mostly unsatisfactory and failing grades, repeated eighth grade, and dropped out . . . in the ninth grade"; (3) "could not live alone, or handle everyday tasks, such as taking his temperature or doing his laundry"; (4) was not "able to maintain any long-term employment"; (5) "suffered the traumatic loss of his father in a house fire"; (6) "had taken antipsychotic medication"; (7) "had a long history of . . . addition to drugs and alcohol"; (8)

relapsed into heavy drinking after his mother died in October 1996, about four months before the murder; and (9) had "cognitive dysfunction" and was "intellectually disabled." (*Id*. at 34-35, 43). Morris further insists that the "absence of a penalty-stage mitigation case was not a strategic choice" but was instead the product of counsel's failure to "undertake a constitutionally adequate investigation," including by retaining a "qualified mitigation expert" to assist in it. (*Id.* at 36-37).

However, the record simply belies Morris's claim that the failure to present mitigating evidence at the penalty phase was a consequence of an antecedent failure on the part of his trial counsel to conduct a reasonable investigation, with or without the help of a "mitigation expert." First, as further discussed below, the record discloses there was, in fact, an extensive inquiry into Morris's background that included interviews with at least Morris's two sisters, obtaining school and other records, and Morris being examined by at least *four* mental health professionals who themselves reviewed Morris's records and background and provided hearing testimony and/or expert reports.[23]   Indeed, that substantial investigation occurred primarily because Morris's trial

---

[23] In support of his failure-to-investigate claim, Morris continues to lean heavily on the fact that, at the beginning of the penalty phase, his attorneys tried to offer a document they had created that was titled, "Defendant's Proposed Mitigating Circumstances." (Doc. # 51 at 36). It listed three categories of potential mitigation: (1) that Morris was allegedly impaired substantially in his ability "to appreciate the criminality of his conduct or conform his conduct to the requirements of law," a statutory mitigating factor under Ala. Code § 13A-5-51(6); (2) that Morris had allegedly "demonstrated an ability to adapt to prison life," offered as a non-statutory mitigating circumstance under Ala. Code § 13A-5-52; and (3) "[s]tatements and/or testimony of family members and others in support of defendant receiving life without parole as opposed to . . . a sentence of death." (Doc. # 15-24 at 46). The trial judge, however, asked Morris's attorney what he expected the court to do with the document. (*Id.*) Counsel replied, "I just wanted you to have it to review to consider – that's what our proposal was. . . . I just was intending to give [the jurors] a copy and you a copy." (*Id.* at 46-47). The court responded, however, "If you want to argue this to the jury[,] you're going to have to have evidence to support it," whereupon counsel withdrew the document. (*Id.* at 47-48). Morris makes no claim, and the court cannot otherwise discern, that defense counsel's act of offering and then withdrawing the document itself caused any kind of prejudice. Morris maintains, however, that the aborted proffer demonstrates that his "counsel understood the many mitigating factors in [his] case but failed to investigate and generate the evidentiary support necessary to put that case before the factfinder." (Doc. # 51 at 36). Admittedly, it is not entirely clear what function Morris's trial counsel perceived the document might serve, although it is unsurprising given its rank hearsay nature that the trial court did not allow its use as substantive evidence. Even so, Morris's argument that the attempted proffer and withdrawal of the document establishes that his counsel failed to conduct a reasonable investigation into mitigation is a non-sequitur. It is clear that there was, in fact, a substantial inquiry into Morris's background and that Morris has not identified any mitigating evidence that appears to have been unknown to his trial counsel as a result of any putative investigation deficiency.

attorneys recognized from the outset that they might potentially pursue defenses related to Morris's competency to stand trial, his sanity at the time of the offense, and his mental disability under *Atkins*.

Second, deficiency in an investigation only matters if as a result counsel is left unaware of additional favorable evidence that could have been presented. *See Borden*, 646 F.3d at 823 (affirming denial of habeas relief where the petitioner failed to identify what additional mitigation evidence would have been revealed by a reasonable investigation); *Heidler v. Warden, GDCP*, 2023 WL 4927253, at *27 (11th Cir. Aug. 2, 2023) (concluding that the petitioner's argument that his counsel failed to reasonably investigate mitigation because they failed to interview witnesses about the petitioner's hallucinations and depression "doesn't work" because "trial counsel were aware of [the petitioner's] mental health problems and made them a focal point of trial"); *cf. Sears v. Upton*, 561 U.S. 945, 951 (2010) ("Because they failed to conduct an adequate mitigation investigation, none of this evidence was known to Sears' trial counsel.  It emerged only during state postconviction relief." (emphasis omitted)).  Morris has not alleged facts in his Rule 32 petition that would support that his trial counsel were, in fact, unaware of any of the putative mitigation evidence he claims should have been investigated and presented at sentencing, because such issues had already been brought out during prior trials and hearings in the case, at which Morris was represented by the same counsel.  Rather, the would-be mitigating circumstances and evidence listed in Morris's Rule 32 petition, federal habeas petition, and Rule 59 motion all appear to have been simply culled by Morris's post-conviction attorneys from the existing trial court records and transcripts in Morris's case, not from any additional investigation or revelations thereafter.

For example, Morris claimed in his Rule 32 petition that his counsel failed to investigate

and present evidence of mitigating circumstances at sentencing that Morris: (1) developed more slowly than other children, as indicated by his not learning to talk until age three and having difficulties playing with other children; (2) was a "very slow learner and that his sisters did his school homework for him because he could not understand what he was supposed to do"; (3) "never held any long-term job and never lived alone"; (4) "cannot manage his money, cannot fill a prescription or take medicine as directed, cannot take his temperature if he becomes sick, and cannot wash his clothes or vacuum properly"; (5) came from a "loving household"; (6) "was adversely affected by his parents divorce when he was 15" and was "shuffled back and forth between his parents" after the divorce; (7) was "traumatized as a teenager by the death of his father in a house fire"; and (8) was "devastated" by his mother's death in October 1996, about four months before the murder, whereupon he "began drinking heavily." (Doc. # 15-56 at 93-96 ¶¶ 68, 70, 72-75, 78). Morris also cites many of these same items in his Rule 59 motion. (Doc. # 51 at 34-35). However, Morris's trial counsel elicited testimony on all of these circumstances from Morris's sisters Faye and Debera at the penalty phase of the first trial and/or the *Atkins* hearing. (*See* Docs. # 15-8 at 33-39; 15-29 at 48-58). Thus, any suggestion that defense counsel failed to investigate or discover them is nonsense. *See Heidler,* 2023 WL 4927253, at *27.

Similarly, Morris alleged in his Rule 32 petition that his counsel failed to investigate and present mitigating evidence that he: (1) suffered from "mental retardation," including as shown specifically by a Primary Mental Abilities Test that Morris took in school at age six indicating he had an IQ of 73; (2) "suffered from mental illness and was treated with antipsychotic mediation while he stayed at the Taylor Hardin Secure Facility awaiting his competency hearing"; (3) dropped out of school in the ninth grade after failing multiple classes; (4) had "serious substance abuse problems" that started before adulthood, which included heavy use of alcohol, marijuana,

and cocaine; and (5) was highly intoxicated at the time of the murder (Doc. # 15-56 at 93-98 ¶¶ 69, 71, 76, 77, 79, 81).  Again, Morris also references some of these in his Rule 59 motion.  (Doc. # 51 at 34-35).

But, all these things were known to Morris's trial counsel, for these matters had been explored in testimony and reports from multiple mental health experts.  *See Wood v. Allen*, 542 F.3d 1281, 1307 (11th Cir. 2008) (upholding denial of claim alleging failure to investigate the petitioner's borderline intellectual functioning at sentencing where it was "undisputed that counsel knew about [the petitioner's] low IQ, borderline intellectual functioning, and third-grade reading level, because it was included in [his expert psychologist's] report"), *aff'd*, 558 U.S. 290 (2010).  These included Dr. Allen Shealy, a psychologist retained by defense counsel who testified at the *Atkins* hearing.  (*See* Docs. # 15-28 at 185-201; 15-29 at 2-47 (Dr. Shealy's testimony at the *Atkins* hearing); 15-43 at 166-76 (Dr. Shealy's report); 184-89 (Morris's school records).  Morris's background, family history, substance abuse, and limited schooling and employment were also addressed at length in a June 1999 report by Dr. Kimberly Ackerson, a psychologist who examined Morris pursuant to the trial court's order to assess his competency to stand trial.  (Doc. # 15-44 at 37-42).  Dr. Ackerson also opined, albeit before she later changed her mind (*see* Doc. # 15-8 at 15-24), that Morris had mild to moderate mental retardation, and she mentioned an approximately three-week period in which Morris was prescribed "psychotropic medication," specifically, Mellaril, for "some possibly paranoid thoughts" and depression, while he was at the Taylor Hardin facility prior to his competency hearing.  (Doc. # 15-44 at 39).  Morris's background, including as it relates to the alleged mitigation referenced by Morris's Rule 32 petition, was similarly explored by Dr. Kamal Nagi, a psychiatrist who examined Morris and provided a report in January 2002 (Doc. # 15-4 at 1-8) and testified at a competency hearing in December of that same year.  (Docs.

# 15-43 at 199-202; 15-44 at 3-28).  Yet another psychologist, Dr. Glen King, also examined Morris and testified for the State about these matters at the *Atkins* hearing.[24]  (Docs. # 15-31 at 2-56; 15-32 at 2-8).

Because Morris has not sufficiently alleged or shown that his attorneys were not aware of the mitigation evidence he says should have been investigated and presented, the question is not whether his counsel's investigation was unreasonable.[25]  Rather, the salient issues are simply whether Morris's counsel ultimately chose not, or otherwise failed, to present such evidence, why, and whether such amounted to constitutionally ineffective assistance.  *See Wood*, 542 F.3d at 1303 (recognizing that because defense counsel had read expert's report and thus knew about the petitioner's low intellectual functioning, "this appeal is about whether not telling the jury about

---

[24] Morris's family history, substance abuse, dropping out of high school, poverty, and thin employment record were also referenced in a pre-sentence investigation report after the first trial.  (Doc. # 15-2 at 157-64).  There was also considerable evidence presented at the guilt phase that Morris spent most of the day of the murder drinking and that he was visibly intoxicated both shortly before the murder and a few hours later.  (Docs. # 15-23 at 7-10, 13, 16, 17, 42-43; 15-18 at 89; 15-20 at 42-43).

[25] The only putative mitigating circumstances cited in the Rule 32 petition that, by the court's estimation, do not appear to have been addressed by the prior testimony of Faye and Debera or by the various mental health experts are Morris's claims that (1) the murder was not premeditated (Doc. # 15-56 at 97 ¶ 79, 81); and (2) "Morris had adapted to prison life." (*Id*. at 98 ¶ 81; *see also id.* at 95 ¶ 76).  Neither is raised in the Rule 59 motion.  In any event, these issues were also raised at trial and thus known to Morris's trial counsel.  That is, the State had itself expressly argued during closing at the guilt phase that Morris had entered the victim's home likely thinking that no one was home. (*Id*. at 92 ¶ 70).  And the suggestion that Morris had "adapted to prison life" was mentioned in the "Defendant's Proposed Mitigating Circumstances" document.  (*See* Doc. # 15-24 at 46).  Morris submits that his trial counsel unreasonably failed to further investigate these issues.  However, his Rule 32 petition did not identify any additional specifics related to either matter that counsel would have discovered upon further investigation, nor did that petition name any witnesses or the substance of their expected testimony.  The state trial court rejected these claims as insufficiently pled on those grounds.  (Doc. # 15-56 at 28-30 ¶¶ 52-54, 59).  That was not unreasonable under § 2254(d).  *See Mills v. Comm'r, Ala. Dep't of Corr.*, 2021 WL 5107477, at *9 (11th Cir. Aug. 12, 2021) (holding that "[r]easonable jurists would not dispute" that the Alabama state court's dismissal of an ineffective assistance claim under Ala. R. Crim. P. 32.6(b), on the basis that the petitioner "did not identify by name any witnesses who should have been called" to testify about the petitioner's good behavior in prison, "was not contrary to or unreasonable under clearly established federal law").  The state court was similarly not unreasonable in holding that Morris could not show prejudice at sentencing on the "lack of premeditation" claim given the State's closing argument acknowledging the point.  The court also notes that the State asked the trial court to consider at sentencing an incident in which Morris, while serving his sentence after the first conviction, allegedly used a broken broomstick or handle to assault another inmate during a fight.  (Doc. # 15-25 at 8).  The trial judge refused to consider the matter, sustaining an objection by Morris's counsel that no evidence of such an incident had been presented.  (*Id*. at 8-9).  However, had such proof been presented to the sentencing jury, even if Morris might have tried to contest it, it could have substantially undercut any claim by Morris that he had adapted to prison life. *See Pye*, 50 F.4th at 1053.

[that circumstance] . . . was ineffective assistance").

On this front, Morris acknowledges that his counsel did call his sister Faye to testify at the penalty phase, but he highlights that she became overwhelmed on the stand almost immediately and could only manage a short plea to spare her brother's life. Morris treats the circumstance as if it were the fault of his trial counsel and suggests that this was a contingency they should have reasonably foreseen. However, the record does not support those conclusions. Morris's counsel obviously did not choose for Faye to become too emotional to testify. In his Rule 32 petition, however Morris blamed his counsel for Faye's breakdown, claiming that his attorneys failed to "adequately prepare" her. (Doc. # 15-56 at 90 ¶ 62). However, as the state court recognized, Morris never identified what his attorneys were supposed to do to make Faye composed enough to testify.

Morris also claimed that his counsel should have "anticipated" that Faye might "be overwhelmed" and should have, therefore, prepared other witnesses in case she did, including specifically Morris's other sister Debera. (*Id.* at 70 ¶ 13). But Morris has also wholly failed to allege facts supporting that his counsel had reason to anticipate that Faye would be unable to testify. "Just as there is no expectation that competent counsel will be a flawless strategist or tactician, an attorney may not be faulted for a reasonable miscalculation or lack of foresight or for failing to prepare for what appear to be remote possibilities." *Richter*, 562 U.S. at 110. Faye had testified without incident at the penalty phase of the first trial; at the *Atkins* hearing; and at the guilt phase of the third trial, just the day before she broke down on the stand at the penalty phase. These events bely the assertion that counsel had reason to "anticipate[ ]" that Faye would become too emotional to testify or might have required some sort of additional, unspecified "prepar[ation]" to do so. *See Knight v. Jones*, 2018 WL 11656388, at *32-34 (S.D. Fla. Apr. 30, 2018) ("Until [the

witness] became mentally and physically unable to testify, there was no reason for counsel to believe that he was not qualified to testify regarding mental health mitigation."), *aff'd sub nom. Knight v. Fla. Dep't of Corr.*, 936 F.3d 1322 (11th Cir. 2019); *see also Hill v. Ozmint*, 339 F.3d 187, 203 (4th Cir. 2003) ("Because [the petitioner's] lawyers could not reasonably have foreseen that [their expert psychiatrist] would suffer a breakdown on the stand, they were not ineffective in presenting him as a witness.").

Similarly, Morris contends that his counsel was ineffective for failing to call Debera specifically. It is undisputed that Morris's counsel did, in fact, ask Debera to testify after Faye said she could not, but Debera said she was also too emotional. Further, Debera, like Faye, had also testified at the penalty phase of the first trial, and Morris alleges nothing to suggest that his counsel might have been unreasonable to expect that Debera would be able to do so again at the third trial.

Morris's Rule 59 motion also contends that this court erred in finding that his Rule 32 petition "did not argue to the state court that the failure to rehabilitate [Faye] constituted ineffective assistance." (Doc. # 51 at 38). He refers here to a page of the court's memorandum opinion explaining this court's refusal to consider an allegation presented for the first time in his federal habeas petition that his attorneys should have asked for "a longer recess to permit [Faye and Debera] to collect themselves." (*See id.* (citing Doc. # 44 at 263 (in turn quoting Doc. # 1 at 41 ¶ 114)). The Rule 59 motion, however, does not even mention that "longer recess" claim. Rather, the motion just highlights that Morris's Rule 32 petition did include allegations his attorneys were ineffective because they did not anticipate that Faye might become overwhelmed and made "no attempt to rehabilitate her on the stand." (Doc. # 51 at 38-39 (quoting Doc. # 15-56 at 90 ¶ 62)). That, Morris says, "is all that the law requires" to exhaust the claim and have it considered on federal habeas review. (*Id.* at 39).

It is not at all clear just what Morris is trying to argue here. As explained, he offers nothing to support that counsel should have reasonably anticipated that Faye or Debera would be unable to testify. To the extent that Morris might be suggesting that counsel should have done something to "rehabilitate [Faye] on the stand" *other than* ask for a longer recess, it is not apparent even now what Morris might mean. That itself supports that the state courts' rejection of any associated ineffective assistance claim as pled with insufficient detail was not unreasonable under § 2254(d)(1).

Alternatively, if Morris is implying that this court erred in refusing to consider the "longer recess" claim or allegation in his federal habeas petition, he is also wrong. It is true that, for federal habeas purposes, a claim is exhausted, and thus not procedurally defaulted, provided that it was "present[ed] . . . to the state courts such that the reasonable reader would understand [the] claim's particular legal basis and specific factual foundation," even if the petitioner would seek to "clarify the arguments" or include "variations in the factual allegations urged in support" of the claim when subsequently presenting it in federal court. *Freeman v. Comm'r, Ala. Dep't of Corr.*, 46 F.4th 1193, 1216-19 (11th Cir. 2022) (cleaned up). So, the court clarifies that Morris's ineffective assistance claim alleging a failure to "rehabilitate [Faye] on the stand" is *exhausted*, including to the extent it might encompass the newer, more specific allegation that counsel should have asked for a longer recess. *See id.* Nevertheless, when reviewing whether the Alabama state courts' rejection of the claim on the merits at the pleading stage was unreasonable under § 2254(d)(1), this court remains limited to considering the allegations of Morris's Rule 32 petition. *See id.* at 1222-23. Because that petition did not include an allegation that counsel was ineffective for failing to request "a longer recess," it was proper for this court to decline to consider it. *See id.*

But, even if the "longer recess" theory were properly considered by this court, it would

fail.  To establish such a claim, Morris must show, among other things, that there was a reasonable probability both (1) that a request for a longer recess would have been, or legally had to be, granted and (2) that the additional delay would have enabled at least one of the sisters to testify.  *See Tillman v. Warden*, 2022 WL 1416207, at *1 (11th Cir. Feb. 10, 2022); *West v. Allen*, 868 F. Supp. 2d 1224, 1297 (N.D. Ala. 2011), *aff'd sub nom. West v. Comm'r, Ala. Dep't of Corr.*, 685 F.3d 1259 (11th Cir. 2012).  Both propositions are highly speculative, however, and, in any event, Morris has not pleaded facts to support either one.  The trial judge had already granted one recess to give Faye a chance to compose herself, and whether to grant more time would have been a decision within that court's sound discretion.  *See Robinson v. State*, 432 So. 2d 518, 520 (Ala. Crim. App. 1983).  At that point, the case had been pending for some ten years, was being tried for the third time, and twelve jurors were empaneled.  When defense counsel reported that both sisters had said they were too emotional to testify, the judge responded, "Well, I'm not going to make them.  I don't know what else you can do. . . . Do you have any additional testimony other than the two sisters?"  (Doc. # 15-24 at 62).  Morris also does not allege how much "longer" of a recess counsel was supposed to ask for or what amount of time might have been required for the sisters to "collect themselves" and testify.  Nor has Morris presented an affidavit from either sister or even alleged in his Rule 32 petition or federal habeas petition that a longer recess would have enabled them to testify.  Finally, any claim to that effect would also be substantially undercut by the fact that, some six weeks after Faye broke down on the stand, she told defense counsel that she would testify at the sentencing hearing before the judge, but she still failed to appear.  (Doc. # 15-25 at 13).

Morris also maintains that this court's analysis of the claim had a "misplaced . . . singular focus" on the fact that defense counsel did attempt to call Faye and Debera as witnesses.  (Doc. # 51 at 38).  Morris insists that his "sisters were [not] the sole source of mitigating evidence available" and that, when they became unable to testify, "it was unreasonable to abandon [his] entire mitigation case—with his life on the line—without any attempt at rehabilitation."  (*Id*.). Rather, Morris maintains, "more mitigating circumstances regarding [his] intellectual disabilities, addictions, and traumatic loss of his parents were available for development, and reasonable counsel would have done so."  (*Id.* at 39).  Indeed, he adds that, "even had [his] sisters been able to testify, . . . the Supreme Court has made clear that a trial counsel who presents even more family witnesses is nonetheless constitutionally ineffective where . . . counsel fails properly to investigate other lines of mitigation."  (*Id.* (citing *Rompilla*, 545 U.S. at 378, and *Williams*, 529 U.S. at 369)). But none of these arguments hit the mark.

As explained, the allegations of Morris's Rule 32 petition do not support that his counsel failed "to properly investigate other lines of mitigation" because the record shows that the mitigating circumstances Morris says should have been investigated and presented were already known to his trial attorneys.  *See Wood*, 542 F.3d at 1303; *Heidler*, 2023 WL 4927253, at *27. Morris also fails to reckon with the state court's determination that his Rule 32 petition does not "plead[] specific facts showing that his trial counsel did not make a reasonable strategic decision not to pursue or investigate other potential witnesses."  (Doc. # 15-56 at 29 ¶ 55).  Indeed, it is clear enough that Morris's counsel intended to pursue a mitigation strategy at the third trial similar to what they had employed at the first, which was also based on the testimony of Faye and Debera. (*See* Doc. # 15-8 at 33-39).  As noted, defense counsel previously elicited testimony from them that focused on Morris's troubles coping with his parents' divorce and deaths, which included

emotional distress and abuse of alcohol; his slow development, trouble doing schoolwork and playing with others as a child; limited mental function; and his alleged inability to perform assorted simple everyday tasks, live alone, or hold a regular job. Such topics cover most of the mitigation that Morris cites in his Rule 59 motion as that which his counsel should have presented. (Doc. # 51 at 34-35). Morris does not explain why his counsel could have reasonably presumed Faye and Debera would provide similar testimony at the penalty phase of the third trial. *Cf. Chambers v. Armontrout*, 907 F.2d 825, 829 (8th Cir. 1990) ("Because [the petitioner's] apparent strategy did not change from the first trial to the second trial and because no indication of new or different testimony existed, reasonable counsel would have anticipated that [the petitioner's] second trial would proceed much as the first did."); *Jackson v. McKaskle*, 729 F.2d 356, 359 (5th Cir. 1984) (recognizing that the content of a witness's testimony was foreseeable because he had previously testified in another proceeding on the defendant's behalf). In fact, Morris himself presumes just that in his Rule 32 petition. (Doc. # 15-56 at 90 ¶ 62 ("Had Mr. Morris's counsel adequately prepared [Faye] to testify, she likely would have been able to testify about Mr. Morris's childhood (as she had during the *Atkins* hearing in 2007 and at both of Mr. Morris's previous trials) and to present numerous mitigating factors from Mr. Morris's life.") (parentheticals original)).

To be sure, defense counsel's plan to present such a mitigation case collapsed when both sisters said they were too emotional to testify. But that occurred suddenly, without warning. It is all too easy for Morris to claim after the fact that his attorneys should have prepared other witnesses. In assessing counsel's performance, however, "every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689. "That [the sisters] did not testify as counsel had anticipated does not make counsel's

strategy deficient." *Hills v. Crews*, 2013 WL 4017331, at *15 (N.D. Fla. Aug. 7, 2013); *see also Garrison v. United States*, 2012 WL 13103339, at *10 (S.D. Fla. Apr. 12, 2012) ("[C]ounsel is not constitutionally deficient for something beyond counsel's control") (quoting *Hereford v. United States*, 2007 WL 470414, *7 (E.D. Tenn. Feb. 12, 2007), *report and recommendation adopted*, 2012 WL 13103338 (S.D. Fla. June 29, 2012)). Morris also cannot claim prejudice based upon testimony the sisters were unable to present for reasons that were not counsel's fault. *See Schiro v. Landrigan*, 550 U.S. 465, 480-81 (2007) (where petitioner's birth mother and ex-wife refused to testify at the petitioner's insistence, the district court did not abuse its discretion in finding that the petitioner could not establish prejudice based on counsel's failure to present evidence that the petitioner later sought to offer, which included "information that [his] birth mother and ex-wife could have offered if [he] had allowed them to testify").

Further, "[t]he mere fact that other witnesses might have been available or that other testimony might have been elicited from those who testified is not a sufficient ground to prove ineffectiveness of counsel." *Jennings v. McDonough*, 490 F.3d 1230, 1244 (11th Cir. 2007) (quoting *Waters v. Thomas*, 46 F.3d 1506, 1514 (11th Cir. 1995) (en banc)). To the extent that Morris is arguing that his counsel should have had other witnesses ready to testify to the same kinds of mitigation that counsel might have expected the sisters to provide, that ignores an evidentiary reality: "counsel is not required to call additional witnesses to present redundant or cumulative evidence." *Ford v. Hall*, 546 F.3d 1326, 1338 (11th Cir. 2008). Likewise, "counsel's decision not to investigate for more mitigating evidence of the same kind counsel had already discovered is not ineffective if the additional evidence would be cumulative of the evidence already discovered." *Reaves v. Sec'y, Fla. Dep't of Corr.*, 872 F.3d 1137, 1157 (11th Cir. 2017)*; see also Bobby v. Van Hook*, 558 U.S. 4, 12 (2009) ("[T]here comes a point at which evidence from more

distant relatives can reasonably be expected to be only cumulative, and the search for it distractive from more important duties."); *Butts v. Wainwright*, 575 F.2d 576, 578 (5th Cir. 1978) (denying ineffective assistance claim based on counsel's failure to locate and call a witness in part because counsel considered the witness's testimony to be cumulative of that of the witness's wife, even though when the wife later testified, she incorrectly recalled the date of an event, undercutting the defendant's alibi); *United States v. Cockrell*, 720 F.2d 1423, 1428 (5th Cir. 1983) (where counsel decided not to call a witness based on an assessment that it "would have simply been cumulative to the testimony she anticipated obtaining from [another witness and the defendant]," such "a tactical choice cannot be the basis for habeas corpus relief simply because in hindsight it appears mistaken").

The state courts also rejected this claim on the ground that Morris' Rule 32 petition fails to make out either deficient performance or prejudice under *Strickland* because that petition did not plead the names of uncalled witnesses or sufficiently describe their expected testimony. Morris insists that his Rule 32 petition was specific enough because it identified "discrete categories of individuals from [his] past who could speak to different aspects of his background," including "one of the psychiatrists who had evaluated [him]," "family members, school teachers, and school administrators," as well as "acquaintances, mental health professionals, and social workers." (Doc. # 51 at 42 (quoting Doc. # 15-56 at 70, 93-96 ¶¶ 13, 69-78)). Morris urges that, contrary to the state court's assertion, "[t]hese are not 'nonspecific allegations' simply because [these categories of individuals] are not identified by name." (*Id.* (quoting Doc. # 44 at 291)). He also says he "provided specific facts," including "his school grades and details about his chemical dependency, recent sobriety, and . . . relapse after the traumatic death of his mother." (*Id.*). That argument cuts no ice.

What Morris must do, but still conspicuously has not, is cite a decision of the Supreme Court of the United States clearly establishing that the Alabama state court's denial of the claim for failure to plead in detail the names and substance of the expected testimony of uncalled witnesses is unreasonable under § 2254(d).  Indeed, the Eleventh Circuit has indicated there is no such Supreme Court authority.  *See Mills v. Comm'r, Ala. Dep't of Corr.*, 2021 WL 5107477, at *9 (11th Cir. Aug. 12, 2021) (holding that "[r]easonable jurists would not dispute" that the Alabama state court's dismissal of an ineffective assistance claim under Rule 32.6(b), on the basis that the petitioner "did not identify by name any witnesses who should have been called" to testify about the petitioner's good behavior in prison, "was not contrary to or unreasonable under clearly established federal law"); *Skillern v. United States*, 2021 WL 3047004, at *14 (11th Cir. Apr. 16, 2021) (rejecting as "conclusory and unsupported by specific facts or arguments" claim that trial counsel was ineffective for failing to call an expert witness where the defendant's § 2255 motion "did not identify any expert witness that [counsel] should have called as a witness"); *see also McNabb v. Comm'r Ala. Dep't of Corr.*, 727 F.3d 1334, 1343 (11th Cir. 2013) (holding that the Alabama state courts reasonably rejected claims of ineffective assistance of counsel because the petitioner "failed to plead any specific facts or provide any specific names or information about his horrific childhood that would mitigate his sentence, or in other words, that would have lessened his culpability for the crimes."); *Reynolds v. Dunn*, 2022 WL 895947, at *117 (N.D. Ala. Mar. 25, 2022) ("Reynolds has failed to state specific, particularized facts which entitle [him] habeas corpus relief" in that he had "not stated any specific facts identifying and detailing who the witnesses were that trial counsel failed to investigate, what specific mitigating evidence they would have provided, or how, absent that evidence Reynolds suffered actual prejudice at trial or in sentencing." (internal quotation marks and citation omitted)), *aff'd sub nom. Reynolds v. Comm'r, Ala. Dep't*

*of Corr.*, 2024 WL 4431791 (11th Cir. Oct. 7, 2024).

Some of the other types of potential mitigation that Morris has claimed his counsel was reasonably required to present would appear to be outside, or at least not necessarily within, the scope of what Faye and Debera had previously testified about and what defense counsel might have expected them to address again.  The Rule 59 motion cites, for example, that Morris "had taken antipsychotic medication"  (Doc. # 51 at 35), citing a section of his Rule 32 petition alleging that he had done so for "mental illness . . . while he stayed at the Taylor Hardin Secure Facility while awaiting his competency hearing."  (Doc. # 15-56 at 95 ¶ 76).  The state court rejected this claim because Morris had failed to sufficiently allege what type of mental illness he suffered, what type of medication he took or how often, or the name of any relevant witness or what their testimony would have been.  (*Id*. at 32-33 ¶ 64).  But, again, Morris has not shown that such a pleading-stage dismissal is unreasonable for purposes of § 2254(d), or even wrong.[26]

Morris similarly complains in the Rule 59 motion that his counsel did not present evidence of his "cognitive dysfunction" and that he was "intellectually disabled."  (Doc. # 51 at 43).  Faye and Debera did touch on this subject from a lay perspective in their prior testimony, in which they claimed that Morris was a "slow learner" and had been unable to do his own schoolwork, follow directions, perform many ordinary tasks, live alone, etc.  To the extent that Morris claims that his

---

[26] Because Morris's Rule 32 petition is devoid of specifics as it relates to counsel's alleged failure to present mitigation based on Morris's alleged "mental illness" and having taken "antipsychotic medication" at Taylor Hardin, the substance of this claim as plead was entirely vague.  The court would recognize, however, that Dr. Ackerson did report that, while held at Taylor Hardin prior to his competency hearing, Morris was examined by a staff psychiatrist on May 25, 1999, who deemed Morris to have "some possibly paranoid thoughts" and depression, for which the psychiatrist prescribed an antipsychotic medication, Mellaril.  (Doc. # 15-44 at 39).  However, Dr. Ackerson's report states that, only three weeks later, on June 15, 1999, Morris was examined again, whereupon he "was considered not to be mentally ill and the previous medication regimen was discontinued."  (*Id.*)  Even if it is assumed that Morris was alluding to these circumstances in Dr. Ackerson's report, they represent only tepid and ambiguous evidence of mental illness, so the failure to present them at sentencing would not have been deficient performance, nor would it have resulted in prejudice.  *See Rose v. McNeil*, 634 F.3d 1224, 1243 (11th Cir. 2011) (rejecting ineffective assistance claim based on counsel's failure to present "weak . . . mental health evidence").

counsel was ineffective for failing to present other witnesses, including experts, to address this subject, the state court rejected the claim for failure to show deficient performance or prejudice because Morris's Rule 32 petition had failed to specifically name the witnesses or experts who should have been called or to describe the substance of their expected testimony.  Again, Morris has not shown that such ruling was unreasonable under § 2254(d)(1).

The state court also concluded that Morris had failed to allege facts that would call into question his trial counsel's "strategic decision" not to call a "mitigation expert" as a witness at sentencing to testify about Morris's limited mental functioning.  (Doc. # 15-56 at 35 ¶ 73).  Here, the state court cited Morris's counsel's statements to the court that they had decided not to call Dr. Shealy to testify again at the penalty phase because his prior testimony, which included that he believed Morris had a full-scale IQ of only 50, would have been "inconsistent" with how Morris had presented while testifying at the guilt phase and thus "would not look good to the jury."  (*Id.* (quoting Doc. # 15-24 at 49)).

Morris still has not presented any specific facts or argument to counter that assessment by the state court.  Moreover, had Morris's counsel called Dr. Shealy or some other unspecified mental health expert to claim that Morris suffered from mental retardation,  substantially impaired mental functioning, or mental illness, that would have opened the door to rebuttal from the State, which might have included considerable evidence from multiple experts who had examined Morris and concluded that he was intentionally faking or exaggerating mental impairment, *i.e.*, malingering, in an effort to escape criminal responsibility.  (*See* Doc. # 44 at 66-81, 273).  Indeed, even Dr. Shealy, who testified for the *defense* at the *Atkins* hearing, did not affirmatively assert that Morris had given a true effort; rather, Dr. Shealy said he believed Morris was mentally retarded even though he acknowledged there were some indications that at times Morris was not giving a

full effort.  (*See id.* at 66, 77-78).  Reasonable counsel could have determined that it was not worth the risk of evidence suggesting that Morris was deceptive, manipulative, and unsympathetic, which might negate counsel's anticipated mitigation case based on the sisters' testimony.  *See Cook v. Warden, Ga. Diagnostic Prison*, 677 F.3d 1133, 1137 (11th Cir. 2012) (holding that state court did not unreasonably apply *Strickland* where "trial counsel made the reasonable choice of bypassing the presentation of mental health evidence" because such could have sparked rebuttal that included "episodes of alleged malingering [and] admissions by Petitioner that he was exaggerating or otherwise faking mental disturbances").

Morris also argues in his Rule 59 motion that his counsel was ineffective for failing to present evidence of his "long history of chemical addiction to drugs and alcohol."  (Doc. # 51 at 35).  Again, Faye briefly referenced this subject in her testimony at the penalty phase of the first trial, where she stated that, after their mother passed away about four months before the murder, Morris "started to drink heavily," "just stayed drunk all the time," and was "drunk every day." (Doc. # 15-8 at 35).  However, the state court rejected this claim for failure to specifically plead the names of any witnesses who would have testified to Morris's substance abuse history or what they would have said about it or its effects on Morris.  (Doc. # 15-56 at 33 ¶ 65).  Morris has not shown that decision was unreasonable under § 2254(d).  Indeed, the Eleventh Circuit has often concluded that counsel is not unreasonable for declining to highlight substance abuse as mitigation because of its potential as a "double-edged sword that itself could harm a petitioner's case," *Mashburn*, 80 F.4th at 1302 (quoting *Brooks v. Comm'r, Ala. Dep't of Corr.*, 719 F.3d 1292, 1304 (11th Cir. 2013)).  The Eleventh Circuit has also recognized that such evidence generally has little mitigating value for purposes of establishing prejudice.  *See Stewart v. Sec'y, Dep't of Corr.*, 476 F.3d 1193, 1217 (11th Cir. 2007).

Finally, Morris argues that the state court's determination that he had failed to plead his claim with sufficient detail to establish prejudice under *Strickland* is "plainly wrong" and that this court's conclusion that the state court's decision was not unreasonable under § 2254(d) "is manifest error." (Doc. # 51 at 45). Morris reiterates that he has identified "compelling mitigation evidence" that his "trial counsel failed to adequately investigate and present at the penalty phase." (*Id.*) Morris maintains that "had counsel presented *any* mitigation evidence whatsoever, a single juror might have changed [their] penalty-phase vote, thereby converting the jury's 10-2 recommendation of a death sentence to a recommendation of life imprisonment." (*Id.*) (emphasis original).

However, as the State has pointed out (*see* Doc. # 52 at 32), under Alabama's capital sentencing scheme in effect at the time of Morris's trial, for the jury to return an advisory verdict recommending life imprisonment, a *majority* of jurors would have had to vote for that sentence. *See* Ala. Code § 13A-5-46(f) (2008). Accordingly, because the jury recommended a death sentence by a vote of 10 to 2, at least five jurors, not just one, would have had to change their vote to life imprisonment to recommend that sentence. But even if only one juror changed their vote in that direction, it would have resulted in a hung jury and a mistrial on the advisory sentencing recommendation. *See id.*, § 13A-5-46(g) (2008). In this context, that would qualify as a different outcome for purposes of prejudice under *Strickland*. *See Lawhorn v. Allen*, 519 F.3d 1272, 1297 & n.28 (11th Cir. 2008).

That said, the court does not agree with Morris that the state court's determination – that the allegations of his Rule 32 petition do not support that, but for counsel's deficient performance, there is a reasonable probability that the outcome of the sentencing proceeding would have been different – was unreasonable for purposes of § 2254(d)(1). "[O]nly the effect of counsel's actions

or inactions that . . . meet [the] deficiency requirement are considered in determining prejudice." *Evans v. Sec'y, Fla. Dep't of Corr.*, 699 F.3d 1249, 1269 (11th Cir. 2012). Thus, if a petitioner's allegations are deemed insufficient to establish deficient performance, as here, such implies "by logical extension" there also was no prejudice cognizable under *Strickland*. *Munoz v. United States*, 520 F. App'x 855, 856 (11th Cir. 2013); *see also Witten v. United States*, 2019 WL 4453624, at *19 (S.D. Fla. Mar. 7, 2019) ("Where there is no deficiency, there is no prejudice."), *report and recommendation adopted*, 2019 WL 4453360 (S.D. Fla. May 8, 2019). That this court concluded that the state courts did not unreasonably determine that Morris had failed to sufficiently plead any claims showing deficient performance itself suggests that the state courts' determination that there was also no prejudice was likewise not unreasonable. Beyond that, the court remains convinced that Morris's "nebulous references to topics of mitigation with no corresponding witnesses or anticipated testimony," as insufficiently pled in his Rule 32 petition, do not demonstrate that the state courts' resolution of the prejudice prong was unreasonable. (Doc. # 44 at 279 n.13).

### D.    Denial of an Evidentiary Hearing

In his final Rule 59 argument, Morris insists that, before denying his claims for federal habeas relief, this court had to grant him an opportunity to prove his claims in an evidentiary hearing. (Doc. # 51 at 49-51). His focus here is particularly on his claim alleging that his trial counsel was ineffective for failing to investigate and present evidence of mitigation at sentencing. (*See id.*; *see also id.* at 42-43) However, nothing in the motion causes the court to reconsider its denial of a hearing. "A district court is not required to hold an evidentiary hearing if the claims are merely conclusory allegations unsupported by specifics or if the record refutes the applicant's factual allegations or otherwise precludes habeas relief." *Allen v. Sec'y, Fla. Dep't of Corr.*, 611

F.3d 740, 745 (11th Cir. 2010) (internal quotation marks and citations omitted).

III.    **CONCLUSION**

Based on the foregoing, Morris's Motion to Alter or Amend the Judgment (Doc. # 51) is due to be denied.  Similarly, for the same reasons explained above, the court denies the request to issue a COA. The court will enter a separate order consistent with this opinion.

**DONE** and **ORDERED** this May 19, 2025.

**R. DAVID PROCTOR**
CHIEF U.S. DISTRICT JUDGE